Matthew S. Hale, Esq.
HALE & ASSOCIATES
Calif. State Bar No. 136690
45 Rivermont Drive
Newport News, VA 23601

Mailing Address:
P.O. Box 1951
Newport News, VA 23601

Telephone No. (757) 596-1143
E-Mail: matthale@verizon.net

Attorney for Plaintiffs, DAVID J. LEE and
DANIEL R. LLOYD

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID J. LEE, and DANIEL R. LLOYD, as individuals and, on behalf of others similarly situated,<br><br>   Plaintiffs,<br><br> vs.<br><br>AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC., a New York corporation, AMERICAN EXPRESS CENTURION BANK, a Utah corporation, AMERICAN EXPRESS BANK, FSB, a Utah corporation,  and DOES 1, through 100, inclusive,<br><br>   Defendants. | Case No.: C-07-4765 CRB<br><br>MEMORANDUM OF POINTS AND AUTHORITIES FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT AMERICAN EXPRESS BANK, FSB'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT<br><br>DATE: November 30, 2007<br>TIME: 10.00 a.m.<br>PLACE: Courtroom 8<br>   19th Floor<br>   450 Golden Gate Ave.<br>   San Francisco, Calf. 94102 |

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.    SUMMARY OF ARGUMENT ................................................................. 1

II.    INTRODUCTION ................................................................................. 3

III.    ARGUMENT ....................................................................................... 8

    A.    Plaintiff's Complaint Is Not Preempted By HOLA And/Or
        12 C.F.R. § 560.2(b)(9) ................................................................. 8

    B.    The UCL, CLRA, And Common Law In The Context Of
        Plaintiffs' Complaint Have, At Most, Only An Incidental
        Effect On Defendants' Credit Operation ......................................... 13

IV.    CONCLUSION .......................................................................................... 18

ADDENDUM

    A.    "Preemption of State Laws Applicable to Credit Card Transactions"
        (Opinion of OTS Chief Counsel, December 24, 1996), 1996 OTS LEXIS
        25

    B.    "California Unfair Competition Act" (Opinion of OTS Chief Counsel,
        March 10, 1999), 1999 OTS LEXIS 4

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

**TABLE OF AUTHORITIES**

**Page[s]**

**Cases**

Alkan v. Citimortgage, Inc. 336 F.Supp.2d 1061 (N.D.Cal. 2004) ............................................... 8

Brinetti v. Washington Mutual Bank, 446 F.Supp.2d 217 (S.D.N.Y. 2006) ................. 2, 7, 13, 16

Commercial Capital Bankcorp, Inc. v. St Paul/Mercury Ins. Co., 2006 U.S.Dist.LEXIS 26340

   (N.D.Cal. 2006)..................................................................................................... 2, 12

Doe v. Kamehameha Schools, 470 F.3d 827 (9th Cir. 2007) ....................................... 13

Douglas v. United States District Court, 495 F.3d 1062 (9th Cir. 2007)........................................ 5

Haehl v. Washington Mutual Bank, 277 F.Supp.2d 933 (S.D.Ind. 2003) ..................................... 10

In re First Alliance Mortgage Company, 280 B.R. 246 (C.D.Cal.2002)....................................... 11

In re: Ocwen Loan Servicing, LLC Mortgage Servicing Litigation, 491 F.3d 638 (7th Cir. 2007)2,

   7, 11, 13

Jeff D. v. Andrus, 899 F.3d 753, 759 (9th Cir. 1989)..................................................... 13

Lozano v. AT&T Wireless Servs., 2007 U.S.App.LEXIS 22430 (9th Cir. 2007)............................ 9

Montgomery v. Bank of America Corp., 2007 U.S.Dist.LEXIS 76268  (C.D.Cal. 2007) ........... 11

Public Service Co. v. Batt, 67 F.3d 234 (9th Cir. 1995)................................................ 13

Rosenberg v. Washington Mutual Bank, F.A., 369 N.J.Super. 456, 849 A.2d 566 (N.J. 2004) 1, 6,

   11, 12

Shroyer v. New Cingular Wireless Servs., 498 F.3d 976 (9th Cir. 2007) ........................................ 5

Silvas v. E*Trade Mortgage Corp., 421 F.Supp.2d 1315 (S.D.Cal. 2006)................................... 10

Sunset Importers, Ltd. v. Continental Vintners, 790 F.2d 775 (9th Cir. 1991) ............................ 13

**Statutes**

12 U.S.C. §§ 1462 et seq.................................................................................................. 1, 4, 5

15 U.S.C. §§ 1601 et seq................................................................................................. 10, 12

California Bus. & Prof. Code § 17283.................................................................................. 9

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

California Bus. & Prof. Code §§ 17200 et seq. ................................................... passim

California Civil Code § 1670.5 ............................................................................... 9, 13

California Civil Code § 1750 et seq. ................................................................... passim

California Civil Code § 1770(a)(19) ........................................................................ 3, 9

California Civil Code § 1780(a) ................................................................................. 10

California Code of Civil Proc. § 1281.4 ...................................................................... 9

## Other Authorities

"California Unfair Competition Act" (Opinion of OTS Chief Counsel, March 10, 1999), 1999

    OTS LEXIS 4.......................................................................................................... 16

"Preemption of State Laws Applicable to Credit Card Transactions" (Opinion of OTS Chief

    Counsel, December 24, 1996), 1996 OTS LEXIS 25 ........................................... 2, 7

61 Fed.Reg. 50951 (September 30, 1996) .................................................................... 2

United States Constitution, Article III ........................................................................ 3

## Regulations

12 C.F.R. § 226 ........................................................................................................... 12

12 C.F.R. § 226.5b ...................................................................................................... 12

12 C.F.R. § 226.9 ........................................................................................................ 12

12 C.F.R. § 560(b) ........................................................................................................ 6

12 C.F.R. § 560.2 .......................................................................................................... 6

12 C.F.R. § 560.2(a) ...................................................................................................... 6

12 C.F.R. § 560.2(b) .................................................................................................. 8, 13

12 C.F.R. § 560.2(b)(9)......................................................................................... passim

12 C.F.R. § 560.2(c).............................................................................................. passim

12 C.F.R. § 560.2(c)(a) ............................................................................................... 17

12 C.R.R. § 560.2(b)(5) .............................................................................................. 10

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

## I.    SUMMARY OF ARGUMENT[1]

Defendant American Express Bank, FSB has moved to dismiss the Complaint on the basis that the statutes under which its causes of action arise including California's Consumer Legal Remedies Act ("CLRA")[2] and California's Unfair Competition Law ("UCL"),[3] and common law are each preempted by the Home Owners Loan Act ("HOLA")[4] and its implementing regulations (specifically 12 C.F.R. § 560.2(b)(9)).  Defendant forwards that preemption occurs because the Complaint, by seeking to render certain terms of Defendant's cardmember agreement unenforceable due to their patent unconscionability, seeks to "rewrite" the terms found to be unconscionable and unenforceable and to otherwise have this Court include "specific statements, information, or other content" in Defendant's cardmember agreement.  Defendant places primary reliance on <u>Rosenberg v. Washington Mutual Bank, F.A.,</u> 369 N.J.Super. 456, 849 A.2d 566 (N.J. 2004).

However, Plaintiffs disagree and forward, based upon controlling and persuasive federal precedent, that no preemption obtains.  First, the predicate requirement for application of 12 C.F.R. § 560.2(b)(9) – <u>i.e.,</u> that the laws underlying Plaintiffs' complaint "require[] specific statements, information, or other content" to be included in the agreement – is not met.  The Complaint is clear that Plaintiffs do not seek to "rewrite the agreement" or to have any "specific

---

[1]    The Summary of Argument is made in compliance with this Court's Standing Order requiring such a Summary for briefs exceeding ten pages in length.

[2]    California Civil Code § 1750 <u>et seq.</u>

[3]    California Bus. & Prof. Code §§ 17200 <u>et seq.</u>

[4]    12 U.S.C. §§ 1462 <u>et seq.</u>

<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</u>
**Memorandum of Points and Authorities Filed in Opposition To Defendant American Express Bank, FSB's Motion to Dismiss**

statements, information, or other content included in" it.  Instead, Plaintiffs' Complaint seeks only to enjoin the enforcement of unconscionable terms written and voluntarily included in the cardmember agreement by Defendant.  Not one of those unconscionable terms deals with fees or fee disclosures, and their inclusion is neither authorized nor required by any Federal or State law or regulation.  Instead, they are included only because Defendant voluntarily chose to include them in order to gain additional advantage over the cardholder.  Neither the CLRA, nor the UCL, nor common law fraud principles, explicitly or impliedly empower or approve the inclusion of any "specific" term in the cardmember agreement on any subject.  And, the Courts are without the power (even if they wanted to) to rewrite the cardmember agreement so as to reform presently unconscionable terms and thereby include "statements" (terms) in the agreement.  Further, preemption does not occur under Subsection 560.2(c) since the effect, if any, of the statutes upon which Plaintiffs' claims are based is, at most, "incidental" to the Defendant's lending business.  Rather, these laws merely "preserve the traditional infrastructure of basic state laws that undergird commercial transactions" and do not open the door to state regulation of lending.  In these regards, Plaintiffs rely primarily on: Section 560.2, In re: Ocwen Loan Servicing, LLC Mortgage Servicing Litigation, 491 F.3d 638 (7th Cir. 2007); Brinetti v. Washington Mutual Bank, 446 F.Supp.2d 217 (S.D.N.Y. 2006); "Preemption of State Laws Applicable to Credit Card Transactions" (Opinion of OTS Chief Counsel, December 24, 1996), 1996 OTS LEXIS 25; 61 Fed.Reg. 50951 (September 30, 1996); and, Commercial Capital Bankcorp, Inc. v. St Paul/Mercury Ins. Co., 2006 U.S.Dist.LEXIS 26340 (N.D.Cal. 2006).

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

## II.     INTRODUCTION

Defendant has voluntarily chosen to author and place unconscionable terms in the charge and credit card cardmember agreement (including, but not limited to, an arbitration provision that contains a waiver of judicial or arbitral class actions, consolidation of claims, and injunctive relief).  Those terms – **none** of which relate to fees or financial disclosures required by Federal law and regulations or, for that matter, are not even terms that are otherwise required by Federal or California law and regulations to be included in a cardmember agreement -- are, as a matter of law, unconscionable under controlling California and Ninth Circuit precedents.  As a result, Defendant has violated not only the CLRA[5] which makes it unlawful to "insert[] an unconscionable provision in the contract"[6] but also the UCL[7] which, because of Defendant's violation of a variety of California statutes and common law, makes Defendant's actions unlawful and unfair.  Defendant also has, due to misrepresentations it made relative to those agreements and terms to Plaintiffs individually as well as to all cardholders consistent with its continuing practice, committed common law fraud.[8]  The primary relief sought by Plaintiffs is statutory:  an injunction enjoining Defendant from enforcing the unconscionable

---

[5]     California Civil Code § 1750 et seq.

[6]     California Civil Code § 1770(a)(19).

[7]     California Bus. & Prof. Code §§ 17200 et seq.

[8]     Defendant American Express Bank FSB has also joined in a motion to dismiss filed by its co-defendants in which, among other things, it argues that dismissal is required because of, among other things, Plaintiffs' lack of standing (both under Article III as well as the CLRA and UCL).  The facts as pled and controlling law that rebut and defeat that other motion to dismiss are discussed fully in Plaintiffs' Opposition thereto and are not, in the interests of economy, repeated here.

