1   Matthew S. Hale, Esq.
    HALE & ASSOCIATES
2   Calif. State Bar No. 136690
    45 Rivermont Drive
3   Newport News, VA 23601

4   Mailing Address:
    P.O. Box 1951
5   Newport News, VA 23601

6   Telephone No. (757) 596-1143
    E-Mail: matthale@verizon.net
7
    Attorney for Plaintiffs, DAVID J. LEE and
8   DANIEL R. LLOYD

9

10              UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13   DAVID J. LEE, and DANIEL R. LLOYD,    )   Case No.: C-07-4765 CRB
     as individuals and, on behalf of others )
14   similarly situated,                   )   MEMORANDUM OF POINTS AND
                                           )   AUTHORITIES IN SUPPORT OF
15              Plaintiffs,                 )   PLAINTIFFS' OPPOSITION TO
                                           )   DEFENDANTS AMERICAN
16        vs.                              )   EXPRESS TRAVEL RELATED
                                           )   SERVICE COMPANY, INC. AND
17                                         )   AMERICAN EXPRESS CENTURION
                                           )   BANK'S MOTION TO DISMISS
18   AMERICAN EXPRESS TRAVEL               )
     RELATED SERVICES, INC., a New York    )
19   corporation, AMERICAN EXPRESS         )
     CENTURION BANK, a Utah corporation,   )   DATE:    November 30, 2007
20   AMERICAN EXPRESS BANK, FSB, a         )   TIME:    10:00 a.m.
     Utah corporation,  and DOES 1, through )  PLACE    Courtroom 8
21   100, inclusive,                       )            19th Floor
                                           )            450 Golden Gate Avenue
22                                         )            San Francisco, Calif.  94102
                                           )
23                                         )
                                           )
24              Defendants.                )
                                           )
25   _____)

26

27

28

                              1

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ……………………………………………………………… ii

I.  SUMMARY OF ARGUMENT ……………………………………………… 1

II.  ARGUMENT ……………………………………………………………… 2

    A.  Standard of Review ……………………………………………………….. 2

    B.  Plaintiffs Have Standing To Maintain The Action And Its Various
        Causes Of Action ……………………………………………………………… 3

    C.  Plaintiffs' Claims Concerning Their Charge, Credit, Gift, And
        Dining Cards Fall Within The Coverage Of The CLRA …………………… 6

    D.  The Complaint Meets The Specificity Requirements Of
        Fed.R.Civ.P. 9(b) …………………………………………………………... 14

    E.  No Cause Of Action Is Barred By The Relevant Statute Of
        Limitations As To Plaintiff Daniel R. Lloyd ……………………………… 17

III.  CONCLUSION …………………………………………………………… 20

ADDENDUM

    A.  <u>Shroyer v. New Cingular Wireless Servs.</u>, 498 F.3d 976 (9th Cir. 2007)

**<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al</u>.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

## <u>TABLE OF AUTHORITIES</u>

**Page[s]**

<u>Cases</u>

<u>AdvanceMe, Inc. v. RapidPay, LLC</u>, 2007 U.S.Dist.LEXIS 59831 (E.D.Texas 2007) ................. 8

<u>Augustine v. FIA Card Servs., N.A.</u>, 485 F. Supp. 2d 1172 (E.D. Cal.  2007) ........................... 12

<u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696 (9th Cir. 1990) ........................................... 3, 18

<u>Barber v. Palo Verde Mut. Water Co.</u>, 198 Cal. 649 (1926) ....................................................... 11

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .............................. 2

<u>Berry v. American Express Publishing Co.</u>, 147 Cal.App.4th 224 (2006) ........................... passim

<u>Bertero v. Superior Court</u>, 216 Cal.App.2d 213, 230 Cal.Rptr. 719 (1963) .................................. 5

<u>Bradford-Whitney Corp. v. Ernst & Whinney</u>, 872 F.2d 1152 (3d Cir. 1989) ........................... 18

<u>Daghlian v. DeVry Univ., Inc.</u>, 461 F.Supp. 1121 (N.D.Cal. 2006) ........................................ 1, 6

<u>DeLeonis v. Walsh</u>, 140 Cal. 175 (1902) ....................................................................................... 5

<u>Douglas v. United States District Court</u>, 495 F.3d 1062 (9th Cir. 2007) ..................................... 17

<u>Flowers v. Carville</u>, 310 F.3d 1118 (9th Cir. 2002) .................................................................... 20

<u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal.4th 797 (2005) ........................................................ 19

<u>Greenwood Trust Co. v. Massachusetts</u>, 776 F.Supp. 21 (D.Mass. 1982) ................................... 8

<u>Grewel v. Choudhury</u>, 2007 U.S.Dist.LEXIS 81856 (N.D.Cal. October 27, 2007) ................. 1, 14

<u>Hernandez v. Hilltop Financial Mortgage, Inc.</u>, 2007 U.S.Dist.LEXIS 808674 (N.D.Cal. October 27, 2007) ........................................................................................................... 1, 12, 13

<u>Hitz v. First Interstate Bank</u>, 38 Cal.App.4th 274 (1995) ..................................................... 1, 6, 7

<u>Hogar Dulce Hogar v. Community Development Corp.</u>, 110 Cal.App.4th 1288 (2003) .......... 2, 19

<u>Howard Jarvis Taxpayers Ass'n v. City of La Habra</u>, 25 Cal.4th 809 (2001) .......................... 2, 18

<u>In re Ameriquest Mortgage Co.</u>, 2007 U.S.Dist.LEXIS 29641 (N.D.Ill. April 23, 2007) ........ 1, 13

<u>In re Silicon Graphics, Inc. v. Sec. Litig.</u>, 183 F.3d 970 (9th Cir. 1999) ..................................... 16

<u>Jefferson v. Chase Home Finance LLC</u>, 2007 U.S.Dist.LEXIS 36298 (N.D.Cal. May 3, 2007).. 1, 13

<u>Jones v. Tracy School Dist.</u>, 27 Cal.3d 99 (1980) ................................................................... 2, 19

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

Kourtis v. Cameron, 419 F.3d 989 (9th Cir. 2007) ...................................................... 2, 20

Lewis & Queen v. N.M. Ball Sons, 48 Cal.2d 141 (1954) .............................................. 5

Lien Huyunh v. Chase Manhattan Bank, 465 F.3d 992 (9th Cir. 2007) ......................... 18

Lozano v. AT&T Wireless Services, Inc., 2007 U.S.App.LEXIS 22430 (9th Cir. September 20,
    2007) .......................................................................................................... 1, 4, 5, 6

Neel v. Magana, Olney, Levy, Cathcard & Gelfand, 6 Cal.3d 176 (1971) ................... 19

Pareto v. F.D.I.C., 139 F.3d 696 (9th Cir. 1998) ........................................................... 2

Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480 (9th Cir. 1995) ........................... 2

Roots Ready Made Garments v. Gap, Inc., 2007 U.S.Dist.LEXIS 81108 (N.D.Cal. October 17,
    2007) ............................................................................................................... 14

Shroyer v. New Cingular Wireless Servs., 498 F.3d 976 (9th Cir. 2007) ................. 2, 17

Sprewell v. Golden State Warriors, 266 F.3d 979 (9th Cir. 2001) .................................. 2

St. Agnes Medical Center v. PacifiCare of California, 31 Cal.4th 1187 (2003) ............. 5

State ex rel. Metz v. CCC Information Services, Inc., 149 Cal.App.4th 402 (2007) ................... 20

Supermail Cargo v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995) ....................... 18

United States v. City of Redwood City, 640 F.2d 963 (9th Cir. 1981) ........................... 3

Van Slyke v. Capital One Bank, 503 F.Supp.2d 1353 (N.D.Cal. 2007) ............... 1, 12, 13

Wool v. Tandem Computers, Inc., 818 F.2d 1433 (9th Cir. 1985) ........................... 1, 16

**Statutes**

California Bus. & Prof. Code § 17200 et seq. ............................................................ 3, 4

California Civil Code § 1750 et seq. .................................................................... passim

California Civil Code § 1761(b) ................................................................................. 11

California Civil Code § 1770 ...................................................................................... 10

California Civil Code § 1770(a)(19) ............................................................................. 4

California Civil Code § 1770(a)(23) (2007) ............................................................... 10

California Civil Code §1770(a) ................................................................................... 11

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

1

**<u>Other Authorities</u>**

2

United States Constitution, Article III ............................................................................... 3

3

**<u>Rules</u>**

4

Fed.R.Civ.P. 12(b) ....................................................................................................... 16

5

Fed.R.Civ.P. 9(b) ............................................................................................. 1, 14, 16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>David Lee, et al. vs. American Express Travel Related Services, Inc., et al.</u>**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

I.     SUMMARY OF ARGUMENT

Plaintiffs have standing to maintain their action arising from an "injury in fact" suffered by them as a result of the unconscionability of the terms of Defendants' arbitration provision and the cardmember agreement: _i.e._, in paying the annual (or other) fee for their American Express cards, Plaintiffs got less than that for which they paid and did not receive the full value of the agreement. Lozano v. AT&T Wireless Services, Inc., 2007 U.S.App.LEXIS 22430 (9th Cir. September 20, 2007); Daghlian v. DeVry Univ., Inc., 461 F.Supp. 1121 (N.D.Cal. 2006).

Plaintiffs' claims and causes of action concerning the charge cards, credit cards, gift cards, and dining cards issued to them by Defendants and for which they paid an annual (or other) fee fall within the coverage of the Consumer Legal Remedies Act ("CLRA" in that, among other reasons, charge cards/gift cards/dining cards do not involve any aspect of "credit" and, in any event, all the cards provide a "convenience service" for which Plaintiffs paid when they paid their annual (or other) fee for the cards. Berry v. American Express Publishing Co., 147 Cal.App.4th 224 (2006) Hitz v. First Interstate Bank, 38 Cal.App.4th 274 (1995); Van Slyke v. Capital One Bank, 503 F.Supp.2d 1353 (N.D.Cal. 2007); Hernandez v. Hilltop Financial Mortgage, Inc., 2007 U.S.Dist.LEXIS 808674 (N.D.Cal. October 27, 2007); Jefferson v. Chase Home Finance LLC, 2007 U.S.Dist.LEXIS 36298 (N.D.Cal. May 3, 2007); and In re Ameriquest Mortgage Co., 2007 U.S.Dist.LEXIS 29641 (N.D.Ill. April 23, 2007).

Plaintiffs' Complaint complies with the specificity requirements of Fed.R.Civ.P. 9(b). Grewel v. Choudhury, 2007 U.S.Dist.LEXIS 81856 (N.D.Cal. October 27, 2007); and, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1985).

The claims and causes of action of Plaintiff Daniel R. Lloyd are timely and not barred by the running of the three year statute of limitations obtaining to claims under the CLRA and for

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

fraud. In any event, the Complaint's failure to identify the date of discovery of the cause of action (which it is not required to do in any event) in the context of alleged continuing acts and violations requires denial of the motion to dismiss since the issue can only be determined in a motion for summary judgment. <u>Howard Jarvis Taxpayers Ass'n v. City of La Habra</u>, 25 Cal.4th 809, 815 (2001); <u>Jones v. Tracy School Dist.</u>, 27 Cal.3d 99, 105 (1980); <u>Hogar Dulce Hogar v. Community Development Corp.</u>, 110 Cal.App.4th 1288, 1295-96 (2003); <u>Flowers v. Carville</u>, 310 F.3d 1118, 1126 (9th Cir. 2002); and <u>Kourtis v. Cameron</u>, 419 F.3d 989, 999-1000 (9th Cir. 2007).

## II.    ARGUMENT

### A.    Standard Of Review

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965. In considering the motion, a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them.[1] <u>Pareto v. F.D.I.C.</u>, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir. 2001); <u>Parks Sch. of Bus., Inc. v. Symington</u>, 51 F.3d 1480, 1484 (9th Cir. 1995).

