STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND (State Bar No. 083013)
STEPHEN J. NEWMAN (State Bar No. 181570)
2029 Century Park East, Suite 1800
Los Angeles, California  90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
lacalendar@stroock.com

Attorneys for Defendants
  AMERICAN EXPRESS TRAVEL RELATED
  SERVICES COMPANY, INC., AMERICAN EXPRESS
  CENTURION BANK and AMERICAN EXPRESS
  BANK, FSB

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID J. LEE and DANIEL R. LLOYD, individually and on behalf of all others similarly situated, | Case No. CV-07-4765  (CRB) |
| Plaintiffs, | THE HON. CHARLES R. BREYER |
| v. | **REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC., a New York corporation, AMERICAN EXPRESS CENTURION BANK, a Utah corporation, AMERICAN EXPRESS BANK, FSB, a Utah corporation, and DOES 1 through 100, inclusive, | DATE:    November 30, 2007
TIME:    10:00 a.m.
PLACE:  Courtroom 8
            19th Floor
            450 Golden Gate Ave.
            San Francisco, CA 94102 |
| Defendants. | |

LA 51010381v3

1

# TABLE OF CONTENTS

2

Page

3

I. INTRODUCTION AND SUMMARY OF ARGUMENT.................................... 1

4

II. ARGUMENT ........................................................................................................ 2

5

6
      A.     Plaintiffs Have Not Met Their Burden Of Showing That They
Have Standing To Maintain This Action. ................................................. 2

7
      B.     Plaintiffs Fail To State A Claim Under the CLRA. ............................... 7

8

9
      C.     The Complaint Does Not Meet The Specificity Requirements Of
Federal Rule of Civil Procedure 9(b). ..................................................... 11

10
      D.     Plaintiffs' CLRA And Fraud Claims Against American Express
Centurion Bank Are Barred By The Statute of Limitations. ................. 11

11

12
III. CONCLUSION .................................................................................................. 13

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bd. of Trade of the City of Chicago v. Commodity Futures Trading Cmm'n,
    704 F.2d 929 (7th Cir. 1983) ..............................................................................3

Berry v. American Express Publishing, Inc.,
    147 Cal. App. 4th 224, 54 Cal. Rptr. 3d 91 (2007) ..........................1, 7, 8, 9, 10

Berryman v. Merit Property Management, Inc.,
    152 Cal. App. 4th 1544 (2007) ..........................................................................10

Bowen v. First Family Fin. Servs., Inc.,
    233 F.3d 1331 (11th Cir. 2000) ............................................................................3

Civil Services Employees Ins. Co. v. Superior Court,
    22 Cal. 3d 362 (1978) ........................................................................................10

Daghlian v. DeVry University, Inc.,
    461 F. Supp. 2d 1121 (C.D. Cal. 2006).............................................................3, 6

Edwards v. Marin Park Inc.,
    356 F.3d 1058 (9th Cir. 2004) ............................................................................11

Flintkote Co. v. General Acc. Assur. Co. of Canada,
    480 F. Supp. 2d 1167 (N.D. Cal. 2007).............................................................13

Hernandez v. Hilltop Financial Mortg., Inc.,
    No. C 06-7401 SI, 2007 WL 3101250
    (N.D. Cal. October 22, 2007) .........................................................................9, 10

Hitz v. First Interstate Bank,
    38 Cal. App. 4th 274, 44 Cal. Rptr. 2d 890 (1995) .............................................9

Hogar v. Community Development Commission,
    110 Cal. App. 4th 1288 (2003) ..........................................................................12

In re Ameriquest Mortgage Lending Practices Litigation,
    No. 05-CV-7097, 2007 WL 1202544
    (N.D. Ill. April 23, 2007).....................................................................................9

In Re Late Fee And Over-Limit Fee Litigation,
    No. C 07-0634 SBA (N.D. Cal. Nov. 16, 2007) ..................................................7

Jefferson v. Chase Home Finance LLC,
    2007 WL 1302984 (N.D. Cal. May 3, 2007) ...............................................9, 10

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

LA 51010381v3

Lozano v. AT&T Wireless Services, Inc.,
    Nos. 05-56466, 05-56511, 2007 WL 2728758 (9th Cir. 2007)..............3, 4, 5, 6

Mass. Mut. Life Ins. Co. v. Super. Ct.,
    97 Cal. App. 4th 1282 (2002) ........................................................................ 12

McKell v. Washington Mutual, Inc.,
    142 Cal. App. 4th 1457 (2006) ...................................................................... 10

Posern v. Prudential Secs., Inc.,
    No. C-03-0507 SC, 2004 WL 771399
    (N.D. Cal. Feb. 18, 2004) ................................................................................ 3

Ruckelshaus v. Monsanto Co.,
    467 U.S. 986 (1984) ......................................................................................... 3

Ryman v. Sears, Roebuck and Co.,
    No. 06-35630 (9th Cir., Oct. 12, 2007) ........................................................... 7

State ex rel. Metz v. CCC Information Services, Inc.,
    149 Cal. App. 4th 402 (2007) ........................................................................ 13

Tamplenizza v. Josephthal & Co., Inc.,
    32 F. Supp. 2d 702 (S.D.N.Y. 1999) ............................................................... 3

Television Adventure Films Corp. v. KCOP Television, Inc.,
    249 Cal. App. 2d 268 (1967) ......................................................................... 12

Walton v. Mead,
    No. C 03-4921 CRB, 2004 WL 2415037
    (N.D. Cal. October 28, 2004) ........................................................................ 11

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...........................................................1, 3, 6, 7, 10

Cal. Civ. Code § 17500 ............................................................................................. 6

Cal. Civ. Code § 1770 .........................................................1, 2, 3, 7, 9, 10, 11, 12, 13

Cal. Civ. Code § 1671 .............................................................................................. 9

Civil Code § 1761 .................................................................................................... 7

**Other Authorities**

Article III of the Constitution .............................................................................. 1, 7

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- iii -

LA 51010381v3

1  **Rules**

2  Fed. Rule Civ. Proc. 9(b) ......................................................................................11

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs do not allege that they have ever attempted to arbitrate a dispute with American Express over their Agreements, or that they were forced to arbitrate against their will or under unfair conditions.  They merely assert that someday they may want to enforce the arbitration provision, but to date they have never taken any steps to do so.  Thus, Plaintiffs' alleged injury lies in the future, if at all, and cannot meet the requirements of concreteness and immediacy for Plaintiffs to have standing under Article III of the Constitution, the UCL or the CLRA, or for the fraud claim.  All claims are barred for lack of standing.

The CLRA claim is also barred under <u>Berry v. American Express Publishing, Inc.</u>, 147 Cal. App. 4th 224, 54 Cal. Rptr. 3d 91 (2007).  Plaintiffs' novel and unsupported notion of "credit" under the CLRA is a transparent attempt to eviscerate the <u>Berry</u> decision, which is the controlling case on the inapplicability of the CLRA to financial services:  "money or credit."  Plaintiffs posit that borrowing money on one's credit card is not credit if one pays one's monthly balance in full and thus incurs no interest.  Plaintiffs are unable to cite a single case in support of this notion.  Further, again without citing any relevant authority, Plaintiffs claim that a "convenience service" is a "service" under the CLRA.  This unsupported attempt at circumventing <u>Berry</u> also fails.

Moreover, Plaintiffs are unable to meet the heightened pleading requirements under the Federal Rules for averring fraud.  The "misrepresentations" they allege are based on no more than flimsy legal conclusions and questionable inferences.  Plaintiffs do not deny receiving the written agreements stating precisely how the cards function.  They also wholly fail to state the "time, place, and specific content of the false representations" upon which Plaintiffs allegedly relied at the time they obtained their credit cards, and they equally fail to reveal the identities of the makers of the alleged misrepresentations.

LA 51010381v3

Finally, Plaintiffs fail to advance any legitimate basis to overcome the three-year statutes of limitations that apply to their CLRA and fraud claims against Centurion Bank. If there is standing, which Plaintiffs deny, then those claims had to have accrued in 2003, when Plaintiffs received their cards and card agreements. Despite their lack of specificity about the factual basis of their claims, Plaintiffs' admission that they received the cards and the agreements in 2003 means that they possessed the facts giving rise to their claims long before the filing of the Complaint. These claims therefore must be time-barred.

## II.   ARGUMENT

### A.   Plaintiffs Have Not Met Their Burden Of Showing That They Have Standing To Maintain This Action.

Plaintiffs' Opposition does not advance their argument for standing. Plaintiffs have failed to take their alleged "injury" beyond the realm of hypothetical abstract rights and into the realm of injuries in fact, as required by law.