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

provisions/terms/agreement, and restitution.[9]    Plaintiffs do not seek to have **any** "specific statement, information, or other content" included in the Defendant's cardmember agreement, however.  After the terms of the agreement and its arbitration provision are found by this Court to be unconscionable and unenforceable, it will be singularly up to Defendant, **if it so chooses**, to rewrite its own agreement.  If Defendant wants to, for instance, include a rewritten arbitration provision that does not contain unconscionable terms in its agreement, Defendant (and Defendant alone) will make that decision and write that provision.  No requirement of California law or action of this Court can require it to do so.

Defendant seeks to escape the liability that must flow from its voluntary placement of unconscionable terms in its cardmember agreement by claiming that because it is a "federal savings bank" under the supervision of the Office of Thrift Supervision ("OTS") and is governed by HOLA and 12 C.F.R. § 560.2(b)(9)), it effectively holds a blanket immunity to Plaintiffs' suit and, resultantly, is above the law and can completely ignore California's law relating to unconscionability as well as California's consumer protection laws that undergird commercial transactions for all non-FSB's in the state.  "California legal theories may not be used to challenge the validity of a contract with a federal savings bank located outside California,"[10] or so it argues.    Defendant's argument has two premises.  First, it argues that

---

[9]      Plaintiffs also seek a non-predominating award of punitive damages under the CLRA (as specifically authorized by that statutory regime) and the fraud claims.

[10]     Defendant's Memorandum of Points and Authorities at 1:6.  The "outside California" comment is interesting in that it seemingly reflects Defendant's untoward belief that Utah law (the law of the State designated in the cardmember agreement as being the choice of controlling law) provides the law of decision or, for that matter, is even relevant in this lawsuit.  Defendant is, of course, wrong in believing that since, as the Ninth Circuit recently held in <u>Douglas v.</u>

<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</u>
**Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss**

Plaintiffs "attempt to rewrite the terms of the agreement."[11]  Second and arising there from, it argues that this "rewrite" causes HOLA and Section 560.2(b)(9) to preempt the CLRA, the UCL, and common law fraud under the Complaint because they "impose requirements regarding

> "9.   Disclosure and Advertising, **including laws requiring specific statements, information, or other content to be included in** credit applications forms, credit solicitations, billing statements, **credit contracts** or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants."  (Emphasis added)

With all due respect, Defendant's argument is poppycock.[12]  A review of Defendant's argument reveals that it is nothing more than a "straw man" based entirely on a situational misrepresentation of the Complaint's allegations and the relief sought.  Resultantly, Defendant's motion just makes up the "facts" and "theories" Defendant apparently believes are necessary to sketch out its preemption position.  However, in the final analysis, Defendant's argument amounts to nothing more than an argument mired in generalities, inapposite precedents, and misrepresentations.

---

United States District Court, 495 F.3d 1062 (9th Cir. 2007), and Shroyer v. New Cingular Wireless Servs., 498 F.3d 976 (9th Cir. 2007), California law is controlling when it comes to the matters raised in the Complaint concerning the unconscionability of Defendant's cardmember agreements, including notably its arbitration provision.  That is, of course, consistent with a long line of California precedents as well.

[11]    Defendant's Memorandum of Points and Authorities at 1:6.

[12]    It is ironically interesting that in the concurrently filed Motion to Dismiss, the American Express Defendants (including FSB which joined in that motion) take the position that the CLRA does not even cover lending (due to the credit element that must definitionally be a part of the "loan").  How is the CLRA preempted if, as Defendant forwards, it has no relationship to lending (which involves credit) and so cannot cover Defendant's lending operation?  The two arguments are obviously at odds with each other.  Notably, the arguments made by Defendants on the CLRA coverage issue in the concurrently filed motion actually supports Plaintiffs' position that the CLRA is not preempted.

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

Defendant's position is without substantive merit for at least two reasons. First, the necessary predicate for the application of Subsection 560.2(b)(9) – that the CLRA, UCL, and common law fraud "**requir[e] specific statements, information, or other content to be included in** credit applications forms, credit solicitations, billing statements, **credit contracts…"** -- is not met or in any way implicated by the allegations of or relief sought by Plaintiffs. Indeed, the essential doctrine relative to unconscionable contractual terms is "severability" and not "inclusion" under both Federal and State law. That being so, the inquiry ends and, on that basis alone, Defendant's motion must be denied.

Second, and although this does not appear to be a position explicitly raised by Defendant as a basis of its motion, preemption 12 C.F.R. § 560.2 does not otherwise exist.[13]  It is the position of the OTS that

> "State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560(b)"

---

[13]   The reason for this uncertainty as discussed below is that Defendant for whatever reason is somewhat inconsistent on this point. In the conclusory comments in its memorandum, Defendant states:

> "Here, Plaintiffs' claims against FSB are all based on the alleged violations of the UCL, CLRA, and common law in FSB's Agreements, including the arbitration provision. Thus, by their Complaint, **Plaintiffs improperly seek to use state laws to impose specific requirements regarding FSB's Agreements.** As the foregoing authorities attest, and as the appellate court in Rosenberg properly found, such claims are expressed barred by federal preemption under 12 C.F.R. § 560.2(a) and (b)(9)."

Defendant's Memorandum at 6:19-24 (emphasis added). Insofar as this might be construed to refer to an argument that California's consumer protection laws and Section 560.2(c) are not implicated and cannot serve as a basis for "non-preemption" here, it behooves Plaintiffs to counter such foolishness.

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

and it is OTS's policy not "to preempt state laws that establish the basic norms that undergird commercial transactions."[14]  Embodying this policy, 12 C.F.R. § 560.2(c) sets the parameters for what "State laws are not preempted": e.g., "(a) contract and commercial law[s]" "to the extent that they only incidentally affect the lending operation…"  The UCL, CLRA, and common law fraud, under the Plaintiff's allegations and theory, fall squarely within the parameters of Subsection (c).[15]  In that instance, preemption does not occur since those matters, at most, "only incidentally affect the lending operations …" The point that Defendant has simply chosen to miss or otherwise not come to grips with is that this result is ineluctable when, as here, the determining standard is

> "whether any impact on lending operations is incidental to the *statute's* primary purpose – not whether the impact of the statue on a bank's lending operation is 'incidental' (which for defendant seems to mean *de minimis*)."  (Italics in original)

Brinetti v. Washington Mutual Bank, 446 F.Supp.2d at 221.[16]  Accord "Preemption of State Laws Applicable to Credit Card Transactions," at 10:

> "While the [consumer protection statute] may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the state – the regulation of the ethical practices of all businesses engaged in commerce…"

---

[14]    See "Preemption of State Laws Applicable to Credit Card Transactions" P IIC (Opinion of OTS Chief Counsel, December 24, 1996), 1996 OTS LEXIS 25, (a copy of which is attached as Addendum A hereto), quoted in, among other precedents, In re: Ocwen Loan Servicing, LLC Mortgage Servicing Litigation, supra..

[15]    As set forth a length below, the OTS and informed Courts have uniformly held that "contract and commercial" statutes, within this subsection, include consumer protection statutes like the UCL and the CLRA as well as common law fraud.

[16]    The fact that this Defendant may miss the point is not due to its attorneys.  In fact, Defendants' counsel in this case also served as counsel for the defense (representing Washington Mutual Bank) in Brinetti and, hence, are well aware of this undeniable fact.

7

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss

Id. Under controlling and persuasive precedents, Plaintiffs' claims and the statutes/common law from which they arise have, at most, only an "incidental" affect on Defendant's lending operation. Denial of Defendant's motion to dismiss is thus appropriate.

## III.    ARGUMENT

### A.  Plaintiff's Complaint Is Not Preempted By HOLA And/Or 12 C.F.R. § 560.2(b)(9)

The entirety of Defendant's motion to dismiss is based upon the overbroad misrepresentation of Plaintiffs' claims and the relief which they seek:  i.e., that by this action Plaintiffs "attempt to rewrite the terms of the agreement." Defendant's Memorandum at 1:6. That is most assuredly not what Plaintiffs seek, what the UCL/CLRA/common law authorize, or, for that matter, what this Court may order. Defendant's overbroad misrepresentations are, however, transparently necessary to its argument. After all and at least according to Defendant, preemption arises because "rewriting" the cardmember agreement necessarily entails a violation 12 C.F.R. § 590.2(b)(9)'s proscription against any State law or judicial action "**requiring specific statements, information, or other content to be included in** … **credit contracts.**" Defendant thus changes the facts to fit the theory. But the Complaint, the UCL, the CLRA, the common law, and this Court's authority admit to only one reality:  Defendant's factual scenario will not and can never happen.[17]

---

[17]    Defendant's overstatements to the contrary notwithstanding that it is literal grab bag in which all State laws reside, As stated by Judge Whelan in Alkan v. Citimortgage, Inc. 336 F.Supp.2d 1061 (N.D.Cal. 2004), "the illustrative examples of lending regulations [in Subsection 560.2(b)] deal with laws affecting the terms of the loan, the rate of interest, the type or amount of security required, any loan-related fees, escrow account requirements, and processing or servicing issues."

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

The Complaint does not contain any request or, by any means, even a suggestion or inference of a request that any "specific statements, information, or other content" be included in the cardmember agreement.  With regard to the contents of the cardmember agreement and/or arbitration provision, all the Complaint requests is

1.    a judicial finding that the designated terms be declared and otherwise found to be unconscionable, [Complaint, ¶¶ 135-138],

2.    that an injunction be issued enjoining the application of those unconscionable provisions, [Complaint, ¶¶ 4, 5; pages 68-69],

3.    that the Court find that the inclusion of the unconscionable terms violates the CLRA (specifically Civil Code § 1770(a)(19)), [Complaint, ¶¶ 4,5, 80-93, 108-119],

4.    that the Court find that the inclusion of the unconscionable terms violates the "illegal" and "unfair" prongs of the UCL (specifically California Civil Code § 1670.5, and California Code of Civil Proc. § 1281.4), [Complaint, ¶¶ 66-79, 80-102, 120-134], and

5.    that Defendant committed fraud in the inducement arising from various misrepresentations, including misrepresentations contained in the agreement itself. Complaint, ¶¶ 103-107.

The relief sought is a statutory injunction, statutory restitution, and, secondarily, punitive damages.  Complaint, pp. 68-69.

Nor does the CLRA, the UCL, and the common law authorize or, by any means, even suggest or infer that a remedy for their violation is that "specific statements, information, or other content" must be included in the cardmember agreement.  In fact, the UCL specifically limits the relief available under it to restitution and injunctive relief.  See California Bus. & Prof. Code § 17283; Lozano v. AT&T Wireless Servs., supra, 2007 U.S.App.LEXIS 22430 at *9 (9th Cir. 2007) ("The only types of relief available under the UCL actions are injunctive and restorative.")  The CLRA also specifies the relief that a court may give for its violation and, as

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

with the UCL, does not admit as a remedy the rewriting of the unconscionable terms of the

cardmember agreement. See California Civil Code § 1780(a)(limiting remedies to "(1) Actual

damages… (2) An order enjoining such methods, acts, or practices. (3) Restitution of property.

(4) Punitive damages…").

These are all a far cry from the preempted statutes or statutory regimes forwarded by

Defendant as being so-called persuasive examples of why the instant statutes must also be

preempted.[18]    Primary amongst these is Rosenberg v. Washington Mutual Bank, FA., 369

---

[18]    One example of that is Haehl v. Washington Mutual Bank, 277 F.Supp.2d 933 (S.D.Ind. 2003), which involved a claim that Section 560.2(b)(5) preempted Indiana's consumer protection law relating to reconveyance fees on real estate mortgages. The Court, correctly, found that such fees fell squarely within the parameters of Subsection (b)(5)'s preemption of State laws dealing with "loan-related fees":

> "By asserting that Washington Mutual Bank violated Ind. Code § 24-4.5-2-203(3) by charging a reconveyance fee that allegedly was neither bona fide nor reasonable, plaintiffs seek to impose requirements of Indiana state law on the types of loan-related fees that a federal savings association may charge. That is exactly the type of state regulation that is expressly preempted by § 560.2(b)(5). Thus, plaintiffs' under § 24-4.5-2-203(3) is preempted…"

277 F.Supp.2d at 941.   That a consumer protection law dealing with fees and financial disclosures can fall within one of the specified areas of preemption is neither novel nor apposite here. Of course one can. It is just that the setting here does not admit to being the type to which preemption applies.