---

[1]    It is, of course, true that a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. <u>Sprewell</u>, 266 F.3d at 988. However, as set forth in the Complaint, no question can exist as to the unconscionability of the various terms of, for instance, the arbitration provision. Complaint, ¶ 71. <u>See</u>, <u>e.g.</u>, <u>Shroyer v. New Cingular Wireless Services, Inc.</u>, 498 F.3d 976 (9th Cir. 2007). In light of this case law, it is indeed strange that Defendants, in footnote 4 of their Memorandum, [Memorandum 3:26-28]], could actually state that Plaintiffs claim "will nonetheless fail on the merits."

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1990).  For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). <u>United States v. City of Redwood City</u>, 640 F.2d 963, 966 (9th Cir. 1981).

**B.    Plaintiffs Have Standing To Maintain The Action And Its Various Causes Of Action**

The "injury in fact" that underlies Plaintiffs' causes of action and animates their Complaint is simply stated:

1.    In paying their annual (or other) fee for their American Express cards, Plaintiffs purchased or acquired the contractual right to mandatory arbitration of all claims they had against Defendants and the merchants from whom they purchased goods or services with their American Express cards, [Complaint, ¶¶ 1, 2, 45-51] ;

2.    the arbitration provision in the agreement which they had imposed upon them by Defendants on a "take it or leave it" basis is, as a matter of law, unconscionable, illegal, and unenforceable, [Complaint, ¶ 71];

3.    Plaintiffs have a claim of fraud against Defendants arising from Defendants' inclusion of unconscionable, illegal, and unenforceable terms in the cardmember agreement (excluding the arbitration provision), [Complaint, ¶¶ 58-61];

4.    Plaintiffs want to but cannot, as a matter of law, enforce the unenforceable and illegal arbitration provision in order to exercise the right to mandatory arbitration for which they paid, [<u>ibid</u>];

5.    Plaintiffs thus got less than that for which they paid – <u>i.e.</u>, they did not get the full value of their contract – and, as a result, lost money (the pecuniary value of the contractual right to mandatory arbitration), [Complaint, ¶¶ 1, 2, 48-53].

Defendants forward that Plaintiffs have not suffered the requisite "injury in fact" and do not otherwise have standing to maintain their causes of action under either Article III, the CLRA, the UCL, or common law fraud.  Defendants are wrong since under controlling Ninth Circuit

precedents and persuasive precedents from this District, standing does exist.  Defendants'

motion to dismiss must, perforce, be denied.

Little need be said to refute Defendants' legal theory and argument since a recent

decision of the Ninth Circuit – rendered several weeks after the filing of this Complaint – is

dispositive of and conclusively establishes that Plaintiffs do have the requisite "injury in fact"

and thus have standing to maintain all of their causes of action:  Lozano v. AT&T Wireless

Services, Inc., 2007 U.S.App.LEXIS 22430 (9th Cir. September 20, 2007).  (A copy of the

decision is Addendum A for the Court's convenience.)  Defendants, of course, do not cite or

even allude to the existence or holding of Lozano which involved a claim under the Consumer

Legal Remedies Act ("CLRA")(California Code §§ 1750 et seq.), the Unfair Competition Law

("UCL")(Bus. & Prof. Code §§ 17200 et seq.), and the Federal Communications Act arising

from AT&T's billing practices.  Lozano's agreement with AT&T contained an arbitration

provision similar to (but not nearly so onerous) as Defendants here since, among other things, it

included a class action waiver as well as a no-consolidation term.

Lozano argued that the AT&T agreement violated the CLRA (Section 1770(a)(19)) by

having unconscionable terms included in it, albeit terms that did not include the class action

waiver or no-consolidation term (no doubt since the Courts had not at the time of the initial

filing of the complaint in 2002 developed the body of law now establishing those term's

unconscionability).  Relative to the CLRA claims, the Court of Appeal impliedly noted the

requisites for standing (in the context of the class certification motion):

> "Any class certified under subsection (a)(19) necessitates a class definition that
> includes individuals who sought to bring class actions in California, but were
> precluded from doing so because of the class action waiver in AWS's arbitration
> agreement, and suffered some resulting damage.  See Wilens v. TD Waterhouse
> Group, Inc., 120 Cal.App.4[th] 746, 15 Cal.Rptr.3d 271, 276-77 (Cal.Ct.App.

2003)(holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract)."

2007 U.S.App.LEXIS at *8.  That disposes of Defendants' CLRA standing argument.  Just as the CLRA class members "who sought to bring class actions, but were precluded form doing so because of the class action waiver, and suffered some resulting damage" had standing so do Plaintiffs here.  Plaintiffs here could not, as a matter of law, seek (and much less obtain) mandatory arbitration under the arbitration agreement of their fraud claim although they wanted to do so.[2]  Complaint, ¶¶ 56-61.

The crux of Defendants' argument and of Lozano's holding deals with the presence of an "injury in fact," the sine qua non for both Article III and UCL standing.  The injury in Lozano was that Lozano did not get that for which he paid under his agreement with the defendant:

"[W]e find that Lozano has properly stated an injury that he did not receive the full value of his contract … and that his injury is redressable under the UCL."

2007 U.S.App.LEXIS at *10.  The redressability for that injury was, of course, the restitutionary relief available under the UCL.  Ibid.  That the same situation obtains here does not require elaboration.

Defendants, of course, argue that no arbitration took place – apparently again overlooking the fact that the right to invoke arbitration does not reside exclusively with them but is, in fact under the cardmember agreement, also a right paid for by Plaintiffs – and, hence,

---

[2]    Illegal contracts are unenforceable and it is against the public policy of California for a party to an illegal contract to even seek to enforce it.  After all, the courts (and necessarily the arbitrator) are under a duty to instigate an inquiry if it appears to them that the contract may be illegal and ought not be enforced.  See, e.g., Lewis & Queen v. N.M. Ball Sons, 48 Cal.2d 141 (1954).  If illegality appears, it is the court's duty to refuse to entertain the action.  DeLeonis v. Walsh, 140 Cal. 175 (1902).  It is thus futile for Plaintiffs to invoke arbitration under an unenforceable arbitration provision and, in fact, doing so would be a waste of time and money.  Bertero v. Superior Court, 216 Cal.App.2d 213, 230 Cal.Rptr. 719 (1963), disapproved on other grounds, St. Agnes Medical Center v. PacifiCare of California, 31 Cal.4th 1187 (2003).

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss

Plaintiffs' injury is hypothetical.  As noted such arbitration was not legally possible.  However, even if it was possible, it was not necessary in order to Plaintiffs to suffer the claimed injury and to therefore have standing.  <u>Daghlian v. DeVry Univ., Inc.</u>, 461 F.Supp. 1121 (N.D.Cal. 2006), which was cited with approval in <u>Lozano</u>, supports this conclusion.  As Judge Morrow held:

> "Defendants emphasize that "nowhere in the FAC does [Daghlian] allege that he actually attempted to transfer to another school that refused to accept his DeVry units, thus forcing him to repeat courses or incur additional tuition expenses." In the absence of such an allegation, defendants assert, Daghlian has failed to show that he suffered the type of "injury in fact" necessary to maintain the third and fourth causes of action.  [¶] Daghlian counters that he has adequately pled injury in fact. He argues that he suffered injury when he "spent tens of thousands of dollars in tuition expecting that his degree would be a foundation for further education" and "did not receive what he had bargained for." ….
>
> **Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $ 40,000 in debt "[i]n reliance on"** defendants' misrepresentations and omissions about the transferability of credits. **This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices**."

461 F.Supp.2d at 1155-56 (emphasis added).  This, of course, also holds true for Plaintiffs' standing to maintain their fraud cause of action.

    **C.**    **Plaintiffs' Claims Concerning Their Charge, Credit, Gift, And Dining Cards Fall Within The Coverage Of The CLRA**

According to the explicit terms of the Defendants' cardmember agreement, the various cards issued by Defendants involved here are to be used for the "purchase of goods and services."  Complaint, Ex.19.  As a matter of law and fact, when one pays the annual or purchase fee for these American Express cards one purchases a "service" from Defendants rather than just a piece of rectangular shaped plastic.  As explained in <u>Hitz v. First Interstate Bank</u>, 38 Cal.App.4th 274 (1995), a credit card and its agreement allows the card holder (1) to transact purchases of goods or services quickly and efficiently, and (2) to borrow (finance) a

specific purchase or service. As a result, the agreement is not just an extension of credit and, in fact, "is much more than that, encompassing *convenience services* in addition to extension of credit." 38 Cal. 4th at p. 286. As the Court explained,

> "A textbook on commercial banking explains these two discrete functions: "The popularity of credit cards is due to the many advantages they offer as a means of payment. These advantages have created two general distinct patterns of credit card use among cardholders--convenience and revolving credit. Many cardholders pay their outstanding balances in full each month; consequently, they incur no monthly finance charge. In fact, nearly half of the cardholders can be classified as convenience users. The remaining cardholders use credit cards as a source of credit and infrequently pay their entire outstanding monthly balance. Both of these uses have distinct advantages over cash, checks, and other means of payment. **Convenience use minimizes the need to carry cash, allows the user to defer payment for goods and services for a short time, and establishes a favorable payment record that is important in credit evaluations. Revolving credit users realize the same advantages plus one other**, namely, they increase their ability to purchase goods and services and in so doing avoid the red tape involved in obtaining a personal loan. Moreover, the credit card holder has considerable flexibility in the timing and amount of debt repayment." (Reed & Gill, Commercial Banking, *supra*, p. 337, italics added.)
>
> An economist whose work is cited by amicus curiae California Bankers Association similarly describes credit cards as encompassing two features: "payments services" for "convenience users" who wish to make purchases "without paying cash or writing a check," and "credit features" for those who wish to borrow. (Litan, The Economics of Credit Cards, *supra*, pp. 2, 4.)
>
> **The convenience feature of credit cards is surely a "service" ...,** wholly apart from the credit feature. Observers of the banking industry view the convenience feature as such; the publications quoted above both include references to "credit card services." (Reed & Gill, Commercial Banking, *supra*, at pp. 339-340; Litan, The Economics of Credit Cards, *supra*, at p. 2.) A credit card user enjoys various benefits *other than borrowing*--primarily cashless and checkless purchasing--regardless of whether the credit feature is used. Indeed, convenience use without borrowing is the "reason that some banks levy a flat charge on the use of the card." (Reed & Gill, *supra*, at p. 339.) Thus, some users even *pay* for these two features separately: their annual charge for the card is attributable to the convenience feature, while they pay for use of the credit feature through finance charges."

38 Cal.App.4[th] at 286-287. The existence and purchase of this "convenience service" by Plaintiffs is specifically alleged in the Complaint:

> "18.    The American Express charge card does not involve "credit" and the purchase of a card membership purchases and provides only a "convenience service" for the card holder.  The charge card has distinct advantages over cash, checks, and other means of payment:  the convenience use it provides minimizes the need to carry cash, allows the card holder to defer payment for a short time (until receipt of the monthly billing statement), and establishes a favorable payment record that is important in financial evaluations."

Complaint, ¶ 18.  See also id, ¶ 19 (credit card provides convenience service; ¶ 21 (gift and dining card provides convenience service).

Some of the cards issued by Defendants are "charge" cards rather than "credit" cards. The charge card, in the present context, is distinguished by the fact that payment of the annual fee for the card requires that the monthly balance be paid in full upon receipt of the monthly billing statement.  See, e.g., AdvanceMe, Inc. v. RapidPay, LLC, 2007 U.S.Dist.LEXIS 59831 (E.D.Texas 2007); Greenwood Trust Co. v. Massachusetts, 776 F.Supp. 21, 43 (D.Mass. 1982). No credit term or feature thus attaches to the charge card.  Some of the cards involved in this action are "credit" cards:

> "19.    The purchase of a card membership (for which a fee is paid) relative to a credit card purchases and provides, at least in great part, a "convenience service" even when "credit" can be implicated if the monthly balance is not paid in full upon receipt of the monthly billing statement.  It provides a means of payment which leaves the option open to the card holder to either pay his/her monthly statement in full upon its receipt (and thus not incur any interest indebtedness or otherwise use the "credit" service of the card) or to not pay the bill in full and use the revolving credit feature.  Regardless of which option is chosen by the card holder, the use of the credit card has distinct advantages over cash, checks, and other means of payment:  i.e., the credit card not only minimizes the need to carry cash and allows the user to defer payment and establish a favorable credit history but also, importantly, increases the card holder's ability to purchase goods and services and in so doing avoid the red tape involved in obtaining a personal loan. Plaintiffs are informed and believe, and on that basis allege, that some holders of credit cards do, from time to time or all of the time, pay the monthly balance in full upon receipt of the monthly billing statement and do not avail themselves of the credit feature of the card."