Plaintiffs' own statement of the issue betrays their inability to demonstrate standing. Plaintiffs state:

> 1.    In paying their annual (or other) fee for their American Express cards, Plaintiffs purchased or acquired the contractual right to mandatory arbitration of all claims they had against Defendants and the merchants from whom they purchased goods or services with their American Express cards;
>
> …
>
> 4.    Plaintiffs want to but cannot, as a matter of law, enforce the unenforceable and illegal arbitration provision in order to exercise the right to mandatory arbitration for which they paid;
>
> 5.    Plaintiffs thus got less than that for which they paid—i.e., they did not get the full value of their contract—and, as a result, lost money (the pecuniary value of the contractual right to mandatory arbitration).

Opposition, at 3 (citations omitted). This is the gist of Plaintiffs' argument for standing, and plainly it fails. The fact that Plaintiffs allegedly "want" to enforce the arbitration provision but supposedly cannot does not state an injury sufficiently concrete and measurable to pass the standing test. They do not say what,

- 2 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

specifically, they do or do not want to arbitrate about.  Nowhere in their Complaint or Opposition do Plaintiffs allege that they have attempted to arbitrate a dispute with American Express over their Agreements, or conversely that they were forced to arbitrate against their will or under unfair conditions.  Plaintiffs' alleged injury, therefore, is <u>purely hypothetical</u>, since they have not shown that they have attempted to vindicate their alleged contractual right to arbitrate and were thwarted.  Abstract injuries of this sort are not legally cognizable injuries.  Plaintiffs' injury is purely hypothetical, based on Plaintiffs' conjectures about what <u>might</u> happen if they were to attempt to arbitrate, or if someone were to attempt to arbitrate against them.  Courts have universally rejected similar arguments, recognizing that arbitration agreements may not be challenged outside the context of a concrete, specific and substantive dispute.  <u>See</u> <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1019 (1984) (no standing where plaintiff "did not allege or establish that it had been injured by actual arbitration under the statute"); <u>Bd. of Trade of the City of Chicago v. Commodity Futures Trading Cmm'n</u>, 704 F.2d 929, 932-34 (7th Cir. 1983) (same); <u>Tamplenizza v. Josephthal & Co., Inc.</u>, 32 F. Supp. 2d 702, 703, 704 (S.D.N.Y. 1999) (refusing to invalidate arbitration provision where no pending or imminent arbitral proceeding); <u>Posern v. Prudential Secs., Inc.</u>, No. C-03-0507 SC, 2004 WL 771399, at *8 (N.D. Cal. Feb. 18, 2004) (same); <u>Bowen v. First Family Fin. Servs., Inc.</u>, 233 F.3d 1331, 1341 (11th Cir. 2000) (same).

Rather than address the above clear authorities, Plaintiffs stake their claim for standing solely on two cases, <u>Lozano v. AT&T Wireless Services, Inc.</u>, Nos. 05-56466, 05-56511, 2007 WL 2728758 (9th Cir. 2007), and <u>Daghlian v. DeVry University, Inc.</u>, 461 F. Supp. 2d 1121 (C.D. Cal. 2006).  Neither of these cases are of any help to them.

Plaintiff in <u>Lozano</u> is a customer of AT&T who brought a class action based on AT&T's disclosures relating to its billing practices for cellular services.  Lozano asserted various claims, including under the CLRA and UCL.  Lozano based these

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

LA 51010381v3

1    claims on allegations that AT&T billed its customers for cellular telephone calls

2    during a billing period other than the billing period in which the calls were made, an

3    industry practice known as "out-of-cycle billing."  Lozano contended that by doing

4    this, AT&T assessed charges for cellular telephone calls that would not have been

5    assessed if the calls had been billed during the billing period in which the calls were

6    made.  AT&T, according to Lozano, did not fully and adequately disclose its billing

7    practices to its customers at the time they entered into contracts with AT&T.

8        Plaintiffs latch on to two quotes from <u>Lozano</u> that, they claim, support their

9    position.  Neither does.  The first is the following:

10           Any class certified under subsection (a)(19) necessitates a class
              definition that includes individuals who sought to bring class
11           actions in California, but were precluded from doing so because
              of the class action waiver in AWS's arbitration agreement, and
12           suffered some resulting damage. <u>See Wilens v. TD Waterhouse
              Group, Inc.</u>, 120 Cal. App. 4th 746, 15 Cal. Rptr. 3d 271, 276-77
13           (2003) (holding a court may not presume damages based on the
              mere insertion of an unconscionable clause in a contract).

14

15   <u>Lozano</u>, 2007 WL 2728758, at *10.  Plaintiffs desperately try to wring "the requisites

16   for standing" out of this passage, which (as is facially obvious) deals not with

17   standing, but rather with the issue of class certification of claims asserted under

18   California Civil Code section 1770(a)(19).  The Plaintiffs, in their eagerness to

19   salvage an argument for standing, have confused class certification with standing.  In

20   any event, <u>Lozano</u>'s citation to <u>Wilens</u> supports Defendants' position:  absent

21   pleading and proof of resulting pecuniary damages, merely inserting an allegedly

22   unconscionable provision in a contract does not confer standing.

23       The issue of standing did arise in <u>Lozano</u> in connection with Plaintiff's UCL

24   claim, but Plaintiffs fail to address the Court's discussion of it.  The court stated:

25           <u>The parties do not dispute that Lozano suffered pecuniary loss</u> as
              a result of his alleged unawareness of AWS's [AT&T's] out-of-
26           cycle billing practices. Shortly after contracting with AWS for
              cellular service, <u>Lozano received an invoice stating that he had
27           been charged fees</u> as a result of out-of-cycle minutes from his
              previous invoice. The record also supports a finding that, during

28

- 4 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

1

2

the course of his contract with AWS, <u>AWS would occasionally charge Lozano an overage fee</u> based on out-of-cycle billing.

3

<u>Lozano</u>, 2007 WL 2728758, at *11 (emphasis supplied).  The court also based its

4

finding that Lozano had standing on the fact that "Lozano contracted for 400 free

5

'anytime' minutes.  Yet, due to out-cycle-billing, he reserved, and therefore lost, a

6

certain number of those minutes each billing period to account for the late-billed

7

roaming calls."  <u>Lozano</u>, 2007 WL 2728758, at *12.  Thus, the court found that

8

Lozano, unlike the Plaintiffs here, had standing based on <u>concrete</u>, <u>measurable</u>,

9

<u>pecuniary</u> injuries, namely, he was charged unnecessary fees by AT&T and he lost at

10

least some of his 400 free "anytime" minutes, which had financial value because they

11

needed to be replaced with purchased minutes.  It is this finding as to standing that

12

underlies the <u>Lozano</u> court's treatment of class certification.  Thus, Plaintiffs ignore

13

the discussion of standing in <u>Lozano</u>, and pin their hopes on the court's class

14

definition under California Civil Code section 1770(a)(19).  However, even facially,

15

the passage the Plaintiffs quote does not help their argument because it specifies

16

"individuals who <u>sought</u> to bring class actions in California" (emphasis added).

17

Plaintiffs here fail to allege that they have actually sought arbitration under their

18

Agreements, or that they had arbitration forced upon them on unfair terms.

19

Therefore, they lack standing.

20

Plaintiffs next cite the following in support of their claim for standing:  "[W]e

21

find that Lozano has properly stated an injury that he did not receive the full value of

22

his contract … and that this injury is redressable under the UCL."  <u>Lozano</u>, 2007 WL

23

2728758 at *13.  However, this is disingenuous.  Plaintiffs neglect to quote the two

24

immediately preceding sentences, which clearly show that the injury in question is

25

both the actual charging of fees and also the loss of some of the 400 free anytime

26

minutes to which Lozano was—again a concrete, measurable injury.  The full

27

passage reads as follows:

28

Here, Lozano has a vested interest in 400 free anytime minutes.
Due to out-of-cycle billing, however, Lozano found it necessary

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 5 -

1
2
3

> to reserve, and therefore lose, a certain number of those minutes each billing period. Accordingly, we find that Lozano has properly stated an injury that he did not receive the full value of his contract with AWS due to its alleged failure to disclose out-of-cycle billing, and that this injury is redressable under the UCL.

4   <u>Lozano</u>, 2007 WL 2728758, at *13.