By the same means, Defendant's reliance on Silvas v. E*Trade Mortgage Corp., 421 F.Supp.2d 1315 (S.D.Cal. 2006), is also misplaced.  Silvas involved a challenge under the UCL's "unlawful" prong to a $400.00 lock-up fee for interest rates paid by the plaintiff which were not refundable when the plaintiff cancelled the transaction (a claimed violation of the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. ("TILA").   The court held that even the UCL/TILA claim was preempted because "[a]lthough Plaintiffs' UCL claims do not impose any substantive requirements on Defendant's lending activities beyond those already provided by federal law, they do provide remedies for violations of federal law in a field preempted entirely by federal law." 421 F.Supp.2d at 1319.  It can be easily concluded as a matter of common sense that that case was wrongly decided:  after all, each of the statutes falling within the

---

10

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss

N.J.Super 456, 849 A.2d 566 (N.J. 2004), a decision of an appellate division of the New Jersey Superior Court and the only case relied upon by Defendant that directly implicated Section 560.2(b)(9).[19]   While <u>Rosenberg</u> may be cited in support of the proposition that in the proper factual setting preemption may arise under Subsection (b)(9), it is clear that it is inapposite to the present dispute, and, in fact supports Plaintiffs' opposition rather than Defendant's motion. <u>Rosenberg</u> involved a claim dealing with adjustable rate mortgages ("ARMs") disclosures contained in a monthly loan statement sent by the bank to the debtor concerning "the type of interest and loan repayment plan they agreed to."  849 A.2d at 568.  Certain allegations were made that the form of the disclosure violated, among other things, New Jersey's consumer protection statutes:

> "the Complaint takes issue with the manner in which [Washington Mutual] advises its customers of the amount due each month and the effect such a monthly payment will have on [Washington Mutual's] New Jersey customers, including Plaintiffs.  The Complaint further alleges that [Washington Mutual's] Monthly Loan statement is deceptive in the manner it is presented to Plaintiffs and the class."

---

parameters of Section 560.2(c) carry with them remedies such as those sought here.  If the intent was to preempt all laws that might add remedies, Subsection 560.2(c) has no meaning or application.  That cannot be.  Indeed, Courts that have done more careful and correct analysis of that matter have found to this to be so.  <u>See</u>, <u>e.g.</u>, <u>In re. Ocwen Loan Servicing, LLC</u>, <u>supra</u>, 491 F.3d at 643 where Judge Posner, writing for the Seventh Circuit, specifically held:  "Against this background of limited remedial authority [under HOLA], we read subsection (c) to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies.";  <u>In re First Alliance Mortgage Company</u>, 280 B.R. 246 (C.D.Cal.2002).

[19]   State court decisions (particularly those outside of California and not involving the Supreme Court level of consideration) are of little moment.  After all, even though this action arises under diversity jurisdiction, the preemption issue is one of federal procedure rather than State substantive law.  That being so, State court precedents like <u>Rosenberg</u> are of no moment and can be ignored by this Court.  <u>See</u>, <u>e.g.</u>, <u>Montgomery v. Bank of America Corp.</u>, 2007 U.S.Dist.LEXIS 76268 at * 17 (C.D.Cal. 2007).

<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</u>
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

<u>Ibid.</u>  The Court, based upon the Rosenberg's specific request for relief authorized by those statutes, held that preemption existed:

> "Here, plaintiffs' state law claims clearly fall within 12 C.F.R. § 560.2(b)(9) as they assert that [Washington Mutual's] billing statements fail to convey, <u>i.e.</u>, disclose, to the debtor that the 'total amount due' figure is something other than what one normally would think of as a 'total amount due.'  **By way of either injunctive relief or monetary damages, plaintiffs seek to insert a form of state regulation by compelling a different type of billings statement disclosure.**"

849 A.2d at 572 (emphasis added).  The <u>Rosenberg</u> statement form at issue contained billing and fee disclosures that were specifically required by Federal law to be included in such statements in a given form.  <u>See</u>, <u>e.g.</u>, Regulation Z (Truth in Lending), 12 C.F.R. Part 226 (including 12 C.F.R. §§ 226.5b, 226.9); Truth in Lending Act, 15 U.S.C. §§ 1601 <u>et</u> <u>seq</u>. Obviously and as noted, the unconscionable terms in the cardmember agreement here are not required by any law to be included in a cardmember agreement, and, importantly, Plaintiffs here do not seek to insert any statement into the cardmember agreement that complies with the non-existent requirements of either the CLRA, UCL, or the common law.  Again, the decision of whether certain terms such as the arbitration provision are to be included in the cardmember agreement and the language that is to be used therein is not subject to any compulsory California or Federal law:  it is a decision that is solely up to the Defendant.

Finally, this Court lacks the authority to add anything to the cardmember agreement by rewriting it or otherwise.  That a Court may not rewrite an agreement is too well-known and settled to require much elaboration.  This Court recognized that principle in <u>Commercial Capital Bankcorp, Inc. v. St. Paul/Mercury Ins. Co.</u>, 2006 U.S.Dist.LEXIS 26340 at * 15 ("Under California law, courts do not rewrite any provision of the contract…").  <u>See</u> <u>also</u> <u>Public Service</u>

<u>**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**</u>
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

<u>Co. v. Batt</u>, 67 F.3d 234 (9th Cir. 1995) ("Courts are not permitted … in any manner to rewrite agreements reached by parties."); <u>Jeff D. v. Andrus</u>, 899 F.3d 753, 759 (9th Cir. 1989)(same). This lack of authority, of course, also extends to rewriting statutes to allow for non-authorized remedies or relief.  <u>See</u>, <u>e.g.</u>, <u>Doe v. Kamehameha Schools</u>, 470 F.3d 827 (9th Cir. 2007); <u>Sunset Importers, Ltd. v. Continental Vintners</u>, 790 F.2d 775 (9th Cir. 1991).  The sole extent of the Court's authority upon its finding one or more of the challenged terms is unconscionable is the determination of whether that term can be severed or, as will be the case for instance, the entire arbitration provision is rendered unenforceable.  <u>See</u>, <u>e.g.</u>, California Civil Code § 1670.5.

Defendant's motion to dismiss must thus be denied.

**B. The UCL, CLRA, And Common Law In The Context Of Plaintiffs' Complaint Have, At Most, Only An Incidental Effect On Defendants' Credit Operation**

Having thus established that no Section 560.2(b) preemption exists here, the question becomes whether or not preemption exists under Section 560.2(c):  <u>i.e.</u>, whether the effect of the UCL/CLRA/common law on Defendant's credit card lending operation is more than "incidental."   Using the OTS and judicial definitions and standards for measuring this phenomenon, it is not and, accordingly, no preemption exists.[20]  Although it is often not good form to include lengthy quotes rather than narrative argument in a memorandum, an exception exists when recent precedent sums up controlling and persuasive precedent and its application.  <u>In re. Ocwen Loan Servicing, LLC</u>, <u>supra</u>, 491 F.3d at 644-45, presents such a situation.  In <u>In</u>

---

[20]    This standard was set forth <u>ante</u> at p. 7 and is "whether any impact on lending operations is incidental to the *statute's* primary purpose – not whether the impact of the statue on a bank's lending operation is 'incidental' (which for defendant seems to mean *de minimis*)."  <u>Brinetti v. Washington Mutual Bank</u>, 446 F.Supp.2d at 221 (italics in original).

<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</u>
**Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss**

re. Ocwen Judge Posner presented the current state of federal precedents relating to Section 560.2(c) which, frankly, is more succinct and persuasive than that which counsel could present and which makes it clear that the present matter is not preempted:

> "[T]he OTS's statement [in "OTS Final Rule," 61 Fed. Reg. 50951, 50966 (Sept. 30, 1996) introducing the final version of Section 560.2] explains that **subsection (c), the list of laws that are not preempted, is designed merely "to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations."** Id. … Hence the statement in subsection (c) that state laws escape preemption only "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." See also Bank of America v. City & County of San Francisco, 309 F.3d 551, 557-61 (9th Cir. 2002)…
>
> The line between subsections (b) and (c) is both intuitive and reasonably clear. **The Office of Thrift Supervision has exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to customers, and setting standards for processing and servicing mortgages.** See 12 U.S.C. §§ 1462, 1463, 1464; 12 C.F.R. §§ 500.1, 500.10; "OTS Final Rule," *supra*, 61 Fed. Reg. at 50965. But though it has some prosecutorial and adjudicatory powers ancillary to its regulatory functions, 12 U.S.C. § 1464(d); 12 C.F.R. § 509.1; Simpson v. Office of Thrift Supervision, 29 F.3d 1418, 1422 (9th Cir. 1994), the Office has no power to adjudicate disputes between the S&Ls and their customers. See OTS, "How to Resolve a Consumer Complaint" 1-2, www.ots.treas.gov/docs/4/480924.pdf (visited June 5, 2007). So it cannot provide a remedy to persons injured by wrongful acts of savings and loan associations, and furthermore HOLA creates no private right to sue to enforce the provisions of the statute or the OTS's regulations. Burns Int'l Inc. v. Western Savings & Loan Ass'n, 978 F.2d 533, 535-37 (9th Cir. 1992).
>
> **Against this background of limited remedial authority, we read subsection (c) to mean that OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies.** Suppose an S&L signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

mortgagee (or a servicer like Ocwen) fraudulently represents to the mortgagor that it will forgive a default, and forecloses, it would be surprising for a federal regulation to bar a suit for fraud. Some federal laws do create such bars, notably ERISA, see 29 U.S.C. §§ 1132(a), (e), but this is recognized as exceptional. [Citations omitted] **Enforcement of state law in either of the mortgage-servicing examples above would complement rather than substitute for the federal regulatory scheme**.

This is well explained in "Preemption of State Laws Applicable to Credit Card Transactions" P IIC (Opinion of OTS Chief Counsel, Dec. 24, 1996, 1996 WL 767462):

> '**State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b).** . . . The [Indiana] DAP [deceptive acts and practices] statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit. Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly…a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.

> **The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions. . . . The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute -- the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law."**

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Memorandum of Points and Authorities Filed in Opposition To Defendant
American Express Bank, FSB's Motion to Dismiss

Ibid. (emphasis added).[21]   The impact of the UCL, CLRA, and common law in the context of

Plaintiffs' Complaint on Defendant's lending practices is, under this analysis, "incidental."