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

Complaint, ¶ 19.  Although having an available credit feature, such cards do not necessarily implicate credit, a situation that exists when the monthly balance is paid in full upon receipt of the monthly billing statement.  Ibid.  The third category of Defendants' cards involved in this action are the "prepaid" cards:  i.e., the American Express Gift Card and the American Express Dining Card.  They too do not involve credit and their purchase pays for a "convenience" service:

> "21.    The purchase of an American Express Gift Card purchases and provides a convenience service since it can be used at retailers, restaurants, amusement parks, sporting events, movie and other theaters, spas, salons and certain other merchants that are located in the United States and that accept the American Express Card, including mail order, online and brick and mortar establishments. It cannot be used at car rentals, cruise lines, for recurring billing purchasers, or at casinos or ATMs.  The purchase of an American Express Dining Card purchases and provides a convenience service as well since it can be used not only for dining at restaurants but, according to the official American Express website, can now be used for the same purposes as a Gift card.  Both the Dining Card and the Gift Card have distinct advantages over cash, checks, and other means of payment:  the convenience use it provides minimizes the need to carry cash or checks or in any way incur indebtedness of any type (including credit)."

Complaint, ¶ 21.  Indeed, as set forth in Exhibits 17 and 18, American Express itself admits that neither is a "charge card, a credit card, or a debit card."

Defendants, lumping together all of various charge cards, credit cards, gift cards, and dining cards issued by it into one large group they like to call "credit cards," seek dismissal of all CLRA-related causes of action.  Their ground for doing so is that

> "neither the Agreements themselves nor the arbitration agreements are agreements for the 'sale or lease of goods or services' as required to pursue a claim under the CLRA."

Defendants' Memorandum at 10:2-4.  Relying on Berry v. American Express Publishing Co., 147 Cal.App.4th 224 (2006), Defendants forward that "credit" cannot fall within the coverage of the CLRA's definition of "goods or services" and, hence, that their "credit cards" are not subject

a cause of action under the CLRA relative to their "insert[ing] an unconscionable term" into the agreement and its arbitration provision.  In forwarding that position, Defendants not only obviously ignore the explicit allegations of the Complaint but also, and more seriously, misread and misapply <u>Berry</u>.[3]

As was explicitly stated in <u>Berry</u>, its real holding is that credit, standing alone and without more, is not a service covered by the CLRA:

> "We conclude neither the express text of CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act"

147 Cal.App. at 233.  It is, however, <u>Berry</u>'s holding that "providing credit *separate and apart* from the sale or lease of any specific good or service falls outside the scope of section 1770," [<u>id.</u> at 232 (italics in original)], that results in <u>Berry</u> actually supporting Plaintiffs' position and, due to the presence of the above-discussed "convenience service" purchased by card holders by payment of their annual (or other) fee for the American Express card, rendering Defendants' motion meretricious.[4][5]  This is particularly so with regard to the "charge" cards as well as the

---

[3]    That is indeed strange and strained since Defendants' present counsel represented them in <u>Berry.</u>

[4]    Plaintiffs, for purposes of the present motion only, accept that <u>Berry</u> was rightly decided. That is not to say, however, that it actually was since the <u>Berry</u> panel of the Orange County Court of Appeals ignored salient points that, if proper weight had been given to them, should have required a different result.  For instance, the basis for that decision was the unexplained deletion of "money or credit" from the definition of consumer during the various mark-ups that preceded the statute's passage.  Although purportedly basing its decision on the CLRA's legislative history, the <u>Berry</u> court, in reaching its strained, hyper technical reading of the statute, ignored salient aspects of that history that, if considered, would likely have changed the result.  One such aspect was the 1995 amendment that made the conduct described in Section 1770(a)(23) (2007) unlawful:

> "The home solicitation … of a **consumer** who is a senior citizen **where a loan is made encumbering the primary residence of that consumer for the purposes of paying for improvements and where the transaction is part of a pattern or**

10

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

Dining Card and Gift Card.  None of those even have a "credit" element.  As a result, <u>Berry</u> is completely inapposite to them and they fall squarely within the coverage of the CLRA.

Defendants have, of course, also misread and misapplied the various precedents that have discussed and applied <u>Berry</u>.  Defendants state, as the hallmark of their argument,

> "… since <u>Berry</u>, a uniform line of cases holds broadly that the CLRAS generally does not regulate financial services.  These broad rulings extend the <u>Berry</u> rule to all of the payment cards alleged in the instant Complaint.  Even if 'credit' is not extended through the dining or gift cards, they nonetheless are tools to substitute for the use of 'money.'"

Defendants' Memorandum at 13:1-5.  First, the same reasoning applies if one characterizes the cards at issue as implicating "money" rather than credit.  In each instance the fees paid purchased, in the "money" context, the same "convenience service" obtaining in the "credit" context.  Second, precedents applying the **actual** holding of <u>Berry</u> support the Plaintiffs' position.  Primary amongst these is one of the cases cited by Defendants in support of their just-

---

**practice in violation of either subsection (h) or (i) of Section 1639 of Title 14 of the United States Code [Truth in Lending Act] …"**  (Emphasis added)

The import of this is obvious.  Since solicitation of a consumer "where a loan is made" is now included as one of the "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or **which results in the sale or lease of goods or services to any consumer**…," [Section 1770(a)(emphasis added)], it may be concluded that "the sale or lease of goods or services" definitionally includes "money" and "credit."  This conclusion is borne out by relevant rules of statutory interpretation. Consistent with the well-settled rule that an amendment is considered to be a continuation of the original law, words and provisions used in the original act are presumed to be used in the same sense in the amendment.  <u>Barber v. Palo Verde Mut. Water Co.</u>, 198 Cal. 649 (1926).  Hence, the addition of "loans" to the acts for which a "consumer" can make a claim under the CLRA necessarily means that "goods or services" prior to the amendment included such things as "loans" and, hence, both "money" and "credit" insofar as these are implicated by consumer credit/charge cards such as the American Express card.

---

[5]    This is, of course, consistent with the CLRA's express language.  As relevant here, "services" within the CLRA's scope include "work, labor, and **services** for other than business or commercial use, **including services furnished in connection with the sale** or repair **of goods**."  California Civil Code § 1761(b) (emphasis supplied)

11

quoted position:  <u>Van Slyke v. Capital One Bank</u>, 503 F.Supp.2d 1353 (N.D.Cal. 2007).  In <u>Van Slyke</u>, Judge Alsup dismissed the CLRA claim involving allegations that that Capital One's repetitive issuance of sub-prime credit cards and a laying on of late fees involved "a predatory scheme involving the extension of multiple lines of credit and high and deceptive fees thereon" rather than an extension of credit.  <u>Id.</u> at 359.  It was, as the Court noted, hard to see the distinction between the two.  In that instance

> "plaintiffs still have not identified any good or service -- the challenge is to the extension of credit. Of course, plaintiffs bought goods and services with their credit cards. But not from defendants. **Plaintiffs do not allege that they were given or had purchased special rights or options under their agreement. They do not allege that defendants sold them any goods under the credit agreement (other than a plastic card evidencing a line of credit). And, they do not allege that defendants sold them any services. In short, this case deals only with the extension of credit, in however unseemly a manner, not with the sale or lease of goods or services. plaintiffs still have not identified any good or service -- the challenge is to the extension of credit.**"

<u>Ibid.</u>  Relying on <u>Berry</u>'s holding the "issuing a line of credit, apart from providing any other good or service, was not a transaction covered by the CLRA," [<u>id.</u> at 358], the Court concluded that dismissal was appropriate.  However, here the absence of the thing that led to dismissal in <u>Van Slyke</u> is present:  the "convenience service" purchased from Defendant.

The other Courts that have considered the question have reached similar conclusions.[6]  Just recently, Judge Illston in <u>Hernandez v. Hilltop Financial Mortgage, Inc.</u>, 2007 U.S.Dist.LEXIS 808674 (N.D.Cal. October 27, 2007), in holding that "mortgage loans, and the activities involved in receiving and maintaining one" – a loan, of course, necessarily involves credit -- falls within the coverage of the CLRA noted:

---

[6]    The one exception to this statement is <u>Augustine v. FIA Card Servs., N.A.</u>, 485 F. Supp. 2d 1172 (E.D. Cal.  2007), which made just a passing reference, without any analysis, to <u>Berry</u>.

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

> "[u]nlike in <u>Berry</u>, the situation in the present case involves more than the mere extension of a credit line. Instead, the circumstances here deal not just with the mortgage loan itself, but also with the services involved in developing, securing and maintaining plaintiffs' loan. <u>See</u> <u>Hitz</u>, 38 Cal. App. 4th 274, 286-87, 44 Cal. Rptr. 2d 890 (Cal. Ct. App. 1995) (finding, in a non-CLRA context, that credit cards provide not only extensions of credit but also certain convenience features that constitute "services")."

So too did Judge Henderson, reach a similar conclusion in <u>Jefferson v. Chase Home Finance LLC</u>, 2007 U.S.Dist.LEXIS 36298 at *3 (N.D.Cal. May 3, 2007):

> "In a related context, an intermediate California appellate court concluded that credit card agreements encompass convenience services in addition to an extension of credit and that, therefore, such agreements qualify as contracts for "services" under a non-CLRA statute. <u>Hitz v. First Interstate Bank</u>, 38 Cal. App. 4th 274, 286-88, 44 Cal. Rptr. 2d 890 (1995). Chase did cite to one recent case where an intermediate California appellate court concluded that issuance of a credit card does not constitute a "service" under the CLRA, but this Court does not find that case persuasive here because (a) the state court relied heavily on the legislature's consideration and rejection of including "credit" as part of the CLRA's definitions and (b) the court failed to consider whether, as the *Hitz* court concluded, a credit card agreement involves other services in addition to simply an extension of credit. <u>Berry v. Am. Express Publishing, Inc.</u>, 147 Cal. App. 4th 224, 229-33, 54 Cal. Rptr. 3d 91 (2007)."

The bottom line on all of this is that dismissal is not appropriate.[7] This conclusion was recently reached, under circumstances similar to those existing here, in <u>In re Ameriquest Mortgage Co.</u>, 2007 U.S.Dist.LEXIS 29641 (N.D.Ill. April 23, 2007)(applying California law). Following a thorough analysis of the "convenience" service and the CLRA's non-coverage of credit except in the circumstances established by <u>Berry</u>, the District Court concluded:

> "it is not inconceivable that, consistent with the allegations of the complaint, plaintiffs could prove the existence of tangential "services" associated with their residential mortgages and establish that these transactions were covered by the CLRA. <u>See</u> <u>McMillan v. Collection Professionals, Inc.</u>, 455 F.3d 754, 759 (7th Cir. 2006) (dismissal inappropriate unless a court finds there is "no set of facts

---

[7]     In view of <u>Berry</u>, <u>Jefferson</u>, <u>Hernandez</u>, and <u>Van Slyke</u> it is obvious that Defendants' characterization of the CLRA as never providing coverage for financial services is clearly wrong. After all, are not mortgage loans, for instance, "financial services"?

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

consistent with the pleadings under which the plaintiff could obtain relief."). Accordingly, we deny defendants' motion to dismiss plaintiffs' Twelfth Cause of Action." Id. at *5.

### D. The Complaint Meets The Specificity Requirements Of Fed.R. Civ.P. 9(b)

A fair reading of Plaintiffs' complaint, in all of its prolixity, creates a reasonable belief that, with regard to the fraud cause of action, it more than complies with the specificity requirement of Fed.R.Civ.P. 9(b). In fact, it is difficult to envision a pleading that could have greater compliance with that Rule. Accordingly, Defendants' motion to dismiss on that basis must be denied.