5       Plaintiffs also cite to <u>Daghlian</u>, but it likewise is distinguishable.  In <u>Daghlian</u>,
6   a student brought an action against a private university under the Private
7   Postsecondary and Vocational Education Reform Act and other statutes, alleging that
8   the university failed to inform him that academic units earned at the university
9   probably would not transfer to other educational institutions; in other words, that
10  what was purchased lacked economic value.  Prior to enrolling, Daghlian met with a
11  university recruiter, who represented that the university was an accredited institution
12  where students were able to obtain degrees.  <u>Id.</u> at 1125.  The recruiter told Daghlian
13  that unlike technical colleges that give students certificates that cannot be used
14  toward advanced degrees, academic credits from the university were transferable to a
15  wide variety of other academic institutions, in other words, that what was purchased
16  had economic value.  <u>Id.</u>  Defendants argued that Daghlian's § 17500 and § 17200
17  claims must be dismissed because he had not established standing to prosecute the
18  claims as required by Proposition 64.  The court disagreed and found that the fact
19  that the plaintiff incurred $40,000 in educational debt based on the recruiter's
20  promises was sufficient to bestow standing on the plaintiff.  Again, the plaintiff was
21  <u>actually</u> out-of-pocket by reason of a specific disclosure violation.

22      <u>Daghlian</u> does not support Plaintiffs' position here.  Unlike Plaintiffs,
23  Daghlian's injury was not conjectural:  he was promised an accredited degree with
24  transferable credits but actually received a degree of far less value.  Daghlian's
25  degree, for which he paid, was less valuable than it would have been but for the
26  defendant's misrepresentations.  This is very different from the case here where
27  Plaintiffs' alleged "injury" is to some <u>future</u> right to arbitrate.  Daghlian's injury
28  springs from the education (or perceived education) he received at defendants'

- 6 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

university and the concrete symbol of that education, i.e., the degree. Plaintiffs' "injury" here, by contrast, is to something hypothetical in the future that has no value until actually exercised. Therefore, Plaintiffs lack standing to maintain their causes of action under Article III of the Constitution, the UCL, the CLRA or for common-law fraud.

**B.    Plaintiffs Fail To State A Claim Under the CLRA.**

In their Opposition, Plaintiffs simply seek to re-litigate Berry, a case that is the controlling decision here.[1] In Berry, the plaintiff asserted a single cause of action for violation of the CLRA, contending that his credit card agreement contained an allegedly "unconscionable" arbitration agreement in violation of Civil Code section 1770(a)(19). Plaintiff contended that his credit card agreement was subject to the CLRA because a credit card supposedly constitutes a "good" or "service" as defined by Civil Code section 1761. Following the plain text of the statute, and relying on a close analysis of its legislative history, the Berry court flatly rejected plaintiff's argument, finding that an extension of credit is neither a "good" nor a "service" under the CLRA. The California Supreme Court denied review of the Court of Appeal's decision in Berry as well as multiple depublication requests.[2]

Plaintiffs attempt to circumvent the Berry decision by arguing that most uses of credit, charge, gift and dining cards do not involve an extension of credit.

---

[1] In footnote 4 of their Opposition, Plaintiffs, whose counsel here represented the Berry plaintiff, suggest that Berry was wrongly decided. However, under Ryman v. Sears, Roebuck and Co., No. 06-35630 (9th Cir., Oct. 12, 2007), this Court must follow Berry.

[2] In In Re Late Fee And Over-Limit Fee Litigation, No. C 07-0634 SBA (N.D. Cal. Nov. 16, 2007) (order granting motion to dismiss), the court dismissed the plaintiffs' CLRA claims, which were based on allegations that the defendant banks charged excessive late fees and/or over-limit fees, on the ground that credit-card accounts are not "goods or services" subject to the CLRA under Berry. The court noted that "[e]very federal court addressing the issue has followed [the Berry] precedent." Id. at 16. For the Court's convenience, a copy of the decision is attached hereto as Exhibit A.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

1  Plaintiffs do not address the <u>Berry</u> court's recognition that the California Legislature

2  expressly excluded transactions for "money or credit" from coverage under the

3  CLRA, and that post-<u>Berry</u> rulings read <u>Berry</u> (correctly) to exclude financial

4  services generally from the CLRA.  This case involves plastic payment cards, which

5  substitute for "money" and which often provide "credit" as well, in the form of

6  deferred repayment.  Plaintiffs assert, in the case of credit cards, that "[a]lthough

7  having an available credit feature, such cards do not necessarily implicate credit …."

8  Opposition, at 9.  Stretching the boundaries of credulity even more, they allege that

9  when one pays the annual fee for a charge card, for example, one purchases a

10  "convenience service" that does not involve the extension of credit at all.  Plaintiffs

11  do <u>not</u>, however, say what specific "convenience service" they bargained for was not

12  provided.  Plaintiffs simply allege – without detail and in contradiction to the

13  relevant card agreements – that "[n]o credit term or feature thus attaches to the

14  charge card" (Opposition, at 8), and, "[t]his is particularly so with regard to the

15  'charge' cards as well as the Dining Card and Gift Card.  None of those even have a

16  'credit' element" (Opposition, at 10-11).  These allegations, which are legal

17  conclusions only, cannot stand in light of <u>Berry</u>'s clear holding that an extension of

18  credit is neither a "good" nor a "service" under the CLRA.  Plaintiffs' argument must

19  therefore be rejected.

20      Plaintiffs appear to construe "credit" very narrowly to mean any use of a credit

21  card that incurs a monthly finance charge.  <u>See, e.g.</u>, Opposition at 7.  Plaintiffs seem

22  to allege that one is borrowing on credit only if one pays interest on the money

23  borrowed.  However, Plaintiffs fail to cite a single case that construes "credit" this

24  narrowly under the CLRA.  Their failure is explainable:  There is none.  An

25  extension of credit is always implicated when one uses a plastic card in lieu of

26  money, regardless of whether one pays one's balances in full at the end of the month

27  or not.  More significantly, use of any plastic card in lieu of cash involves a

28  transaction for "money or credit" that <u>Berry</u> excludes from the CLRA.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

LA 51010381v3

1    Plaintiffs fail to cite a single case in support of their claim that a "convenience

2   service" is a "service" within the meaning of the CLRA.  Again, there is none.

3   Plaintiffs extensively quote from <u>Hitz v. First Interstate Bank</u>, 38 Cal. App. 4th 274,

4   286-87, 44 Cal. Rptr. 2d 890 (1995), particularly for the proposition that credit cards

5   provide not only extensions of credit but also certain convenience features that

6   constitute "services."  However, <u>Hitz</u> is unavailing because it arose in the context of

7   not the CLRA, but a different statute, California Civil Code section 1671, which

8   governs only the enforceability of liquidated damages provisions.  Section 1671 is

9   irrelevant to this litigation.

10    The other cases cited by Plaintiffs in support of their position are from the

11   residential-mortgage context.  <u>Hernandez v. Hilltop Financial Mortg., Inc.</u>, No. C 06-

12   7401 SI, 2007 WL 3101250, at *6 (N.D. Cal. October 22, 2007), is not on point.  In

13   <u>Hernandez</u>, "plaintiffs did not seek just a loan; they sought defendants' services in

14   developing an acceptable refinancing plan by which they could remain in possession

15   of their home.  Thus, unlike in <u>Berry</u>, the situation in the present case involves more

16   than the mere extension of a credit line."  <u>Id</u>.  And unlike the ephemeral

17   "convenience service" Plaintiffs posit, "the circumstances here deal not just with the

18   mortgage loan itself, but also with the services involved in developing, securing and

19   maintaining plaintiffs' loan."  <u>Id</u>.  Similarly unhelpful to Plaintiffs is <u>Jefferson v.</u>

20   <u>Chase Home Finance LLC</u>, 2007 WL 1302984 (N.D. Cal. May 3, 2007).  In

21   <u>Jefferson</u>, the court held that the CLRA applied to certain services connected with

22   mortgages, specifically to a program under which debtors were able to prepay their

23   mortgages without penalty.  However, the claim under the CLRA was not aimed at

24   the extension of credit itself.  Rather, it was directed at the defendant's prepaid

25   mortgage practices, a financial service provided to debtors.  (<u>Jefferson</u> also predated

26   the denial of review in <u>Berry</u>.)  Finally, Plaintiffs cite <u>In re Ameriquest Mortgage</u>

27   <u>Lending Practices Litigation</u>, No. 05-CV-7097, 2007 WL 1202544, *6 (N.D. Ill.