---

[21]    There was, in addition to the 1996 OTS General Counsel Advisory letter, another letter entitled "California Unfair Competition Act" (Opinion of OTS Chief Counsel, March 10, 1999), 1999 OTS LEXIS 4, which deals specifically with the UCL, a copy of which is Addendum B hereto.  It is interesting to note that the 1999 letter specifically states that the CLRA "is structured like the Indiana statute," [1999 Advisory Letter at 5-6], which the OTS found was not preempted.  While it might facially appear that the two advisory letters are in conflict, they are not as is obvious from their text and as explained in Brinetti v. Washington Mutual Bank, supra, 446 F.Supp. at 220:

> "The 1999 OTS opinion … declared that federal law preempts the application of certain provisions of the California UCA to three specific areas of lending operations, including advertising, forced placement of hazard insurance, and the imposition of certain loan-related fees. However, OTS bent over backwards to distinguish the opinion from its 1996 opinion, and to limit the scope of the opinion to the very "narrow circumstances" presented.
>
> While recognizing that the UCA, like the Indiana DAP, "may [] be viewed as a form of contract and commercial law under § 560.2(c)," OTS stated, "In our view the situation [presented in the 1999 opinion] is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the circumstances [] describe[d] seeks to set very particular requirements on the Associations' lending operations." 1999 OTS LEXIS 4, *25 (March 10, 1999). OTS recognized that, in a number of lawsuits, plaintiffs had used the UCA to require particular lending disclosures, limit the Associations' choice of insurers and cap certain fees. Accordingly, "The UCA has been and is being used, by private and governmental parties, in an attempt to set substantive standards for the Associations' lending operations and practices." Id. at *26-27. This has resulted in "a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA." Id. at *35.
>
> "As such, under § 560.2(c), the application of the UCA as described above has more than an incidental impact on the Associations' lending activities and is contrary to the purpose of uniform standards of operations." Id. at 25.
>
> Of critical importance, is OTS's emphasis on "the extremely limited nature of our preemption determination here." OTS expressly stated,

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

The UCL/CLRA/common law are all, in the context of Plaintiff's complaint, "traditional contract and commercial law" under Section 560.2(c)(a).  They are not aimed at lending practices, fees, or fee disclosures and, indeed, do not even address them.  They, like the doctrine of unconscionability itself, are actually complementary to and non-substitutive of the Federal regulatory scheme.  Indeed, they are the California embodiment of laws that are designed only to "preserve the traditional infrastructure of basic state laws that undergird commercial transactions."  They and the doctrine of unconscionability merely require that certain common standards be observed by businesses, including Defendant, that have chosen to engage in commerce in California.  Here, concerning the arbitration provision, for instance, it comes into play only after the "loan" has been made and does not affect the way or the means in which the loan is made.  Preemption does not occur under those circumstances.[22]

---

'Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not preempt the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.' Id. at 37."

[22]  In this instance,  Federal preemption does not ignore common sense:  there are simply some actions by entities such as Defendant that are common to all businesses and must be subject to State laws.  One is the form of their contracts.  When businesses such as Defendant cross over the proverbial line and impose unconscionable terms on their customers, then and only then do the UCL, CLRA, and common law come into play.  That is the price that is paid for wanting to tap the lucrative California market.  However and as is obvious by the present motion, Defendant does not want to pay it and, yet, still wants to reap the benefits of that market.  That is simply too bad and cannot support preemption.

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Memorandum of Points and Authorities Filed in Opposition To Defendant**
**American Express Bank, FSB's Motion to Dismiss**

1

## IV.    CONCLUSION

2    For the reasons stated above, in the Complaint (with attachments and exhibits), and in

3    the documents of which judicial notice is concurrently sought, Defendant's motion to dismiss

4    should be denied.

5

6    Dated: November 9, 2007                          Respectfully submitted,

7

8

9                                                     _____
                                                      Matthew S. Hale
10                                                    Attorney for Plaintiffs
                                                      David J. Lee and Daniel R. Lloyd
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          18

28    <ins>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</ins>
      **Memorandum of Points and Authorities Filed in Opposition To Defendant**
      **American Express Bank, FSB's Motion to Dismiss**

# Addendum

1996 OTS LEXIS 25, *

LEXSEE 1996 OTS LEXIS 25, *20

Office of Thrift Supervision

*1996 OTS LEXIS 25*

December 24, 1996

**SUBJECT:** [*1]  **Preemption of State Laws Applicable to Credit Card Transactions**

Dear Text Omitted

   This responds to your inquiry, submitted on behalf of Text Omitted (the "Association"), to the Office of Thrift Supervision ("OTS") regarding the application of three specific Indiana laws to the Association's proposed Text Omitted credit card loan program. Your inquiry raises issues regarding federal preemption and application of the Most Favored Lender ("MFL") provision of the Home Owners' Loan Act ("HOLA"). n1

   n1 *12 U.S.C.A. § 1463*(g) (West Supp. 1996).

   In brief, we conclude that federal law does not preempt the cited Indiana law prohibiting fraudulent and deceptive loan practices. Federal law does, however, preempt the cited Indiana laws that pertain to disclosure and loan-related charges (except for charges that constitute "interest" under the MFL provision). Moreover, under the MFL provision, the Association may elect to charge interest (including charges that constitute interest) up to the maximum amount authorized by the laws of Indiana for the state's most favored lender, notwithstanding any contrary provision in Indiana's laws or the laws of any other states where borrowers reside.  [*2]

**I. Background**

   The Association is a federal savings bank Text Omitted located in Indiana. The Association proposes to issue Text Omitted credit cards to customers nationwide.

   You indicate that the Indiana Uniform Consumer Credit Code (the "UCCC") regulates all persons making consumer loans in Indiana, including unsecured credit card loans. n2 The UCCC addresses two areas: (1) finance charge rates and other charges; n3 and (2) disclosure requirements incorporated from the federal Truth in Lending Act (the "TILA") and Federal Reserve Board Regulation Z. n4 You also represent that the Indiana deceptive acts and practices statute (the "DAP") regulates the activities of lenders by prohibiting specified acts and representations in connection with consumer transactions. n5

   n2 See Ind. Code § 24-4.5-1-101 et seq. (1995).

   n3 Ind. Code § 24-4.5-3-508 (1995), as amended by 750 IAC 1-1-1, provides that the maximum finance charge permissible for supervised consumer loans is 36% for unpaid balances of less than $ 870; 21% for unpaid balances between $ 870 and $ 2,900; and 15% for unpaid loan balances in excess of $ 2,900.

n4 The UCCC directs the creditor to "disclose to the debtor to whom credit is extended with respect to a consumer loan the information required by the Federal Consumer Credit Protection Act." Ind. Code § 24-4.5-3-301(2) (1995). The UCCC defines "Federal Consumer Credit Protection Act" to mean the federal Truth in Lending Act *(15 U.S.C.A. § 1601* et seq.) as amended by the Truth in Lending Simplification and Reform Act (Pub. L. 96-221, 94 Stat. 168), and any regulations issued thereunder. Ind. Code §§ 24-4.5-1-102(4) and 24-4.5-1-302 (1995). Regulation Z implements TILA and is located at 12 C.F.R. Part 225 (1996).

[*3]

n5 See Ind. Code §§ 24-5-0.5-1 et seq. (1995). For example, the statute prohibits a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of the consumer transaction, if it does not and the [person] knows or should reasonably know that it does not" and from making oral or written representations that a consumer transaction involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false." Ind. Code § 24-5-0.5-3(6) & (8) (1995).

You inquire whether the Association must comply with these three Indiana laws in connection with Text Omitted credit card loans issued to borrowers located in Indiana and in other states.

## II. Discussion

A complete response to the Association's inquiry requires examination of both HOLA's MFL provision and OTS's lending regulations.

When a savings association issues credit cards, it may utilize the MFL rate authorized by section 4(g) of the HOLA. This provision permits savings associations to charge interest on loans at the most favorable rate allowed any [*4] lender by the laws of the state in which the association is located, notwithstanding any contrary state law. Moreover, a savings association may "export" the favorable MFL rate of the location state when making loans to borrowers who reside in other states. n6 The practical effect of section 4(g) is to preempt state usury laws to a limited extent.

n6 See *Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299 (1978).*

Beyond the MFL provision, the HOLA also authorizes OTS to promulgate regulations that have preemptive effect. Prior to enactment of the HOLA, "'the states had developed a hodgepodge of savings and loan laws and regulations. . . . [When enacting HOLA.] Congress hoped that [the] . . . rules [of the Federal Home Loan Bank Board and now OTS] would set an example for uniform and sound savings and loan regulation.'" n7 Consistent with this intent, courts have long recognized that federal savings associations are uniquely federalized financial institutions - even more so than national banks. n8 As the Supreme Court has recognized:

Congress directed that, in regulating federal [savings associations], the [Bank Board and now OTS should] consider "the [*5] best practices of local mutual thrift and home financing institutions in the United States," which were at the time all state-chartered. By so stating, Congress plainly envisioned that federal savings [associations] would be

governed by what the [Bank Board and now OTS] - not any particular state - deemed to be the best practices, and approved the . . . promulgation of regulations superseding state law. . . . n9

Consistent with the foregoing, the OTS has authority to issue regulations preempting state laws that affect the operations of federal savings associations.

n7 *Conference of Federal Savings and Loan Associations v. Stein, 604 F.2d 1256 (9th Cir. 1979)* (citations omitted).

n8 *People v. Coast Federal Savings and Loan Association, 98 F. Supp. 311, 319 (S.D. Calif. 1951).*

n9 *Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 153-154 (1982).*

The OTS and the Bank Board have long taken the position that federal lending laws and regulations are intended to occupy the entire field of lending regulation for federal savings associations, leaving no room for state regulation. n10 For these purposes, the field of lending  [*6]  regulation has been defined to encompass all laws affecting lending by federal thrifts, except certain specified areas where state law furthers a vital state interest and has only an incidental effect on lending operations.

n10 For a general discussion of the principles of federal preemption, see OTS Op. Chief Counsel (Oct. 11, 1991).

The preamble to OTS's recent final rule streamlining its lending and investment regulations explains the rationale for this position:

Instead of being subject to a hodgepodge of conflicting and overlapping state lending requirements, federal thrifts [should] be free to originate loans under a single set of uniform federal laws and regulations. This furthers both the "best practices" and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden. At the same time, the interests of borrowers are protected by the elaborate network of federal borrower-protection statutes applicable to federal thrifts . . . . In addition, in those instances where OTS has detected a gap in the federal protections provided to borrowers, the agency has promulgated [*7]  regulations imposing additional consumer protection requirements on federal thrifts. n11

n11 *61 Fed. Reg. 50951 at 50965-50966 (Sept. 30, 1996).*

Accordingly, OTS has preempted most state laws affecting lending by federal thrifts. This position was previously reflected in the OTS regulation at 12 C.F.R. § 545.2 (1996), has been confirmed

1996 OTS LEXIS 25, *

and carried forward in OTS's recent final rule updating and streamlining its lending and investment regulations, and will be codified in OTS regulations at 12 C.F.R. § 560.2. n12

n12 See *61 Fed. Reg. at 50972.* The preamble to this regulation, which became effective on October 30, 1996, contains an extensive discussion of the scope of, and the legal basis for, the OTS authority to preempt by regulation. See *61 Fed. Reg. at 50965-67.* A copy of the preamble is enclosed for your reference.

The preamble to OTS's recent final rule describes the analytic framework to be used in determining whether a particular state law that affects lending is, or is not, preempted by federal law. The preamble states:

When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question [*8] is listed [among the illustrative examples of preempted state laws] in paragraph (b) [of § 560.2]. If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of [the types of state laws not preempted, as described in § 560.2(c)]. For these purposes, paragraph (c) is intended to be interpreted narrowly. n13

n13 *61 Fed. Reg. at 50966.*

We have examined the three cited Indiana laws under this analytic framework.