The standard for adjudging whether compliance with Rule 9(b) exists was described by this Court in Grewel v. Choudhury, 2007 U.S.Dist.LEXIS 81856 (N.D.Cal. October 25, 2007):

> "Under Rule 9(b), an averment of fraud should state with particularity the circumstances constituting the fraud. Fed.R.Civ.P. 9(b). 'Under California law, the elements needed to establish fraud are (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter) (3) intent to defraud, i.e., to induce reliance; and (5) resulting damages.' G. Hirsch & Co., Inc. v. Amerisourcebergen Corp., 2006 U.S.Dist. LEXIS 32895, 2006 WL 1348568 (N.D.Cal. May 17, 2006)… **The Ninth Circuit has interpreted Rule 9(b) to require that 'allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done nothing wrong.'** Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)(citations and quotations omitted). 'The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity.' Neubronner v. Milken, 6 F.3d 666, 671-72 (9th Cir. 1993)."

2007 U.S.Dist.LEXIS 81856 at *2 (emphasis supplied). See also Roots Ready Made Garments v. Gap, Inc., 2007 U.S.Dist.LEXIS 81108 (N.D.Cal. October 17, 2007). That standard is met here if for no other than reason than it cannot be seriously argued that Defendants are not on sufficiently put on notice of their specific misconduct and surrounding facts to mount a defense.

The only lack of purported specificity identified by Defendants is that:

"Plaintiffs fail to identify with the requisite particularity any statements made by anyone at American Express upon which Plaintiffs relief at the time they obtained their credit cards.  Plaintiffs allege no specific acts of wrongdoing by American Express."

Defendants' Memorandum at 14:19-22 (underlining in original).  Once again Defendants have created their own straw man by emphasizing the time Plaintiff "obtained" his card and downplaying that the Plaintiff's annual payment of the fee in and after 2003 as well as amendments to the agreement in, among other times, 2005 are not also accrual triggers.  Even if that were not so, the Complaint abounds with specificity concerning the "statements" made by Defendants that underlay the fraud   The cardmember agreement came with or after the charge/credit/gift/dining cards were issued (not when they "obtained" their cards by having their applications approved by Defendants) as alleged in

1.     ¶ 28 (when in April 2006 Lee obtained his Starwood American Express card),

2.     ¶¶ 39-40 (Lloyd's receipt of the card in 2003 and then the agreement, including an amendments thereto in ensuing years),

3.     ¶ 29 [Lee, after getting first American Express card sent a Civil Code § 1782 letter to Defendants in November 2006 concerning the unconscionability of the agreement),

4.     ¶ 30 (Lee obtained in November 2006 a reply to that letter from American Express in which it was stated that New York law controlled and, inferentially, the agreement was conscionable under that law),

5.     ¶ 31 (all of which were statements made by American Express after it already knew of and was bound by the ruling in Berry v. American Express Publishing Co., Case No. 05CC00049 (O.C. Superior Court), that California law controlled the cards under a conflicts of law analysis, a final ruling to which American Express was bound under res judicata principles),

6.     ¶ 33 (these types of misrepresentations were the continuing practice of Defendants),

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss

7.      ¶ 34 (in reliance on the statements made in the November 2006 letter from American Express concerning the legality and conscionability of the card agreement, Lee paid the annual fee on his Starwood American Express Card),

8.      ¶ 35 (in reliance on the statements made in the November 2006 letter from American Express concerning the legality and conscionability of the card agreement, Lee purchased an American Express Gift Card and Dining Card, respectfully),

9.      ¶¶ 36-38 (in reliance on the statements made in the November 2006 American Express letter, Lee applied for, obtained and paid for an American Express Green charge card),

10.     ¶ 39 (Lloyd paid his annual fee in 2003 following review of American Express agreement's statements concerning right to include terms in the cardmember agreement),

11.     ¶ 41 (Lloyd  in each year up to and including 2007 paid his annual fee for his card in reliance on all of the above-statements and writings), and

12.     ¶ 83 (Lloyd sent letter pursuant to Civil Code § 83 to Defendants upon discovery of Defendants' fraud).

Even had such specificity not been presented in the Complaint, the fact that each document which is implicated by and supports the cause of action and claim is attached as exhibits to the Complaint more than meets the notice and specificity requirements of Rule 9 (b).  As was held in Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1985):

"In cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers.  Under such circumstances, a plaintiff fulfills his particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity…."[8]

---

[8]     The myriad of American Express-generated documents attached to the Complaint as Exhibits can be used for this purpose since it is well-settled that when confronted with a Fed.R.Civ.P. 12(b) motion this court may consider exhibits submitted with or alleged in the complaint.  See In re Silicon Graphics, Inc. v. Sec. Litig., 183 F.3d 970, 976 (9th Cir. 1999).

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss

Defendants' motion to dismiss on the basis of non-compliance with Rule 9(b) should be denied.

### E.  No Cause Of Action Is Barred By The Relevant Statute Of Limitations As To Plaintiff Daniel R. Lloyd

Defendants have forwarded that the Plaintiff Lloyd's CLRA and fraud causes of action against American Express Centurion Bank are time-barred.[9]  The purported "factual" bases underlying that argument are that "Lloyd obtained the charge card at issue and the card agreement in January 2003)", [Defendants' Memorandum at 15:15-16], and Defendants' ipse dixit conclusion that "[t]he facts underlying Plaintiffs' [sic] alleged fraud claim were fully known to them [sic] when Plaintiff Lloyd obtained the American Express Platinum charge card from Centurion Bank, and received his cardmember agreement, in January, 2003." Id. at 16:7-10.  The limitations period for both fraud and the CLRA is three years.[10]  Defendants' argument is without merit and must be denied.  In determining this is so it must, of course, be noted that

---

[9]     This covers Causes of Action Four, Five, Six, Ten, Eleven, Twelve, and Thirteen as to Plaintiff Lloyd alone.  Thus, even assuming that Lloyd's claims were untimely – an assumption not borne out by the facts or law – these causes of action remain since no allegation was made concerning untimeliness of Plaintiff Lee's identical claims.

[10]    Defendants' argument concerning the applicability of Utah and New York law to the limitations argument is of no moment and reflects Defendant's untoward belief that they (being as they are, the law of the State designated in the cardmember or card  agreement as being the choice of controlling law) provides the law of decision or, for that matter.  Defendant is, of course, wrong in believing that since, as the Ninth Circuit recently held in Douglas v. United States District Court, 495 F.3d 1062 (9th Cir. 2007), and Shroyer v. New Cingular Wireless Servs., 498 F.3d 976 (9th Cir. 2007), California law is controlling when it comes to the matters raised in the Complaint concerning the unconscionability of Defendant's cardmember agreements, including notably its arbitration provision.  That is, of course, consistent with a long line of California precedents as well.  In any event, Defendants are bound by the final order and unappealed order issued by the Superior Court and entered in Berry v. American Express Publishing Co., supra, (in which all present defendants were defendants), that California law is controlling with regards to issues of unconscionability.  The doctrine of res judicata and/or collateral estoppel obviously preclude Defendants from making any argument concerning California being the controlling law.

Plaintiffs have no burden relating to initially establishing in their Complaint the timeliness of their causes of action, [see, e.g., Bradford-Whitney Corp. v. Ernst & Whinney, 872 F.2d 1152, 1161 (3d Cir. 1989)], while the Defendants do have a burden of establishing the absence of sufficient facts to support the cause of action.  See, e.g., Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).  That the Complaint itself avers that the actions complained of occurred within the past three years is, without more, sufficient to overcome Defendants' argument.  See Complaint, ¶ 104.  The Complaint also specifically alleges that Plaintiff Lloyd also has made annual fee payments from the time he received the card up to and including the present time, [id., at ¶ 41-42], and that Defendants have periodically amended the cardmember agreement (apparently most recently in 2005, a time well within the 3-year limitations period). Id., ¶¶ 3 (page 7:9-15), 40, 64, 71.

Quite frankly, the Complaint, consistent with controlling California precedents dealing with accrual of causes of action, alleges sufficient facts to overcome Defendants' argument. Indeed, Defendants' argument presents the paradigm of a statute of limitations dismissal argument that the Ninth Circuit has repeatedly held should not be granted.  See, e.g., Lien Huyunh v. Chase Manhattan Bank, 465 F.3d 992, 99-97 (9th Cir. 2007); Supermail Cargo v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995).  It is, of course, true that Plaintiff Lloyd got his first American Express card in 2003.  However, the overarching error of Defendants' position is that Lloyd's cause of action did not necessarily and automatically accrue so as to trigger the running of the statute of limitations at the time he received the card.  Under California law, a cause of action accrues "upon the occurrence of the last element essential to the cause of action," [Howard Jarvis Taxpayers Ass'n v. City of La Habra, 25 Cal.4[th] 809, 815 (2001)], or when the cause of action is "complete with all of its elements."  Fox v. Ethicon

Endo-Surgery, Inc., 35 Cal.4[th] 797, 807 (2005).  In other words, the statute of limitations accrues when a plaintiff has the right to sue on a cause of action.  Neel v. Magana, Olney, Levy, Cathcard & Gelfand, 6 Cal.3d 176, 187 (1971) At common law, that is usually at the time of the injury.  Id., 35 Cal.4[th] at 808.  Here, of course, the alleged "injury" is when Plaintiff did not "get that for which he paid."  Complaint, ¶¶ 1, 2, 48-53.  That occurs at the time each payment of the annual fee was made (well within the 3 year limitations period), and/or at the time of the 2005 amendment to the arbitration provision and cardmember agreement (well within the 3 year limitations period), and/or at the time at which each charge to Plaintiff Lloyd's charge card was made which was subject to the terms of the agreement and arbitration provision (well within the 3 year limitations period, and/or at the time of the first use of an additional or replacement card (which reactivated the agreement to the agreement, well within the 3 year limitations period).

Even if factual accrual had not, as it did, occur within the 3 year limitations period, several important exceptions to the basic accrual rule exist which are applicable here and assure that accrual occurred within the 3 years preceding the filing of the action.  The first is the "discovery" rule which postpones accrual until Plaintiff discovers or has reason to discover the cause of action.  Id., 35 Cal.4[th] at 807.  Another exception applicable under the facts pled in the Complaint is the "delayed discovery" rule.  See, e.g., Jones v. Tracy School Dist., 27 Cal.3d 99, 105 (1980); Hogar Dulce Hogar v. Community Development Corp., 110 Cal.App.4[th] 1288, 1295-96 (2003).  Under the "delayed discovery" rule

> "when an obligation or liability arises on a recurring basis [like the need to make the annual fee payment to Defendants for the credit card], a cause of action accrues each time a wrongful act occurs, triggering a new limitations period."

Hogar Dulce Hogar, 110 Cal.App.4[th] at 1295.  So too does the "continuing" nature of Defendants' actions present an exception.  See, e.g., Flowers v. Carville, 310 F.3d 1118, 1126

**David Lee, et al. vs. American Express Travel Related Services, Inc., et al.**
**Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss**

(9th Cir. 2002)(in the presence of "continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends."); State ex rel. Metz v. CCC Information Services, Inc., 149 Cal.App.4th 402, 418-19 (2007).

The bottom line on all of this was noted in Kourtis v. Cameron, 419 F.3d 989, 999-1000 (9th Cir. 2007), in reversing a dismissal on statute of limitations grounds under circumstances analogous to those present here:

> "The initial act ... indeed falls outside the statute of limitations. Nevertheless, the complaint also alleges several acts of continuing infringement .... Because the complaint does not identify the date on which the Kourtises discovered these acts of continuing infringement, it can not be concluded that the Kourtises' claim is time barred in its entirety. ... Cameron is free, of course, to pursue the statute of limitations issue on summary judgment." (Internal citations omitted)

This Court should reach the same conclusion here and deny Defendants' motion to dismiss.

## III.    CONCLUSION

For the reasons stated above and on the record as a whole, Defendants' motion to dismiss is without merit and should be denied.