28   April 23, 2007), for the general proposition that "it is not inconceivable that . . .

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

- 9 -

1   plaintiffs could prove the existence of tangential 'services' associated with their

2   residential mortgages and establish that these transactions were covered by the

3   CLRA."  Indeed, this is not inconceivable at all, since <u>Jefferson</u> and <u>Hernandez</u>,

4   notably also residential mortgage cases, similarly held that the CLRA may apply

5   where "the circumstances … deal not just with the mortgage loan itself, but also with

6   the services involved in developing, securing and maintaining plaintiffs' loan."

7   <u>Hernandez</u>, 2007 WL 3101250, at *6.  But the services at issue in these cases are a

8   far cry from a "convenience service."

9           Plaintiffs also fail to address cases in the mortgage and real-estate context

10  where the court found the CLRA inapplicable.  For example, in <u>Berryman v. Merit</u>

11  <u>Property Management, Inc.</u>, 152 Cal. App. 4th 1544 (2007), homeowners filed a

12  putative class and representative action against the managing agent for a

13  homeowners association, alleging violations of the Davis-Stirling Common Interest

14  Development Act, the UCL and CLRA, and other claims.  The homeowners' claims

15  were based on allegations that the agent wrongfully charged homeowners document

16  and transfer fees upon the purchase or sale of homes.  The California Court of

17  Appeal held that the homeowners failed to state a claim against the agent for

18  violations of the CLRA.  Also, in <u>McKell v. Washington Mutual, Inc.</u>, 142 Cal. App.

19  4th 1457 (2006), the plaintiffs claimed that the defendants overcharged them "for

20  underwriting, tax services, and wire transfer fees in conjunction with home loans."

21  <u>Id.</u> at 1465.  Finding that the defendants' "actions were undertaken in transactions

22  resulting in the sale of real property," rather than "the sale or lease of goods or

23  services," the court held the CLRA inapplicable to the facts of the plaintiffs' case.

24  <u>Id.</u> at 1488.

25          <u>Berry</u>, as well as many other cases cited in the Motion to Dismiss, simply

26  develop the basic principle recognized in <u>Civil Services Employees Ins. Co. v.</u>

27  <u>Superior Court</u>, 22 Cal. 3d 362, 376 (1978), that the CLRA only regulates those

28  things that are "technically" goods or services, as traditionally understood.  The

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 10 -

1   payment cards at issue indisputably involve transactions for "money or credit," as

2   traditionally understood, and therefore are excluded from the CLRA. Plaintiffs'

3   CLRA claim should be dismissed without leave to amend.

### C.    The Complaint Does Not Meet The Specificity Requirements Of Federal Rule of Civil Procedure 9(b).

A plaintiff who alleges fraud must meet the heightened pleading requirements

of Federal Rule of Civil Procedure 9(b), which provides that, "[i]n all averments of

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity."  To avoid dismissal for inadequacy under Rule 9(b), Plaintiffs must

state the "time, place, and specific content of the false representations as well as the

identities of the parties to the misrepresentation."  Walton v. Mead, No. C 03-4921

CRB, 2004 WL 2415037, *7 (N.D. Cal. October 28, 2004) (citing Edwards v. Marin

Park Inc., 356 F.3d 1058, 1066 (9th Cir. 2004)).

Plaintiffs assert in their Complaint that American Express made

misrepresentations to Plaintiffs and other cardmembers concerning the terms

contained in American Express's Agreements and that these representations were

made not only in the Agreements themselves but also in direct communications

between Plaintiffs and American Express.  (Compl. ¶ 104.)  However, neither in their

Complaint nor in the Opposition do Plaintiffs describe the alleged (mis-)

representations, much less state the "time, place, and specific content of the false

representations" upon which Plaintiffs relied at the time they obtained their credit

cards.  The "misrepresentations" Plaintiffs allege are non-specific, and therefore non-

compliant with Rule 9(b).  The fraud claim should be dismissed.

### D.    Plaintiffs' CLRA And Fraud Claims Against American Express Centurion Bank Are Barred By The Statute of Limitations.

Plaintiffs' CLRA and fraud claims against Centurion Bank also are barred by

the three-year statutes of limitations which, if somehow there is standing to assert

these claims, would have accrued when Plaintiff Lloyd obtained his American

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

- 11 -

1   Express card and card agreement in 2003, as Plaintiffs admit both in the Complaint

2   and Opposition.  See Opposition at 18, Compl. ¶ 39.  In 2003, Plaintiffs possessed all

3   the relevant facts giving rise to their CLRA and fraud claims and yet, for nearly four

4   years, chose to do nothing.  Their claims, thus, are time-barred.

5          Plaintiffs' attempts at extricating themselves from this bind are unavailing.

6   Plaintiffs claim that Defendants periodically amended the Agreement and thus

7   perhaps accrual started later.  Not so.  Plaintiffs allege in paragraph 63 of the

8   Complaint that "[t]he arbitration provision in effect in 2003-05 relative to Plaintiff

9   Lloyd (and those card holders whom he seeks to represent) was similar [to the

10  arbitration provision contained in the 2006 version of the agreement between

11  Plaintiff Lee and American Express]."  (Compl. ¶¶ 62-63.)  Thus, the amendments to

12  Plaintiff Lloyd's 2003 agreement fail to explain Plaintiffs' delay in pressing their

13  claims in a timely fashion.

14         Next, although Plaintiffs correctly identify the rule of accrual, this rule clearly

15  shows why Plaintiffs' claims are barred.  Essentially, the rule is the same for both

16  CLRA and fraud claims: the time starts to run from the discovery by the aggrieved

17  party of the facts giving rise to the cause of action.  See Mass. Mut. Life Ins. Co. v.

18  Super. Ct., 97 Cal. App. 4th 1282, 1295 (2002); Television Adventure Films Corp. v.

19  KCOP Television, Inc., 249 Cal. App. 2d 268, 279 (1967).  Plaintiffs contend that the

20  "[injury] occurs at the time each payment of the annual fee was made … and/or at

21  the time of the 2005 amendment to the arbitration provision and cardmember

22  agreement …."  (Compl. ¶19.)  Plaintiffs further allege that the "delayed discovery"

23  rule applies, with each payment of the annual fee triggering a new limitations period.

24  (Opposition at 19.)  In support of their position, Plaintiffs quote the following from

25  Hogar v. Community Development Commission, 110 Cal. App. 4th 1288, 1295

26  (2003):  "[w]hen an obligation or liability arises on a recurring basis, a cause of

27  action accrues each time a wrongful act occurs, triggering a new limitations period."

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067–3086

- 12 -

LA 51010381v3

1    But this is not a case of <u>recurring</u> wrongs. Plaintiffs allege only one supposed

2  wrong: the inclusion of certain terms dealing with arbitration and choice of law in

3  the original 2003 agreement. The subsequent amendments to the agreement, by

4  Plaintiffs own admission, did not materially change the agreement and thus cannot

5  constitute a new injury. (<u>See</u> Compl. ¶¶ 62-63.) The fact that Plaintiffs made several

6  annual payments has no bearing whatsoever on when their causes of action accrued.

7  Those causes of action accrued in 2003 – when, by their own admission, Plaintiffs

8  received their credit card and agreement. The alleged wrongs in the credit agreement

9  do not sprout anew every time Plaintiffs pay their fees. <u>See, e.g.</u>, <u>State ex rel. Metz</u>

10  <u>v. CCC Information Services, Inc.</u>, 149 Cal. App. 4th 402, 418 (2007); <u>Flintkote Co.</u>

11  <u>v. General Acc. Assur. Co. of Canada</u>, 480 F. Supp. 2d 1167, 1178 (N.D. Cal. 2007).

12    Therefore, Plaintiffs' CLRA and fraud claims against Centurion Bank are

13  time-barred and should be dismissed without leave to amend.

14                          **III.   CONCLUSION**

15    For the foregoing reasons, American Express respectfully requests that this

16  Court grant the Motion and dismiss the Complaint in its entirety.

17

18  Dated:  November 16, 2007                  Respectfully submitted,

19                                             STROOCK & STROOCK & LAVAN LLP
                                               JULIA B. STRICKLAND
20                                             STEPHEN J. NEWMAN

21

22                                             By:   s/Stephen J. Newman
                                                     Stephen J. Newman
23

24                                             Attorneys for Defendants
                                               AMERICAN EXPRESS TRAVEL
25                                             RELATED SERVICES COMPANY,
                                               INC., AMERICAN EXPRESS
26                                             CENTURION BANK and
                                               AMERICAN EXPRESS BANK, FSB
27

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East, Suite 1800
Los Angeles, California 90067-3086

LA 51010381v3

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

IN RE: LATE FEE AND
OVER-LIMIT FEE LITIGATION

No. C 07-0634 SBA

**ORDER**

_____

Before the Court is the defendants'[1] joint motion to dismiss [Docket No. 91] the plaintiffs'[2] consolidated complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). After reading and considering the complaint and the arguments presented by the parties, the Court finds this matter appropriate for resolution without a hearing. *See* FED. R. CIV. P. 78. For the reasons that follow, the Court GRANTS the defendants' motion to dismiss.