### A. Interest Rates and Related Charges

The new OTS lending regulation specifically addresses your inquiry regarding federal preemption of state laws regulating interest rates and related charges. The illustrative list of preempted state laws at § 560.2(b) indicates, in subparagraph (12), that state interest rate ceilings are preempted to the extent provided in the MFL provision of the HOLA. Thus, when the Association issues a credit card under the MFL provision, it may "charge [*9] interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of [Indiana]," notwithstanding any contrary provisions in Indiana law or the law of the states where borrowers reside. n14 The OTS MFL regulation defines interest as follows:

The term 'interest' . . . includes any payment compensating a creditor or prospective creditor for an extension of credit . . . . It includes, among other things, the following fees connected with credit extension or availability: numerical periodic interest rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of

credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports. n15

n14 The OTS recently conformed the text of its regulation implementing HOLA § 4(g) to the regulation implementing a similar statutory MFL provision for national banks. See *61 Fed. Reg. at 50981* (to be codified at 12 C.F.R. § 560.110). The Office of the Comptroller of the Currency's ("OCC") rule implementing *12 U.S.C.A. § 85* (West 1989) is found at *61 Fed. Reg. 4849, 4869* (Feb. 9, 1996) (to be codified at 12 C.F.R. § 7.4001).

[*10]

n15 12 C.F.R. § 560.110(a).

Loan-related fees not covered by the definition of interest under the MFL provision of the HOLA are governed by subparagraph (5) of § 560.2(b). n16 This provision preempts state laws regulating "loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees," but does not apply to numerical interest rates. Subparagraph (5) reflects OTS's determination that federal thrifts should be free to contract with customers for fees that are driven by the market for financial services, rather than government regulation, provided adequate loan-fee disclosure is given to consumers (as federal law mandates).

n16 See 12 C.F.R. § 560.110(b) ("Except as provided in this paragraph, the applicability of state law to Federal savings associations shall be determined in accordance with § 560.2 of this part.")

We note that at least one type of fee (late fees) listed as preempted in subparagraph (5) also falls within the scope of the term "interest" under the OTS MFL regulation. Because the statutory MFL provision is a specific expression of Congressional intent, any overlap between that [*11] provision and subparagraph (5) must be resolved in favor of the MFL provision whenever a lender originates a loan under the MFL provision. What this means for the Association is as follows.

Indiana's UCCC sets a maximum finance charge for supervised consumer loans that varies based on the amount of the unpaid balance of the loan. Under the UCCC, the finance charge is broadly defined to include "all charges payable directly or indirectly to the lender as an incident to the extension of credit." n17 This language is broad enough to encompass all fees and charges that constitute "interest" under the MFL provision. Thus, when issuing a credit card loan under the MFL provision, the Association must abide by any limits in the Indiana UCCC governing not only the numerical interest rate, but also late fees, NSF fees, overlimit fees, annual fees, cash advance fees, and membership fees.

n17 Ind. Code § 24-4.3-109(1) (1995).

The Indiana UCCC also purports to apply its usury limits to any charges imposed by the Association "for any guarantee or insurance protecting the lender against the debtor's default or other credit loss; and charges incurred for investigating the collateral or credit-worthiness [*12] of the debtor." n18 These charges, however, are expressly excluded from the definition of "interest" under

OTS's MFL regulation. n19 As provided in the MFL regulation at § 560.110(b), the status of state laws that are not encompassed by the MFL regulation are governed by the general principles of preemption set forth in § 560.2. As noted above, § 560.2(b)(5) preempts state laws that attempt to "impose requirements regarding . . . loan-related fees." This language encompasses fees charged for appraisals required for loan origination and premiums charged for credit insurance.

n18 Id.

n19 12 C.F.R. § 560.110(a) (Interest "does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, . . . or fees incurred to obtain credit reports.")

Thus, when issuing credit cards, the Association will be required to limit all fees and charges that constitute "interest" (as defined in § 560.110(a)) to the maximum rate authorized for Indiana's most favored lender. No other state's laws will apply to these fees and charges, even if the Association's borrowers reside in another state. All state laws that [*13] purport to address loan-related fees that are not included within the MFL definition of interest are preempted by federal law.

### B. Disclosure Requirements

The new OTS lending regulation also addresses federal preemption of disclosure requirements. Section 560.2(b)(9) provides that state laws imposing lending disclosure and advertising requirements are preempted. State laws within the purview of § 560.2(b)(9) include those that require specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents. The provision of the Indiana UCCC requiring specific lending disclosures by the Association is preempted by this federal regulation. n20 Instead, the Association is required to comply with the elaborate federal network of disclosure laws, including TILA and Regulation Z. n21

n20 This conclusion is consistent with the agency's longstanding position that state disclosure laws are preempted. See e.g., OTS Op. Dep. Chief Counsel (Oct. 18, 1994) (state law requiring a savings association to provide copies of credit reports held by the savings association); OTS Op. Chief Counsel (Jan. 3, 1991) (state law requiring disclosure of information on escrow accounts for mortgages); FHLBB Op. by Gen. Counsel (Apr. 28, 1987) (state regulations purporting to regulate lending disclosure); and FHLBB Op. by Gen. Counsel (Nov. 12, 1985) (state truth in lending laws).

[*14]

n21 Because the Indiana law merely incorporates by reference already-applicable federal requirements under TILA and Regulation Z, we recognize that the practical effect of preemption, in this instance, would be negligible.

This conclusion is not altered by the fact that the MFL provision will apply to the Association's credit card program. Although institutions utilizing the MFL provision must comply with any provisions of state law that are "material to the determination of the permitted interest rate." n22 Indiana's disclosure laws are not material to this determination.

n22 12 C.F.R. § 560.110(b).

In the past, state laws have been deemed to be material to the determination of the interest rate in only two instances. First, whenever a state authorizes an interest rate for a particular category of loan, the provisions of law defining the fundamental characteristics of that category of loan must be observed. n23 Second, state laws defining how interest is to be computed must also be observed. n24

n23 See OCC Interpretive Letter No. 354 [1985-87 Transfer Binder] Fed. Bank L. Rep. (CCH) P 85.524. The OTS and the FHLBB have long looked to OCC precedent interpreting the national bank MFL provision for guidance in interpreting section 4(g) and the OTS implementing regulation. See e.g. OTS Op. Chief Counsel, Dec. 24, 1992, pp. 3-4.

[*15]

n24 Id.

Indiana's UCCC disclosure law, however, neither defines the fundamental characteristics of the category of loans covered by the usury rates in question nor affects the manner of computing the interest rate. Accordingly, the UCCC disclosure law is not material to the interest rate and is not encompassed by the MFL provision. n25

n25 Accord OCC Interpretive Letter No. 178, [1981-82 Transfer Binder] Fed. Bank. L. Rep. (CCH) P 85.259; OCC Interpretive Letter No. 333, [1985-87 Transfer Binder] Fed. Bank. L. Rep. (CCH) P 85.503. This determination is consistent with the preamble to the OTS regulation which states that a disclosure provision will be material to the determination of the interest rate only in "rare instances." *61 Fed. Reg. 50968.* This position reflects a change in the OTS's interpretation of the MFL statute. Under the prior OTS regulation at 12 C.F.R. § 571.22 (1996), thrifts were required to comply with consumer protection laws, including disclosure provisions, of the state in which they were located when making loans under the MFL provision. Id. Under the new regulation, consumer protection laws no longer automatically apply.

Thus, general [*16] principles of federal preemption determine what disclosure requirements apply to loans made by the Association under the MFL provision. n26 As indicated above, § 560.2(b)(9) preempts the Indiana disclosure law.

n26 12 C.F.R. § 560.110(b).

You have also asked whether federal law would preempt a cited Ohio disclosure law which requires lenders to provide written statements notifying borrowers of their rights under state anti-discrimination statutes. n27 Specifically, this statute requires that credit application forms (or where there is a multi-state distribution, notices of acceptance or rejection of the application) include the following statement: "Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers." As already discussed above, the OTS regulation at § 560.2(b)(9) preempts state laws imposing disclosure requirements, including the cited Ohio disclosure law. n28 Accordingly, the Association need not comply with this disclosure provision.

n27 Ohio Rev. Code Ann. § 4112.021(g) (Anderson 1996).

n28 We note that the Ohio law is largely duplicative of the disclosure requirement contained in Regulation B which implements the Equal Credit Opportunity Act. See 12 C.F.R. § 202.9(a)(2) (1996). This regulation requires lenders to provide a notice setting forth the protections contained in section 701(a) of the Act "whenever an adverse action is taken with regard to a credit application."

[*17]

## C. Deceptive Acts and Practices Statute

Your final preemption inquiry involves Indiana's DAP law. State laws prohibiting deceptive acts and practices in the course of commerce are not included in the illustrative list of preempted laws in § 560.2(b). Thus, a more extensive preemption analysis of Indiana's DAP statute is required. The DAP statute prohibits specified acts and representations in all consumer transactions without regard to whether the transaction involves an extension of credit. n29 Although not directly aimed at lenders, this law affects lending to the extent that it prohibits misleading statements and practices in loan transactions by a federal savings association. Accordingly, under the analysis described above, a presumption arises that the DAP statute would be preempted in connection with loans made by the Association.

n29 See Ind. Code § 24-5-0.5-2(1) (1995) (definition of consumer transaction).

The OTS has indicated, however, that it does not intend to preempt state laws that establish the basic norms that undergird commercial transactions. n30 Accordingly, in § 560.2(c), the OTS has identified certain categories of state law that are not preempted. [*18] n31 A state law that falls within the specified categories will not be preempted if the law only incidentally affects the lending operations of federal savings associations, or is otherwise consistent with the objectives that underlie OTS's preemption position, as set forth in paragraph (a) of § 560.2. n32 Paragraph (a) indicates that the OTS's objectives are to facilitate the safe and sound operation of federal savings associations, to enable federal associations to conduct their operations in accordance with best practices of thrift institutions in the United States, and to further other purposes of the HOLA.

n30 61 Fed. Reg. at 50966.

n31 12 C.F.R. § 560.2(c)(1) through (5). These categories include: contract and commercial law, real property law, homestead laws, tort law and criminal law.

n32 12 C.F.R. § 560.2(c).

The Indiana DAP falls within the category of traditional "contract and commercial" law under § 560.2(c)(1). While the DAP may affect lending relationships, the impact on lending appears to be only incidental to the primary purpose of the statute -- the regulation of the ethical practices of all businesses engaged in commerce in Indiana. There is [*19] no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United States, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lend-

ing operations. Accordingly, we conclude that the Indiana DAP is not preempted by federal law. n33

> n33 This conclusion is consistent with relevant case law. See *Morse v. Mutual Federal Savings and Loan Association of Whittingham, 536 F. Supp. 1271 (D. Mass. 1982)* (federal savings associations are subject to a general Massachusetts statute proscribing unfair and deceptive trade practices).

You have asked whether the Association may "export" the Indiana DAP prohibitions when issuing credit cards to borrowers located in other states under the MFL provision. In other words, may the Association comply with Indiana's DAP in lieu of the deceptive practices laws of any other state?

As noted above, only state laws that set the maximum amount [*20] of interest or that are material to the determination of interest are covered by the MFL provision. Indiana's DAP does not establish the maximum interest permitted under Indiana law, does not prescribe unique characteristics of a specified class of loans permitted under Indiana law, and does not address the manner in which interest is computed. Accordingly, the DAP is not covered by the MFL provision.

Thus, general principles of federal preemption govern. As indicated above, nothing in federal law preempts general deceptive practices statutes. The Association is required to comply with the Indiana DAP and those deceptive practices statutes of other states that are worded in a manner to apply to the Association's loans. The applicability of conflicting state requirements should be resolved under traditional conflicts of laws principles and may turn on the facts of the specific transaction. Under some circumstances, the deceptive practices laws of more than one state may apply to the same transaction.

In reaching the foregoing conclusions, we have relied upon the representations made in the materials you submitted and in subsequent discussions. Our conclusions depend upon the accuracy [*21] and completeness of those representations. Any material difference in facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please feel free to contact Karen Osterloh, Counsel (Banking and Finance), (202) 906-6639.