Dated: November 9, 2007                                Respectfully submitted,



_____
Matthew S. Hale
Attorney for Plaintiffs
David J. Lee and Daniel R. Lloyd

David Lee, et al. vs. American Express Travel Related Services, Inc., et al.
Plaintiffs' Memorandum of Points & Authorities in Opposition to Defendants' Motion to Dismiss

# Addendum

**PAUL LOZANO, on behalf of himself and all others similarly situated and as a private attorney general on behalf of the members of the general public residing within the State of California, Plaintiff-Appellee-Cross Appellant, v. AT&T WIRELESS SERVICES, INC., a Delaware Corporation, Defendant-Appellant-Cross Appellee.**

**Nos. 05-56466, 05-56511**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*2007 U.S. App. LEXIS 22430*

**June 4, 2007, Argued and Submitted, Pasadena, California
September 20, 2007, Filed**

**PRIOR HISTORY:** [*1]

Appeal from the United States District Court for the Central District of California William J. Rea, District Judge, Presiding. [*] D.C. No. CV-02-00090-AHS.

[*] After this appeal was filed, the Honorable Alicemarie H. Stotler replaced the late Honorable William J. Rea as presiding judge in this case.

.

*Lozano v. At&T Wireless, 2003 U.S. Dist. LEXIS 21780 (C.D. Cal., Oct. 28, 2003)*

**DISPOSITION:**    AFFIRMED in part, REVERSED in part.

**COUNSEL:** J. Paul Gignac (argued) and Katherine Donoven, Arias, Ozzello & Gignac, LLP, Santa Barbara, California, and Peter Bezek and Robert A. Curtis, Foley Bezek Behle & Curtis, LLP, Santa Barbara, California, for the plaintiff-appellee-cross appellant.

James C. Grant (argued) and Kelly Twiss Noonan, Stokes Lawrence, P.S., Seattle, Washington, and Mark E. Weber and Gabriel J. Pasette, Gibson, Dunn & Crutcher, LLP, Los Angeles, California, for the defendant-appellant-cross appellee.

**JUDGES:** Before: Cynthia Holcomb Hall and Consuelo M. Callahan, Circuit Judges, and James L. Robart, [**] District Judge.

[**]    The Honorable James L. Robart, United States District Judge for the Western District of Washington, sitting by designation.

**OPINION BY:** ROBART

**OPINION**

ROBART, District Judge:

This opinion addresses cross-appeals of the district court's order denying in part, and granting in part, Paul Lozano's class certification [*2] motion. Lozano appeals the district court's denial of a nationwide class for his Federal Communications Act ("FCA") and declaratory relief claims. Lozano also appeals the court's denial of a California subclass on these claims, as well as his breach of contract claim. AT&T Wireless Services, Inc. ("AWS") appeals the district court's certification of a California subclass for Lozano's state law claims. We have jurisdiction to hear this appeal pursuant to *Rule 23(f) of the Federal Rules of Civil Procedure*

2007 U.S. App. LEXIS 22430, *

and *28 U.S.C. § 1292(e)*. For the reasons stated, we affirm in part and reverse in part.

## I. Background

Lozano is a customer of AWS and brought this putative class action based on AWS's disclosures relating to its billing practices for cellular services. [1] On October 4, 2004, Lozano filed a Second Amended Complaint in the district court. In his complaint, Lozano asserts claims under the FCA, the Declaratory Judgment Act ("DJA"), California contract law, the California Consumer Legal Remedies Act ("CLRA"), and California Unfair Competition Law ("UCL"). Lozano bases these claims on allegations that AWS billed its customers for cellular telephone calls during a billing period other than the [*3] billing period in which the calls were made, a practice termed "out-of-cycle billing." Lozano contends that by doing this, AWS assessed charges for cellular telephone calls that would not have been assessed if the calls had been billed during the billing period in which the calls were made. AWS, according to Lozano, did not fully and adequately disclose its billing practice to its customers at the time they entered into contracts with AWS.

> 1    Lozano brought this suit against AWS, AT&T Wireless Services of California, and Santa Barbara Cellular Systems. Only AWS sought a petition for interlocutory review of the district court's order on class certification.

## A. Out-of-Cycle Billing

Out-of-cycle billing occurs when the local calling area for a customer's plan includes areas that are not covered by AWS's cellular network. When a customer places or receives a call in an area not covered by AWS's network, the call is routed through another wireless carrier, and the call is termed a "roaming call." Due to the nature of the routing process, AWS does not immediately learn of the roaming call,

and consequently, does not immediately charge the call against the customer's allotted minutes. Occasionally, [*4] AWS will learn of the roaming call only after the customer's monthly billing cycle has ended. When this occurs, AWS bills the customer for the roaming call in the next billing cycle, which may put the customer over the allotted minutes for that cycle. For example, a roaming call made in the August billing cycle may be billed in the September invoice because of the late receipt of information from the other carrier. Assuming the customer had already reached his or her allowable minutes for September, and had not for August, the August roaming call could result in an overage fee on the September invoice. According to AWS, out-of-cycle billing occurs infrequently, and when it does occur, it is just as likely to result in a reduction in fees as opposed to an increase. That is, under the above scenario, the customer could benefit from out-of-cycle billing by avoiding an overage fee in August if she used all her minutes in August, but not September.

In or about May 2001, Lozano contracted with AWS to receive cellular telephone service for one year. Lozano's cellular plan with AWS provided him with a minimum of 400 "free anytime minutes" and 1,000 "night and week-end minutes" per month. As [*5] part of a promotional offer, AWS gave Lozano an additional 200 free anytime minutes. Based on the information AWS provided, Lozano believed that he would not be charged for cellular calls unless he exceeded 600 anytime minutes or 1,000 night and weekend minutes in one billing cycle.

When Lozano received his September 18, 2001 invoice from AWS, however, he was surprised to discover that his September invoice included calls that were made during the previous billing cycle. The addition of these extra minutes caused his September usage to exceed the "free" minutes set forth in his contract with AWS. Because he exceeded his allotted usage,

AWS charged Lozano an overage fee for the calls that it billed from the previous cycle.

Lozano called AWS to inquire as to why there were calls from the previous billing cycle on his current invoice. An AWS representative explained to him that roaming cellular telephone calls are billed to its customers based on the date that AWS receives the information regarding the call, not on the date the call was actually made. The AWS representative offered to reimburse Lozano for the overage charges, but would not do so unless he agreed to sign-up for another year [*6] of service with AWS. Lozano declined the offer. On October 25, 2001, after Lozano lodged additional complaints with AWS, it issued him a credit for the charges he incurred as a result of out-of-cycle billing. The AWS representative who issued the credit wrote in the customer notes that it "was a ONE TIME COURTESY CR[EDIT] for delayed billing . . . ." The representative informed Lozano that out-of-cycle billing could happen again. Lozano filed the instant suit a few weeks later, and the credit appeared on Lozano's November invoice from AWS. [2]

> 2   In its preceding order on summary judgment, the district court found that AWS reimbursed Lozano only after realizing that Lozano was instigating legal proceedings against it.

AWS contends it fully discloses the implications of out-of-cycle billing in its Welcome Guide, which customers receive when they sign-up for service. Lozano does not dispute that he received a copy of the Welcome Guide when he purchased his service from AWS. Indeed, Lozano admits that the AWS salesperson "paged through" the Welcome Guide with Lozano, and gave him the opportunity to ask any questions. Lozano instead contends that these disclosures are not adequate to inform [*7] the consumer of AWS's out-of-cycle billing practices.

## B. Arbitration Agreement

The Welcome Guide Lozano received also contains an arbitration agreement that prohibits class actions:

> Any dispute or claim arising out of or relating to this Agreement or to any product or service provided in connection with this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration . . . . [Y]ou and we both waive any claims for punitive damages and any right to pursue claims on a class or representative basis.

Shortly after Lozano filed this putative class action lawsuit, AWS moved to compel arbitration.

The district court initially granted AWS's motion to compel arbitration. AWS then filed for a writ of mandamus with this court. We denied the writ, but instructed the district court to reconsider its ruling in light of *Ting v. AT&T*, decided after the district court's order compelling arbitration. *319 F.3d 1126, 1150 (9th Cir. 2003)* (finding class action waivers in arbitration agreements to be unconscionable when contained in adhesion contracts). On August 18, 2003, after reconsidering its order in light of *Ting*, the district [*8] court vacated the order compelling arbitration. In so doing, the district court relied both on *Ting*, and the subsequent case of *Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1176 n.15 (9th Cir. 2003)* (holding that "an essentially unilateral bar on class-wide arbitration is substantively unconscionable"). The district court held that the limitation on class action relief contained in AWS's Welcome Guide was both procedurally and substantively unconscionable and therefore unenforceable under California law. [3]

3    AWS appealed the district court's order denying arbitration, but voluntarily dismissed this appeal when we accepted the parties' petitions for interlocutory review of the district court's class certification order.

## C. Lozano's Injury

The district court considered AWS's motion for summary judgment before Lozano sought class certification. In its summary judgment order, the district court addressed whether Lozano had any legally cognizable injuries, in order to determine whether he had standing to bring his claims. AWS argued that because it had reimbursed Lozano for the out-of-cycle overage fees in October 2001, and he did not bring suit until November 2001, he could not show [*9] injury. The district court disagreed. While recognizing that AWS's reimbursement to Lozano before suit raised concerns regarding Lozano's ability to meet an essential element of his claims, i.e., damages, the district court nevertheless concluded that (1) AWS could not avoid a class action by reimbursing the potential representative prior to filing suit; and (2) Lozano suffered damages based on a so-called "reservation" injury, and that AWS's use of out-of-cycle billing continued to injure Lozano. The "reservation" injury, as described by the district court, relates to those AWS customers who are aware of out-of-cycle billing, and in turn, reserve a certain percentage of minutes each month to compensate for any late-charged roaming calls from the previous billing cycle. The customer is thereby denied the full use of his or her allotted minutes each month. On these bases, the district court found that Lozano sufficiently alleged the presence of an injury, and had standing to bring these claims. [4]

4    Lozano does not attack the actual practice of out-of-cycle billing, presumably because *section 332 of the FCA* would preempt such a claim. *See 47*

*U.S.C. § 332(c)(3)(A)* (prohibiting states from [*10] regulating the entry of or the rates charged by any commercial mobile service or any private mobile service). Here, in order for Lozano to maintain his UCL claim, while avoiding FCA preemption, his claim must be tied to the unfairness of AWS's disclosures regarding its billing practices, and not to the practices themselves.

## D. Class Certification

The district court next considered Lozano's motion for class certification. In his motion, Lozano requested that the court certify two classes: (a) one national class for claims based on FCA violations, declaratory relief, and breach of contract; and (b) another California subclass based on Lozano's state-law claims brought pursuant to the CLRA and UCL. Lozano termed the first class as "the Class" and the subclass as "the California Subclass."

Lozano's proposed definition for the Class included:

> all residents of the United States of America who initiated cellular telephone service with AT&T Wireless on or after March 1, 1999 and who at any time between March 1, 1999 and the date of filing the Second Amended Complaint in this action have been charged by AT&T Wireless for cellular telephone calls during a billing period other than the billing period [*11] in which the calls were made.

Lozano proposed an identical subclass for his state claims, except that this definition only included residents of the State of California.

The district court declined to certify a national class for Lozano's FCA and derivative

DJA claims because to do so would require a state-by-state analysis of conscionability jurisprudence with respect to the enforceability of class action waivers. The court also denied Lozano's request for class action status for his breach of contract claim. The district court certified a California class action for Lozano's CLRA claim, based on AWS's inclusion of an unconscionable term in its agreement, i.e., the class action waiver; the district court declined to certify a class for Lozano's other theories of liability pursuant to the CLRA. Finally, the district court certified a class action on two theories of liability under the UCL; one claim based on a violation of the CLRA (the "derivative UCL claim") and a second claim based on the "unfairness" prong of the UCL.