**BACKGROUND**

The plaintiffs represent a putative class of "credit cardholders who have paid excessive late fees and/or over-limit fees ("Penalty Fees")" to the defendants, most of the large credit card issuers in the United States. Docket No. 63 (Compl. ¶ 1). The plaintiffs allege that "these excessive Penalty Fees violate[ ] the National Bank Act's ("NBA") and the Depository Institutions Deregulation and Monetary Control Act of 1980's ("DIDA") prohibitions against overcharging consumers. In addition, defendants have conspired to fix prices and maintain a price floor for late fees in violation of §1 of the Sherman Act." *Id.* According to the plaintiffs, when credit card holders are late in making payments or go over their credit limits, the cardholders are charged up to $39 dollars in late fees and over-limit fees by the

---

[1] The defendants are Bank of America, N.A.; Bank of America Corporation; N.B. Holdings; MBNA America Bank, N.A.; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; Chase Bank USA, N.A.; JPMorgan Chase & Co.; Bank One Corporation; Bank One; Citibank South Dakota, N.A.; Citigroup, Inc.; Washington Mutual Bank; Providian; Washington Mutual, Inc.; Wells Fargo & Company; Wells Fargo Bank, N.A.; Wells Fargo Financial Bank; and Wells Fargo Financial National Bank.

[2] The plaintiffs are Andrew T. Piñon, Betty Simm, Cathy Simm, Sara Prentiss-Shaw, Audree Halasz, David V. Brotman, Gwen Martin, Celeste Brackley, Marilyn Foster-Nemec, Aaron González, and Elizabeth Young.

1    defendants. The plaintiffs seek to represent nationwide and California classes of persons holding credit

2    cards issued by the defendants and are requesting injunctive relief and damages on behalf of all holders

3    of credit cards issued by the defendants. *See* Docket No. 63 (Compl. ¶¶ 38-41).

4        The complaint contends that the defendants together control over seventy percent of the U.S.

5    credit card market. *See* Docket No. 63 (Compl. ¶ 86). In general, the complaint's substantive

6    allegations refer to the defendants in collective terms and do not advance individualized allegations

7    about particular defendants.[3]

8        The plaintiffs assert multiple causes of action based on allegedly high late and over-limit fees

9    that the defendants charged on credit card accounts. They assert two primary federal causes of action

10   (constitutional due process claims and antitrust claims) and several causes of action under California

11   state law. Counts One through Four of the complaint allege the defendants' charging of late and over-

12   limit fees violates the National Bank Act (12 U.S.C. §§ 85, 86) and the Depository Institutions

13   Deregulation and Monetary Control Act of 1980 (12 U.S.C. § 1831d). Count Five asserts the defendants

14   are transgressing the antitrust provision of section 1 of the Sherman Act. Counts Six through Ten put

15   forward claims under California law: the Unfair Competition Law, the Consumers Legal Remedies Act,

16   the Cartwright Act, breach of covenant of good faith and fair dealing, and unjust enrichment,

17   respectively.

18

19                          **LEGAL STANDARDS**

20        Federal Rule of Civil Procedure 12(b)(6) provides that a pleading may be challenged and

21   dismissed for failing to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The

22

23   _____

24   [3]    Each plaintiff claims to have paid at least one late or over-limit fee in the four years preceding
           the filing of the complaint. *See* Docket No. 63 (Compl. ¶¶ 12-22.) No plaintiff identifies
25         which of the defendants (if any) issued a credit card to him or her, no plaintiff specifies which
           type of fee (*i.e.*, late fee or over-limit fee) he or she has paid, and no plaintiff pleads to which
26         of the defendants (if any) he or she paid that unspecified fee. The plaintiffs do not allege that
           the defendant holding companies issued their credit cards, imposed late or over-limit fees on
27         them, or otherwise took any action in connection with the conduct that the complaint raises.

28                                           2

1     minimum pleading requirement is set by Rule 8(a), requiring a complaint to include "a short and plain

2     statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair

3     notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema*

4     *N.A.*, 534 U.S. 506, 512 (2002); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam).

5     While a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough

6     to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-

7     65 (2007). A complaint must allege "enough facts to state a claim to relief that is plausible on its face."

8     *Id.* at 1974.

9        When considering a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally

10    construed and all well-pleaded facts are taken as true. *Syverson v. IBM Corp.*, 472 F.3d 1072, 1075 (9th

11    Cir. 2007). However, conclusory allegations of law, unwarranted deductions of fact, or unreasonable

12    inferences are insufficient to defeat a motion to dismiss. *See Fields v. Legacy Health Sys.*, 413 F.3d 943,

13    950 n.5 (9th Cir. 2005); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

14        Courts generally do not look outside the pleadings, including any attachments thereto, in

15    deciding a motion to dismiss. *See United States v. LSL Biotechs.*, 379 F.3d 672, 699 (9th Cir. 2004).

16    A document is not considered outside the complaint if it is "incorporated by reference," *i.e.*, the

17    complaint specifically refers to the document and if its authenticity is not questioned. *See Knievel v.*

18    *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1997).

19    If dismissal of the complaint is warranted, it is generally without prejudice, unless it is clear that the

20    complaint can not be saved by any amendment. *See Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir.

21    2005), *cert. denied*, 126 S. Ct. 1335 (2006); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

22

23

24                      **ANALYSIS**

25 **A.**     **Counts One Through Four**

26        The plaintiffs' principal claim in this case is that the defendants impose late and over-limit fees

27

28                           3

1   up to $39, and that such fees significantly exceed any actual damages that the defendants incur as a

2   result of cardholders' making late payments or exceeding their credit limits.  On this basis, plaintiffs

3   assert that the defendants' late and over-limit fees are excessive "punitive damages" subject to limitation

4   under the Due Process Clause as interpreted in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538

5   U.S. 408 (2003), and other recent Supreme Court decisions.  In *State Farm*, the Supreme Court

6   addressed "the measure of punishment, by means of punitive damages, *a State may impose* upon a

7   defendant in a civil case." *Id.* at 412 (emphasis supplied).  The Court reiterated prior holdings that

8   "there are procedural and substantive constitutional limitations on these awards [State imposed punitive

9   damages]." *Id.* at 416.  The Court declared that "few awards exceeding a single-digit ratio between

10  punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.

11  "Single-digit multipliers are more likely to comport with due process, while still achieving the State's

12  goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ." *Id.*

13      The plaintiffs contend that the Court must interpret federal banking statutes, principally the

14  National Bank Act (NBA),[4] to incorporate *State Farm*'s Due Process limits on credit card late and over-

15  limit fees, as the plaintiffs equate such fees as "punitive damages."  They also assert that the remedial

16  provisions of the banking statutes, such as 12 U.S.C. § 86, provide them with a cause of action for such

17  allegedly excessive fees.

18      Section 85 of the NBA allows the defendants to "take, receive, reserve, and charge . . . interest

19  at the rate allowed by the laws of the State, Territory, or District where the bank is located . . . ."  12

20

21  [4]        The plaintiffs assert claims under the NBA with respect to all defendants except
    Washington Mutual Bank, which they allege is subject to the Depository Institutions
22  Deregulation and Monetary Control Act, 12 U.S.C. § 1831d.  The defendants maintain that
    Washington Mutual Bank is in fact subject to 12 U.S.C. § 1463.  Because the parties do not
23  dispute that the various provisions are virtually identical, the Court will refer solely to the
    NBA.
24
            The NBA authorizes a national bank to charge whatever rates are allowed by the laws
25  of the state where the bank is located.  Here, in the states where the defendant banks are
    located, the state laws allow any rates agreed to in the contracts between the banks and their
26  customers. *See* DEL. CODE, tit. 5, §§ 943-945, 950; NEV. REV. STAT. § 99.050; S.D. CODIFIED
    LAWS § 54-3-1.1; VA. CODE ANN. § 6.1-330.63(A).
27

28                                                      4

1    U.S.C. § 85.  Section 86 of the NBA provides the remedy for overcharges of amounts allowed under

2    section 85:

3           The taking, receiving, reserving, or charging a rate of interest greater than is allowed by
            section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire
4           interest which the note, bill, or other evidence of debt carries with it, or which has been
            agreed to be paid thereon.  In case the greater rate of interest has been paid, the person
5           by whom it has been paid, or his legal representatives, may recover back, in an action
            in the nature of an action of debt, twice the amount of the interest thus paid from the
6           association taking or receiving the same . . . .