Very truly yours,

(signed)
Carolyn J. Buck
Chief Counsel

Enclosure

cc: All Regional Directors
All Regional Counsel

LEXSEE 1999 OTS LEXIS 4

Office of Thrift Supervision

*1999 OTS LEXIS 4*

March 10, 1999

**SUBJECT:**  [*1]  California Unfair Competition Act
P-99-3

Dear Text Omitted:

   This responds to your inquiry submitted on behalf of Text Omitted, a savings and loan holding company, and its two wholly-owned federal savings association subsidiaries, Text Omitted ("Association A") and Text Omitted ("Association B"), located in Text Omitted (Association A and Association B are collectively referred to herein as the "Associations"). You request that the Office of Thrift Supervision ("OTS") confirm your conclusion that federal law preempts the application of provisions of the California Unfair Business Practices Statute n1 and the California Deceptive, False and Misleading Advertising Statute n2 (collectively, the "Unfair Competition Act" or "UCA") to the Associations in three specific areas of their lending operations: (1) advertising; (2) the forced placement of hazard insurance; and (3) the imposition of certain loan-related fees.

       n1 Cal Bus. & Prof. Code §§ 17200 et seq.

       n2 Cal Bus. & Prof. Code §§ 17500 et seq.

   In brief, we conclude that, in the narrow circumstances you describe, federal law preempts the manner in which specified provisions of the UCA have been applied to the Associations [*2]  that interferes with the Associations' lending activities in the areas of advertising, the forced placement of hazard insurance and the imposition of certain specified loan-related fees.

**I. Background**

   **A. The Associations**

   The Associations are headquartered and conduct a substantial portion of their lending activities in California. A significant portion of the Associations' business consists of originating residential and multi-dwelling mortgage loans and servicing the mortgage loans that they own.

   **B. The UCA**

   **1. The UCA as written**

   Under § 17203 of the UCA, any "person" (which includes corporations) engaging in "unfair competition" may be enjoined in any court of competent jurisdiction and the court may order restitution of any interest in money or property acquired by means of such unfair competition. n3 The

UCA defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) . . . of the Business and Professions Code." n4

> n3 Cal. Bus. & Prof. Code §§ 17201, 17203.

> n4 Cal. Bus. & Prof. Code § 17200.

You have [*3] advised us that California courts have interpreted other key terms left undefined in the statute. For instance, under the UCA, a "practice" can be based on a pattern of behavior pursued in a course of business, and can include a single act if that act affects plaintiffs on a classwide basis. n5 "Unlawful" business practices are those that violate any predicate law, state or federal, civil or criminal, even if the predicate law does not provide for a private cause of action. n6 An "unfair" business practice is one whose harm to the victims outweighs its benefits to society. n7 "Fraudulent" business conduct is any conduct by which the public is likely to be deceived; no actual deception, reasonable reliance, or damages are required. n8

> n5 *Allied Grape Growers v. Bronco Wine Co., 249 Cal. Rptr. 872, 884 (1988); People v. Casa Blanca Convalescent Hospital, Inc., 206 Cal. Rptr. 164, 174-75 (1987).*

> n6 See, e.g., *Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668 (Cal. 1983); Barquis v. Merchants Collection Ass'n., 496 P.2d 817, 829-31 (Cal. 1972); Podolsky v. First Healthcare Corp., 58 Cal. Rptr.2d 89, 98 (1996).*

[*4]

> n7 See, e.g., *Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980).* The court noted that this definition is intentionally broad in order to allow courts maximum discretion to prohibit new schemes to defraud.

> n8 *Committee on Children's Television, 673 P.2d at 668-69.*

Section 17500 of the UCA forbids "untrue or misleading" advertising in connection with the disposition of real or personal property or services. This prohibition is very similar to the UCA's definition of "unfair competition" in § 17200 as "unfair, deceptive, untrue or misleading advertising." n9 The Supreme Court of California has noted that, under § 17500, an advertisement is "untrue or misleading" if it is likely to deceive the audience, and the intent of the disseminator and the knowledge of the customer are irrelevant. n10 You have informed us that alleged violations of the two statutes are generally pled and litigated as a single cause of action, and that California courts do not distinguish between the two.

> n9 Indeed, as noted, § 17200 specifically incorporates acts that violate § 17500. Section 17500, however, appears to be narrower than § 17200 in three respects. First, § 17500 applies only to false advertising, whereas § 17200 also forbids "fraudulent business practices." Sec-

ond, § 17500 is limited to advertising that concerns real or personal property or services or the circumstances of their disposition or performance, whereas § 17200 contains no such limitation. Third, a defendant violates § 17500 only if he knows the advertising is false or misleading or in the exercise of reasonable care should know it to be, whereas § 17200 imposes strict liability.

[*5]

n10 *Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).*

California courts have noted that, under § 17200, violation of the UCA is a strict liability offense. n11 There is no need to show that the defendant intended to injure anyone. n12

n11 *Podolsky, 58 Cal. Rptr.2d at 98.*

n12 Id.; *State Farm Fire and Cas. Co. v. Superior Court, 53 Cal. Rptr.2d 229, 233-34 (1996).*

Under the UCA, the California Attorney General and county district attorneys have the express right to sue for unfair competition violations on behalf of the people of California or upon the complaint of any person, corporation or association. n13 An action also may be brought by any person acting for the interests of itself, its members or the general public. n14

n13 Cal. Bus. & Prof. Code § 17204.

n14 Id.

The UCA authorizes a trial court to fashion a remedy to prevent unfair trade practices. n15 The trial court can also make such orders and judgments as may be necessary to restore to a person any money or property that may have been acquired by means of unfair competition. n16 Remedies under the [*6] UCA are cumulative to each other and to the remedies or penalties available under other state laws. n17

n15 Cal. Bus. & Prof. Code § 17203.

n16 Id.

n17 Cal. Bus. & Prof. Code § 17205. This aspect of the UCA is borne out by the examples of UCA claims filed against the Association discussed infra at 7-9. In two of those examples, UCA claims based on the forced placement of insurance and the imposition of loan-related fees, the complaints included a variety of other causes of action, such as breach of contract, conversion, RICO violations, and unjust enrichment.

In addition to injunctive relief, the UCA provides that public officials (but not private litigants) can sue for civil penalties for violations. n18 Any civil penalties collected by state and local offi-

cials in prosecuting an unfair competition claim are required to be paid to the state and local entities bringing such suit. n19

n18 Cal. Bus. & Prof. Code § 17206(a).

n19 Id.

## 2. The UCA as applied

You represent that the UCA has been broadly interpreted and applied and cite several aspects of the statute to support your position. First, you maintain that the statutory terms in the UCA have been [*7] defined broadly. For instance, you indicate that California courts interpreting the UCA have found that the UCA does not require a breach of contract, or a violation of real property, commercial or tort law, but rather merely a finding of "unfairness" to sustain a cause of action. n20 As noted above, a business practice is "unfair" if its harm to the victims outweighs its benefits to society, and this term has been interpreted broadly to allow courts maximum flexibility to prohibit new schemes to defraud. n21

n20 See, e.g., *Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980); Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).*

n21 See *Motor's Inc., 162 Cal. Rptr. at 546.*

You further represent that under the UCA's definition of "fraudulent conduct," i.e., any conduct in which the public is likely to be deceived, n22 there is no requirement that a person actually be deceived or suffer any damages as a result of fraudulent conduct or reliance thereon. n23 Even a true statement can constitute "fraudulent conduct" if it is likely to deceive the public. n24 [*8]

n22 *Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668-69 (Cal. 1983)* (construing § 17200 of the UCA).

n23 Id.

n24 *Id. at 668,* citing *Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).*

Similarly, you indicate that under the UCA § 17200, "unfair, deceptive, untrue or misleading advertising" is advertising by which a person is likely to be deceived. n25 California courts have defined "untrue or misleading" advertising under UCA § 17500 in the same way. n26

n25 *Committee on Children's Television, 673 P.2d at 668-69.*

n26 See, e.g., *Chern, 544 P.2d at 1316.*

These broad definitions are in contrast to another state unfair business practices statute that the OTS has reviewed, the Indiana Deceptive Acts and Practices Statute, and discussed in a December

24, 1996 OTS opinion ("1996 Opinion"). n27 Unlike the open-ended terms to describe "unfair" business practices in the UCA, the Indiana statute reviewed in the 1996 Opinion set out a list of specific acts or representations [*9] that were deemed to be "deceptive" acts, thereby providing some certainty as to what types of activities violated the statute. n28 (We note that the California Civil Code contains a provision, § 1770 (part of the "Consumers Legal Remedies Act" n29), that is structured like the Indiana statute. n30 You do not ask, however, about Civil Code § 1770, and therefore we do not consider its impact, if any, on your inquiry.)

     n27 OTS Op. Chief Counsel (December 24, 1996), construing the Indiana Deceptive Acts and Practices Statute, Ind. Code §§ 24-5-0.5-1 et seq. (1995).

     n28 Ind. Code § 24-5-0.5-3(a). Statutory examples of such "deceptive" acts included: representing that a specific price advantage exists as to the subject of a consumer transaction, if it does not and the supplier knows or should reasonably know that it does not; and representing that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false. Ind. Code at §§ 24-4-0.5-3(a)(6) and (8) (1995).

     n29 Cal. Civ. Code §§ 1750 et seq. (West 1998).
[*10]

     n30 Cal. Civ. Code § 1770 (West 1998 and Supp. 1999).

   You also indicate that the UCA's standing rules are extremely liberal and contrast sharply with the standing requirements of traditional areas of state jurisdiction, such as contract or tort law. For instance, under the UCA, any "person" (including corporations) may bring an action "for the interests of itself, its members, or the general public," n31 and, in cases where a plaintiff sues on behalf of the general public, the plaintiff need not prove actual harm by the allegedly unfair business practices or personal dealings with the defendant. n32 Nor must the plaintiff bring the suit as a class action, where he must show he will fairly and adequately protect the interests of the class, and where other affected persons would be bound by the outcome.

     n31 Cal. Bus. & Prof. Code § 17204.

     n32 You maintain that the private standing to remedy unfair practices on behalf of the general public does not require the numerosity, commonality, adequacy, typicality, manageability, or other requirements of class actions under the California or Federal Rules of Civil Procedure.

   As one commentator has noted, many states, like California, [*11] have extended to private consumers the right to sue for deceptive and unfair business practices, creating problems between enforcement of the Federal Trade Commission ("FTC") Act n33 and many state deceptive and un-

fair business practices statutes. n34 The UCA's allowance for actions by private litigants is in contrast to the enforcement mechanism in the FTC Act, on which the UCA is based. n35 The FTC Act requires that the FTC proceed only when it appears that doing so is in the public interest, and only the FTC may prosecute an action under the Act. n36 Individual consumers have no recourse when the FTC declines to bring a case. n37 But once the FTC obtains a remedy, it would benefit all consumers.

n33 *15 U.S.C.A. §§ 41* et seq. (West 1997).

n34 See Sovern, "Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model," *52 Ohio St.L.J. 437 (Spring 1991)* at 437 ("While [extending private rights of action] has indeed aided injured consumers, it has also generated problems of its own") and 452 ("'Little FTC Acts' arm consumers with a powerful weapon against merchants, enabling consumers to prevail even when it may not be in society's interest for them to win").

[*12]

n35 See, e.g., *Rubin v. Green, 847 P.2d 1044, 1052 (Cal. 1993)* (the UCA is one of the so-called "little FTC Acts" enacted by many states).

n36 *Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C. Cir. 1973); Carlson v. Coca-Cola Co., 483 F.2d 279* (9<th> Cir. 1973). Compare *15 U.S.C. § 45*(b) (FTC may issue a complaint if "it shall appear to the [FTC] that a proceeding by it in respect [to an unfair or deceptive business practice] would be in the interest of the public . . .") with Cal. Bus. & Prof. Code § 17204 (Actions may be brought "by any person acting for the interests of itself . . .").

n37 *Heckler v. Chaney, 470 U.S. 821 (1985)* (Food and Drug Administration refusal to commence proceeding is not reviewable absent statute so providing).