## II. Standards of Review

Class certifications are governed by *Federal Rule of Civil Procedure 23*. As the party seeking class certification, Lozano bears the burden of [*12] demonstrating that he has met each of the four requirements of *Rule 23(a)* and at least one of the requirements of *Rule 23(b)*. [5] *See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001)*. We review the district court's decision regarding class certification for abuse of discretion. *See Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)*. The district court abuses its discretion if its certification order is premised on impermissible legal criteria. *See Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 479 (9th Cir. 1983)*. Finally, while we review the district court's factual findings under the clearly erroneous standard, *Husain v. Olympic Airways, 316 F.3d 829, 835 (9th Cir. 2002)*, we review the district court's determination of standing and mootness *de novo*. *See Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1111 n.11 (9th Cir. 2002)* (standing); *Nat'l Audubon Soc'y, Inc. v. Davis, 307 F.3d 835, 850 (9th Cir. 2002)* (mootness).

[5] The Federal Rules of Civil Procedure allow class certification if the proponent shows: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, [*13] (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Fed. R. Civ. P. 23(a)*. Additionally, the class action proponent must meet one of the requirements set forth in *Rule 23(b)*. Here, the district court's class certification order is based primarily on its analysis of the additional requirement found in *Rule 23(b)(3)*; that is, whether questions of law or fact "common to the members of the class predominate over any questions affecting only individual members and that class action is superior to other available methods." *Fed. R. Civ. P. 23(b)(3)*.

## III. Discussion

### A. Arbitration of FCA Claims

Lozano first contends that the district court erred by finding predominance of individual claims based on differing state laws on whether class action waivers are unconscionable. The district court, according to Lozano, should not have considered the variances in state law on this issue because, as a matter of federal law, no claim can be subject to arbitration under the FCA. Lozano contends that the FCA's plain language precludes adjudication by arbitration. [*14] Whether the FCA permits adjudication by binding arbitration is a question of law that we review *de novo*. *See S.E.C. v. Gemstar-TV Guide Intern., Inc., 401 F.3d 1031, 1044 (9th Cir. 2005)*.

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate a

controversy shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2*. The FAA sets forth a liberal federal policy favoring arbitration and reverses years of hostility by the courts towards arbitration agreements. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*. Contractual arbitration agreements are equally applicable to statutory claims as to other types of common law claims. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)*. Indeed, the *Mitsubishi* Court went so far as to state that, absent the sort of "fraud or overwhelming economic power that would provide grounds for the revocation of any contract," the FAA "provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability." *Id.* (citations [*15] and internal quotation marks omitted).

This does not mean that all statutory rights are suitable for arbitration. There are some statutes where Congress has evinced an intent to preclude arbitration of claims. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude arbitration of the statutory claims involved. *See Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)*; *Nghiem v. NEC Elec., 25 F.3d 1437, 1441 (9th Cir. 1994)*. Lozano attempts to meet this burden by arguing that Congress, by limiting fora to the Federal Communications Commission ("FCC") and federal district courts, evidenced an intent to preclude other fora, including arbitration. As additional support, Lozano points to this court's decision in *AT&T Corp. v. Coeur D'Alene Tribe, 295 F.3d 899 (9th Cir. 2002)*, as controlling authority on the issue.

The district court rejected both of Lozano's arguments. Relying on the standard set forth in

*Mitsubishi*, the district court found no evidence of a congressional intent to prohibit arbitration of FCA claims. [6] The district court also found our holding in *Coeur d'Alene Tribe* to be confined to the adjudication of claims in [*16] the tribal forum. We agree.

> 6 At least two other federal courts have implicitly recognized the right of parties to agree to arbitrate their FCA claims. *See Penberthy v. AT&T Wireless Servs., 354 F. Supp. 2d 1323, 1328 (M.D. Fla. 2005)*; *In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F. Supp. 2d 1107, 1134 (D. Kan. 2003)*.

1. Congressional Intent

If congressional intent to bar arbitration exists in the FCA, it must be found in the text of the statute, its legislative history, or "an inherent" conflict between arbitration and the FCA's underlying purpose. *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)*. Lozano argues that because important public policy considerations are litigated in FCA claims, Congress intended to limit the adjudication of these claims to the FCC and the federal district courts, and to the exclusion of an arbitral forum. Lozano also argues that, due to the inherent inequality in unequal bargaining power between telecommunications providers and consumers, Congress intended to preclude providers from keeping consumers out of a judicial forum. While we recognize these as important public policy considerations, the United States Supreme Court has rejected [*17] these same arguments in other statutory contexts, in light of the strong public policy favoring arbitration.

For example, the Supreme Court in *McMahon* evinced a strong desire to permit arbitration of statutory claims by upholding an arbitration agreement that encompassed federal claims arising under the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations ("RICO") statutes. *482 U.S.*

*at 242.* The Court found RICO claims arbitrable even in the face of RICO's strong public policy considerations. *See id.* ("The special incentives necessary to encourage civil enforcement actions against organized crime do not support nonarbitrability of run-of-the-mill civil RICO claims brought against legitimate enterprises."); *see also Mitsubishi, 473 U.S. at 632* (reasoning that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims); *Gilmer, 500 U.S. at 35* (holding that employment claims brought pursuant to the Age Discrimination in Employment Act of 1967 are subject to mandatory arbitration); *Green Tree Fin'l Corp.-Alabama v. Randolph, 531 U.S. 79, 90, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)* (holding claims brought under the Truth in Lending Act, a statute [*18] designed to "further important social policies," are arbitrable). Accordingly, we conclude that, even considering the important public policy concerns associated with FCA claims, these claims are arbitrable absent evidence of congressional intent to the contrary.

Lozano also argues that, based on the inequality in bargaining power between consumers and communications companies, FCA claims should not be arbitrable. The Supreme Court has likewise rejected this argument. In *Gilmer*, the Court held that "[m]ere inequality in bargaining power . . . is not sufficient reason to hold that arbitration agreements are never enforceable in the employment context. Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we nevertheless held in *Rodriguez de Quijas* and *McMahon* that agreements to arbitrate in that context are enforceable." *500 U.S. at 33* (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989)* and *McMahon, 482 U.S. at 230*)). Neither the public policy considerations in the FCA, nor the inequality of bargaining power between the parties, is sufficient to show congressional intent to preclude arbitration.

## 2. [*19] *Coeur d'Alene Tribe*

Lozano next argues that, pursuant to our decision in *Coeur d'Alene Tribe*, FCA claims are not subject to mandatory arbitration. Although, in *Coeur d'Alene Tribe*, we discussed the limited fora for adjudication of FCA claims, we did not consider the appropriateness of arbitration as a possible forum.

The issue in *Coeur d'Alene Tribe* was whether tribal courts had jurisdiction to adjudicate claims brought pursuant to the FCA. *295 F.3d at 904*. Relying on *section 207 of the FCA*, we determined that the tribal court did not have jurisdiction to adjudicate these claims based on the plain language of *section 207*:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

*47 U.S.C. § 207*. In *Coeur d'Alene Tribe*, we held that, by restricting jurisdiction to the FCC and the federal district court, Congress [*20] intended to leave no room for "adjudication in any other forum -- be it state, tribal, or otherwise." *295 F.3d at 905*. Lozano argues that the arbitral forum is therefore precluded.

In *Coeur d'Alene Tribe,* this court did not determine whether the same statutory language barred the arbitral forum, which as stated above, requires that we find a strong showing of congressional intent. We do not. The fact

that Congress drafted the amendments to the FCA to include the designation of fora for the adjudication of its claims, without more, does not establish congressional intent. For example, the jurisdictional language for suits pursuant to the Sherman Act, *15 U.S.C. § 1, et seq.*, has similar language to the FCA. *Compare 47 U.S.C. § 207 (FCA)* ("may bring suit . . . in any district court of the United States of competent jurisdiction") *with 15 U.S.C. § 15(a)* (Sherman Act) ("may sue therefor in any district court of the United States"). Faced with this similar language, the Court in *Mitsubishi* held that claims under the Sherman Act are subject to arbitration. *473 U.S. at 640.* We likewise hold that FCA claims may be subject to agreements to arbitrate.

## B. [*21] Differing State Laws on Class Action Waivers

Lozano next contends that the district court abused its discretion by going beyond the factors enumerated in *Rule 23(b)(3)* and seizing on AWS's premature argument that if a class is certified, and it seeks to compel arbitration, predominance is defeated. Lozano argues that the district court erred in resting its finding of predominance of individual issues on speculation as to AWS's future litigation strategy. In the alternative, Lozano contends that determining whether the class action waiver in this case is unconscionable for all fifty states is not impractical and should not destroy predominance.

The district court properly considered the effect of AWS's intent to seek to arbitrate the class action claims. As discussed above, while the district court found the class action waiver to be unconscionable under California law, it also recognized that the waiver may not be unconscionable under other states' laws. The district court therefore determined that predominance was defeated because AWS's intent to seek arbitration of the class would necessitate a state-by-state review of contract conscionability jurisprudence. While Lozano argues that

[*22] the district court's analysis of AWS's future intent was an abuse of discretion, we find the district court's practical consideration of future events reasonable. In fact, in *In re Hotel Telephone Charges*, this court expressed dissatisfaction over the district court's unwillingness to address the impact of future individual questions in its analysis of predominance. *500 F.2d 86, 90 (9th Cir. 1974)* ("However difficult it may have been for the District Court to decide whether common questions predominate over individual questions, it should not have sidestepped this preliminary requirement of the Rule by merely stating that the problem of individual questions 'lies far beyond the horizon in the realm of speculation.'"). Moreover, the law on predominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions. *Id.* In *Blackie v. Barrack*, for example, we held that the trial court properly considered the "future course of the litigation" in determining whether class certification was appropriate. *524 F.2d 891, 900-01 (9th Cir. 1975)* ("[T]he district judge is necessarily bound to some degree of speculation by the uncertain state [*23] of the record on which he must rule.") (citations and quotations omitted).

Furthermore, the fact that AWS intended to compel arbitration was not speculative. By the time the district court decided Lozano's class certification motion, AWS had already moved to compel arbitration of Lozano's claims, and appealed the district court's denial of that motion. Finally, with respect to his second claim of error, that the district court should have determined whether the class action waiver in this case would be enforceable for each state, we note that Lozano offers no explanation of how the district court was to conduct this analysis and how practical such analysis would be in this context. Thus, although he suggests that the district court should be required to engage in this analysis, he makes no attempt to do so himself. Nevertheless, we reject the notion that the district court was obligated to conduct a

comprehensive survey of every state's law on this issue.

Based on our conclusion that the district court did not abuse its discretion in considering AWS's intent to move to compel arbitration of the class, and that it was not required to conduct a state-by-state analysis of this issue, we [*24] find that the district court did not abuse its discretion by declining to certify a class on this basis.

### C. DJA Claim

Lozano also claims the district court erred when it held that Lozano's DJA claim could not be certified as a class because it was "parasitic" of Lozano's FCA claim. Although the district court did not specifically articulate its decision regarding class certification of the DJA claim, its ultimate conclusion is sound. If the certification of a potential nationwide class would require a state-by-state legal analysis of the arbitration agreement, and its accompanying class action waiver, then the same predominance analysis applies with equal force to preclude Lozano's DJA claim. Lozano does not contend that his DJA claim is exempt from the arbitration agreement, or that his DJA claim requires a separate analysis. Lozano simply, and unconvincingly, contends that the district court failed to articulate its reasoning for denying class certification of the DJA claim. Counsel for Lozano conceded as much at oral argument, agreeing that the DJA claim is "parasitic" of the FCA claim, but requested a separate analysis of the claim under *Rule 23(b)(2)*. As discussed *infra*, however, [*25] we find that the district court did not abuse its discretion in declining to certify a class under *Rule 23(b)(2)* for Lozano's FCA claims.