7    12 U.S.C. § 86.

8           Despite the language of section 85 allowing interest rates to be set at a rate consistent with the

9    laws of the home states of the defendants, the plaintiffs argue that the Court should construe section 85

10   to implicitly constrain the late and over-limit fees to amounts not excessively disproportionate to the

11   actual losses suffered by the credit card issuers.  The plaintiffs contend that it is necessary to interpret

12   section 85 as containing an "implicit" interest limitation other than that set by state law in light of *State*

13   *Farm* and the canon of statutory construction of constitutional avoidance.[5]  In other words, the plaintiffs

14   are arguing that the Court should construe the NBA as allowing the "exportation" of only those home

15   state penalty fees that are not excessively disproportionate to the actual losses incurred by the defendants

16   from late payments because such penalty fees are excessive "punitive damages" prohibited by *State*

17   *Farm.*  In order to save the NBA from this constitutional infirmity, the Court must read section 85 as

18   containing a limitation not provided for in its text.  And once section 85 is thus "construed," the

19   defendants' actions are then in violation of section 86 and the plaintiffs have a viable cause of action

20   for damages.  These factual gyrations are flawed, however, and when unwound and examined, fail to

21   state a claim.

22          Counts One through Four fail as a matter of law to state claims upon which relief can be granted.

23

24   _____

25   [5]    Based upon the doctrine of constitutional avoidance, "where an otherwise acceptable
            construction of a statute would raise serious constitutional problems, the Court will construe the
26          statute to avoid such problems unless such construction is plainly contrary to the intent of
            Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
27          485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501,
            504 (1979)).

28
                                                    5

1   First, the defendants' late and over-limit fees are not "punitive damages" subject to the Due Process

2   Clause. The punitive damages at issue in *State Farm* and similar Supreme Court decisions are damages

3   that a court, *i.e.*, the state, levies against a defendant to "punish reprehensible conduct and . . . deter its

4   future occurrence" for the benefit of society generally. *International Bhd. of Elec. Workers v. Foust*,

5   442 U.S. 42, 48 (1979) (citation omitted). Such damages "serve the same purposes as criminal

6   penalties," *State Farm*, 538 U.S. at 416, by punishing and deterring conduct that is deemed particularly

7   reprehensible and "pose[s] a substantial risk of harm to the general public." *Philip Morris USA v.*

8   *Williams*, 127 S. Ct. 1057, 1064 (2007).

9       The plaintiffs have not shown that the defendants' late and over-limit fees fit within this rubric.

10   The fees are not imposed by a court and they are not in any sense penalties "advanc[ing] governmental

11   objectives," *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 47 (1991), to protect against behavior that

12   harms the "general public." *Phillip Morris USA*, 127 S. Ct. at 1064. Rather, they are paid by one party

13   to another pursuant to private contract.

14       The Supreme Court also has explained that punitive damages implicate the Due Process Clause

15   because their discretionary, case-variable nature can contravene "'[e]lementary notions of fairness

16   enshrined in our constitutional jurisprudence'" which "'dictate that a person receive fair notice not only

17   of the conduct that will subject him to punishment, but also of the severity of the penalty that the State

18   may impose." *State Farm*, 538 U.S. at 417 (citation omitted). Thus, "the fundamental due process

19   concerns to which [the Supreme Court's] cases refer" are "risks of arbitrariness, uncertainty, and lack

20   of notice." *Phillip Morris USA*, 127 S. Ct. at 1063. None of these considerations apply to the

21   defendants' late and over-limit fees. The fees are not uncertain in amount, nor do cardholders lack

22   notice regarding the amount or existence of the fees. To the contrary, the parties establish the fees in

23   advance in the written credit-card contract.

24       The plaintiffs rely on common law doctrines that characterize excessive contract damages as

25   "punitive" in nature or as "penalties." But the use of that terminology does not mean that the contract

26   damages they describe are therefore "punitive damages" subject to the Due Process Clause. Private

27

28                                6

1   contractual fees, regardless of whether they are "punitive" in a contractual sense, bear no resemblance

2   to the court-imposed awards that the Supreme Court has subjected to constitutional scrutiny. The

3   plaintiffs cite no authorities suggesting that the Supreme Court's punitive damages jurisprudence applies

4   to privately set contractual fees. And any claims that the defendants' fees violated the contractual

5   doctrines of liquidated damages or the like are pre-empted. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S.

6   735, 744 (1996).

7          Second, even if the defendants' fees could be regarded as some kind of private "punitive

8   damages," the fees still would not implicate the Constitution. The Due Process Clause constrains

9   government action; it does not restrain or protect against "private conduct." *Blum v. Yaretsky*, 457 U.S.

10  991, 1002 (1982). The defendants' late and over-limit fees are not set by governmental mandate; their

11  imposition and amount are the product of private contract between bank and borrower. The mere fact

12  that federal banking statutes allow the defendant banks and the plaintiffs to enter into private contracts

13  allowing for such fees does not transform the charging of those fees into state action. *See id.* The "mere

14  availability of a remedy" and the "subtle encouragement . . . which inheres in the [government's]

15  creation or modification of any legal remedy" do not "so significantly encourage[ ] the private activity

16  as to make the [government] responsible for it." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

17  53 (1999). Indeed, the plaintiffs' argument runs counter to the principles animating the Due Process

18  Clause. That Clause serves to restrain government encroachment upon private parties' liberty and

19  property interests. Congress does not offend the Due Process Clause by legislating to permit parties

20  freedom in arranging their private credit arrangements. To the contrary, that governmental objective

21  is entirely rational and constitutional. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152

22  (1938) ("regulatory legislation affecting ordinary commercial transactions is not to be pronounced

23  unconstitutional unless . . . it is of such a character as to preclude the assumption that it rests upon some

24  rational basis . . . .").

25         Finally, there is no basis for the plaintiffs' assertion of a damages claim under the NBA. The

26  plaintiffs' theory is that, pursuant to the doctrine of constitutional avoidance, this Court should construe

27

28                                                    7

the usury provision of the NBA, 12 U.S.C. § 85, to incorporate Due Process Clause limits on "punitive damages," as articulated in *State Farm* and similar decisions. The theory fails on two grounds. Initially, for the reasons described above, the plaintiffs have not shown the existence of any "'grave and doubtful constitutional questions'" that the Court should seek to avoid through statutory construction. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (citation omitted). In addition, the doctrine of constitutional avoidance applies only where statutory text is "susceptible of two constructions," *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted), based on "ordinary textual analysis." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). That is not the case with section 85 of the NBA. That provision allows banks to charge "interest at the rate allowed by the laws of the State . . . where the bank is located." There is nothing ambiguous about that text, nor is there any term therein that could be construed to express the Due Process Clause limit the plaintiffs seek to have written into the statute. It is undisputed that late and over-limit fees are "interest" within the meaning of the statute, *see* 12 C.F.R. § 7.4001(a)[6]; *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 745 (1996), and the laws of the states in which defendant banks are located expressly allow banks to charge fees at any amount specified in their credit card contracts. The plaintiffs therefore cannot recover damages under section 86 of the NBA.

**B.    Counts Five and Eight**

In Counts Five and Eight, the plaintiffs claim that the defendants conspired to fix the terms and pricing of late fees in violation of section 1 of the Sherman Act and California's Cartwright Act,

---

[6] Title 12 C.F.R. § 7.4001(a) defines "interest" as used in 12 U.S.C. § 85 as including: "any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports."

1  respectively. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in

2  the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States,

3  or with foreign nations." To state a claim under section 1, a plaintiff must allege that "(1) there was an

4  agreement, conspiracy, or combination between two or more entities; (2) the agreement was an

5  unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint

6  affected interstate commerce." *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir.

7  1996); *see also Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (same).

8        The plaintiffs do not identify any actual agreement among the defendants. Rather, the plaintiffs

9  allege that some of the defendant banks, at some times during the last decade had late fee terms on some

10  credit card accounts that were in part parallel behavior, or "lockstep pricing" of late fees. The plaintiffs

11  also allege that there were opportunities and incentives for the defendant banks to enter into agreements

12  about pricing, even if the plaintiffs cannot identify any such agreement. The plaintiffs contend that

13  alleging such opportunities and incentives, together with the partially parallel conduct, states a claim

14  on which relief can be granted under the Sherman Act.