You also claim that the UCA's remedial authority is sweeping. n38 You note that California appellate courts have found that a trial court in a UCA proceeding has broad authority to fashion a remedy that not only enjoins unfair trade practices, but requires specific [*13] actions designed to deter the defendant and others from engaging in such practices in the future. n39 You further represent that there is no requirement that penalties be tied to the actual harm suffered. n40 Moreover, once calculated, penalties may be imposed jointly and severally on all defendants. n41

n38 Cal. Bus. & Prof. Code § 17203.

n39 See *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 662 P.2d 916, 920 (Cal. 1983); People v. Toomey, 203 Cal. Rptr. 642, 654 (1984).*

n40 *People v. Toomey, 203 Cal. Rptr. at 657.*

n41 *People v. Bestline Products, Inc., 132 Cal. Rptr. 767, 794-96 (1976).*

You argue that this combination of broad definitions, liberal standing requirements, and generous remedial provisions makes UCA claims extremely attractive for plaintiffs to pursue and nearly impossible for the Associations to defend or obtain finality as to acceptable practices. You indicate that the UCA has been increasingly used as a vehicle to challenge aspects of the Associations' and other federal thrifts' lending operations that historically [*14] have been within the purview of federal law.

### 3. UCA claims filed against the Associations based on their lending activities

In support of your request, you inform us that the Associations have faced, or are currently facing, litigation brought under the UCA challenging certain aspects of the Associations' lending operations as "unfair." You argue that, although the UCA is not directly aimed at federal savings associations, or lenders in general, it has been used by plaintiffs to challenge areas of the Associations' lending activities that have traditionally been governed by federal law.

You provide three examples of lending activities that have been challenged under the UCA -- advertising, the forced placement of hazard insurance, and the imposition of loan-related fees -- and the following information relating thereto.

### a. Advertising

In 1994, the District Attorney's Office for the County of Text Omitted, California, asserted an action against Association A in Superior Court alleging that Association A's advertising of one of its loan programs, which featured an adjustable rate mortgage loan with a bi-weekly payment, was misleading and constituted an unfair practice under [*15] the UCA. The District Attorney alleged, among other things, that the advertising and promotional material that Association A used in connection with the particular loan program violated the UCA because the advertising did not include an example disclosing the maximum permissible annual percentage rate for loans offered under the program. n42 Association A ultimately settled the case, agreeing to end the advertising program and to pay a civil penalty to the District Attorney's office, without conceding any wrongdoing.

n42 People v. Text Omitted, Superior Court, Text Omitted County, California (Text Omitted).

### b. Forced placement of insurance

Association A currently is defending a class action lawsuit alleging that during the course of force placing hazard insurance on behalf of its borrowers, as a result of the borrowers' failure to pay the insurance premiums under their existing policies, Association A did not mitigate avoidable costs that were then passed on to the borrowers. n43 Specifically, the complaint alleges that when the borrowers' hazard insurance coverages expired, Association A force placed alternative coverage from a different insurance company at a higher cost [*16] than the cost of the lapsed policy. n44 The plaintiffs contend that Association A had an obligation to mitigate avoidable losses by maintaining the same policy in effect with the same insurance carrier at the same price (or even less). The plaintiffs allege that Association A's procedures for force placing hazard insurance constitute an "unfair business practice" in violation of § 17203 of the UCA.

n43 Text Omitted, Superior Court, Text Omitted County, California (Text Omitted). All the plaintiffs in the Text Omitted class action are private individuals who obtained mortgage loans from Association A; there are no governmental plaintiffs in the action.

n44 The complaint in Text Omitted alleges that the new policies, which Association A places pursuant to an arrangement it has with an unaffiliated insurance company, often cost two to five times more than the lapsed policies.

Besides the UCA claim, the plaintiffs' complaint also asserts causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment and imposition of a constructive trust, and declaratory relief, all based on the forced placement of insurance. n45 [*17]  You indicate that trial in this matter is currently scheduled for later this year.

n45 See Complaint, Text Omitted, Superior Court, Text Omitted County, California (Text Omitted).

### c. Loan-related fees

You represent that Association A has faced several challenges to its imposition of certain loan-related fees. You specifically cite a legal challenge based on the UCA to two fees -- "demand statement" fees and facsimile fees n46 -- that Association A charges when a borrower pays off a mortgage loan. n47 In that lawsuit, the plaintiffs alleged that Association A charged impermissibly inflated demand statement and facsimile fees when borrowers refinanced their mortgage loans and that such practice constituted an "unfair business practice" under the UCA. n48 In addition to the UCA claim, the plaintiffs' complaint also asserted causes of action for breach of contract, RICO violations, and restitution. n49 You maintain that Association A has incurred substantial money and time defending such lawsuits.

n46 When a borrower refinances a mortgage loan, the existing mortgagee generates a statement, called a demand statement or payoff statement, setting forth all outstanding amounts on the current mortgage. The current mortgagee then normally transmits the demand statement to the new mortgagee by facsimile. Association A charges a fee for each of these services.

[*18]

n47 See, e.g., Text Omitted (subsequently voluntarily dismissed). The named plaintiff, who resided in Illinois, filed a claim in federal court in Illinois against Association A based on an alleged violation of the UCA.

n48 Id.

n49 See Complaint, Text Omitted (subsequently voluntarily dismissed).

## II. Discussion

### A. Analytical framework

Pursuant to §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"), n50 the OTS is (and before it, the Federal Home Loan Bank Board ("FHLBB") was) authorized to provide for the safe and sound operation of federal savings associations and has exclusive plenary authority to regulate all aspects of the operations of federal savings associations. Extensive judicial and other authority supports the principle that HOLA § 5(a) and the OTS's implementing regulations preempt state laws that purport to regulate the activities or operations of federal savings associations because Congress conferred on the FHLBB, and now the OTS, exclusive authority to regulate the operations of federal savings associations. n51 Extensive authority also confirms that OTS (and formerly FHLBB) regulations preempt state law where the law in question [*19] conflicts with, or is otherwise an obstacle to, the achievement of the objectives of federal regulations. n52

n50 *12 U.S.C.A. §§ 1463*(a) and 1464(a) (West Supp. 1998).

n51 See, e.g., *Conference of Federal Savings and Loan Associations v. Stein, 604 F. 2d 1256, 1260* (9<th> Cir. 1979) ("The regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly preempt the field of regulatory control over these associations."), aff'd mem., *445 U.S. 921 (1980); FHLBB v. Empie, 628 F. Supp. 223, 225 (W.D. Okla. 1983)* ("Congress intended the HOLA to preempt all state regulation over federally-chartered savings and loan institutions."), aff'd, *778 F.2d 1447* (10<th> Cir. 1985); *People v. Coast Federal Savings and Loan Ass'n, 98 F. Supp. 311, 316 (S.D. Cal. 1951)* ("The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). See also OTS Op. Chief Counsel, (January 18, 1996) (state reporting requirements preempted); OTS Op. Chief Counsel (October 11, 1991) (deposit taking); FHLBB Op. General Counsel (April 28, 1987) (lending and examination).

[*20]

n52 *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 156, 159 (1982)* (preempting state limitation on due on sale practices that conflicted with FHLBB regulation); see also *First Federal Savings and Loan Ass'n of Boston v. Greenwald, 591 F. 2d 417, 425* (1<st> Cir. 1979) (preempting Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); *Kupiec v. Republic Federal Savings and Loan Ass'n, 512 F.2d 147-50* (7<th> Cir. 1975) (preempting "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

In 12 C.F.R. § 560.2(a) (1998), the OTS states its intention to totally occupy the field of the regulation of the lending activities of federal savings associations. One of the express purposes of § 560.2(a) is to allow federal savings associations "maximum flexibility to exercise their lending

powers in accordance with a uniform federal scheme of regulation." n53 The preamble to § 560.2 sets out the analytical framework to be used in determining [*21] whether a state law that affects lending is preempted by federal law. n54 Under this framework, state laws of the type listed in § 560.2(b) are preempted. State laws of the types listed in § 560.2(c) are generally not preempted. However, under subsection (c), a state law of the type traditionally left to the states or that the OTS finds furthers a vital state interest is nevertheless preempted if the law has more than an "incidental impact" on a thrift's lending operations or is otherwise contrary to the purposes of § 560.2(a).

n53 12 C.F.R. § 560.2(a) (1998).

n54 *61 Fed. Reg. 50951, 50965-67* (September 30, 1996).

Under § 560.2(b), the general types of state laws that federal law preempts based on this occupation of the field include state laws purporting to impose requirements regarding "disclosure and advertising," n55 "the ability of a creditor to require private mortgage insurance, insurance for other collateral, or other credit enhancements," n56 and "loan-related fees." n57 Under § 560.2(c), the specific types of state laws that generally are not preempted by federal law include contract and commercial law, real property law, tort law, certain [*22] homestead laws, and criminal law. n58 Aggrieved consumers thus may use these types of laws to obtain relief. n59

n55 12 C.F.R. § 560.2(b)(9) (1998).

n56 12 C.F.R. § 560.2(b)(2) (1998).

n57 12 C.F.R. § 560.2(b)(5) (1998).

n58 12 C.F.R. § 560.2(c) (1998).

n59 Aggrieved customers of federal savings associations may also pursue relief through OTS's consumer complaint process. See discussion, infra at 18.

The OTS utilized this analytical framework in the 1996 Opinion, which examined whether federal law preempted the Indiana Deceptive Acts and Practices Statute. The Indiana Deceptive Acts and Practices Statute prohibited specified acts and representations in connection with consumer transactions. For example, the statute prohibited a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of a consumer transaction, if it does not and the [person] knows or should reasonably know that it does not," and from making oral or written representations that a consumer transaction involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should [*23] reasonably know that the representation is false." n60

n60 1996 Opinion at 2, citing Ind. Code § 24-4-0.5-3(6) and (8) (1995).

The 1996 Opinion reviewed the state statute in the context of a proposed lending program and there was no suggestion that the state statute was being (or would be) applied in a manner that impermissibly affected lending. The 1996 Opinion concluded that the Indiana statute fell within the category of "contract and commercial law" under § 560.2(c)(1), that the law's impact on lending was incidental, that there was no indication that the law conflicted with any federal objectives identified in § 560.2(a) of the OTS's lending regulation, and, therefore, that the Indiana statute was not preempted by federal law. n61

> n61 The 1996 Opinion also reviewed a separate Indiana statute that required specific lending disclosures by a federal savings association, and concluded that the Indiana statute was preempted under § 560.2(b)(9). Id. at 7-8.

We will review the UCA, as it affects the Associations' lending practices regarding advertising, insurance requirements and loan-related fees, under the same analytical framework set forth in § 560.2. We note that [*24] the UCA, as drafted, is not directly aimed at federal savings associations, or lenders generally. The question is thus whether the UCA, as applied in the three circumstances you describe, has been and is being used by both private and governmental plaintiffs as a vehicle to improperly impose requirements on the Associations' lending operations regarding matters that have traditionally been within the exclusive purview of the OTS and federal law. A preemption analysis requires consideration of the relationship between federal and state laws as they are interpreted and applied, not merely as they are written. n62

> n62 *Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977);* see also *DeCanas v. Bica, 424 U.S. 351, 363-65 (1976).*

### B. Section 560.2(c)

As indicated above, § 560.2(c) provides that specified types of state laws, including contract and commercial laws or a law that the OTS finds furthers a vital state interest, generally are not preempted to the extent that the state law's effect on lending is only incidental and the state law is consistent with the objectives of § 560.2(a), including allowing federal savings [*25] associations to operate in accordance with uniform standards. However, if such a state law has a more than incidental impact on a federal thrift's lending operations or is inconsistent with the objectives of § 560.2(a), the state law may be preempted.