#### 1. *Rule 23(b)(2)* Injunctive Relief

Lozano argues that the district court failed to address his request for *Rule 23(b)(2)* injunctive relief. This is incorrect. The district court addressed Lozano's request for injunctive relief

pursuant to *Rule 23(b)(2)* and held that, based on the type of relief requested by Lozano in his Second Amended Complaint, Lozano was seeking primarily monetary damages, which defeats class certification under *Rule 23(b)(2)*. *See In re Paxil Litig., 218 F.R.D. 242, 247 (C.D. Cal. 2003)* (finding a proposed class that is aimed at obtaining monetary relief to be inappropriate for certification under *Rule 23(b)(2)*); *see also Molski v. Gleich, 318 F.3d 937, 950 (9th Cir. 2003)* (focusing on the intent of the plaintiffs in bringing the suit). Here, the district court determined that Lozano sought primarily monetary damages, and thus, *Rule 23(b)(2)* certification was not appropriate. Indeed, even on appeal, Lozano does not contend that he is seeking primarily injunctive relief. Because the district court did not abuse its discretion in [*26] declining to certify a class pursuant to this provision, we affirm.

#### 2. California Subclass for FCA and DJA Claims

At a minimum, Lozano claims that the district court should have considered certifying a California subclass for his FCA and DJA claims. Lozano contends that a smaller California class would not be barred by issues of predominance. Lozano never requested that the district court consider a California subclass for these claims. Importantly, in requesting certification, Lozano distinguished his breach of contract claim by requesting that a nationwide Class, or alternatively, a California Subclass, be certified on this claim. Lozano did not make a similar, alternative request with respect to the FCA and DJA claim.

The district court did not err in failing to consider whether Lozano could bring his FCA and DJA claims as part of the California Subclass because Lozano never requested it. *See Mpoyo v. Litton Electro-Optical Sys., 430 F.3d 985, 988 (9th Cir. 2005)*; *Cruz v. Am. Airlines, Inc., 360 U.S. App. D.C. 25, 356 F.3d 320, 329 (D.C. Cir. 2004)* (holding that its decision rests on its "well-established discretion not to con-

sider claims that litigants fail to raise sufficiently below and on which district [*27] courts do not pass"); *see also Hawkins v. Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir. 2001)* (holding that plaintiff bears the burden of constructing and proposing subclass, not the district court) (quotations and citations omitted). We therefore reject Lozano's appeal on this issue.

## D. CLRA Claim

The CLRA makes it unlawful to use "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer. *Cal. Civ. Code § 1770.* The district court certified a class action based on AWS's inclusion of an unconscionable class action waiver in an arbitration agreement pursuant to *section 1770(a)(19) of the CLRA* ("*subsection (a)(19)*"). *Id.* at *§ 1770(a)(19)* (stating that the inclusion of an unconscionable provision in a contract is an unlawful business practice). The district court certified this class pursuant to a theory that was neither pled, nor properly considered by the district court when granting class certification. Accordingly, we reverse this district court's order certifying a California class for Lozano's CLRA claim.

In his complaint, Lozano asserts allegations under *subsection (a)(19)*, but none relate to class action waivers. Instead, [*28] Lozano alleges that "[b]y engaging in the practice of out-of-cycle billing while making inadequate and incomplete disclosures to consumers . . . Defendants have violated, and continue to violate, the CLRA in at least the following respects: . . . (d) in violation of *section 1770(a)(19)* of the CLRA, Defendants have inserted an unconscionable provision in a contract." Thus, there is little doubt that Lozano's *subsection (a)(19)* claim, as originally pled, was tied entirely to AWS's failure to adequately disclose its *billing practices* and not the class action waivers. After the district court held AWS's class action waiver to be unconscion-able pursuant to *Ting* and *Ingle*, however, Lozano argued that his *subsection (a)(19)* claim included the unconscionable class action waiver.

The district court rigorously analyzed the *Rule 23(a)* factors in considering whether to certify a class based on AWS's practice of out-of-cycle billing and its disclosures relating to this practice. The district court did not analyze Lozano's CLRA claim based on the unconscionability of the class action waiver against any of the four prerequisites for class action litigation: numerosity, commonality, typicality, and [*29] adequacy of representation. *See Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).* The only class action factor the court considered was whether *Rule 23(b)(3)'*s predominance of class issues was satisfied. Because a class may be certified only if the district court is satisfied "after a rigorous analysis" that the prerequisites of *Rule 23(a)* have been met, we reverse the district court's decision to certify a class action based on the unconscionability of AWS's class action waiver. *See Chamberlan v. Ford Motor Co., 402 F.3d 952, 961 (9th Cir. 2005)* (citing *Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).*

The district court's failure to analyze the *Rule 23(a)* factors in determining whether to grant class certification based on Lozano's un-conscionability claim also resulted in its certifying a theory with no definable class. As stated above, the district court adopted a class definition for the California Subclass based solely on out-of-cycle billing.

The class the district court certified under *subsection (a)(19)* is wholly unrelated to this definition. Any class certified under *subsection (a)(19)* necessitates a class definition that includes individuals who sought [*30] to bring class actions in California, but were precluded from doing so because of the class action waiver in AWS's arbitration agreement, and suffered some resulting damage. *See Wilens v.*

*TD Waterhouse Group, Inc., 120 Cal. App. 4th 746, 15 Cal.Rptr. 3d 271, 276-77 (Cal. Ct. App. 2003)* (holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract). The new class would be unrecognizable from the class definition adopted by the district court. The district court's failure to analyze Lozano's *section (a)(19)* claim, and resulting failure to identify a class based on a violation of this section, was manifest error. Accordingly, based on all the above reasons, we reverse the district court on this issue. [7]

> 7   The district court also certified a class pursuant to the UCL based solely on Lozano's claim that AWS violated the CLRA. The above analysis applies with equal force to the district court's certification of the derivative UCL claim.

## E. UCL Claim

The district court granted class certification for Lozano's UCL claim based on his theory that AWS's written disclosures were inadequate to inform AWS customers about the possibility of out-of-cycle billing. AWS claims the [*31] district court erred by granting Lozano's motion for class certification for his UCL claim because (1) Lozano has no damages and therefore lacks standing; (2) Lozano's damages, if any, are not typical of the class; and (3) individual issues predominate over class issues.

The UCL is a broad remedial statute that permits an individual to challenge wrongful business conduct "in whatever context such activity might occur." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co., 20 Cal. 4th 163, 83 Cal.Rptr.2d 548, 561, 973 P.2d 527 (1999)* (citation omitted). It prohibits "unfair competition," which it broadly defined as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." *Cal. Bus. & Prof. Code § 17200*. Because the statute

is written in the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of *section 17500* (false or misleading advertisements). *Cel-Tech, 83 Cal.Rptr.2d at 565*. Each prong of the UCL is a separate and distinct theory of liability; thus, the "unfair" practices prong offers an independent basis for relief. *South Bay Chevrolet v. Gen. Motors Acceptance Corp., 72 Cal. App. 4th 861, 85 Cal.Rptr.2d 301, 316-317 (Cal. Ct. App. 1999)* [*32] (citation and quotation omitted). Lozano asserts that AWS's conduct was "unfair" because it did not fully and adequately disclose its billing practices at the time customers contracted with it to obtain cellular services.

### 1. Standing

AWS argues that Lozano lacks standing under the UCL because he suffered no damages from out-of-cycle billing. When Lozano filed this action, any person could assert a UCL claim on behalf of the general public regardless of whether they suffered an actual injury. *Cal. Bus. & Prof. Code § 17204 (2003)*. Thus, as originally drafted, the UCL gave any person authority to assert a UCL claim on behalf of the public as a private attorney general. In 2001, Lozano filed this putative class action both as a private attorney general and as an injured plaintiff.

After filing this lawsuit, but before the district court granted class certification, the voters of California enacted Proposition 64, which eliminated private attorney general standing for UCL claims. *Cal. Bus. & Prof. Code § 17204*. After Proposition 64, a person asserting an unfair competition claim must allege that (1) he or she "suffered injury in fact," and (2) "lost money or property as a result of such unfair [*33] competition." *Id.* While Proposition 64 did not expressly declare that the new standing requirements applied to cases pending at the time of its enactment, in July 2006, the California Supreme Court answered the question in the affirmative. *See Californians for Disability*

*Rights v. Mervyn's, LLC, 39 Cal. 4th 223, 46 Cal.Rptr. 3d 57, 64, 138 P.3d 207 (Cal. 2006)* ("For a lawsuit properly to be allowed to continue standing must exist at all times until judgment is entered and not just on the date the complaint is filed.").

The district court did not consider Lozano's standing as a private attorney general, but focused instead on whether his claimed injuries were such that he had standing to bring a UCL claim as an injured plaintiff. The district court, incorporating its findings from its summary judgment order, found that Lozano had sufficient evidence of actual injury as a result of AWS's inadequate disclosures -- the reimbursement of which the district found to be an attempt to avoid suit -- together with an injury it termed the "reservation" injury. Thus, we must determine whether the type of injury articulated by the district court is sufficient to establish Lozano's standing pursuant to *section 17204*, as amended [*34] by Proposition 64.

The parties do not dispute that Lozano suffered pecuniary loss as a result of his alleged unawareness of AWS's out-ofcycle billing practices. Shortly after contracting with AWS for cellular service, Lozano received an invoice stating that he had been charged fees as a result of out-of-cycle minutes from his previous invoice. The record also supports a finding that, during the course of his contract with AWS, AWS would occasionally charge Lozano an overage fee based on out-of-cycle billing. AWS contends, however, that these charges were offset by the benefits Lozano received from out-of-cycle billing. In considering these claims of error, we must address the effect of AWS's reimbursement to Lozano for his out-of-cycle charges prior to his filing suit, and the effect of the claimed offset of benefits Lozano received during the same time.

With respect to the former issue regarding the effect of AWS's reimbursement prior to suit, the district court found that AWS reimbursed Lozano only after realizing that Lozano "was instigating legal proceedings" against it. Based on this factual finding, which we review for clear error, the district court concluded that it was not divested [*35] of its power to hear the case. In so concluding, the district court relied on *United States v. W.T. Grant*, where the Supreme Court held that "the voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case," unless there is no reasonable expectation that the wrong will be repeated; otherwise, the "defendant is free to return to his old ways." *345 U.S. 629, 632, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)* (citations and quotations omitted); *see also DeFunis v. Odegaard, 416 U.S. 312, 318, 94 S. Ct. 1704, 40 L. Ed. 2d 164 (1974)*. The district court found that it did not need to speculate as to whether AWS would return "to its old ways" because AWS's position was that its practice of out-of-cycle billing was legal and adequately disclosed to its customers.

While we agree with the district court's ultimate decision regarding the justiciability of Lozano's claim, we analyze the claim differently to address issue of both standing and mootness. As stated above, the district court relied on *W.T. Grant* and *DeFunis* to support its finding that Lozano's injuries, capable of being repeated, were justiciable. Both cases are based on mootness, i.e., plaintiff had standing when he or she filed suit but due to a [*36] changed circumstance his or her claim became moot. Here, AWS argues that Lozano did not have standing to bring this action in the first instance. While some courts have characterized mootness simply as "the doctrine of standing set in a time frame," *see Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)*, a careful analysis should distinguish the two doctrines.

In determining mootness, the *defendant* bears the burden of showing that its voluntary compliance moots a case by convincing the court that "it is absolutely clear the allegedly wrongful behavior could not reasonably be ex-

pected to recur." *Friends of the Earth, 528 U.S. 167, 190* (citation omitted). By contrast, in determining standing issues the court considers whether the *plaintiff* has demonstrated that, "if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending." *Id.* (internal quotation marks and citations omitted). Thus, Lozano bears the initial affirmative burden of showing that AWS's conduct is likely to continue and that the threatened injury is certainly impending. Conversely, to establish mootness, AWS [*37] must convince the court that its conduct is not reasonably expected to recur.

Based on the facts before us, we find that Lozano, when faced with the realistic threat that AWS would continue to charge him for out-of-cycle calls, had standing to bring this claim. Likewise, there is nothing in the record that supports a finding that Lozano's claim is now moot. We base our decision on the following: (1) Lozano continues to be a customer of AWS's cellular service, subject to AWS's out-of-cycle billing practices; (2) after this suit was filed, Lozano suffered another overage charge as a result of out-of-cycle billing; [8] and (3) if the disclosures were inadequate, then Lozano may show that as a result of the inadequacies of the disclosures, he did not receive the full benefit of his contract with AWS. This latter injury is what the district court defined as the "reservation" injury. That is, Lozano contracted for 400 free "anytime" minutes. Yet, due to out-cycle-billing, he reserved, and therefore lost, a certain number of those minutes each billing period to account for the late-billed roaming calls.