15        Relying to a large extent on the Supreme Court's recent decision in *Bell Atlantic Corp. v.*

16  *Twombly*, 127 S. Ct. 1955 (2007), the defendants move to dismiss Count Five on the ground that the

17  plaintiffs have not adequately alleged the first element of a section 1 claim—an "agreement, conspiracy,

18  or combination." *Twombly* dealt with the "question of what a plaintiff must plead in order to state a

19  claim under § 1 of the Sherman Act." *Twombly*, 127 S. Ct. at 1964. In that case the Supreme Court

20  stated:

21        Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation
        of agreement at some unidentified point does not supply facts adequate to show
22        illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1
        claim, they must be placed in a context that raises a suggestion of a preceding agreement,
23        not merely parallel conduct that could just as well be independent action.

24  127 S. Ct. at 1966. Based upon the pleading standards set forth by *Twombly*, the Court concludes that

25  the plaintiffs' complaint fails as a matter of law to state a claim on which relief can be granted under

26  section 1 of the Sherman Act.

27

28
                                            9

The heart of the plaintiffs' antitrust allegations is paragraph 86 of the complaint, containing a chart of allegedly current late-fee levels of the six defendant banking organizations, and the surrounding paragraphs which discuss late-fee levels at other times.[7]   The chart alleges that, at present, three defendants have late fees for at least some credit cards at the following levels: they charge $15 for late payment if the customer's balance is up to $100; $29 for a late payment if the customer's balance is $100 to $250; and $39 for a late fee if the customer's balance is higher.  This allegation is the plaintiffs' centerpiece, but it does not suggest a "preceding agreement" rather than "merely parallel conduct that could just as well be independent action."   The same chart shows that the three other alleged co-conspirators have *different* late-fee price levels.  The complaint further explains that the defendants' fee levels have all followed different pricing paths at different times, not even roughly in parallel.  For example, Citibank implemented its three-tier late-fee billing structure in 2001, while Capital One and Washington Mutual did not adopt any kind of tiered late fees until three years later and even then adopted different tiered structures.

As the Supreme Court explained in *Twombly*, this kind of pricing pattern is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," 127 S. Ct. at 1964, as it is with an agreement on pricing.  *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999) (holding that time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy).  To survive the motion to dismiss, the plaintiffs are required to allege some "further circumstance pointing toward a meeting of the minds." *Twombly*, 127 S. Ct. at 1966.  Those circumstances must be enough to make the claim of conspiracy not merely "conceivable" but in fact "plausible." *Id.* at 1974.  The plaintiffs have not met this standard.

The complaint does include several conclusory allegations that the defendants agreed to increase late fees, but it provides no details as to when, where, or by whom this alleged agreement was reached.

---

[7]    The chart lists seven card issuers, but two are controlled by defendant Bank of America.

10

1    *See* Docket No. 63 (Compl. ¶¶ 72, 123-24). In *Twombly*, the Supreme Court dismissed as insufficient

2    similar "stray statements" about agreements, when unsupported by concrete allegations about the

3    content and circumstances of any actual agreement. 127 S. Ct. 1971 n.10.

4        Moreover, as in *Twombly*, the complaint itself provides an alternative explanation for the

5    increases in late fees, namely that they were the result of a "rational and competitive business strategy

6    unilaterally prompted by common perceptions of the market." 127 S. Ct. at 1964. The complaint

7    alleges, for example, that the defendants all faced declining interest rate revenue (Compl. ¶ 62),

8    increased competition from new market entrants (*id.* ¶ 75), elimination of annual fees as a revenue

9    source (*id.* ¶ 74), and higher costs due to expanded reward and affinity programs (*id.*). Confronted with

10   that competitive environment, it would have been entirely rational for each defendant *independently* to

11   decide to increase late fees as a way to raise revenue, "expecting [its] neighbors to do the same thing."

12   *Twombly*, 127 S. Ct. at 1972.[8] And it would have been equally rational for the other defendants to

13   follow those increases, rather than seek to undercut them, since "surely they knew the adage about him

14   who lives by the sword." *Id.*

15       The plaintiffs suggest that it is somehow suspicious that the defendants increased late fees

16   contemporaneously with reducing what plaintiffs call "front end" features such as annual fees and

17   interest rates. Docket No. 63 (Compl. ¶ 88). But here, as in *Twombly*, the complaint fails to allege facts

18   showing that it would have been "potentially more lucrative," 127 S. Ct. at 1972, to compete by cutting

19   late fees. What the plaintiffs term "front end" features, *e.g.*, no annual fees, low interest fees for balance

20   transfers, cash back awards, are highly visible to prospective cardholders. Thus, the plaintiffs'

21   allegation that credit card issuers have competed vigorously for consumer business by focusing on "front

22   end" features suggests nothing more than a common recognition among issuers that those "front end"

23   features have the greatest marketing potential. *See* Docket No. 63 (Compl. ¶ 88).

24

25

26   [8]    The complaint also explains why late fees were lower before 1995: state regulatory provisions
          constrained late fees until 1995, when the Comptroller of the Currency issued a regulation
27        interpreting the NBA to preempt those laws. *See* Docket No. 63 (Compl. ¶¶ 3, 62-63).

28                                              11

1    Therefore, as in *Twombly*, when viewing the entire complaint, the plaintiffs have not placed their

2    allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct

3    that could just as well be independent action." *Id.* at 1966; *see also In re Elevator Antitrust Litig.*, 502

4    F.3d 47, ---, 2007 WL 2471805, at *3 (2d Cir. 2007) (per curiam) (affirming dismissal of section 1 claim

5    based in part on allegations of parallel pricing because "similar pricing can suggest competition at least

6    as plausibly as it can suggest anticompetitive conspiracy").

7         In their brief, the plaintiffs rely on a variety of what they call "plus factors" to raise the

8    inference of conspiracy set the price of late fees to the level of plausibility. *See* Docket No. 94 (Pl.'s

9    Br. 19-23). The plaintiffs in *Twombly* alleged many of these same "plus factors," but here, as there, the

10   factors, whether taken singly or together, are insufficient to plead a case. Following are the "plus

11   factors" identified by the plaintiffs:

12   **1.    Opportunities to Communicate**

13        The plaintiffs argue that the defendants' membership in the Visa and MasterCard networks, their

14   relationships with third-party processors and consultants that did business with many industry

15   participants, and their membership in industry-wide trade associations, provided opportunities for them

16   to communicate and agree to fix prices. *See* Docket No. 63 (Compl. ¶¶ 80-81, 87). The Supreme Court

17   rejected similar allegations in *Twombly*, 127 S. Ct. at 1971 n.12, and other courts have consistently

18   refused to infer the existence of a conspiracy from these kinds of averments. *See, e.g., In re Citric Acid*

19   *Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999); *In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607,

20   at *12 (D.N.J. 2006); *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *11 (S.D.N.Y. 2006); *Yellow*

21   *Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, 2001 WL 1468168, at *13 (S.D.N.Y. 2001).

22   **2.    Market Concentration**

23        The complaint alleges that the defendants have a combined 70% share of the credit card market

24   (Compl. ¶ 6), and the plaintiffs argue that such concentration is conducive to conspiracy. *See* Docket

25   No. 94 (Pls.' Br. 22). But the relevant market in *Twombly*—where defendants were alleged to possess

26   a 90% share—was more highly concentrated, and the Supreme Court nevertheless concluded that the

27

28                                          12

complaint there failed to state a claim under section 1. 127 S. Ct. at 1962 n.1. As the *Twombly* Court

noted, parallel behavior in a concentrated market is insufficient to suggest a conspiracy because it is a

"common reaction of firms in a concentrated market" to "recogniz[e] their shared economic interests"

and to reach similar "price and output decisions" independently. *Id.* at 1964 (citation omitted, alteration

in original). Thus, even if the alleged market were concentrated, this would not render the asserted

conspiracy plausible.

### 3.    Motive to Conspire

The plaintiffs argue that "defendants had a strong motive to fix the prices of late fees at supra-

competitive levels." Docket No. 94 (Pls.' Br. 22). But again, this simply mirrors the allegations in

*Twombly*, 127 S. Ct. at 1971, and the Court there still found the complaint insufficient. As one court

put it, if "a motive to achieve higher prices" were sufficient, every company in every industry could be

accused of conspiracy because they all "would have such a 'motive.'" *In re Baby Food Antitrust Litig.*,

166 F.3d at 133. A leading antitrust treatise also states that "[m]otivation to enter a conspiracy is never

enough" to show an agreement. VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis

of Antitrust Principles and Their Application* ¶ 1411, at 68 (2d ed. 2003).