In the 1996 Opinion, we concluded that the Indiana Deceptive Acts and Practices Statute fell within the category of "contract and commercial law" under § 560.2(c). The UCA may also be viewed as a form of contract and commercial law under § 560.2(c). Nevertheless, in our view the situation faced by the Associations is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the circumstances you describe seeks to set very particular requirements on the Associations' lending operations. As such, under § 560.2(c), the application of the UCA as described above has more than an incidental impact on the Associations' lending activities and is contrary to the purpose of uniform standards of operations.

### 1. As applied, the UCA has more than an incidental impact on lending

Unlike the statute at issue in the 1996 Opinion, it appears, based on the information you have provided, that in this [*26] case the practical effect of the application of the UCA as a basis for al-

leging "unfair competition" creates more than an incidental impact on the Associations' lending operations. n63

> n63 By contrast, the Indiana Deceptive Acts and Practices Statute did not attempt to regulate the content of a federal savings association's advertising or the amount of a loan-related fee, but rather, sought only to protect the integrity of such representations and charges once made. A federal thrift, as part of a loan contract, could decide what fees to charge and would only run afoul of the Indiana statute if it did not abide by its agreements or representations regarding those fees. Here, the UCA is being used in a manner that attempts, indirectly through the regulation of "unfair" business practices, to establish state-imposed, substantive standards for the lending activities of federal thrifts.

Even though the UCA, on its face, may appear to further a state's vital interest in regulating commercial transactions and is not specifically aimed at the lending practices of federal savings associations, the UCA has been and is being used, by private and governmental parties, in an attempt to set [*27] substantive standards for the Associations' lending operations and practices. You have identified specific lawsuits in which plaintiffs have used the UCA in attempts to require particular lending disclosures, limit the Associations' choice of insurers and cap certain fees. Advertising lending programs, protecting security property, and imposing certain loan-related fees are all integral components of the Associations' lending operations, and the UCA as applied would have a significant impact on those operations. n64

> n64 We emphasize that our conclusion as to such undue impact applies only with respect to the three areas of the Associations' lending operations described herein.

There is little doubt that the three lending activities identified by the Associations -- advertising, insurance requirements, and loan-related fees -- are areas in which the OTS has made clear that federal law prevails over state law to enable federal thrifts to use uniform standards of operation. n65 Thus, to the extent that the UCA is being used to affect these activities, such an application of the UCA (i) has more than an incidental effect on a federal thrift's lending operations and (ii) is inconsistent [*28] with the purposes of § 560.2(a).

> n65 OTS regulation § 560.2(b) presupposes that state laws regarding advertising, insurance requirements and loan-related fees have a more than incidental and impermissible impact on the lending operations of federal savings associations, and provides that such laws are preempted. See 12 C.F.R. §§ 560.2(b)(2), 560.2(b)(5) and 560.2(b)(9); *61 Fed. Reg. 50951, 50966* (September 30, 1996) ("[Section] 560.2 is based on the premise that any state law that affects lending is preempted unless it clearly falls within the parameters of paragraph (c).")

**a. Advertising**

Under § 560.2(b)(9), state laws purporting to impose requirements regarding the advertising and disclosures of federal savings associations are the types of state laws that the OTS has identified as being preempted by § 560.2(a). Moreover, there is a specific federal regulation governing advertising by federal savings associations. OTS's advertising regulation, 12 C.F.R. § 563.27 (1998), prohibits any savings association from using advertising or making any representation "which is inaccurate in any particular or which in any way misrepresents its services, [*29] contracts, invest-

ments, or financial condition." This definition of prohibited advertising is similar to that of "unfair competition" in the UCA. Federal thrifts are also subject to an elaborate network of federal disclosure laws, including the Truth-in-Lending Act ("TILA") and Regulation Z, which require certain methods of interest rate disclosure. n66 In this regard, the 1996 Opinion concluded that federal law preempted the application of a state statute requiring specific lending disclosures to a federal savings association. n67

> n66 *15 U.S.C.A. §§ 1601* et seq. (West 1998); 12 C.F.R. Part 226 (1998).

> n67 1996 Opinion at 7-8.

A state law that, on its face, purported to regulate the advertising of a federal savings association would be preempted under § 560.2(b). Accordingly, to the extent that the UCA is being used, directly or indirectly, to require a particular form of interest rate disclosure in advertising the Associations' lending programs in order to be considered "fair" or not "misleading," the UCA is preempted. n68 We note that at least one California appellate court has ruled that 12 C.F.R. § 563.27, the OTS's advertising regulation, [*30] preempts a state UCA claim based on allegedly false and misleading advertising. n69

> n68 The UCA essentially permits an open-ended, county-by-county determination of what information must be contained in an advertisement for it to be "fair." This contrasts sharply with the approach of the Indiana Deceptive Acts and Practices Statute examined in the 1996 Opinion, which sets forth specific acts or representations that would violate the statute. See discussion, supra at 5, n.29 and 11, n.60.

> n69 Text Omitted (unpublished opinion) (UCA claims based on fraud and misrepresentation preempted by 12 C.F.R. § 563.27).

### b. Force-placed insurance

The OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations. n70 Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are preempted by federal law. Moreover, OTS regulations require a federal savings association to adopt real estate lending practices that reflect prudent underwriting standards. n71 Such standards must reflect, inter alia [*31] , "additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)." n72

> n70 OTS Mem. Chief Counsel (Sept. 2, 1997) at 6-8.

> n71 12 C.F.R. § 560.1(b) (1998).

> n72 See Interagency Statement on Real Estate Lending, Appendix to 12 C.F.R. § 560.101 (1998).

Until 1996, an OTS policy statement provided that a savings association was required to include in its loan documents provisions requiring a borrower to maintain hazard insurance to protect the association from loss in the event the property securing the loan was damaged or destroyed. n73 In removing that policy statement as unnecessary, the OTS stated that the general requirement that an association maintain safe and sound lending practices by following the required prudent underwriting standards, and standard business practices in the mortgage lending industry, were sufficient to authorize a federal savings association to force place hazard insurance. n74 As noted, supra, lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the UCA [*32] is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the UCA is preempted as an impermissible interference with the Associations' lending programs. n75

n73 12 C.F.R. § 571.4 (1996).

n74 *61 Fed. Reg. 60173, 60175-76* (November 27, 1996).

n75 Indeed, the OTS has already found that a state law that impedes a federal savings association's ability to protect the collateral securing its loans has more than an incidental effect on lending operations. OTS Mem. Chief Counsel (Sept. 2, 1997) at 7.

### c. Loan-related fees

Section 560.2(b) also presupposes that state laws imposing requirements on a federal savings association's charging of loan-related fees are preempted by federal law. The fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees. n76 Accordingly, to the extent that the UCA is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the UCA is preempted.

n76 See discussion, supra at 9, n.46.

[*33]

### 2. As applied, the UCA violates the objectives of § 560.2(a), including the objective of allowing federal savings associations to exercise their lending powers in accordance with uniform standards of operation

Moreover, as you have described the manner in which the UCA is being applied and used in these three areas, the effect of that application and use is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers "in accordance with a uniform scheme of federal regulation." n77

n77 12 C.F.R. § 560.2(a).

Because the statutory terms defined in the UCA are vague and there is no single enforcement body to set standards for applying the UCA, it is difficult for the Associations and other federal savings associations to know with any certainty what lending practices will be acceptable under the

UCA in any particular county in California at any particular time. As a result of how governmental and private plaintiffs have used the UCA, the Associations have been exposed or subjected to varying standards of acceptable practice in their lending operations rather than being able to operate under uniform [*34]  federal standards within California as well as nationwide.

For instance, the Associations' advertising, while perhaps acceptable to one county attorney in California, might be viewed as impermissible in the eyes of another county attorney in California. n78 Similarly, UCA suits based on the Associations' efforts to protect their security interests in property by force placing insurance when borrowers allow their hazard insurance to lapse, and suits based on the charging of loan-related fees, could subject the Associations to different standards within California as well as in other states. This result is inconsistent with, and violates the objectives set forth in, § 560.2(a). n79 This result is also particularly troubling in the areas of advertising, security property, and loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation.

> n78 We do not here address the merits of the challenge to Association A's advertising in Text Omitted (see n.42, supra) and do not suggest that the advertising is immune from challenge; we merely find that such a claim cannot be pursued under the UCA.

[*35]

> n79 As with the claims based on Association A's advertising, we do not here address the merits of the plaintiffs claims regarding force-placed insurance and loan-related fees (see discussion, supra at 8-9). We merely find that such claims cannot be pursued under the UCA. For example, in instances where the placement of insurance and charging of fees are addressed in the loan agreement (as they were in the UCA claims against Association A discussed herein), plaintiffs could bring claims based on those practices as traditional breach of contract claims.

The manner in which the provisions of the UCA have been applied to the Associations in these three areas results in a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA. As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation. Accordingly, as applied, the UCA does not meet the requirements of § 560.2(c) to be considered a type of state law that is not preempted by federal law.

## III. Conclusion

Based on the foregoing, we conclude that federal law [*36]  preempts the UCA as it has been applied in these instances to the Associations' advertising, forced placement of hazard insurance, and charging of loan-related fees in connection with their lending activities. More specifically, federal law preempts application of the UCA to the Associations in a manner that (i) has more than an incidental affect on the Associations' lending activities, or (ii) is inconsistent with the objectives set forth in § 560.2(a), including the objective of allowing federal savings associations to operate in accordance with uniform standards of operation.

The practical effect of the application of the UCA to the Associations here has resulted in significant interference with the Associations' lending operations by purporting to set standards in these three areas. The Associations have been subjected to varying standards of acceptable lending practices based on allegations regarding integral components of the Associations' lending operations. A state law purporting on its face to regulate these areas of a federal savings association's lending operations would be preempted; the UCA cannot be used to accomplish indirectly what a state could not accomplish directly.  [*37]

We wish to emphasize the extremely limited nature of our preemption determination here. Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not preempt the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.

We further emphasize that preempting application of the UCA in these three areas should have little practical effect on an allegedly aggrieved party's ability to seek and obtain relief. In instances of perceived "unfair" or "misleading" advertising, an aggrieved party can invoke the OTS's advertising regulation (and, where appropriate, Regulation Z) and initiate the OTS's consumer complaint process by contacting the nearest OTS Regional office or calling the OTS's toll-free consumer number, (800) 842-6929. n80 The plaintiffs' claims described herein based on the forced placing [*38] of insurance or the charging of loan fees may still be brought in state court based on traditional contract claims or other causes of action, such as those alleged by plaintiffs in the lawsuits against Association A discussed herein. n81

n80 See A Guide to Consumer Assistance (December 1996), available from the OTS Consumer Programs Office, 1700 G St., N.W., Washington, D.C. 20552 and on the OTS's website: www.ots.treas.gov/consass.html.

n81 See discussion, supra at 8-9.

In reaching the foregoing conclusions, we have relied on the factual information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please feel free to contact Timothy P. Leary, Counsel (Banking & Finance), at (202) 906-7170 or Vicki Hawkins-Jones, Assistant Chief Counsel, Regulations and Legislation, at (202) 906-7034.

Very truly yours,

(Signed)
Carolyn J. Buck
Chief Counsel

1999 OTS LEXIS 4, *

cc. Regional Directors
Regional Counsel