[8] Whether this overage charge was offset by benefits Lozano received as a result of out-of-cycle [*38] billing is a determination better left to a fact-finder during the merits portion of the lawsuit.

The next question we address is whether these injuries are recoverable under the UCL. The only types of relief available under the UCL actions are injunctive and restorative. *Cal. Bus. & Prof. Code § 17203*; *see also Cel-Tech, 83 Cal.Rptr.2d at 560.* While restoring Lozano's overage payments, if any, fits squarely within the restorative context of the UCL, we question whether restoring Lozano's "reserved" minutes falls into this category. Restitution in the UCL context, however, includes restoring money or property that was not necessarily in the plaintiff's possession. The California Supreme Court has "stated that the concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person. Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *See Juarez v. Arcadia Fin., Ltd., 152 Cal. App. 4th 889, 61 Cal.Rptr. 3d 382, 400 (Cal. Ct. App. 2007)* (citing *Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 131 Cal.Rptr.2d 29, 42, 63 P.3d 937 (2003)).* Here, Lozano has a vested [*39] interest in 400 free anytime minutes. Due to out-of-cycle billing, however, Lozano found it necessary to reserve, and therefore lose, a certain number of those minutes each billing period. Accordingly, we find that Lozano has properly stated an injury that he did not receive the full value of his contract with AWS due to its alleged failure to disclose out-of-cycle billing, and that this injury is redressable under the UCL. *See Daghlian v. DeVry Univ., Inc., 461 F. Supp. 2d 1121, 1155 (C.D. Cal. 2006)* (accepting plaintiff's theory that he suffered injury under the UCL because he paid thousands of dollars of tuition to defendant university and "did not receive what he had bargained for" due to its alleged unfair business practices).

2. Typicality

AWS next contends that, even if Lozano could show injury, his injury is not typical of

the class, and he therefore is an inadequate class representative. AWS bases its contentions on the fact that Lozano was reimbursed for his out-of-cycle billing charges, he benefitted overall from out-of-cycle billing over the course of his contract with AWS, and his claimed damages for "reserving" minutes is unique to him.

Under *Rule 23(a)(3)*, it is not necessary [*40] that all class members suffer the same injury as the class representative. *See Negrete v. Allianz Life Ins. Co. of N. Am., 238 F.R.D. 482, 488 n.8 (C.D. Cal. 2006)* (citing *Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir. 1992)* (further citations omitted)); *see also Simpson v. Fireman's Fund Ins. Co., 231 F.R.D. 391, 396 (N.D. Cal. 2005)* ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff.") (quoting *Rosario, 963 F.2d at 1018*).

We agree with the district court that Lozano's injuries are typical of the class. The class definition includes all California customers that AWS charged for calls made during a billing period other than the billing period in which the calls were made. Given AWS's policy of offering a one-time reimbursement to customers who complain when they receive an invoice containing charges for out-of-cycle calls, along with an explanation of out-of-cycle billing, it does not strain the parameters of typicality to presume that many of these customers will thereafter reserve minutes to account for AWS's billing practice. Thus, the class is likely to include customers [*41] who were charged for overage fees, as well as customers who, after learning of out-of-cycle billing, reserved their minutes. We therefore do not find that the district court erred in holding Lozano's claims typical of the class.

3. Predominance of Common Issues

AWS argues that because all of Lozano's claims involve some proof of individual knowledge and expectations, all should fail under *Rule 23(b)(3)* because individual issues would necessarily predominate over common issues. The district court itself found that individual issues predominated in Lozano's breach of contract and CLRA claims, but found that common issues predominated in the UCL claim.

In its order on class certification, the district court found that Lozano's breach of contract and CLRA claims required an individualized analysis of awareness and knowledge of AWS's out-of-cycle billing practices, such that the predominance prong of *Rule 23(b)(3)* was not met. AWS now argues that the district court's finding, that predominance was not fatal to class certification of Lozano's UCL claim, is inconsistent with its findings with respect to the breach of contract and CLRA claims. First, we examine the basis of the district court's [*42] decisions not to certify on those claims and then turn to considering how the UCL claim does, or does not, differ.

Though Lozano requested certification on four separate theories under the CLRA, the district court denied certification on the first three theories, which were based on fraudulent or misleading representations, and granted certification on the fourth, relating to insertion of an unconscionable arbitration clause. In denying certification on the first three theories, the district court relied on the analysis of "materiality" in *Caro v. Procter & Gamble Co., 18 Cal. App. 4th 644, 22 Cal. Rptr. 2d 419 (Cal. Ct. App. 1993)*. There, the California Court of Appeals concluded that individual issues predominated in the plaintiff's CLRA class action based on orange juice labeling. *Id. at 432-33*. Because the CLRA requires that any misrepresentations be material, the court found that it would have to determine whether each customer in the class thought the orange juice was "fresh" as advertised, or whether the customer had read the side

of the carton disclosing that the juice came from concentrate. *Id.* Similarly, the district court in this case found that it would have to conduct an individualized review as to [*43] each class member's awareness and knowledge of out-of-cycle billing and AWS's disclosures to determine whether its representations were material under the CLRA.

With respect to Lozano's breach of contract claim, the district court held that it would have to ascertain each individual's expectations about the contract, and determine whether those expectations were reasonable. Thus, the district court found that individual issues predominated over the class issues with respect to Lozano's breach of contract claim. The district court specifically noted, however, that its decision would be different had Lozano based his contract claim on a theory about the uniformity of AWS's disclosures about out-of-cycle billing, rather than about reasonable expectations.

The legal analysis required under the UCL resembles, but remains distinct from, both the CLRA's materiality inquiry and the common law's emphasis on reasonable expectations. Construing Lozano's theory to be based on AWS's uniform written disclosures to its customers, the district court considered the weight individualized proof would play under the test prescribed by *South Bay* . This test involves balancing the harm to the consumer against [*44] the utility of the defendant's practice. *See South Bay, 85 Cal.Rptr.2d at 315.* The district court held that "the possibility of some slightly different individual circumstances" would not destroy the predominance of common issues in light of the legal standard. AWS argues that the district court erred because the UCL in fact does require consideration of individual issues.

California's unfair competition law, as it applies to consumer suits, is currently in flux. In 1999, the California Supreme Court rejected the balancing test in *South Bay* in suits involving unfairness to the defendant's competitors. *See Cel-Tech, 20 Cal. 4th 163, 83 Cal.Rptr.2d*

548, 973 P.2d 527. The court held that this balancing test was "too amorphous" and "provide[d] too little guidance to courts and businesses." *Id. at 567.* The court then held that unfairness must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id. at 565.* This holding, however, was limited to actions based on unfairness to competitors. *Id.* at n.12.

The California courts have not yet determined how to define "unfair" in the *consumer* action context after *Cel-Tech*. In the First District Court of Appeals, the court [*45] extended the *Cel-Tech* definition to consumer cases. *See Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 128 Cal.Rptr.2d 389 (Cal. Ct. App. 2002).* The Fourth District Court of Appeals initially proposed a test along the lines of *Cel-Tech* but later avoided the question by dismissing the claim under both the old and the new standard. *See Bardin v. Daimlerchrysler Corp., 136 Cal. App. 4th 1255, 39 Cal.Rptr. 3d 634, 636 (Cal. Ct. App. 2006); Scripps Clinic v. Superior Court, 108 Cal. App. 4th 917, 134 Cal.Rptr.2d 101 (Cal. Ct. App. 2003).* The Second District Court of Appeals has issued two conflicting decisions, one applying the old balancing test, *see McKell v. Washington Mut., Inc., 142 Cal. App. 4th 1457, 49 Cal.Rptr. 3d 227, 238 (Cal. Ct. App. 2006),* and another, issued during the same week, holding that *Cel-Tech* overruled all prior definitions of unfairness and created a new test, *see Camacho v. Automobile Club of Southern California, 142 Cal. App. 4th 1394, 48 Cal.Rptr. 3d 770, 776 (Cal. Ct. App. 2006).* In *Camacho*, the court chose to apply the three-pronged test contained in the Federal Trade Commission Act, *15 U.S.C. § 45(a). See id. at 776.*

While we agree with the Fourth District that *Cel-Tech* effectively rejects the balancing approach, we do not agree that the FTC test is appropriate in this [*46] circumstance. Though the California Supreme Court did reference FTC's *section 5* as a source of "guidance," that

discussion clearly revolves around anti-competitive conduct, rather than anti-consumer conduct. *See Cel-Tech, 83 Cal.Rptr.2d at 565* ("As the issue before us in this case arises out of a claim of unfair competition between direct competitors, the relevant jurisprudence would be that arising under *section 5*'s prohibition against "unfair methods of competition."). Accordingly, we decline to apply the FTC standard in the absence of a clear holding from the California Supreme Court.

The remaining options, then, are to apply *Cel-Tech* directly to this case and require that the unfairness be tied to a "legislatively declared" policy, *see Scripps Clinic, 108 Cal. App. 4th 917, 134 Cal.Rptr.2d 101*, or to adhere to the former balancing test under *South Bay*. These options, however, are not mutually exclusive. In *Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 93 Cal.Rptr.2d 439 (Cal. Ct. App. 2000)*, the appellate court in the First District reversed the dismissal of a complaint in an unfair competition case where the alleged unfairness was *both* tethered to a legislatively declared policy *and* the plaintiff could prove facts showing [*47] that the harm was not outweighed by the utility. Because adopting one standard does not necessitate rejection of the other, we hold that, no matter the status of *Cel-Tech*, the district court did not apply the wrong legal standard by relying on the balancing test from *South Bay*. In the absence of further clarification by the California Supreme Court, we endorse the district court's approach to the law as if it still contained a balancing test.

AWS argues that, under *South Bay*, though, individualized circumstances matter in the determination of whether a practice is unfair. We agree that evidence about individual knowledge and expectations may help the court determine the extent of the harm for the purposes of the UCL's balancing test. In *South Bay*, the appellate court rejected a car dealership's claim that the manufacturer's financing arm used an unfair method of calculating interest. The court found

that "substantial evidence indicated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the [allegedly unfair] method to calculate interest." *See South Bay, 85 Cal.Rptr. at 316*. Based on this record, and in light of the [*48] fact that this method was widely used and even expected in contracts with other dealerships, the court found that practice was not unfair as to South Bay Chevrolet itself.

The district court in this case took individual circumstances into account but ultimately determined that *South Bay* was distinguishable. The district court found that Lozano's claim was based on uniform disclosures made by AWS to all its consumers, whereas the disclosures in *South Bay* varied from dealer to dealer. Therefore, the individual circumstances regarding how these disclosures were read or received would not destroy predominance, in the district court's view. Though we might have decided the issue differently, our review is "limited to assuring that the district court's determination has a basis in reason." *Gonzales v. Free Speech Coalition, 408 F.3d 613, 618 (9th Cir. 2005)* (citation omitted). The district court gave full consideration to AWS's argument and did not abuse its discretion in determining that individual circumstances would not defeat the predominance of common issues. We accordingly affirm its certification of the class.

Finally, we find no basis for AWS's contention that the district court failed [*49] to consider the effect of affirmative defenses on class treatment. Our review of the district court's order reveals that it properly considered each of AWS's defenses in determining whether to certify a class.

## CONCLUSION

We reverse the district court's order granting class certification of Lozano's CLRA claim based on the inclusion of an unconscionable clause in the agreement. Similarly, we reverse

2007 U.S. App. LEXIS 22430, *

the district court's certification of Lozano's UCL claim based on unlawful conduct, as it is dependent on Lozano's CLRA claim. We otherwise affirm the district court's order on class certification. Each party shall bear its own costs on appeal. *See Fed. R. App. P. 39(a)(4)*

**AFFIRMED in part, REVERSED in part.**