### 4.    Price Leadership

The plaintiffs also argue that a "tradition of following the price leadership" of one firm can

suggest a conspiracy (Pls.' Br. 21), but the complaint does not allege such a tradition. *See* Docket No.

63 (Compl. ¶¶ 83-87). And even if there were a pattern of price leadership, "[a] section 1 violation

cannot . . . be inferred from . . . an industry's follow-the-leader pricing strategy." *In re Citric Acid

Litig.*, 191 F.3d at 1102.

### 5.    Similar Cost Structures

The plaintiffs also claim that similar cost structures are a plus factor that may support an

inference of conspiracy. They acknowledge, however, that they "did not specifically allege that

defendants have similar costs." Docket No. 94 (Pls.' Br. 21). And even if the plaintiffs had made such

an allegation, it would not have been sufficient to infer a conspiratorial agreement. If anything, similar

cost structures would explain why the defendants' prices would naturally be similar without the need for any agreement. *See* Donald F. Turner, *The Definition of Agreement Under The Sherman Act: Conscious Parallelism and Refusals To Deal*, 75 HARV. L. REV. 655, 662 (1962) (explaining that where sellers have identical costs, no inference of conspiracy can be drawn from the fact that they charge identical prices).

### 6.    **High Barriers to Entry**

The plaintiffs also contend that a conspiracy is plausible because "entry in the payment card market is exceedingly difficult," so that a pricing conspiracy would generally be protected from competition. Docket No. 94 (Pls.' Br. 22). But the complaint does not allege that entry barriers are high. Moreover, the plaintiffs themselves acknowledge that the industry is in general "fiercely competitive." *Id.* at 16.

### 7.    **Parallel Price Increases that Bear no Relationship to Costs**

Finally, the plaintiffs argue that "rapid increases in price unjustified by changes in defendants' costs" are suggestive of a conspiracy. *Id.* at 20. Even if this were true when there is no independent explanation of the price increases, the complaint here provides just such an alternative explanation. It shows that late fees began increasing after the Comptroller of the Currency promulgated a regulation in 1995 providing that credit card issuers were not bound by state regulations concerning late fees, and that these increases provided a way for card issuers to recapture revenue they lost from other sources due to competition among the very companies here alleged to be conspiring. *See* Docket No. 63 (Compl. ¶¶ 3, 62-64). Given these "natural explanations" for the increases in late fees, those increases do not support any inference of conspiracy. *See Twombly*, 127 S. Ct. at 1972 (rejecting inference of conspiracy where there was "an obvious alternative explanation" for the allegedly parallel conduct).

The Court concludes that none of these allegations moves the claim of conspiracy from the realm of the "conceivable" to the "plausible" in light of the context here indicating that the defendants' "parallel conduct . . . could just as well be independent action."

For these reasons, the plaintiffs have failed to plead a case adequate under applicable law to state

14

1    a claim for relief under section 1 of the Sherman Act, and therefore Count Five is dismissed.  Count

2    Eight alleges the same claim under California's Cartwright Act.  Because "analysis under California's

3    antitrust law mirrors the analysis under federal law," Count Eight shall also be dismissed.  *County of*

4    *Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

5

6    **C.     Counts Six, Seven, Nine, and Ten (California State Law Claims)**

7         The plaintiffs assert four additional state law claims: violations of the California Unfair

8    Competition Law (UCL) (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*); the Consumers Legal Remedies

9    Act (CLRA) (CAL. CIV. CODE §§ 1750 *et seq.*); breach of the covenant of good faith and fair dealing;

10   and unjust enrichment.  Each of these counts fails as a matter of law to state a claim on which relief can

11   be granted.

12        **1.     Count Six (Unfair Competition Law Claim)**

13        Count Six asserts that because the defendants' late and over-limit fees purportedly violate the

14   federal banking laws or the antitrust laws, they are also "unlawful" and "unfair" and that the

15   concealment of their illegality from cardholders is a "deceptive" practice in violation of California

16   Business and Professions Code sections 17200 *et seq. See* Docket No. 63 (Compl. ¶¶ 131-36).  Because

17   the plaintiffs' theories are explicitly premised on the assertion that the fees violate federal law and the

18   Court has determined that no such claim has been stated, the UCL claim is not cognizable.  Moreover,

19   the Supreme Court has held that challenges to the levels of a national bank's late fees under the UCL

20   are preempted by the NBA.  *Smiley*, 517 U.S. at 738 & n.1, 744, 747.  Finally, under the substantive

21   terms of the UCL, the defendant banks could not properly be deemed to have engaged in unfair or

22   deceptive practices under the statute by acting consistently with all existing legal interpretations of the

23   NBA and with the express disclosures of their contracts concerning late and over-limit fees.  *See, e.g.*,

24   *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 828 (2003) (statute provided safe harbor from UCL claim

25   even though subsequently invalidated); *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134,

26   1147-48 (2003) (where particular "conduct has been deemed lawful," it cannot provide the basis for a

27

28                                                   15

1  section 17200 cause of action); *see also Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740,

2  at *6 (N.D. Cal. 2006) (actions consistent with the "fully-disclosed terms of the contract . . . cannot

3  plausibly be labeled a deception").

4        **2.     Count Seven (Consumers Legal Remedies Act Claim)**

5        Count Seven alleges that the defendants' fees violate California Civil Code section 1750. *See*

6  Docket No. 63 (Compl. ¶¶ 137-42). The plaintiffs' theory again appears to be that illegality under the

7  federal claims gives rise to liability under this California statute. This count is accordingly dismissed;

8  the Court already has found no claim stated under federal law. Moreover, as with Count Six, the state

9  law claim is preempted by the NBA. *See Smiley*, 517 U.S. at 738 & n.1, 744, 747. Indeed, the plaintiffs

10 did not contest defendants' argument on preemption of the CLRA claim.

11       The plaintiffs' CLRA claim must also be dismissed because, as California appellate courts have

12 held, credit card accounts are not "goods or services" subject to that statute. *Berry v. Am. Express*

13 *Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007) (discussing CAL. CIV. CODE § 1770(a)). Every federal court

14 addressing the issue has followed this precedent. *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d

15 1353, 1358 (N.D. Cal. 2007); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172, 1175 (E.D. Cal.

16 2007).[9]

17       **3.     Count Nine (Good Faith and Fair Dealing)**

18       Count Nine contends the defendants' fees violate the implied contractual covenant of good faith

19 and fair dealing because the fees are punitive damages prohibited by the federal banking laws. *See*

20 Docket No. 63 (Compl. ¶¶ 146-48). This claim fails automatically with the dismissal of the underlying

21 federal banking law claims and because the plaintiffs do not contest its preemption. *See Smiley*, 517

22 U.S. at 738 & n.1, 744, 747. In addition, the plaintiffs concede that the fees under challenge are

23

24

---

25 [9]    The plaintiffs have argued that credit card accounts are "goods or services" as that phrase is
26     used in other statutes, but those *different* statutes are inapposite, especially in light of the
    particular legislative history of the CLRA making it clear that the legislature intentionally
27     excluded credit. *See, e.g., Van Slyke*, 503 F. Supp. 2d at 1358-59; *Augustine*, 485 F. Supp. 2d
    at 1175.

28

explicitly provided for in cardholders' contracts, and therefore this claim independently fails under the well-settled principle that the implied covenant cannot prohibit that which the contract specifically permits. *See Carma Developers v. Marathon Dev.*, 2 Cal. 4th 342, 374 (1992). The plaintiffs' brief does not contest dismissal on these theories.

**4.     Count Ten (Unjust Enrichment)**

The plaintiffs' last claim, Count Ten, must also be dismissed. First, there simply "is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). "Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." *Id.* (citations and quotations omitted). Moreover, the plaintiffs' claim of "unjust enrichment," does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability in their complaint. *See* Docket No. 63 (Compl. ¶¶ 149-55). Accordingly, this claim must necessarily be dismissed when the other claims are dismissed.

CONCLUSION

Accordingly, the Court GRANTS the defendants' joint motion to dismiss [Docket No. 91]. The plaintiffs' consolidated complaint is DISMISSED without prejudice. The plaintiffs have the Court's leave to submit an amended complaint that would be viable under the law as stated in this order, if they can do so in good faith, within 20 days of the date of this order. Should the plaintiffs file an amended complaint, the defendants shall have 30 days to answer or otherwise respond.

IT IS SO ORDERED.

November 16, 2007                        _____
                                        Saundra Brown Armstrong
                                        United States District Judge

17