RECORD NO. 08-15015

In The

# *UNITED STATES COURT OF APPEALS*
For The Ninth Circuit

## DAVID J. LEE, AND DANIEL R. LLOYD,

*Plaintiffs - Appellants,*

**v.**

## AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., AMERICAN EXPRESS CENTURION BANK, AND AMERICAN EXPRESS BANK, FSB,

*Defendants - Appellees,*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

--------

## APPELLANTS OPENING BRIEF

--------

| | |
|---|---|
| **Mr. Matthew S. Hale** | **Ms. Julia B. Strickland** |
| **45 Rivermont Drive** | **Stroock & Stroock & Lavan, L.L.P.** |
| **P.O. Box 1951** | **2029 Century Park East** |
| **Newport News, VA 23601** | **Los Angeles, CA 90067-3086** |
| **(757) 596-1143** | **(310) 556-5806** |
| *Counsel for Appellants* | *Counsel for Appellees* |

## <u>CORPORATE DISCLOSURE STATEMENT</u>

None of the Appellants have any corporate affiliation whatsoever.

Dated:        June 9, 2008

Matthew S. Hale
*Counsel for Appellants*

By: _____

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ……………………………….. i

TABLE OF CONTENTS ……………………………………………....ii

TABLE OF AUTHORITIES …………………………………………….... iv

I.     STATEMENT OF JURISDICTION …………………………... 1

II.    ISSUES PRESENTED …………………………………………… 1

III.   STATEMENT OF THE CASE ………………………………….... 4

IV.    STATEMENT OF FACTS ………………………………………... 14

       A. <u>American Express Cards And Arbitration Provisions</u> …………. 14

       B.  <u>Facts Concerning Lee And Lloyd</u> ……………………………... 19

       C. <u>Lee And Lloyd Have Arbitrable Claims</u> ……………………… 22

V.     SUMMARY OF ARGUMENT …………………………………… 27

VI.    STANDARD OF APPELLATE REVIEW …………….………… 35

VII.   ARGUMENT …………………………………………………… 36

       A. <u>Principals of Standing And Dismissal And Their Application</u> … 36

       B. <u>Lee And Lloyd Have Suffered A Redressible Concrete
       Injury As A Result of American Express' Conduct That
       Is Sufficient to Sustain Standing On All Causes of Action</u> ……. 40

       C. <u>The Arbitration Provision's Unconscionability And
       Resulting Unenforceability Create A Sufficient Threat
       Of Imminent Injury To Sustain Standing</u> ………………………. 46

    D.  <u>Lee's and Lloyd's Injury is Ripe: Arbitration Is</u>
         <u>Neither Required Nor A Necessary Element of</u>
         <u>Lee's And Lloyd's Standing</u> …………………………............ 47

    E.  <u>The Violation Of Lee's And Lloyd's California</u>
         <u>Statutory Right To Not Have Unconscionable Terms</u>
         <u>Inserted In Their Contracts Provides An Independent</u>
         <u>Injury And Source of Standing</u> ………………………………… 54

VIII.  CONCLUSION ……………………………………………………… 57

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ……………….. 58

ADDENDUM

    1.     ATT&T wireless formally Cingular wireless cellular telephone customer contract;

    2.     T-Mobile cellular telephone customer contract.

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page[s]**

<u>**Cases**</u>

<u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136 (1967) ................................. 49

<u>Allen v. Wright</u>, 468 U.S. 737 (1984) ........................................................ 43

<u>Appliance Distributors, Inc. v. Mercury Electric Corp.</u>, 202 F.2d 651 (10th

  Cir. 1953) ................................................................................................ 40

<u>Armanderiz v. Foundation Health Psychcare Services, Inc.</u>, 24 Cal.4[th] 83

  (2000) ...................................................................................................... 23

<u>ATT Techs. Inc. v. Communication Workers of Am.</u>, 475 U.S. 643 (1991) 45

<u>Bagdasarian v. Gragnon</u>, 31 Cal.2d 744 (1948) ............................................ 9

<u>Baker v. Liberty Mut. Ins. Co.</u>, 143 F.3d 1260 (9th Cir. 1998).................... 53

<u>Benson v. Kwikset Corp.</u>, 152 Cal.App.4[th] 1254 (2007).............................. 41

<u>Berry v. American Express Publishing Co.</u>, 147 Cal.App.4[th] 224 (2007).... 56

<u>Berry v. American Express Publishing Co.</u>, O.C.S.C. Case No. 05CC00049

  (2005) ................................................................................................ 21, 26

<u>Bertero v. Superior Court</u>, 216 Cal. App. 2d 213 (1963) ............................. 50

<u>Bigge Crane & Rigging Co. v. Docutel Corp.</u> 371 F.Supp. 240 (E.D.N.Y.

  1973 ........................................................................................................ 45

<u>Bragg v. Linden Research, Inc.</u>, 487 F.Supp.2d 593 (E.D.Pa. 2007)..... 23, 24

<u>Brawley v. Crosby Research Foundation, Inc.</u>, 73 Cal.App.2d 103 (1966). 43

Bronx Household of Faith v. Bd. of Educ., 492 F.3d 89 (2d Cir. 2007) ...... 49

Brooklyn Legal Servs. Corp. v. Legal Servs. Corp., 462 F.3d 219 (2d Cir. 2006) ................................................................................................ 49

Broughton v. Cigna Healthplans, 21 Cal.4th 1066 (1999) ...................... 24, 34

Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006)......... passim

C.W. Anderson Hosiery Co. v. Dixie Knitting Mills, 204 F.2d 503 (4th Cir. 1953) ................................................................................................ 40

California Grocer's Assn v. Bank of America, 22 Cal.App.4th 205 (1994) . 55

Cantrell v. City of Long Beach, 241 F.3d 674 (9th Cir. 2001)...................... 54

Central Delta Water Agency v. United States, 306 F.3d 938 (9th Cir. 2002) ................................................................................................ passim

Chamberlain v. Ford Motor Co., 369 F.Supp.2d 1138 (N.D.Cal. 2005)...... 41

Clark v. Mitchell, 425 F.3d 270 (9th Cir. 2005)........................................... 30

Colgan v. Leatherman Tool Group, Inc., 135 Cal.App.4th 663 (2006) ........ 41

Comb v. PayPal, Inc., 218 F.Supp.2d 1165 (N.D.Cal. 2002)...................... 24

Cruz v. PacificCare Health Systems, Inc., 30 Cal.4th 303 (2003) ............... 24

Davis v. O'Melveny & Meyers, 485 F.3d 1066 (9th Cir. 2007) ............. 24, 35

Desert Outdoor Adver., Inc. v. City of Moreno Valley, 103 F.3d 814 (9th Cir. 1996)................................................................................................ 54

Dhaglian v. DeVry Univ., Inc., 461 F.Supp.2d 1121 (C.D. Cal. 2006) . 31, 41

Discover Bank v. Superior Court, 36 Cal.4th 148 (2005) ...................... 23, 24

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83

    (2d Cir. 2002) ........................................................ 49

Douglas v. U.S. District Court, 495 F.3d 1062 (9th Cir. 2007).................... 23

Dunham v. Envtl. Chem. Corp. 2006 U.S.Dist.LEXIS 61068 (N.D.Cal.

    August 16, 2006) .................................................... 24

Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141 (9th Cir.

    2000)............................................................ 27, 38

El Camino Community College Dist. v. Superior Court, 173 Cal.App.3d 606

    (1985) ............................................................. 16

Elder v. Holloway, 975 F.2d 1388 (9th Cir. 1991)......................... 34

Equity Lifestyle Prop., Inc. v. County of San Luis Obispo, 505 F.3d 860 (9th

    Cir. 2007)........................................................... 36

Fair v. EPA, 795 F.2d 851 (9th Cir. 1986) ................................. 43

Fairfield-Noble Corp. v. Pressman-Gutman Co., 475 F.Supp. 899 (S.D.N.Y.

    1970)............................................................... 16

Falk v. General Motors Corp., 496 F.Supp.2d 1088 (N.D.Cal. 2007) ......... 41

First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995)................... 51

Fitz v. NCR Corp., 118 Cal.App.4th 702 (2004)........................... 24

FMC Corp. v. Boesky, 852 F.2d 981 (7th Cir. 1988).................................. 55

Ford v. Verisign, Inc., 252 Fed. Appx. 781(9th Cir. October 16, 2007) ....... 35

Freeman v. Mattress Gallery, 2007 Cal.App.Unpub.Lexis 9102 ................ 55

Friends of the Earth v. Gaston Copper Recycling Corp. 204 F.3d 149 (4th

    Cir. 2000)(en banc) ................................................................... 47

Friery v. L.A. Unified Sch. Dist., 448 F.3d 146 (9th Cir. 2006) ................... 53

Gantt v. Sentry Insurance, 1 Cal.4[th] 1083 (1992) ......................................... 53

Gentry v. Superior Court, 42 Cal.4[th] 443 (2007) ......................................... 24

Geoffrey v. Washington Mutual Bank, 484 F.Supp.2d 1115  (S.D.Cal. 2007)

    .................................................................................................. 23, 24

Gonlugur v. Circuit City Stores, Inc., 2004 Cal.App.Unpub.LEXIS 8140 . 23,

    24

H.S.Crocker Co. v. McFaddin, 148 Cal.App.2d 639 (1957) ........................ 31

Harlow v. Carleson, 16 Cal.3d 731 (1976) .................................................. 31

Harper v. Ultimo, 113 Cal.App.4[th] 1402 (2003) .......................................... 24

Hernandez v. Hilltop Financial Mortgage, Inc., 2007 U.S.Dist.LEXIS 80867

    (N.D.Cal. October 27, 2007) .................................................... 56

Hiresch v. American Express Co., 2006 U.S. Dist. LEXIS 87785 (E.D. Tex.

    December 5, 2006) .................................................................... 26

Hitz v. First Interstate Bank, 38 Cal.App.4[th] 274 (1995) ............................. 56

Hobbs v. Bateman Eichler, Hill & Richards, 164 Cal.App.3d 174 (1985) .. 21

Homa v. American Express Company, 496 F.Supp.2d 440 (D.N.J. 2007).. 26

Hood v. Bekins Van & Storage Co., 178 Cal. 150 (1918) .......................... 42

Hunter v. GMC, 2007 Cap.App.Unpub. 9252 (November 19, 2007) .......... 41

In re Merchant's Litigation, 2006 U.S.Dist.LEXIS 11742 (S.D.N.Y. March

    16, 2006)................................................................................................ 26

Ingle v. Circuit City Stores, Inc., 328 F.3d 1165 (9th Cir. 2002)...... 23, 24, 34

Janda v. T-Mobile USA, Inc., 2008 U.S.App.LEXIS 4627 (9th Cir. April 15,

    2008)................................................................................................ 29, 34

Jefferson v. Chase Home Finance LLC, 2007 U.S.Dist.LEXIS 36298

    (N.D.Cal. May 3, 2007).......................................................................... 56

Kagan v. Gibraltar Savings & Loan Ass'n, 35 Cal.3d 582 (1984).............. 55

Kahn v. Lischner, 128 Cal.App.2d 480 (1954) ........................................... 42

Kaufman v. American Express Travel Related Services Co., Inc., 2008

    U.S.Dist.LEXIS 18129 (N.D.Ill. March 7, 2008) ............................... 14, 26

Kreamer v. Earl, 91 Cal. 112 (1891) .......................................................... 53

Laster v. T-Mobile USA, Inc., 2007 U.S.App.LEXIS 25265 (9th Cir. October

    16, 2007)........................................................................................... 29, 34

Law Enforcement Syst. v. American Express Co., 2006 U.S. Dist. LEXIS

    48354 (S.D.N.Y. July 17, 2006)............................................................. 26

Louisville Title Ins. Co. v. Surety Title & Guar. Co., 60 Cal.App.3d 781

(1976) ...................................................................................... 43

Lowden v. T-Mobile USA, Inc., 512 F.3d 1213 (9th Cir. 2008)............. 29, 34

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................... 36, 37

Lyddon v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 (E.D. Cal.

October 27, 2006) ...................................................................... 6

Magnolia Motor & Logging Co. v. United States, 264 F.2d 950 (9th Cir.

1959) ...................................................................................... 34

Miller v. U.S., 363 F.3d 999 (9th Cir. 2004) ...................................... 44

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614

(1985) ...................................................................................... 8

Morta v. Korea Ins. Co., 840 F.2d 1452 (9th Cir., 1989) ..................... 44

Nagrampa v. MailCoups, Inc., 469 F.3d 1257 (9th Cir. 2006) (en banc)

................................................................................... passim

Nelson v. NAFA, 512 F.3d 1134 (9th Cir. 2008) ................................ 49

Net Global Marketing, Inc. v. Dialtone, Inc., 217 Fed.Appx. 598 (9th Cir.

2007) ...................................................................................... 23, 24

Newpark Shipbuilding-Pelican Island v. Rig Pan Producer, 21 F.Supp.2d

756 (S.D.Tex. 2003) .................................................................. 45

Pegasus Satellite Television, Inc. v. DirectTV, 318 F.Supp.2d 968 (C.D.Cal. 2004) ................................................................................................ 31

People v. McKale, 25 Cal.3d 626 (1979) ...................................................... 6

Pleasants v. American Express Co., 2007 U.S. Dist. LEXIS 60747 (E.D.Mo. August 17, 2007) ................................................................................. 26

PowerAgent v. Electronic Data Systems, 358 F.3d 1187 (9th Cir. 2004)..... 52

Preston v. Ferrer, 128 S.Ct. 978 (2008) ........................................................ 8

Reveles v. Toyota By The Bay, 57 Cal.App.4th 1139 (1997) ....................... 41

Ross v. Bank of America, 524 F.3d 217, LEXSEE 2008 U.S. APP. LEXIS 8927 (2d Cir. April 21, 2008) ................................................ 29, 48, 49, 50

Shroyer v. New Cingular Wireless Services, Inc., 498 F.3d 976 (9th Cir. 2007) ................................................................................... 23, 24, 29, 34

Sierra Club v. Morton, 405 U.S. 727 (1972) ............................................... 37

Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26 (1976).... 37

Smith v. State Farm Mutual Automobile Ins Co., 93 Cal.App.4th 700 (2001)6

Snow v. Ford Motor Co., 561 F.2d 787 (9th Cir. 1977) ............................... 41

St. Agnes Medical Center v. PacifiCare of California, 31 Cal.4th 1187 (2003) ...................................................................................................... 50

State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093 (1996) ........................................................................................................ 6

Steel Co. v. Citizens For A Better Environment, 523 U.S. 83 (1998) ......... 39

Supak & Sons Mfg. v. Pervel Industries, Inc., 593 F.2d 135  (4th Cir. 1979)

............................................................................................................. 16

Szetela v. Discover Bank, 97 Cal.App.4th 1094 (2002)................................. 9

Taniguchi v. Schultz, 303 F.3d 950 (9th Cir. 2002) ...................................... 53

Tennant v. Wilde, 98 Cal.App. 437 (1929) .................................................. 42

Ting v. AT&T, 182 F.Supp.2d 902, (N.D. Cal. 2002) ................................... 6

Ting v. AT&T, 319 F.3d 1126 (9th Cir. 2003)................................... 6, 24, 34

Triple G Landfills, Inc. v. Board of Commissioners, 977 F.2d 287 (7th Cir.

1992).......................................................................................................... 54

United States v. Realty Company, 163 U.S. 427 (1896)................................ 9

Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354 (9th Cir. 1947)

............................................................................................................. 42

Vallens v. Tillman, 103 Cal. 187 (1894) ...................................................... 40

Valley Forge Christian College v. Americans United for Separation of

Church & State, 454 U.S. 464 (1982) ....................................................... 36

Victoria v. Superior Court, 40 Cal.3d 734 (1985) ........................................ 44

Vogel v. Bankers Bldg. Corp., 112 Cal.App.2d 160 1952).......................... 43

Warrant Bros. Co. v. Cardi Corp., 471 F.2d 1304 (1st Cir. 1971) ............... 45

Warth v. Seldin, 422 U.S. 490 (1975) .................................................... 38, 45

Whitmore v. Arkansas, 495 U.S. 149 (1990) ......................................... 37, 45

Willingham v. Hooven, Owens, Rentschler & Co., 74 Ga. 233 (1894) ....... 41

Yahoo!, Inc. v. Le Ligue Contre Le Racisme, 433 F.3d 1199 (9th Cir. 2006)

........................................................................................................ 49

## **Statutes**

12 U.S.C. §§ 1462 et seq. (2008) ................................................................ 12

28 U.S.C. § 1291 (2008) ............................................................................... 1

9 U.S.C. § 1 et seq. (2008) ........................................................................... 8

9 U.S.C. § 10 (2008) .................................................................................. 53

9 U.S.C. § 2 (2008) .................................................................................... 12

Cal. Bus. & Prof. Code §§ 17200 et seq. (2008) .................................. passim

Cal. Civ. Code § 1670.5 (2008) .......................................................... 3, 5, 54

Cal. Civ. Code § 1670.5 (a) (2008) .............................................................. 5

Cal. Civ. Code § 1770(a)(19) (2008) ................................................... 3, 5, 54

Cal. Civ. Code § 3513 (2008) ...................................................................... 5

Cal. Civ. Code §§ 1750 et seq. (2008) .................................................. passim

Cal. Civ. Code §1668 (2008) ....................................................................... 5

Cal. Civ. Proc. § 12194(a) (2008) .............................................................. 21

## Other Authorities

Article III, United States' Constitution .................................................. passim

U.C.C. § 2-207 (1970) ................................................................. 16

## Rules

Fed.R.Civ.P. 9(b)(2008) ............................................................. 13

Fed.R.Civ.P.12(b)(6) (2008)................................................... passim

## Treatises

1 Witkin, Summary of California Law, "Contract" § 420 p. 461 (10th ed.) . 53

3A Wright, Miller & Kane, Fed. Prac. & Proc. Civ. 3d § 3531.2 (2005) .... 48

6 Williston on Contracts (4th ed. 1995) § 12.5............................................. 33

7AA Wright, Miller & Kane, Fed. Prac. & Proc. Civ. 3d § 1785.1 (2005) . 38

## Regulations

12 C.F.R. § 560.2(b)(9)(2008)....................................................... 13

# I.    STATEMENT OF JURISDICTION

This appeal is from an order and judgment granting a motion to dismiss for lack of standing pursuant to Fed.R.Civ.P.12(b)(6) (2008). Such orders are immediately appealable pursuant to 28 U.S.C. § 1291 (2008).

The Order granting Defendants' Motion to Dismiss was entered on December 6, 2007. (E.R., Tab No. 2, Page 004) The Notice of Appeal was timely filed on December 31, 2007. (E.R., Tab 1, Page 001)

# II.    ISSUES PRESENTED

1.    Must an American Express cardholder, who has a claim that the American Express Arbitration Provision (but not the entire card agreement)("Arbitration Provision") is unconscionable and unenforceable, first arbitrate that claim in order to sustain a ripened injury sufficient to support standing under Art. III, California's Consumer Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL"), respectively, for causes of action alleging that the Arbitration Provision violates the UCL and CLRA?

2.    Does payment of the required annual fee or purchase price as consideration required under the American Express card agreement ("card agreement") serve, in whole or part, as consideration for the various terms and services contained therein, including the Arbitration Provision?

3.      Does the contract right to a dispute resolution service by mandatory arbitration contained in the card agreement have pecuniary value so that its loss, due to the Arbitration Provision's unconscionability and unenforceability, affects an injury sufficient to sustain standing under Art. III, the CLRA, and the UCL?

4.      Does receiving unconscionable terms in the card agreement (e.g., American Express having a unilateral right to non-waiver and to change the terms of the agreement at any time) affect an injury sufficient to sustain standing under Art. III, the CLRA and/or the UCL for the cardholder who has paid the annual fee or purchase price for the American Express card?

5.      As a matter of law and public policy, may a cardholder who has an otherwise arbitrable claim against American Express seek arbitration by enforcing/invoking an unconscionable and unenforceable Arbitration Provision?

6.      Does a cardholder alleging that the Arbitration Provision is unconscionable waive his claims concerning that unconscionability when he invokes that Arbitration Provision or participates in a mandatory arbitration under it?

7.      Is it futile for a cardholder challenging the unconscionability of the Arbitration Provision (but not the entire card agreement) to invoke

mandatory arbitration or arbitrate that issue under that Arbitration Provision?

8.      In order to suffer an injury sufficient to sustain standing under Art. III, the CLRA and/or the UCL for a challenge to the unconscionability of the Arbitration Provision and resulting violation of the CLRA and UCL must a cardholder first either have American Express invoke/enforce the Arbitration Provision against him or himself do so and/or engage in mandatory arbitration pursuant to it even when the Arbitration Provision specifically states that claims concerning "the validity, enforceability or scope of this Arbitration Provision" are not subject to arbitration?

9.      Does the violation of the statutory rights given by the CLRA to not have unconscionable terms inserted in contracts pursuant to California Civ. Code § 1770(a)(19) (2008), and Cal. Civ. Code § 1670.5 (2008) to that same effect, respectively, provide Lee and Lloyd with standing to maintain a CLRA cause of action?

10.     Does an unconscionable and unenforceable Arbitration Provision pose a sufficient threat of injury to a cardholder who has otherwise arbitrable claims to sustain standing under Art. III, the UCL and/or CLRA?

11.     Does a threat of injury sufficient to sustain standing under Art. III, the CLRA and/or the UCL exist when a cardholder challenging the

unconscionability of the Arbitration Provision would, by operation of law, waive his claims and objections by requesting or participating in an arbitration pursuant to an unenforceable Arbitration Provision?

12.     Do Lee and Lloyd otherwise allege an injury sufficient to sustain standing under Art. III, the CLRA and/or the UCL to challenge the unconscionability of the Arbitration Provision and other terms of the card agreement and their concomitant statutory violations as well as fraud in the inducement?

## III.    STATEMENT OF THE CASE

Plaintiffs David J. Lee and Daniel R. Lloyd ("Lee" and "Lloyd") brought suit against Defendants American Express Travel Related Services Company , Inc., American Express Centurion Bank, and American Express Bank, FSB ("American Express"). The crux of their action is a global assault on the unconscionability of the Arbitration Provision contained in the adhesive standardized card agreements accompanying the issuance of various charge, credit, Dining, and Gift cards to them for which an annual or purchase fee is paid: e.g., a class action waiver, a consolidation of terms waiver, and a broad-based injunction waiver. (E.R., Tab 9, Pages 037, 069 [¶¶ 3, 71]) They also challenge certain non-arbitration terms of the card agreement: e.g., that American Express has a unilateral right to alter, amend,

or add new terms to the agreement at their option, and also has a unilateral non-waiver right. (E.R., Tab 9, Page 086 [¶ 105])  In no instance do they seek the rescission of that agreement.

The Complaint alleges that the insertion of these respective terms violates the CLRA, Cal. Civ. Code § 1770(a)(19)(which makes it an unlawful, unfair, deceptive practice to "insert[] an unconscionable provision to the contract"), and California's UCL, Cal. Bus. & Prof. Code §§ 17200 et seq. (which makes it an unfair and unlawful practice to violate Cal. Civ. Code §§ 1670.5,[1] 1668,[2] 3513,[3] 1770(a)(19), and the common law.[4] Of the

---

[1]    Cal. Civ. Code § 1670.5 (a) (2008) provides, in relevant part:

"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable … the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause …"

[2]    Cal. Civ. Code § 1668 (2008) provides, in relevant part,

"All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[3]    Cal. Civ. Code § 3513 (2008) provides, in relevant part,

"Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

twenty alleged causes of action, ten deal with the unconscionability and illegality of the Arbitration Provision, nine deal with the unconscionability and illegality of non-arbitration terms of the card agreement (including one cause of action for a declaratory judgment that the challenged terms are unconscionable). The remaining cause of action alleges that insertion of unconscionable terms (excluding the arbitration provision) into the card agreement constitutes fraud in the inducement. Only injunctive and restitutionary relief are sought, except that punitive damages are requested for the fraud and CLRA causes of action.

The common Art. III, UCL, and CLRA injury alleged by Lee and Lloyd is that they have been economically injured by American Express' actions: i.e.,

they paid for an enforceable contractual right to a dispute resolution service by mandatory arbitration of *bona fide* claims

---

[4]     An unconscionable contract or contract provision or term is, as a matter of law, an unfair practice under the UCL. See People v. McKale, 25 Cal.3d 626, 634-35 (1979); Smith v. State Farm Mutual Automobile Ins Co., 93 Cal.App.4th 700, 719 (2001); State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1104 (1996); Lyddon v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 at *101-102 (E.D. Cal. October 27, 2006); Ting v. AT&T, 182 F.Supp.2d 902, 921-22, (N.D. Cal. 2002) aff'd in part, rev'd on other grounds in part, 319 F.3d 1126, 1150 (9th Cir. 2003).

they have against American Express in paying the annual fee or

purchase price for their respective cards **but**

they did not receive the full value of the contract because they,

instead, received only a defective and unenforceable Arbitration

Provision because American Express chose to make the terms

thereof (and the arbitration provision itself) unconscionable and

unenforceable as a matter of law and legal fact (and with regard

to the fraud claim, American Express included unconscionable

non-arbitration terms).

In other words, their injury is that they cannot arbitrate otherwise arbitrable

claims they have against American Express, and their financial loss is the

loss in value that, as a matter of law and fact, attaches to the unenforceable

dispute resolution service by mandatory arbitration for which they paid.

Although the existence of this injury is informed by the law, its

recognition labors under a possible perceptual difficulty since it arises in a

context different than those with which the courts usually deal: e.g., cases in

which the consumer, after having filed suit, is faced with a motion to compel

arbitration under an unconscionable arbitration provision. In this situation,

the question is not whether the consumer wants to arbitrate his claims but,

rather, whether he is to forgo fair play by being forced to arbitrate them on

terms that are one-sided due to the arbitration provision's quintessential unconscionability (no class action, no consolidation of claims, no broad-based injunctive relief). Tacit in this Court's rulings finding such arbitration provisions to be unenforceable is that arbitration on a level playing field is a good thing: <u>i.e.</u>, it is faster and less expensive than litigation, and has many features that benefit the consumer. <u>See</u> <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 633 (1985)("It is often a judgment that streamlined proceedings and expeditious result will best serve the needs that causes parties to agree to arbitrate their disputes"). Arbitration, in fact, conforms to the sanctity of contract when the consumer agrees to arbitrate based on this purpose and use. Indeed, the Courts have enforced the Federal Arbitration Act, 9 U.S.C. § 1 <u>et</u> <u>seq</u>. (2008), on that basis for decades. <u>See</u> <u>Preston v. Ferrer</u>, 128 S.Ct. 978, 986 (2008).

However, credit card issuers like American Express, cell telephone providers like Cingular or T-Mobile, and employers like Circuit City, relying on the not-unreasonable assumption that consumers (or employees) either do not actually read the agreements or, if they do, lack the legal knowledge to assess the unconscionability and enforceability of those their terms, have egregiously tilted the playing field. They have done so by framing arbitration provisions based on their recognition that they could be

used as a shield to thwart litigation as well as actual arbitrations against them

when "poison pill" terms like class action waivers are made their primary

features.[5]  Quite simply, the question of whether a given term is

unconscionable (and whether that renders the provision unenforceable) rests

on a sophisticated legal judgment which the consumer cannot be presumed

to have.[6]  Until this Court, and then the California Supreme Court, stepped

up in order to protect the consumer from adhesive unconscionable terms, the

---

[5]     See Szetela v. Discover Bank, 97 Cal.App.4th 1094, 1101 (2002)(those
terms push "boundaries of good business practices" with the knowledge that
relatively few, if any, customers will seek legal remedies" pertaining "to that
single customer without collateral estoppel effect.")

[6]     United States v. Realty Company, 163 U.S. 427, 438 (1896), provides
an apt description of why the presumption of knowledge of the law is
inapplicable here:

> "There are occasions when the presumption that every man
> knows the law must be enforced for the safety of society itself.
> An individual on trial for a violation of the criminal law will
> not be heard to allege as a defense that he did not know the
> action of which he was guilty was criminal. But in such a case
> as this [when a statute is being challenged as unconstitutional],
> knowledge of the invalidity of the law in advance of any
> authoritative declaration to that effect will not be imputed to
> those who are acting under its provisions, and receiving the
> benefits provided by its terms."

California law is in accord. Cf Bagdasarian v. Gragnon, 31 Cal.2d 744, 748
(1948) ("An independent investigation … does not preclude reliance on
representations where … the party relying thereon is not competent to judge
the facts without expert assistance.")

corporation's got away with their scheme. However, the resulting jurisprudence neither means that the consumer doesn't want to arbitrate his claims **nor** that the intentional denial of that right to him – after presenting him with terms about which the consumer is unable to make the legal judgment that his right to arbitration is unenforceable – is anything other than an injury to the consumer. Rather, it means that an injury does occur and that such an injury gives the consumer standing to challenge the unconscionability of the arbitration provision and its violation of California's consumer protection statutes.

Lee's and Lloyd's loss and injury is as palpable now as would be if they had paid for certain good or services and received only non-conforming or defective ones in return. It is not the "use" of those goods or services that triggers their injury, but, rather, it is their receipt of them. Lee and Lloyd currently have claims but cannot, as a matter of law and public policy, arbitrate them under the unenforceable Arbitration Provision. That injury is neither affected by the fact that American Express has not enforced the Arbitration Provision against Lee and Lloyd nor that they have not themselves invoked it or engaged in any arbitration. Indeed, whether or not arbitration has occurred or been invoked is nothing more than a red herring designed to keep the focus on "process" rather than on the injury. Even

assuming otherwise, the absence of arbitration has no effect on their standing since it is not, as a matter of contract and law, either required or available to Lee and Lloyd since:

(1) the Arbitration Provision itself specifically excludes claims concerning "the validity, enforceability or scope of this Arbitration Provision" from claims that are subject to arbitration;

(2) no enforceable Arbitration Provision exists under which any arbitration can take place,

(3) arbitration would be futile,

(4) Lee and Lloyd's invocation or involvement in any arbitration would waive their right to make objections concerning the unconscionability of the Arbitration Provision (which would necessarily cascade into waiving their causes of action in that regard under the CLRA and UCL), and, most importantly,

(5) the issue of the unconscionability of the Arbitration Provision is, as a matter of law, one for the Courts to decide rather than an arbitrator under controlling Supreme Court and Ninth Circuit precedent.

After all, <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 445-46 (2006)("<u>Buckeye</u>"), holds that Lee's and Lloyd's challenge to the unconscionability of the Arbitration Provision is one that is never subject to arbitration: "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." So too does <u>Nagrampa v. MailCoups, Inc.</u>, 469 F.3d 1257, 1263-64 (9th Cir. 2006) (en banc)("<u>Nagrampa</u>"), hold:

> **"When the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable** under 9 U.S.C. § 2 of the FAA."

In spite of this controlling law and in derogation of the Arbitration Provision stating that claims regarding the "validity, enforceability and scope of this Arbitration Provision" are excluded from the definition of claims subject to mandatory arbitration, American Express moved to dismiss the Complaint pursuant to Fed.R.Civ.P.12(b)(6) on the grounds that Lee and Lloyd lacked standing in that the Arbitration Provision had not been enforced against them and/or they had not themselves invoked it and engaged in arbitration of all their claims.[7] Following briefing and oral

---

[7]     Other grounds for dismissal raised by American Express were that all causes of action were preempted by the Home Owners Loan Act (12 U.S.C. §§ 1462 <u>et</u> <u>seq.</u> (2008)) and its implementing regulations (specifically 12

argument, the District Court issued a Memorandum Order on December 6, 2007 granting American Express' motion on the grounds that Lee and Lloyd lacked standing.  Missing from the Memorandum Order was any reference to <u>Buckeye</u>'s or <u>Nagrampa</u>'s holding. Apparently assuming, although even American Express could not forward the argument, that a contractual right to a dispute resolution service by mandatory arbitration has no value (which is, of course, contrary to controlling California law), the District Court held that no injury had occurred:

> "At bottom, plaintiffs' argument is that they were damaged by the mere existence of the allegedly unconscionable terms in their card agreements. The challenged terms have not, for instance, been invoked against plaintiffs and they have not prohibited plaintiffs from asserting their rights."

(E.R., Tab No. 2, Page 011) The District Court did not rule on the other proffered grounds.

Lee and Lloyd filed this appeal on December 31, 2007. (E.R., Tab 1, Page 001).

---

C.F.R. § 560.2(b)(9)(2008), Lloyd's claims were time-barred, the fraud cause of action was pled with insufficient specificity pursuant to Fed.R.Civ.P. 9(b)(2008), and the CLRA's coverage does not extend to credit cards.

## IV.    STATEMENT OF FACTS

### A.    American Express Cards And Arbitration Provisions

American Express issues various cards: charge cards,[8] credit cards,[9] and Dining and Gift cards.[10] It currently has approximately 40,000,000 charge card and credit card accounts in the United States, at least ten (10) per cent of which are issued to California residents. (E.R., Tab 9, Page 050

---

[8]    American Express' "charge cards" now include its Centurion (Black), Gold, Platinum and Green cards, respectively, which charge an annual fee, have no credit or revolving credit feature (but do have a late charge assessment, usually $35 or 2.99% of the unpaid balance), and require all charges be paid when the monthly statement is received. The annual fees for the personal charge cards are $95.00 (Green), $125.00 (Gold), $150 (Rewards Plus Gold) $450.00 (Platinum). (E.R., Tab 9, Pages 050-051 [¶ 24])

[9]    American Express' "credit cards" charge an annual fee, and are revolving credit instruments that do not need to be paid off in full at the end of the monthly billing cycle. The annual fees for the personal credit cards range from $35.00 to $135.00. (E.R., Tab 9, Page 053-055 [¶¶ 25-26]) The "corporate/business" credit card annual fees range from $ 125.00 to $350.00 to some other negotiated amount depending upon the number of cards issued. Ibid.

[10]    The American Express Gift Card and Dining Card are prepaid payment devices that are not credit cards, charge cards or debit cards. (E.R., Tab 9, Page 047 [¶ 16]) The purchase fee for the Dining and Gift cards is the face amount of the card plus $3.95 (plus shipping and handling) and a $2.00 monthly service charge. (E.R., Tab No. 9, Pages 055 [¶ 27]) See Kaufman v. American Express Travel Related Services Co., Inc., 2008 U.S.Dist.LEXIS 18129 (N.D.Ill. March 7, 2008). Although American Express does issue other credit cards for which no annual fee is paid, this action involves only cards for which an annual or purchase fee is paid due to the economic loss element of standing.

[¶ 23)]) Each of these respective cards provide a convenience service arising from their distinct advantages over cash, checks, and other means of payment that is unrelated to "credit": <u>e.g.</u>, the convenience use they provide minimizes the need to carry cash, allows the cardholder to defer payment for a short time (at least until receipt of the monthly billing statement), establishes a favorable payment record that is important in financial evaluations, and provides a built-in dispute resolution service. (E.R., Tab 9, Page 048 [¶¶ 17-19])

The issuance of American Express' various cards is accompanied by a standardized card agreement containing the various terms that the cardholder must accept. In the late 1990's an Arbitration Provision was added to its agreements which was not applicable to California cardholders "unless and until you use the Card after we notify you in writing that it is applicable in California." (E.R., Tab 9, Pages 059 [¶ 39], 235) That writing came in December, 2003 when, by bill-stuffer, California cardholders were notified that American Express was unilaterally modifying the agreement so that "Cardmembers having California billing addresses will no longer be excluded from the coverage of the section called Arbitration." (E.R., Tab 9, Pages 060 [¶ 40], 242) A dispute resolution service by mandatory arbitration

thus became a primary and material feature of the card.[11]

As a result of the 2003 notification, American Express' Arbitration Provision imposed the following term on California cardholders:

> "As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us **arising from or relating to …this Agreement** … For purposes of this Arbitration Provision, 'you' and 'us' also includes any corporate parent, or wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns, … all agents, employees, directors and representatives of any of the foregoing… 'Claim' includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and **claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity.** … The term 'Claim' is to be given the broadest possible meaning that will be enforced …

> *Initiation of Arbitration Proceeding/Selection of Administrator.* Any claim shall be resolved, upon the election of you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organizations to which the Claim is referred in effect at the time the claim is filed, except to the extent the Code conflicts with this Agreement. ….

> "Significance of Arbitration. IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OUR HAVE A JURY TRIAL ON THAT CLAIM. FURTHER, YOU AND WE WILL NOT

---

[11] As a matter of law, the Arbitration Provision is a "material" term of the card agreement. See, El Camino Community College Dist. v. Superior Court, 173 Cal.App.3d 606, 617 (1985); Fairfield-Noble Corp. v. Pressman-Gutman Co., 475 F.Supp.899 (S.D.N.Y. 1970)(using U.C.C. § 2-207 (1970)); Supak & Sons Mfg. v. Pervel Industries, Inc., 593 F.2d 135, 136 (4th Cir. 1979).

HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU OR WE WOULD HAVE IF WE WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

*Restrictions on Arbitration.* If either party elects to resolve a Claim by arbitration, that Claim shall be arbitrated on an individual basis. *There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated.* The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, Claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties. No arbitrator's award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. " (Italics and capitalization in original)

(E.R., Tab 9, Page 235)(Italics and capitalization in original, emphasis added))

The 2003 Arbitration Provision required that **all** claims be taken to arbitration:

"As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to … this Agreement …, **including the**

**validity, enforceability or scope of this Arbitration Provision or the Agreements**."

(E.R., Tab 9, Pages 067 [¶ 63], 235)(emphasis supplied) That requirement remains extant in the Gift and Dining card's Arbitration Provision. (E.R., Tab 9, Page 067 [¶ 64]) However, with regard to credit and charge cards, an amendment was unilaterally made by American Express in 2005 which excluded from arbitration all claims dealing with the unconscionability of the Arbitration Provision:

> "As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to … this Agreement …, **except for the validity, enforceability or scope of this Arbitration Provision or the Agreements**."

(E.R., Tab 9, Pages 065 [¶ 62], 177)(emphasis added) As relevant here, all other terms of the 2003 agreement remain the same, except that the following language was also added as the ultimate sentence to the "Restrictions on Arbitration" paragraph following the language waiving class actions, consolidations, and broad-based injunctive relief:

> "Notwithstanding any other provision in the Agreement (including but not limited to the '*Continuation*' provision below and without waiving either party's right to appeal such decision, should any portion of the "*Restrictions on Arbitration*' provision be deemed invalid or unenforceable, then the entire Arbitration Provision (with the exception of this sentence) will not apply. … " (Italics and capitalization in original)

18

Ibid.

In addition to the Arbitration Provision, the card member agreements also contain the following terms as pertinent here:

> "Changing this Agreement/Assignment of this Agreement. We may change the terms or add new terms to this Agreement at any time, in accordance with applicable law. We may apply any changed or new terms to any then-existing balances on your Account as well as to future balances."

> "Our failure to exercise any of our rights under this Agreement, our delay in enforcing any of our rights, or our waiver of our rights on any occasion, shall not constitute a waiver of such rights on any other occasion."

> "This Agreement and your Account [or, relative to the Gift Card and the Dining Card, 'These terms and conditions and your … Card] and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah [or, relative to the Gift Card and Dining Card, "the State of New York USA] (without regard to internal principles of conflicts and laws), and by applicable federal law [the last phrase being omitted from the Gift Card and Dining Card agreement]."

(E.R., Tab 9, Pages 067 [¶ 65], 160-169, 170-175, 176-185, 222-227, 228-233, 234-241).

## B.    Facts Concerning Lee And Lloyd

Lloyd obtained his Platinum American Express charge card in 2003 and has, since that time, paid his annual fee therefor. (E.R., Tab 9, Page 059 [¶ 39]) His card was accompanied by the 2003 unamended version of the card member agreement. Ibid. He received the various bill-stuffers that

amended that Arbitration Provision and agreement in 2003 and 2005, respectively. (E.R., Tab 9, Page 060 [¶ 40])

Lee has two American Express cards and has also purchased the Gift card and Dining card. He obtained an American Express Starwood Preferred Guest credit card in April 2006. (E.R., Tab 9, Page 056 [¶ 28]) While no annual fee was paid for the first year (it having been waived by American Express as an application inducement), he has paid the annual fee for his card during subsequent years. (E.R., Tab 9, Page 056 [¶ 29])

After receiving his Starwood card, Lee became concerned that terms of that agreement, including the Arbitration Provision, might be unconscionable under California and Ninth Circuit law. He thus wrote to Kenneth Chenault (President/CEO of American Express Travel Related Services) as well as Mr. Poulsen (President/CEO of Centurion Bank) and Mr. Short (President/CEO of American Express Bank FSB), requesting information concerning that matter and that they change the terms so that they would not be unconscionable. Ibid. Only Mr. Chenault responded, stating only that "Although the credit card laws of California are changing, American Express cards are governed by the laws of the State of Utah" and thus averring that the arbitration agreement and card agreement were both legal and conscionable. (E.R., Tab 9, Pages 057 [¶ 30], 192). That occurred

after the California Superior Court for Orange County had ruled in <u>Berry v. American Express Publishing Co.</u>, O.C.S.C. Case No. 05CC00049 (2005) (from which no appeal was taken)[12], that the agreements were governed by California law and that the arbitration provision was unconscionable and unenforceable. (E.R., Tab 9, Page 057 [¶ 31])

Lee thereafter paid the annual fee for his card and purchased the Gift and Dining Card, respectively. (E.R., Tab 9, Page 059 [¶ 36]) He also obtained a "Green" charge card in June 2007. (E.R., Tab 9, Page 059 [¶ 37]) He did so in reliance on having been advised by American Express that its card agreements and arbitration provisions were conscionable, enforceable, and governed by other than California law.[13] (E.R., Tab 9, Pages 058 [¶ 34], 059 [¶ 36]) He, like Lloyd, uses the cards for personal and household purposes.

---

[12]    Under California law the denial of a motion to compel arbitration is an immediately appealable final order. The failure by American Express to file an appeal that Order rendered it "final" for collateral estoppel purposes. <u>See</u> Code Civ. Proc. § 12194(a) (2008); <u>Hobbs v. Bateman Eichler, Hill & Richards</u>, 164 Cal.App.3d 174, 191 (1985). (E.R., Tab 9, Page 058 [¶ 32])

[13]    After purchasing the Gift and Dining cards and obtaining the Green card, Lee again wrote to Messrs. Chenault, Short, and Poulsen requesting that they either delete or amend what he again identified to be unconscionable terms in the card agreement. (E.R., Tab 9, Pages 083-84 [¶¶ 82-83]) Lloyd did the same in 2007. (E.R., Tab 9, Page 79 [¶ 83]). No response to these respective letters was received. (E.R., Tab 9, Page 79 [¶¶ 82, 83]) These letters fulfill the jurisdictional requirements of California Civ. Code § 1782.

### C.    Lee And Lloyd Have Arbitrable Claims

Lee and Lloyd are authorized by the Arbitration Provision to make claims against American Express based on, among other things, any "claim, dispute or controversy … arising from or relating to your Account, this Agreement…" **The Arbitration Provision does not require that claims dealing with these matters be accompanied by or predicated upon any other "claim" relating to such things as unwarranted late fees, unwarranted charges, or any other matters.** After receiving the amended 2005 card agreements and paying the requisite consideration, Lee and Lloyd identified five separate arbitration claims they have against American Express which involve "dispute[s] or controvers[ies] … relating to [the terms of the] Agreement." As pled in the Complaint (and in which these claims appear as causes of action), these arbitration claims are:

> **Claim One**: Certain terms of the card agreement (excluding the arbitration clause) are unconscionable: i.e., American Express "may change the terms or add new terms to this Agreement at any time, in accordance with applicable law…"; American Express' "failure to exercise any of [its] rights under this Agreement, [its] delay in enforcing any of [its] rights, or our waiver of [its] rights on any occasion, shall not constitute a waiver of such rights on any other occasion"; and that the agreement is "governed by the laws of the State of Utah [or, relative to the Gift Card and Dining Card, "the State of New York] (without regard to internal principles of conflicts and laws)."

(E.R., Tab 9, Pages 084 [¶ 105], 088 [¶108], 151-156), 228-233).

**Claim Two:** These unconscionable terms in the card agreement (excluding the arbitration provision) violate the UCL and CLRA. They are procedurally unconscionable since they were imposed on all cardholders on a "take it or leave it" basis and are contained in an adhesive form agreement prepared by American Express and concerning which American Express was in a much stronger bargaining position than the cardholder (see <u>Discover Bank v. Superior Court</u>, 36 Cal.4[th] 148, 159-160 (2005)("<u>Discover Bank</u>"); <u>Armanderiz v. Foundation Health Psychcare Services, Inc.</u>, 24 Cal.4[th] 83, 113-114 (2000); <u>Shroyer v. New Cingular Wireless Services, Inc.</u>, 498 F.3d 976 (9th Cir. 2007)("<u>Shroyer</u>"). They are also substantively unconscionable since they provide American Express with a "right" to make any unilateral modification, including adding new terms to the agreement but provide no such right to the cardholder (see <u>Net Global Marketing, Inc. v. Dialtone, Inc.</u>, 217 Fed.Appx. 598 (9th Cir. 2007); <u>Ingle v. Circuit City Stores, Inc.</u>, 328 F.3d 1165, 1179 (9th Cir. 2002)("<u>Ingle</u>"); <u>Geoffrey v. Washington Mutual Bank</u>, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); <u>Bragg v. Linden Research, Inc.</u>, 487 F.Supp.2d 593, 609 (E.D.Pa. 2007) (applying California law); <u>Gonlugur v. Circuit City Stores, Inc.</u>, 2004 Cal.App.Unpub.LEXIS 8140 at *13-14), provide American Express (but not the cardholder) with the ability to take any action without waiving any rights that it might have under the agreement or under the law; and, are inconsistent with <u>Douglas v. U.S. District Court</u>, 495 F.3d 1062 (9th Cir. 2007)(holding California law is the choice of law on issues of unconscionability of arbitration provision) since they require that New York or Utah law (depending on the card) be the controlling law on class action waivers.

(E.R., Tab 9, Pages 086 [¶ 105], 088 [¶ 108])

**Claim Three:** These unconscionable provisions are also misrepresentations which constitute fraud in the inducement. (E.R., Tab 9, Page 084-087 [¶¶ 88-104])

**Claim Four:** The Arbitration Provision is procedurally unconscionable for the same reasons stated above, and is

substantively unconscionable due to its class action waiver,[14] consolidation of claims waiver,[15] broad-based injunction waiver,[16] failure to provide copies of the relevant arbitral rules with presentation of the agreement or specifying which specific code applies,[17] requiring that all statutory injunction requests be arbitrated even though injunction requests under the CLRA and UCL are never arbitrable,[18] providing no way for the cardholder to know at the time he/she initially agreed to arbitrate what the rules would be at the time of the arbitration as well as what inconsistencies existed between the agreement and the Code because American Express has given itself the unilateral right to amend the arbitration provision at any time (including before, during, or after any arbitration) and the arbitration provision otherwise makes the applicable arbitration rules those in effect when the arbitration is filed,[19] and assorted other terms.

---

[14]    See Gentry v. Superior Court, 42 Cal.4th 443 (2007); Discover Bank, supra; Schroyer, supra; Ting v. AT&T, 319 F.3d 1126, 1150 (9th Cir. 2003); Ingle v. Circuit City Stores, Inc., 328 F.3d at 1176; Nagrampa, supra.

[15]    See Ingle, supra; Discover Bank 36 Cal. 4th at 153; Comb v. PayPal, Inc., 218 F.Supp.2d 1165, 1175 (N.D.Cal. 2002).

[16]    See Broughton v. Cigna Healthplans, 21 Cal.4th 1066 (1999); Cruz v. PacificCare Health Systems, Inc., 30 Cal.4th 303 (2003); Davis v. O'Melveny & Meyers, 485 F.3d 1066, 1080 (9th Cir. 2007); Nagrampa, 469 F.3d at 1289-1293).

[17]    See Harper v. Ultimo, 113 Cal.App.4th 1402 (2003); Fitz v. NCR Corp., 118 Cal.App.4th 702, 721 (2004); Dunham v. Envtl. Chem. Corp. 2006 U.S.Dist.LEXIS 61068 (N.D.Cal. August 16, 2006).

[18]    Broughton v. Cigna Healthplans, supra.; Cruz v. PacificCare Health Systems, Inc., supra.

[19]    See Net Global Marketing, Inc. v. Dialtone, Inc., supra; Ingle, 328 F.3d at 1179; Geoffrey v. Washington Mutual Bank, 484 F.Supp.2d at 1123; Bragg v. Linden Research, Inc., 487 F.Supp.2d at 609; Gonlugur v. Circuit City Stores, Inc., 2004 Cal.App.Unpub.LEXIS 8140 at *13-14.

(E.R., Tab 9, Page 069 [¶ 71)

> **Claim Five:** The unconscionable and unenforceable terms of
> the Arbitration Provision violate the UCL and CLRA,
> respectively, for the reasons stated above.

Of these five claims, numbers 1-3 deal solely with the card agreement (excluding the Arbitration Provision) and are clearly subject to arbitration under the explicit terms of the Arbitration Provision and controlling law. See Buckeye, 546 U.S. at 445-46; Nagrampa, 469 F.3d at 1263-64. Lee and Lloyd "are and have been willing to immediately invoke the American Express Arbitration Provision" so that these claims could be arbitrated under the Arbitration Provision. (E.R., Tab 9, Page 063 [¶ 57]) That is so since arbitration "is a speedy and inexpensive means of dispute resolution," [(E.R., Tab No. 9, Page 061 [¶ 45])], and they paid for the right to arbitrate their claims. (E.R., Tab 9, Page 061 [¶ 48]) The stand-alone fourth claim (unconscionability of the Arbitration Provision) is not, however arbitrable under Buckeye and Nagrampa as well as the explicit terms of the Arbitration Provision that excludes such claims from the definition of what is subject to arbitration. The fifth claim is necessarily also not arbitrable due to the arbitrator's legal inability to decide the predicate question of the Arbitration Provision's unconscionability.

American Express, although it is its practice in other jurisdictions, did not seek to enforce the Arbitration Provision against Lee and Lloyd (an act that is collaterally estopped by Berry and which, in any event, it surely knows would be a waste of time, effort, and money).[20] Reflecting the reality of its unconscionability and unenforceability, neither Lee nor Lloyd sought to enforce or invoke the Arbitration Provision either because, as specifically alleged in the Complaint, it was legally and factually impossible for them do so due to: (1) the arbitrator's inability as a matter of law to determine the issue of the Provision's unconscionability, (2) the Arbitration Provision's patent unenforceability, (3) the patent futility of seeking arbitration of issues that the arbitrator could not consider or decide (and which would not otherwise provide any resolution of facts necessary for judicial determination of the issue), and (4) waiver of their objections to its unconscionability if they did invoke the arbitration provision. See, e.g., E.R.,

---

[20]    See, e.g., Kaufman v. American Express Travel Related Serv., 2008 U.S. Dist. LEXIS 18129; Pleasants v. American Express Co., 2007 U.S. Dist. LEXIS 60747 (E.D.Mo. August 17, 2007); Homa v. American Express Company, 496 F.Supp.2d 440 (D.N.J. 2007); Hiresch v. American Express Co., 2006 U.S. Dist. LEXIS 87785 (E.D. Tex. December 5, 2006); Law Enforcement Syst. v. American Express Co., 2006 U.S. Dist. LEXIS 48354 (S.D.N.Y. July 17, 2006); In re Merchant's Litigation, 2006 U.S.Dist.LEXIS 11742 (S.D.N.Y. March 16, 2006).

Tab 9, Pages 063, 064 [¶¶ 57, 59-60]).

Instead, Lee and Lloyd filed this lawsuit on September 19, 2007.

## V.   SUMMARY OF ARGUMENT

Even if the threshold for establishing standing was not very low,[21] the Complaint sufficiently alleges that Lee and Lloyd have sustained or are sufficiently threatened by sustaining an injury-in-fact that falls squarely within the universe of injuries defined by paying for, but not receiving, the full value of their contract with American Express and, hence, that they have standing under Art. III, the CLRA, and the UCL, respectively. The particular "value" they did not receive was the enforceable dispute resolution service by mandatory arbitration, a service for which they gave monetary consideration, as a matter of California law, when they paid the annual fee or purchase price required by the card agreements.

This Court has not yet explicitly applied that genre of injury to a situation where the "thing" paid for but not received is an enforceable contractual right to a dispute resolution service by mandatory arbitration. Lee and Lloyd recognize a perceptual difficulty may exist that, at least a first glance, has caused the lower courts to form a less-than-complete appreciation of their injury. This is due to their injury not being presented in

---

[21]   Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000).

the contexts with which the Courts have usually dealt: <u>e.g.</u>, a motion to compel arbitration after suit (concerning some claim such as an unwarranted charge, unwarranted late fee, or change in terms) that is opposed by the consumer on the ground that the arbitration provision is unconscionable and unenforceable.  Rather, Lee and Lloyd's injury arises from the fact, consistent with the card agreement's terms, they want to arbitrate their arbitrable claims against American Express but the only way they can do so is under an enforceable arbitration provision (which most assuredly does not exist here).  In this context, recognizing the existence of their injury is consistent with and a natural extension of this Court's recent precedents.  There is no legally cognizable difference between receiving a non-conforming, or inferior quality, or defective good or service (all of which are paradigmatically "injuries" sufficient for standing) and receiving a right to mandatory arbitration that is unenforceable (and, hence, "non-conforming" and "of inferior quality" and "defective") due to American Express' inclusion of unconscionable terms in it.  Recognition of that injury actually compliments this Court's evolution of the law relating to the unconscionability of arbitration provisions in adhesive contracts. Indeed, its recognition gives teeth to this Court's prior precedents: it will force those entities – such as American Express which have not changed their

agreements to conform with this Court's precedents – to no longer thumb their noses at this Court.[22]

Even though no arbitration has been sought or occurred, Lee's and Lloyd's injury is sufficiently ripened so that it is neither conjectural nor hypothetical but, rather, is presently sufficient to sustain standing. The Second Circuit Court of Appeal in <u>Ross v. Bank of America</u>, 524 F.3d 217, 2008 U.S.APP.LEXIS 8927 (2d Cir. April 21, 2008), recently found this to be the case when it affirmatively answered the issue whether "mandatory arbitration clauses found in credit card contracts … assuming they are the product of illegal collusion among credit providers, give rise to Article III 'injury in fact,'" <u>Id.</u> at * 2. Its rationale, quite simply, was that the arbitration tail could not wag the litigation dog. It thus rejected as "error" the lower court's decision which was remarkably similar to that of the District Court here.

_____

[22]    For instance, in spite of the clarity of this Court's holdings in, <u>inter alia</u>, <u>Janda v. T-Mobile USA, Inc.</u>, 2008 U.S.App.LEXIS 4627 (9th Cir. April 15, 2008), <u>Lowden v. T-Mobile USA, Inc.</u>, 512 F.3d 1213 (9th Cir. 2008), <u>Laster v. T-Mobile USA, Inc</u>., 2007 U.S.App.LEXIS 25265 (9th Cir. October 16, 2007), <u>Lozano</u>, 504 F.3d at 723, and <u>Shroyer</u>, 498 F.3d 982-987, apparently neither T-Mobile nor Cingular believe that this Court meant what it held since neither has amended the terms of its respective Arbitration Provision. Lee and Lloyd have requested that this Court take judicial notice of their respective and current Arbitration Provisions. For convenience, those Provisions are exhibits 1 and 2 to the addendum hereto.

The District Court here, by agreeing with American Express' argument, forcibly wagged the litigation dog. Misconstruing some, and just plain ignoring other, allegations of the Complaint and, more egregiously, controlling recent precedents of this Court, the District Court dismissed the Complaint pursuant to Fed.R.Civ.P.12(b)(6). The District Court's reasoning and rationale are, at best, a product of cognitive dissonance[23] rather than a reasoned consideration of the specific allegations of the Complaint and controlling law. First and with regard to the "injury" itself, the District Court essentially determined that an enforceable dispute resolution by mandatory arbitration service has no value and, hence, that in receiving only an unenforceable right Lee and Lloyd received the full value of their contract. That, of course, is completely contrary to common sense, controlling law, and the Complaint's explicit allegations: e.g., that Lee and Lloyd, in fact and as a matter of California contract law, paid monetary consideration for that contractual right to mandatory arbitration when they

---

[23]    As recently noted in Clark v. Mitchell, 425 F.3d 270, 295 (9th Cir. 2005) (Merritt, J., dissenting):

> "Courts sometimes decide that they want to reach a particular result, come what may, and simply forget about important facts and inconsistent legal principles. This form of 'cognitive dissonance' seems to be what has happened in this case."

paid their annual fee or purchase price[24] and thus have a vested contractual right to mandatory arbitration[25] as well as specifically alleging that the right has a pecuniary value. (E.R., Tab 9, Page 062 (¶¶ 51-53) It is also contrary to controlling caselaw holding that delivery of a non-conforming and defective form of that service (whether due to fraud or otherwise) is an "injury" sufficient to support standing.[26]

In any event, the District Court completely ignored that standing can certainly be founded upon the threat of future injury. In this action, that threat of future injury is created by the unenforceable arbitration provision's

---

[24]    See, e.g., H.S.Crocker Co. v. McFaddin, 148 Cal.App.2d 639, 645 (1957) ("A single consideration may support several counterpromises made by the other party to a transaction").

[25]    See, e.g., Harlow v. Carleson, 16 Cal.3d 731, 735 (1976) ("The term … denote[s] generally a right 'already possessed' or 'legitimately acquired'."); Pegasus Satellite Television, Inc. v. DirectTV, 318 F.Supp.2d 968, 979 (C.D.Cal. 2004)("A 'vested' interest is one that is 'unconditional,' 'absolute', and 'not contingent.'").

[26]    See, e.g., Lozano v. AT&T Wireless Servs. 504 F.3d 718, 734 (9th Cir. 2007) (finding that the failure to deliver contracted-for "any time" cell phone minutes was an injury that provided standing because "he did not receive the full value of his contract with AWS **due to its alleged failure** to disclose out-of-cycle billing")(emphasis added); Dhaglian v. DeVry Univ., Inc., 461 F.Supp.2d 1121, 1155 (C.D. Cal. 2006) (cited with approval in Lozano, 504 F.3d at 734) ("accepting plaintiff's theory that he suffered injury under the UCL because he paid thousands of dollars of tuition to defendant university [that were not transferable to other schools] and 'did not receive what he had bargained for' due to its alleged unfair business practices" where he had not even applied to other schools).

effect on cardholder's currently-held arbitrable claims: i.e., that the injury

necessary for standing is founded upon the absolute probability that the

Arbitration Provision's unconscionability and unenforceability will preclude

arbitration of Lee's and Lloyd's otherwise arbitrable claims and, perforce,

affect a loss of the value of the dispute resolution service paid for by them.

That certainty, reflecting as it does the unexceptionable recent precedents of

this Court and California's Supreme Court, does not rest on the existence of

an arbitration actually occurring or, for that matter, being requested.

The fatal flaw in the District Court's reasoning that led to dismissal

was its determination that Lee's and Lloyd's "theory rests on hypothetical

assumptions about what may or may not transpire":

> "To accept plaintiffs' position, the Court must first assume that
> plaintiffs will actually seek to arbitrate their fraud claims. The
> Court must also assume that the arbitrator will find that certain
> provisions of the contract, such as the class action waiver, are
> unconscionable. Next, the Court must assume that as a result of
> that finding, or perhaps other findings, defendants will insist
> that the arbitration clause is unenforceable and therefore that
> the fraud claim must be litigated in court, thereby depriving
> plaintiffs of their right to arbitrate. Or, if defendants do not
> insist on courtroom litigation, that the arbitrator will sua sponte
> refuse to arbitrate the case any further even if both parties agree
> to arbitrate. In other words, since plaintiffs profess to want to
> arbitrate their claims, their injury rests on the assumption that
> defendants will thwart arbitration or the arbitrator will refuse to
> arbitrate even the parties want arbitration. These assumptions,
> especially the last assumption, are questionable, and, in any
> event, certainly premature. As such, it is impossible to conclude

> that plaintiff have described an injury that is 'imminent' within
> the meaning of <u>Lujan</u>."

(E.R., Tab 2, Page 008). In each instance, that which the District Court classified as a "hypothetical" is a specifically pled allegation and/or the ineluctable result of this Court's controlling case law. The District Court's first "hypothetical assumption" -- <u>i.e.</u>, "the Court must first assume that plaintiffs will actually seek to arbitrate their fraud claim" – ignores the specific allegations of the Complaint that Lee and Lloyd "are and have been willing to immediately invoke the American Express Arbitration Provision" (E.R., Tab 9, Page 063 [¶ 57]), that they did not do so because of the bar presented by the arbitration provision's unenforceability, that to do so would be against public policy, and that while the illegality of the provision cannot be waived[27] their invocation/participation in arbitration would waive their objections to the Provision's unconscionability relative to violations of the UCL and CLRA. <u>See</u>, <u>e.g.</u>, (E.R., Tab 9, Pages 063 & 064 (¶¶ 57, 59-60)) <u>See</u> <u>Nagrampa</u>, 469 F.3d at 1279-1281.

By the same means, the District Court's second "hypothetical assumption" – <u>i.e.</u>, that "the arbitrator will find that certain provisions of the contract, such as the class action waiver are

---

[27]    <u>See</u> 6 Williston on Contracts (4th ed. 1995) § 12.5.

unconscionable" – is make-weight and equally flawed. The arbitrator's lack of authority to decide the Arbitration Provision's unconscionability is a legal certainty and fact[28] rather than a "hypothetical assumption. See Buckeye, 546 U.S. at 445-46, and Nagrampa, 469 F.3d at 1263, both of which were ignored and not even cited in the District Court's opinion. So also is it too well-settled to doubt that class action waivers, consolidation of claims waivers, and broad-based injunction waivers are unconscionable terms that render the arbitration provision in which they are contained unconscionable and unenforceable. See, e.g., Janda v. T-Mobile USA, Inc., supra.; Lowden v. T-Mobile USA, Inc., supra; Laster v. T-Mobile USA, Inc., supra; Lozano, 504 F.3d at 723; Shroyer, 498 F.3d 982-987; Ting v. AT&T, 319 F.3d at 1150; Ingle 328 F.3d at 1176; Broughton, supra; Davis v. O'Melveny &

---

[28]    The concept of "legal fact" is particularly apt in the context of unconscionability of an arbitration provision where the issues are purely ones of law. Magnolia Motor & Logging Co. v. United States, 264 F.2d 950, 952 (9th Cir. 1959). Commonly used in the context of qualified immunity in civil rights litigation, the Ninth Circuit in Elder v. Holloway, 975 F.2d 1388, 1394 (9th Cir. 1991), provided examples of things that are "legal facts" directly analogous to the allegations and citations in the Complaint: e.g., "whether any court has held that a particular constitutional right exists or that conduct similar to that of the officers in the case at hand violates that constitutional right," "the number of times the particular right has been recognized," "whether the alleged constitutional right was apparent from the cases", "how clear the holdings were," "which courts made the decisions." Using this as a yardstick, the unconscionability of the arbitration provision crosses the line from "maybe" to a certainly not admitting to an exception under controlling law.

<u>Meyers</u>, 485 F.3d at 1080; <u>Nagrampa</u>, 469 F.3d at 1289-1293; <u>Ford v. Verisign, Inc.</u>, 252 Fed. Appx. 781(9th Cir. October 16, 2007).

The District Court's final "hypothetical assumption" is also neither hypothetical nor an assumption: "since plaintiffs profess to want to arbitrate their claims, their injury rests on the assumption that defendants will thwart arbitration or the arbitrator will refuse to arbitrate even [though] the [parties] want arbitration." (E.R., Tab 2, Page 008) In addition to the allegations specified above, it is a pled and legal fact that American Express has "thwarted" arbitration of the Provision's unconscionability by specifically excluding that matter from the coverage of its Arbitration Provision: <u>i.e.</u>, "…'Claim' means any claim, dispute or controversy between you and us arising from or relating to … this Agreement … **except for the validity, enforceability or scope of this Arbitration Provision or the Agreements.**" (E.R., Tab 9, Pages 065, 066-067 (¶¶ 62-63)(emphasis added)) It is also a pled and legal fact that the arbitrator lacks authority, in any event, to decide that issue under <u>Buckeye</u> and <u>Nagrampa</u>.

Reversal of the District Court Order and Judgment is thus mandated.

## VI.    STANDARD OF APPELLATE REVIEW

The de <u>novo</u> standard of review is to be applied in an appellate review of dismissal for lack of standing pursuant to Fed.R.Civ.P. 12(b)(6) (2008).

Equity Lifestyle Prop., Inc. v. County of San Luis Obispo, 505 F.3d 860, 865 (9th Cir. 2007).

## VII.  ARGUMENT

### A.  Principles Of Standing And Dismissal And Their Application Here

Article III, § 2 of the Constitution states that the federal courts may only adjudicate "cases" and "controversies," and thus imposes what the Supreme Court has called "the irreducible constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The requirement of standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Central Delta Water Agency v. United States, 306 F.3d 938, 947 (9th Cir. 2002), quoting Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472 (1982).

Three well-established elements are required in order for a party to have standing to bring a lawsuit.  First, the plaintiff must have suffered an "injury in fact." Lujan, 504 U.S. at 560.  An injury in fact is an invasion of a legally protectable interest which is both "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical." Id. (citing

Sierra Club v. Morton, 405 U.S. 727, 740-41 n.16 (1972)).  Second, there must be a "causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560.  In other words, the injury must be "fairly traceable" to the actions of the defendant. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976).  Third, and finally, it must be "likely" that the injury complained of can be redressed by a favorable court decision. Lujan, 504 U.S. at 561.

The injury must, of course, be "distinct and palpable," as opposed to "abstract," and the harm must be "actual or imminent," not "conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155-56 (1990).  However, the "threshold inquiry into standing 'in no way depends on the merits of the [plaintiffs'] claim.'" Whitmore, 495 U.S. at 155.  In this regard it should be noted that an injury-in-fact differs from a "legal interest" in that an injury-in-fact need not be capable of sustaining a valid cause of action under applicable law.  An injury-in-fact may simply be the fear or anxiety of future harm. For example, exposure to toxic or harmful substances is sufficient to satisfy the Article III injury-in-fact requirement even without physical symptoms of injury caused by the exposure, and even though exposure alone may not provide sufficient ground for a claim. Central Delta Water Agency, 406 F.3d at 947-48.

When the allegations of the Complaint are measured against these standards, dismissal for lack of standing is unwarranted. This is particularly so since the threshold for determining if standing exists is very low. See Ecological Rights Foundation, 230 F.3d at 1147; 7AA Charles Alan Wright, Arthur Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. 3d § 1785.1 (2005)("The requisite of an injury is not applied too restrictively. If plaintiff can show that there is a possibility that defendant's conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied."). In considering whether dismissal for lack of standing is appropriate, a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them, and the complaint must be read in the light most favorable to the nonmoving party. That necessarily includes, as stated in Warth v. Seldin, 422 U.S. 490, 502 (1975), that the allegations of the Complaint concerning the effect of challenged conduct is to be taken as true:

> "We must assume, taking the allegations of the complaint as true, that Penfield's zoning ordinance and the pattern of enforcement by respondent officials have had the purpose and effect of excluding persons … We also assume, for purposes here, that such intentional exclusionary practices, if proved in a proper case, would be adjudged violative of the constitutional and statutory rights of the persons excluded."

See also Central Delta Water Agency, 306 F.3d at 947, citing for the applicable principle, Steel Co. v. Citizens For A Better Environment, 523 U.S. 83, 104 (1998)("**because defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), plaintiffs need only show that the facts alleged, if proved, would confer standing**")(emphasis supplied).

The factual allegations and controlling case law establish that standing exists under these principles because it must be assumed that (1) Lee and Lloyd have claims against American Express that would be subject to arbitration under an enforceable arbitration provision, (2) Lee and Lloyd paid monetary consideration for the contractual right to mandatory arbitration, (3) the arbitration provision is unconscionable and unenforceable, (4) Lee and Lloyd want to arbitrate their arbitrable claims against American Express, (5) Lee and Lloyd may not, as a matter of law and public policy, seek to enforce an unconscionable arbitration provision, (6) that a real threat exists that should Lee and Lloyd arbitrate or seek to arbitrate their claims they would waive their objections to the unconscionability of the arbitration provision, (7) that arbitration of their allegations that the arbitration provision is unconscionable is not legally possible under controlling law, (8) that arbitration of their claims against American Express would be futile, and as a result (9) Lee and Lloyd did not

get the full value of their contract with American Express because they received no enforceable right to mandatory arbitration of their claims which caused them an economic loss (of the value of the consideration paid by them). That is a sufficient injury to sustain standing.

**B.  Lee And Lloyd Have Suffered A Redressible Concrete Injury As A Result of American Express' Conduct That Is Sufficient To Sustain Standing On All Causes of Action**

A person suffers an injury sufficient for standing when he loses "money" or "value" because he does "not receive the full value of his contract," [Lozano, 540 F.3d at 734], or otherwise does not get that for which he paid (including when one gets something that is unfit for the purpose). That rule is equally applicable regardless of whether the reason for not receiving "full value" sounds in deception, misrepresentation, or delivering non-conforming or inferior quality or defective goods and services. It is, for instance, well settled that one suffers an injury-in-fact by receiving non-conforming or inferior quality goods or services (and, certainly, American Express' unenforceable dispute resolution service by mandatory arbitration fits squarely within that paradigm).[29]  So too is the

---

[29]   See, e.g., Vallens v. Tillman, 103 Cal. 187 (1894)( failure to supply satisfactory cigars); C.W. Anderson Hosiery Co. v. Dixie Knitting Mills, 204 F.2d 503 (4th Cir. 1953)(unfinished nylon defective); Appliance Distributors, Inc. v. Mercury Electric Corp., 202 F.2d 651 (10th Cir. 1953)(awning fans defective and non-conforming); Willingham v. Hooven, Owens, Rentschler

rule applicable when one receives less than what was paid for (such as Lozano's "any time" cell phone minutes or Daghlian's non-transferable college credits). Similarly, an injury sufficient for Art. III standing exists when one receives something which is different from that for which one paid, a situation that often arises because of deception or defect (including such "defects" as unconscionable terms in an arbitraton provision).[30] Indeed, as a cornerstone of contract and consumer protection law, that rule is equally applicable regardless of the nature of the affected personal property or service. In each instance, it is the receipt – and not the actual use or downstream sale – of the good or service that informs the injury. Thus, Lee'

---

& Co., 74 Ga. 233, 249-50 (1894)(mill unfit for purpose for which purchased in that quality inferior to that contracted for).

[30]    See, e.g., Daghlian v. DeVry Univ., Inc., 461 F.Supp.2d at 1155-56 (UCL/CLRA violation from possibly non-transferable college credits); Chamberlain v. Ford Motor Co., 369 F.Supp.2d 1138 (N.D.Cal. 2005) (CLRA/UCL violation when defective engine intake manifold not what was purchased); Falk v. General Motors Corp., 496 F.Supp.2d 1088 (N.D.Cal. 2007)(CLRA/UCL violation due to defective speedometers in GM trucks); Snow v. Ford Motor Co., 561 F.2d 787 (9th Cir. 1977) (CLRA violation due to incomplete trailer equipment); Hunter v. GMC, 2007 Cap.App.Unpub. 9252 (November 19, 2007)(violation of UCL due to purchasing an automobile with defective brakes rather than non-defective brakes even though no car crash as a result of defect); Colgan v. Leatherman Tool Group, Inc., 135 Cal.App.4th 663 (2006) (CLRA violation because an American made hammer was purchased that was made in China); Benson v. Kwikset Corp., 152 Cal.App.4th 1254 (2007) (CLRA violation because lockset made in China rather than in U.S.); Reveles v. Toyota By The Bay, 57 Cal.App.4th 1139 (1997) (CLRA/UCL violation arising from damaged and hazardous used car purchased rather than one fit for use), overruled on other grounds.

and Lloyd's alleged injury is presently existing, palpable, not hypothetical, and more than sufficient to sustain standing.

Further Lee's and Lloyd's "injury" arose from something for which money was paid. As previously noted, the District Court labored under the false impression that neither Lee nor Lloyd had paid money for the dispute resolution service by mandatory arbitration or that it otherwise had no value that could be "lost." That is unsupported by the law or alleged facts: i.e., the Complaint specifically alleges that an enforceable right to mandatory arbitration has a pecuniary value, [Complaint, ¶¶ 48, 50, 52], which must be honored,[31] and it is well-settled that the $35.00 annual fee paid by Lee, the $450.00 annual fee paid by Lloyd, and Lee's payment of the $3.95 fee for each of the Gift and Dining cards serves as consideration for all promises made in the card agreement, including the right to avail themselves of the dispute resolution service by mandatory arbitration. See Tennant v. Wilde, 98 Cal.App. 437, 442-43 (1929):

---

[31]    See, e.g., Hood v. Bekins Van & Storage Co., 178 Cal. 150 (1918) ( quoting Wigmore on Evidence, "The owner of an article, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth…"); Kahn v. Lischner, 128 Cal.App.2d 480, 486 (1954); Fed.R.Ev. 701; Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354 (9th Cir. 1947) (owner is competent to give his opinion as to the value of his property).

> "where there is consideration for any of the agreements specified in a contract the contract as a whole cannot be said to lack mutuality or consideration nor can any particular promise of agreement contained therein be singled out and deemed inoperative because no special or particular consideration appears to have been given or promised for it." 'While a consideration is a necessary element of every contract, it is not necessary that each separate promise or covenant should have a distinct consideration. If there is but one consideration offered in return for several promises, and it is accepted for them together, it will support them….'"

See also Louisville Title Ins. Co. v. Surety Title & Guar. Co., 60 Cal.App.3d 781, 793 (1976); Brawley v. Crosby Research Foundation, Inc., 73 Cal.App.2d 103, 118-19 (1966); Vogel v. Bankers Bldg. Corp., 112 Cal.App.2d 160, 169 (1952).

The pled facts are that Lee and Lloyd paid the annual fee for their respective cards and Lee paid the purchase price for his Gift and Dining cards. That they lost some or all of the value paid by not receiving an enforceable contractual right to a dispute resolution service constitutes an economic loss. After all, the application of standing requirements must not be turned into a "mechanical exercise," [Allen v. Wright, 468 U.S. 737, 751 (1984)], and "[p]ecuniary injury is a sufficient basis for standing." Fair v. EPA, 795 F.2d 851, 853 (9th Cir. 1986).

The existence of this injury is not diminished by the nature of the arbitrable claims made by Lee and Lloyd. The claims upon which they

sought arbitration are all authorized by the card agreement: <u>i.e.</u>, arbitration thereunder is available for any "claim arising from or relating to … this Agreement …" (E.R., Tab 9, Pages 065, 066-067 (¶¶ 62-63) The agreement does not require that a claim challenging the enforceability and/or unconscionability of a term of the agreement be tied to some monetary claim such as an unwarranted fee or charge billed to the card.  Rather, they can be stand-alone.[32]   Indeed, the sanctity of contract doctrine gives the equal rank and dignity to any other cognizable claim. In that their "claims" are specifically authorized by the Arbitration Provision, it is as true here as it was in <u>Morta v. Korea Ins. Co.</u>, 840 F.2d 1452, 1460 (9th Cir., 1989), that:

> "At root, this case is about the respect the law ought to accord agreements between private parties. Despite recent cynicism, **sanctity of contract remains an important civilizing concept**. *See, e.g.*, C. Fried, *Contract as Promise* 1, 132 (1981) ("these are indeed the laws of freedom"). **It embodies some very important ideas about the nature of human existence and about personal rights and responsibilities: that people have the right, within the scope of what is lawful, to fix their legal relationships by private agreement; that the future is inherently unknowable and that individuals have different visions of what it may bring; that people find it useful to resolve uncertainty by "mak[ing] their own agreement and thus designat[ing] the extent of the peace being purchased,"**

---

[32]     Even if it is assumed, <u>arguendo</u>, that some question exists in this regard relative to the agreement's language (which it does not), basic contract law requires the contract must be read in favor of Lee and Lloyd and against American Express, its author. <u>See</u> <u>Miller v. U.S.</u>, 363 F.3d 999 (9th Cir. 2004); <u>Victoria v. Superior Court</u>, 40 Cal.3d 734 (1985).

> ***Bernstein*, 290 Md. at 459, 430 A.2d at 606; that courts will respect the agreements people reach and resolve disputes thereunder** according to objective principles that do not favor one class of litigant over another; and that enforcement of these agreements will not be held hostage to delay, uncertainty, the cost of litigation or the generosity of juries...."

(emphasis supplied). Indeed, when looked at from the judicially self-imposed limitations of what may be considered in adjudging a motion to dismiss, any judgment that Lee's and Lloyd's arbitrable claims may be "flimsy" or somehow "manufactured" is simply of no moment. Just as standing 'in no way depends on the merits of the [plaintiffs'] claim,'" [Whitmore, 495 U.S. at 155 (quoting Warth v. Seldin, 422 U.S. at 500)], the merits (or lack thereof) of Lee's and Lloyd's otherwise arbitrable claims do not diminish or affect the duty to arbitrate them under an enforceable arbitration provision. See, e.g., ATT Techs. Inc. v. Communication Workers of Am., 475 U.S. 643, 649-50 (1991)("Whether 'arguable' or not, indeed even if it appears to the court to be frivolous, the defendant's claim is to be decided not by the court ... but by the arbitrator"); Warrant Bros. Co. v. Cardi Corp., 471 F.2d 1304, 1309 (1st Cir. 1971)("duty to arbitrate is not diminished by the fact that a claim of one of the parties may be lacking in merit"); Newpark Shipbuilding-Pelican Island v. Rig Pan Producer, 21 F.Supp.2d 756, 759 (S.D.Tex. 2003); Bigge Crane & Rigging Co. v. Docutel Corp. 371 F.Supp. 240, 244 (E.D.N.Y. 1973).

C.     **The Arbitration Provision's Unconscionability And
Resulting Unenforceability Create A Sufficient Threat
Of Imminent Injury To Sustain Standing**

Assuming, <u>arguendo</u>, that somehow Lee's and Lloyd's injury is not

presently sufficiently concrete to sustain standing under traditional concepts,

the imminent threat of injury to their otherwise arbitrable claims arising

from the unconscionability and unenforceability of the Arbitration Provision

and its terms provides standing. This result is informed by analogy to toxic

exposure cases in which standing has been found to exist since exposure to

the unconscionable and unenforceable Arbitration Provision is, of course,

just as toxic and harmful to Lee's and Lloyd's arbitrable claims as chemicals

are to the human body, and their resultant injury is even more palpable and

immediate. As this Court stated in <u>Central Delta Water Agency</u>:

> "The injury alleged has not yet occurred; it is threatened.
> Nevertheless, the possibility of future injury may be sufficient
> to confer standing on plaintiffs; threatened injury constitutes
> "injury in fact." *Ecological Rights Foundation v. Pacific
> Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000). 'The
> Supreme Court has consistently recognized that threatened
> rather than actual injury can satisfy Article III standing
> requirements.' *Friends of the Earth v. Gaston Copper
> Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc).
> The Court most recently recognized this principle in *Friends of
> the Earth v. Laidlaw*, 528 U.S. 167, 180-81, 145 L. Ed. 2d 610,
> 120 S. Ct. 693 (2000). (holding that "the threat of . . . 'injury in
> fact' "is sufficient to confer standing.)

306 F.3d at 947-948. Just as with threatened environmental harm, the threatened harm posed by an unconscionable and unenforceable Arbitration Provision is "by nature probabilistic." Citing <u>Friends of the Earth v. Gaston Copper Recycling Corp.</u> 204 F.3d 149 (4th Cir. 2000)(en banc) with approval and adopting its rule as its own, it is as true relative to the Arbitration Provision as it was with up-stream pollution that:

> "By producing evidence that Gaston Copper is polluting Shealy's nearby water source, CLEAN has shown an increased risk to its member's downstream uses. This threatened injury is sufficient to provide injury in fact. **Shealy need not wait until his lake becomes barren and sterile or assumes an unpleasant odor and smell before he can invoke the protections of the Clean Water Act. Such a novel demand would eliminate the claims of those who are directly threatened but not yet engulfed by an unlawful discharge. Article III does not bar such concrete disputes from court.**

<u>Central Delta Water Agency</u>, 306 F.3d at 948 (emphasis added), quoting <u>Gaston Copper</u>, 204 F.3d at 159-60. The same is true here. Lee and Lloyd thus having standing.

**D.     <u>Lee's And Lloyd's Injury Is Ripe: Arbitration Is Neither Required Nor A Necessary Element of Lee's And Lloyd's Standing</u>**

Having thus established that Lee and Lloyd have a legally cognizable injury in fact and/or that their injury is sufficiently threatened, the question is whether that injury is sufficiently "ripened." That is, is their injury "speculative" because they have not had the Arbitration Provision enforced

against them by American Express or, alternatively, have not themselves either sought to or actually engaged in arbitration of their claims?[33] The District Court held that it was, a conclusion that is incorrect as a matter of contract and of law.  The Second Circuit's recent opinion in <u>Ross v. Bank of America</u> assists in informing this conclusion.  <u>Ross</u>, of course, held that arbitration was not necessary for the plaintiffs there to have standing to raise their challenges arising from the banks' arbitration provisions:

> "The district court appears largely to have overlooked the cardholders' antitrust arguments, instead viewing their claims, at the banks' urging, merely as challenges to the arbitration provisions in their credit agreements. For example, the district court opined that 'Plaintiffs' claims challenge arbitration clauses that were not invoked against them when they commenced the litigation. A plaintiff has no Article III standing to challenge an arbitration clause that has not been invoked.' *In re Currency Conversion*, 2006 U.S.Dist.LEXIS 66986, at * 14-15. **In short, the court agreed with the banks that 'until the arbitration clauses are invoked against Plaintiffs, they are dormant contract provisions incapable of creating the requisite Article III injury-in-fact.'** *Id.* **at * 13. This conclusion was an error and beside the mark in terms of the antitrust injuries that the cardholders have asserted.**"

---

[33]     Ripeness is an adjunct of standing. <u>See</u> 13A Wright, Miller & Kane, <u>Fed. Prac. & Proc. Civ.</u> 3d § 3531.2 (2005) ("The blending of standing and ripeness theories is so important that courts should become more assiduous to recognize the advantages of" considering the two as part of a single inquiry.)

524 F.3d 217, 2008 U.S.APP.LEXIS 8927 at *12-13 (emphasis added). That

conclusion was based, in part, on its determination that the claims were

"ripe" without having first been subject to arbitration:

> "The banks further contend that the cardholders' claims are not
> ripe for adjudication because the cardholders are not faced with
> a sufficiently imminent threat of injury, and, as a prudential
> matter, their antitrust claims would better be entertained at a
> later time. We disagree.

> "The requirement that a dispute must be ripe "prevents a federal
> court from entangling itself in abstract disagreements over
> matters that are premature for review because the injury is
> merely speculative and may never occur." Dougherty v. Town
> of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d
> Cir. 2002). Furthermore, "[r]ipeness overlaps in some respects
> with standing, 'most notably in the shared requirement that the
> [plaintiff's] injury be imminent rather than conjectural or
> hypothetical.'" Bronx Household of Faith v. Bd. of Educ., 492
> F.3d 89, 111 (2d Cir. 2007) (Leval, J., concurring) (quoting
> Brooklyn Legal Servs. Corp. v. Legal Servs. Corp., 462 F.3d
> 219, 225 (2d Cir. 2006)). We have already held that the
> antitrust harms asserted by the cardholders are sufficiently
> "actual and imminent" to constitute Article III injury in fact.
> For the same reasons, we find that these alleged injuries are not
> merely speculative or hypothetical, and that judicial review of
> the cardholders' claims at this time is appropriate."

524 F.3d 217, 2008 U.S.APP.LEXIS 8927 at *20.  The law of this Circuit is

to the same effect and mandates an identical conclusion. See Nelson v.

NAFA, 512 F.3d 1134 (9th Cir. 2008); Yahoo!, Inc. v. Le Ligue Contre Le

Racisme, 433 F.3d 1199 (9th Cir. 2006). See also Abbott Laboratories v.

Gardner, 387 U.S. 136, 148 (1967). Lee and Lloyd would certainly suffer

hardship occasioned by having to engage in an arbitration proceeding that, as noted below, could not consider their claims and by, of course, also expending money for an arbitration that could not go forward. See, e.g., Bertero v. Superior Court, 216 Cal. App. 2d 213 (1963) (parties improperly ordered to arbitrate "would be put to the unnecessary delay and expense of an arbitration, further court proceedings, and an appeal, after which they would be required to start over"), disapproved on other grounds in St. Agnes Medical Center v. PacifiCare of California, 31 Cal.4th 1187, 1192 (2003).

While Ross, as the latest case in the area, does assist in informing the conclusion that arbitration is not a necessary "ripening" agent for Lee's and Lloyd's causes of action, other (and even stronger) reasons exist. First and foremost, arbitration is not needed for standing since the Arbitration Provision specifically excludes claims challenging the unconscionability of the Arbitration Provision from the definition of "claims" that are subject to arbitration:

> "As used in this Arbitration Provision, the term **'Claim' means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement … except for the validity, enforceability or scope of this Arbitration Provision or the Agreements….**"

(E.R., Tab 9, Page 065 [¶ 62]) It is thus not possible, as a matter of contract, for Lee or Lloyd to have arbitrated claims that the Arbitration Provision

itself excludes from arbitration. Nor is it possible, as a matter of law, for them to do so. Justice Breyer, writing in <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944-48 (1995), held that such language makes the matter categorically **not** arbitrable: "a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration…" Justice Breyer in <u>First Options</u>, but certainly not District Judge Breyer below, got it right: arbitration of Lee's and Lloyd's claims cannot occur as a matter of contract and, hence, its absence can have no effect on their standing. Accordingly, standing is unrelated to arbitration and, resultantly, the "need" for arbitration is reduced to being nothing more than a red herring offered by American Express to distract this Court's attention.

Moreover, arbitration of the claims that the Arbitration Provision is unconscionable and violates the UCL/CLRA is legally precluded by <u>Buckeye</u> and <u>Nagrampa</u> since the "crux" of the Complaint is the unconscionability of the Arbitration Provision:

> **"[W]hen the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator.** *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S. Ct. 1204, 1209, 163 L. Ed. 2d 1038 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967). **When the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal**

**courts must decide whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA.**"

Nagrampa, 469 F.3d at 1263-64. Of particular interest to the issues here is that Nagrampa's analysis was based on the presence of two causes of action in which the plaintiff, as here, had alleged that the unconscionability of the arbitration clause violated the CLRA and UCL. See, e.g., id. at p. 1264 ("However, Nagrampa's fifth and sixth causes of action are directed specifically to the arbitration provision, placing these challenges squarely within the category of claims that must be decided by a federal court."). The two causes of action referred to "specifically challenge the validity and enforceability of the arbitration provision…. [a**lleging] that the arbitration provision is substantially one-sided, does not fall within the reasonable expectations of Nagrampa, and is unduly oppressive, unlawful, unfair, fraudulent, and unconscionable**." Id. at p. 1266.

Three additional bases also establish, as a matter of law, that Lee's and Lloyd's standing does not rest on having the Arbitration Provision invoked against them or on their invoking it or actually engaging in arbitration. First, arbitration is not required since Lee's or Lloyd's invoking it would waive all objections each has to the Provision's unconscionability and violation of the CLRA and UCL. See PowerAgent v. Electronic Data Systems, 358 F.3d 1187, 1192 (9th Cir. 2004); Nagrampa, 469 F.3d at 1279-

81. Second, it would be illegal and against public policy for Lee and Lloyd to invoke the unconscionable and unenforceable arbitration provision. See Baker v. Liberty Mut. Ins. Co., 143 F.3d 1260, 1264 (9th Cir. 1998)("parties may not generally bargain for or agree to an illegal term"); Gantt v. Sentry Insurance, 1 Cal.4th 1083, 1093 (1992)("We have … long declined to enforce contracts inimical to law or the public interest"); Kreamer v. Earl, 91 Cal. 112, 117 (1891); 1 Witkin, Summary of California Law, "Contract" § 420 p. 461 (10th ed.).  Third, it would be futile for Lee or Lloyd to have sought to arbitrate his Arbitration Provision claims. That futility is a matter of certainty since had Lee and Lloyd filed for arbitration, their efforts would have been a waste of time and he would have ended up back in this Court with the same claims under all scenarios: either (1) the arbitrator would dismiss the arbitration for lack of jurisdiction under the commands of Buckeye and Nagrampa, or (2) the arbitrator, unruffled by Nagrampa, would rule on the unconscionability merits of the claims only to have it set aside when the victor files a 9 U.S.C. § 10 (2008) petition to confirm the arbitral award because the arbitrator acted in excess of his authority. This Court has long held that such futile actions are not necessary for standing to exist. See e.g., Friery v. L.A. Unified Sch. Dist., 448 F.3d 146, 149 (9th Cir. 2006), citing Taniguchi v. Schultz, 303 F.3d 950, 957 (9th Cir. 2002), ("We have

consistently held standing does not require exercises in futility."); Desert

Outdoor Adver., Inc. v. City of Moreno Valley, 103 F.3d 814, 818 (9th Cir.

1996).  As was noted in Triple G Landfills, Inc. v. Board of Commissioners,

977 F.2d 287, 291 (7th Cir. 1992), the ripeness doctrine does not require

Lee/Lloyd to jump through a series of hoops, the last of which [they are]

certain to find obstructed by a brick wall."

Accordingly, neither invocation of the Arbitration nor involvement in

any arbitration is required for Lee's and Lloyd's injury to be sufficient to

sustain standing.

**E.    The Violation Of Lee's And Lloyd's California Statutory Right To Not Have Unconscionable Terms Inserted In Their Contracts Provides An Independent Injury And Source Of Standing**

While Art. III and UCL standing are clearly based on the same injury

in fact, so too is the "damage" needed for standing under the CLRA.

However, an additional basis for CLRA standing also exists: i.e., the alleged

violation of Lee's and Lloyd's right under Cal. Civ. Code §§ 1670.5 and

1770(a)(19) to not have an unconscionable term inserted in their credit card

agreements. A violation of a California statutory right, without more,

provides standing.  See Cantrell v. City of Long Beach, 241 F.3d 674 (9th

Cir. 2001), which held:

> "We agree with the Seventh Circuit [in <u>FMC Corp. v. Boesky</u>, 852 F.2d 981, 992 (7th Cir. 1988), which held that the violation of a state-created legal right can, in itself, satisfy the injury in fact requirement for standing under Article III], that state law can create interests that support standing in federal courts. If that were not so, there would not be Article III standing in most diversity cases, including run-of-the-mill contract and property disputes. State statutes constitute state law that can create such interests."

That such a statutory right exists is clear from <u>Kagan v. Gibraltar Savings & Loan Ass'n,</u> 35 Cal.3d 582, 592 (1984)("**We thus reject [the] effort to equate pecuniary loss with the statutory requirement that consumers 'suffer any damage.' As it is unlawful to engage in any of the deceptive business practices enumerated in section 1770, consumers have a corresponding legal right not to be subjected thereto**" (emphasis added)), and Section 1670.5 (a violation of which may be used to state a cause of action under the UCL).[34] <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Freeman v. Mattress Gallery</u>, 2007 Cal.App.Unpub.LEXIS 9102 at *11-13.

Lee's and Lloyd's standing under the CLRA is not diminished by the fact that "credit" is implicated relative to Lee's American Express credit card. It is not that the CLRA doesn't cover "credit cards" as such but, rather and at most, that "providing credit *separate and apart* from the sale or lease

---

[34]    <u>See California Grocer's Assn v. Bank of America</u>, 22 Cal.App.4th 205, 218 (1994).

of any specific good or service falls outside the scope of section 1770."

Berry v. American Express Publishing Co., 147 Cal.App.4th 224, 232 (2007)

(italics in original). This is due to the fact that "credit cards" (and, indeed,

charge, gift and dining cards) provide a "convenience service" – a service

that persuasive California and Federal precedents hold is covered by the

CLRA regardless of the presence of a "credit" element – so that the

American Express card agreement is a "contract" for "goods or services"

subject to the CLRA. See, e.g., Jefferson v. Chase Home Finance LLC,

2007 U.S.Dist.LEXIS 36298 (N.D.Cal. May 3, 2007); Hernandez v. Hilltop

Financial Mortgage, Inc., 2007 U.S.Dist.LEXIS 80867 (N.D.Cal. October

27, 2007). As explained in Hitz v. First Interstate Bank, 38 Cal.App.4th 274,

286 (1995):

> "**Convenience use minimizes the need to carry cash, allows the user to defer payment for goods and services for a short time, and establishes a favorable payment record that is important in credit evaluations. Revolving credit users realize the same advantages plus one other**, namely, **they increase their ability to purchase goods and services and in so doing avoid the red tape involved in obtaining a personal loan**. …' [¶] … **The convenience feature of credit cards is surely a "service" …**, wholly apart from the credit feature. … A credit card user enjoys various benefits *other than borrowing*--primarily cashless and checkless purchasing-- regardless of whether the credit feature is used. …"

Id. at 286-87 (internal citations omitted; emphasis supplied).

Accordingly, standing under the CLRA exists.

## VIII. CONCLUSION

For the reasons stated above and in the record as a whole, Lee and Lloyd have standing to maintain their causes of action. The Order of the District Court must, perforce, be reversed.

Dated: June 9, 2008                                  Respectfully submitted,

                                                     _____
                                                     Matthew S. Hale
                                                     *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.      The brief is prepared using fourteen point, proportionally spaced, serif typeface: Microsoft Word 7, Times New Roman, 14 point.

2.      Exclusive of the table of contents, table of authorities, citations, corporate disclosure statement, and the certificate of service, the Appellants' brief contains 13954 words.

Dated:      June 9, 2008

Matthew S. Hale
*Counsel for Appellants*

By: _____

# ADDENDUM

# Exhibit 1



Print this page

# Service Agreement

By checking "I have read and agree to the service agreement", you will be bound to the following for the two-year term of the agreement:
1) The Terms of Service, including the binding arbitration clause
2) The "Plan Terms" and other information regarding your Rate Plan contained on the Rate Plan page
3) The terms and conditions and other information regarding features provided on the page where you selected your features.

Printed materials containing much of this information will also be provided to you.

**TERMS OF SERVICE:**
"AT&T"or "we,'"us"or "our"refers to AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T. "You"or "your"refers to the person or entity that is the customer of record. PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION. This Agreement requires the use of arbitration to resolve disputes and also limits the remedies available to you in the event of a dispute.

**SERVICE COMMITMENT; EARLY TERMINATION FEE**
Your Service Commitment begins on the day we activate your service. You have received certain benefits from us in exchange for any Service Commitment greater than one month. If we terminate your service for nonpayment or other default before the end of the Service Commitment, or if you terminate your service for any reason other than (a) in accordance with the cancellation policy; or (b) pursuant to a change of terms, conditions, or rates as set forth below, you agree to pay us with respect to each Equipment identifier or telephone number assigned to you, in addition to all other amounts owed, an Early Termination Fee of $175. For Service Commitments beginning on or after May 25, 2008 the Early Termination Fee will be reduced by $5.00 for each full month toward your minimum term that you complete ("Early Termination Fee"). The Early Termination Fee is not a penalty, but rather a charge to compensate us for your failure to satisfy the Service Commitment on which your rate plan is based. AFTER YOUR SERVICE COMMITMENT, THIS AGREEMENT SHALL AUTOMATICALLY RENEW ON A MONTH-TO-MONTH BASIS UNTIL EITHER PARTY GIVES NOTICE PURSUANT TO THE TERMINATION PROVISION BELOW.

**30-DAY CANCELLATION PERIOD/TERMINATION**
You may terminate this Agreement within thirty (30) days after activating service without paying an Early Termination Fee. You will pay for service fees and charges incurred through the termination date, but AT&T will refund your activation fee, if any, if you terminate within three (3) days of activating the service. Also, you may have to return any handsets and accessories purchased with this Agreement. If you terminate after the 30th day but before expiration of the Agreement's Service Commitment, you will pay AT&T an Early Termination Fee for each wireless telephone number associated with the service. Either party may terminate this Agreement at any time after your Service Commitment ends with thirty (30) days notice to the other party. We may terminate this Agreement at any time without notice if we cease to provide service in your area. We may interrupt or terminate your service without notice for any conduct that we believe violates this Agreement or any terms and conditions of your rate plan, or if you behave in an abusive, derogatory, or similarly unreasonable manner with any of our representatives, or if we discover that you are underage, or if you fail to make all required payments when due, or if we have reasonable cause to believe that your Equipment is being used for an unlawful purpose or in a way that may adversely affect our service, or if you provided inaccurate credit information or we believe your credit has deteriorated and you refuse to pay any requested advance payment or deposit.

**CHARGES AND DISPUTES**
You are responsible for paying all charges for or resulting from services provided under this Agreement. You will receive monthly bills that are due in full as shown thereon. YOU MUST, WITHIN 100 DAYS OF THE DATE OF THE BILL, NOTIFY US IN WRITING AT AT&T, BILL DISPUTE, SUITE 1400, 5565 GLENRIDGE CONNECTOR, P.O. BOX 16, ATLANTA, GA 30342 ("AT&T'S ADDRESS") OF ANY DISPUTE YOU HAVE WITH RESPECT TO THE BILL, INCLUDING ANY CHARGES ON THE BILL AND ANY SERVICE WE PROVIDED FOR WHICH YOU WERE BILLED, OR YOU WILL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL OR SUCH SERVICES AND TO BRING, OR PARTICIPATE IN, ANY LEGAL ACTION RAISING ANY SUCH DISPUTE (not applicable to charges disputed by California customers due to a lost/stolen phone). Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; restoral and reactivation charges, payment fees, any other charges or calls billed to your phone number; and applicable taxes and governmental fees, whether assessed directly upon you or upon AT&T. To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you are required to provide us with your residential or business street address. If you do not provide us with such address, or if it falls outside our licensed service area, we may reasonably designate a PPU within the licensed service area for you. Subscriber must live and have a mailing address within AT&T's owned network coverage area.

**PURCHASES AND AUTHORITY TO USE**
Your AT&T phone can be used to purchase goods and services including ring tones, graphics, games or news alerts (including subscription plans) from AT&T or elsewhere from third parties ("Goods, Content, and Services"). Goods, Content, and Services

**Addendum**
**Exhibit 1 – Page 1**

may be purchased directly with any phone assigned to your account or on-line. Charges for Goods, Content, and Services will appear on your bill. Data transport charges are also incurred in the purchase of mobile content and such charges appear separately on your bill. Unless you have a data plan, in which case you will be billed according to your data plan, you will be billed at the standard per kilobyte charge for the mobile content transport when delivered. You have full-time access to your Goods, Content, and Services transaction history on our website. You are responsible for all phones and other Devices containing a SIM assigned to your account ("Devices"). Except as otherwise provided in this Agreement, if such Device is used by others to purchase Goods, Content, and Services, you are responsible for all such purchases and all associated charges. You are giving those other users your authority 1) to order Goods, Content, and Services from those Devices, including subscription services, and to incur charges for those Goods, Content, and Services that will appear on your bill and 2) to give any consent required for those Goods, Content, and Services, including the consent to use that user's location information to deliver customized information to that user's Device, or to make any representation required for those Goods, Content, and Services, including a representation of the user's age, if requested. Usage by others can be restricted by use of parental controls or similar features. Visit our website to learn more.

**LOCATION-BASED SERVICES**
Your Device may be location-enabled meaning that the Device is capable of using optional Goods, Content, and Services, at your request or the request of a user on your account, offered by AT&T or third parties that make use of a user's location ("Location-Based Services"), using location technology such as Global Positioning Satellite ("GPS"), wireless network location, or other location technology. Please review the terms and conditions and the associated privacy policy for each Location-Based Service to learn how the location information will be used and protected. We may also use location information to create aggregate data from which your personally identifiable information has been removed or obscured. Such aggregate data may be used for services like traffic-monitoring. It is your responsibility to notify users on your account that the Device they are using may be location-enabled. The use of certain Location-Based Services or the disclosure of location information may be restricted by use of parental controls or similar features. Visit our website to learn more.

**AT&T 411 Info**
In some cases our directory assistance service (411) will use the location of Device to deliver relevant customized 411 information based upon the user's request for a listing or other 411 service. By using this directory assistance service, the user is consenting to our use of that user's location information for such purpose. This location information may be disclosed to a third party to perform the directory assistance service and for no other purpose. Such location information will be retained only as long as is necessary to provide the relevant customized 411 information and will be discarded after such use. Please see our privacy policy at att.com/privacy for additional details about our use and protection of your personal information.

**UNAUTHORIZED CHARGES TO YOUR PHONE: (CALIFORNIA CUSTOMERS ONLY)**
You are not liable for charges you did not authorize, but the fact that a call was placed from your phone is evidence that the call was authorized. You may submit documents, statements, and other information to show any charges were not authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. (See section "IF YOUR PHONE IS LOST OR STOLEN"). If you notify us of any charges on your bill you claim are unauthorized, we will investigate. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it.

**UNLIMITED VOICE SERVICES**
Unlimited voice services are provided solely for live dialog between two individuals. Unlimited voice services may not be used for conference calling, call forwarding, monitoring services, data transmissions, transmission of broadcasts, transmission of recorded material, or other connections which do not consist of uninterrupted live dialog between two individuals. If AT&T finds that you are using an unlimited voice service offering for other than live dialog between two individuals, AT&T may, at its option terminate your service or change your plan to one with no unlimited usage components. AT&T will provide notice that it intends to take any of the above actions, and you may terminate the agreement.

**OFF-NET USAGE**
If your minutes of use (including unlimited services) on other carrier networks ("off-net usage") during any two consecutive months exceed your off-net usage allowance, AT&T may, at its option terminate your service, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net usage. Your off-net usage allowance is equal to the lesser of 750 minutes or 40% of the Anytime Minutes included with your plan. AT&T will provide notice that it intends to take any of the above actions, and you may terminate the agreement.

**BILLING AND PAYMENT**
Except as provided below, monthly service and certain other charges are billed one month in advance, and there is no proration of such charges if service is terminated on other than the last day of your billing cycle. Monthly service and certain other charges are billed in arrears if you are a former customer of AT&T Wireless and maintain uninterrupted service on select AT&T rate plans, provided, however, that in either case, if you elect to receive your bills for your AT&T services combined with your landline phone bill (where available) you will be billed in advance as provided above. You agree to pay for incoming and outgoing calls, and data services sent to and from your Device. AIRTIME AND OTHER MEASURED USAGE ("CHARGEABLE TIME") IS BILLED IN FULL-MINUTE INCREMENTS, AND ACTUAL AIRTIME AND USAGE ARE ROUNDED UP TO THE NEXT FULL-MINUTE INCREMENT AT THE END OF EACH CALL FOR BILLING PURPOSES. AT&T CHARGES A FULL MINUTE OF AIRTIME USAGE FOR EVERY FRACTION OF THE LAST MINUTE OF AIRTIME USED ON EACH WIRELESS CALL. DATA TRANSPORT IS BILLED IN FULL-KILOBYTE INCREMENTS, AND ACTUAL DATA TRANSPORT IS ROUNDED UP TO THE NEXT FULL-KILOBYTE INCREMENT AT THE END OF EACH DATA SESSION FOR BILLING PURPOSES. AT&T CHARGES A FULL KILOBYTE OF DATA TRANSPORT FOR EVERY FRACTION OF THE LAST KILOBYTE OF DATA TRANSPORT USED ON EACH DATA SESSION. NETWORK OVERHEAD, SOFTWARE UPDATE REQUESTS, AND RESEND REQUESTS CAUSED BY NETWORK ERRORS CAN INCREASE MEASURED KILOBYTES. If you select a rate plan that includes a predetermined allotment of services (for example, a predetermined amount of airtime, megabytes or text messages), unless otherwise specifically provided as a part of such rate plan, any unused allotment of services from one billing cycle will not carry over to any other billing

cycle. We may bill you in a format as we determine from time to time. Additional charges may apply for additional copies of your bill, or for detailed information about your usage of services. Charges for usage of services on networks maintained by other carriers or on networks acquired by AT&T after August 31, 2004, may appear on your bill after the billing cycle in which the usage occurred. Chargeable Time begins for outgoing calls when you press SEND (or similar key) and for incoming calls when a signal connection from the caller is established with our facilities. Chargeable Time ends after you press END (or similar key), but not until your wireless telephone's signal of call disconnect is received by our facilities and the call disconnect signal has been confirmed. All outgoing calls for which we receive answer supervision or which have at least 30 seconds of Chargeable Time, including ring time, shall incur a minimum of one minute airtime charge. Answer supervision is generally received when a call is answered; however, answer supervision may also be generated by voicemail systems, private branch exchanges, and interexchange switching equipment. Chargeable Time may include time for us to recognize that only one party has disconnected from the call, time to clear the channels in use, and ring time. Chargeable Time may also occur from other uses of our facilities, including by way of example, voicemail deposits and retrievals, and call transfers. Calls that begin in one rate period and end in another rate period may be billed in their entirety at the rates for the period in which the call began. If your wireless phone or other Device is lost or stolen, you must contact us immediately to report the Device lost or stolen. AT&T will take into account the information provided by the customer to evaluate on an individual basis whether grounds exist for further relief. You also remain responsible for paying your monthly service fee if your service is suspended for nonpayment. We may require payment by money order, cashier's check, or a similarly secure form of payment at our discretion.

## IF YOUR PHONE IS LOST OR STOLEN
You are not liable for charges you did not authorize, but the fact that a call was placed from your phone is evidence that the call was authorized. (California Customers see section "Unauthorized Charges to Your Phone".) Once you report to us that the Device is lost or stolen you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend service without a charge by contacting us at the phone number listed on your bill or at www.att.com/wireless. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may be asked to provide information and you may submit information to support your claim. We will advise you of the result of our investigation within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to, your monthly fee. We and you have a duty to act in good faith in a reasonable and responsible manner, including in connection with the loss or theft of your Device.

## DISHONORED CHECKS AND OTHER INSTRUMENTS
We will charge you $30 or the highest amount allowed by law, whichever is less, for any check or other instrument (including credit card chargebacks) tendered by you and returned unpaid by a financial institution for any reason. You agree to reimburse us the fees of any collection agency, which may be based on a percentage at a maximum of 33% of the debt, and all costs and expenses, including reasonable attorneys' fees, we incur in such collection efforts.

## CHANGES TO TERMS AND RATES
We may change any terms, conditions, rates, fees, expenses, or charges regarding your service at any time. We will provide you with notice of such changes (other than changes to governmental fees, proportional charges for governmental mandates, roaming rates or administrative charges) either in your monthly bill or separately. You understand and agree that State and Federal Universal Service fees and other governmentally imposed fees, whether or not assessed directly upon you, may be increased based upon the government's or our calculations. IF WE INCREASE THE PRICE OF ANY OF THE SERVICES TO WHICH YOU SUBSCRIBE, BEYOND THE LIMITS SET FORTH IN YOUR RATE PLAN BROCHURE, OR IF WE MATERIALLY DECREASE THE GEOGRAPHICAL AREA IN WHICH YOUR AIRTIME RATE APPLIES (OTHER THAN A TEMPORARY DECREASE FOR REPAIRS OR MAINTENANCE), WE WILL DISCLOSE THE CHANGE AT LEAST ONE BILLING CYCLE IN ADVANCE (EITHER THROUGH A NOTICE WITH YOUR BILL, A TEXT MESSAGE TO YOUR DEVICE, OR OTHERWISE), AND YOU MAY TERMINATE THIS AGREEMENT WITHOUT PAYING AN EARLY TERMINATION FEE OR RETURNING OR PAYING FOR ANY PROMOTIONAL ITEMS, PROVIDED YOUR NOTICE OF TERMINATION IS DELIVERED TO US WITHIN THIRTY (30) DAYS AFTER THE FIRST BILL REFLECTING THE CHANGE. If you lose your eligibility for a particular rate plan, we may change your rate plan to one for which you qualify.

## CONTINGENT BENEFITS
You may receive or be eligible for certain rate plans, discounts, features, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement"). Any and all such Benefits are provided to you solely as a result of the corresponding Business Agreement, and such Benefits may be modified or terminated without notice. If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your account information with that entity and/or its authorized agents. If you are on a rate plan and/or receive certain Benefits tied to a Business Agreement with us, but you are liable for your own charges, then you authorize us to share enough account information with that entity and/or its authorized agents to verify your continuing eligibility for those Benefits and/or that rate plan. You may receive Benefits because of your agreement to have the charges for your service billed ("Joint Billing") by a landline company affiliated with AT&T ("Affiliate") or because you subscribe to certain services provided by an Affiliate. If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.

## DEVICE
Your Device must be compatible with, and not interfere with, our service and must comply with all applicable laws, rules, and regulations. We may periodically program your Device remotely with system settings for roaming service, to direct your Device to use network services most appropriate for your typical usage, and other features that cannot be changed manually. Devices designed and purchased for use on AT&T's system are designed for use exclusively on AT&T's system ("Equipment"). You agree that you will not make any modifications to the Equipment or programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems. You can get details on AT&T policies for modifying Equipment by calling 1-866-246-4852.

## ADVANCE PAYMENTS AND/OR DEPOSITS

We may require you to make deposits or advance payments for services, which we may offset against any unpaid balance on your account. Interest will not be paid on advance payments or deposits unless required by law. We may require additional advance payments or deposits if we determine that the initial payment was inadequate. Based on your creditworthiness as we determine it, we may establish a credit limit and restrict service or features. If your account balance goes beyond the limit we set for you, we may immediately interrupt or suspend service until your balance is brought below the limit. Any charges you incur in excess of your limit become immediately due. If you have more than one account with us, you must keep all accounts in good standing to maintain service. If one account is past due or over its limit, all accounts in your name are subject to interruption or termination and all other available collection remedies.

## LATE PAYMENT CHARGES
Late payment charges are based on the state to which the area code of the wireless telephone number assigned to you is assigned by the North American Numbering Plan Administration (for area code assignments see http://www.nationalnanpa.com/area_code_maps). You agree that for amounts not paid by the due date, AT&T may charge, as a part of its rates and charges, and you agree to pay, a late payment fee of $5 in CT, D.C., DE, IL, KS, MA, MD, ME, MI, MO, NH, NJ, NY, OH, OK, PA, RI, VA, VT WI, WV; the late payment charge is 1.5% of the balance carried forward to the next bill in all other states.

## SERVICE LIMITATIONS; LIMITATION OF LIABILITY
Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers. We may block access to certain categories of numbers (e.g. 976, 900, and international destinations) or certain websites at our sole discretion. We may, but do not have the obligation to, refuse to transmit any information through the service and may screen and delete information prior to delivery of that information to you. There are gaps in service within the service areas shown on coverage maps, which, by their nature, are only approximations of actual coverage. WE DO NOT GUARANTEE YOU UNINTERRUPTED SERVICE OR COVERAGE. WE CANNOT ASSURE YOU THAT IF YOU PLACE A 911 CALL YOU WILL BE FOUND. Airtime and other service charges apply to all calls, including involuntarily terminated calls. AT&T MAKES NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, OR PERFORMANCE REGARDING ANY SERVICES OR GOODS, AND IN NO EVENT SHALL AT&T BE LIABLE, WHETHER OR NOT DUE TO ITS OWN NEGLIGENCE, for any: (a) act or omission of a third party; (b) mistakes, omissions, interruptions, errors, failures to transmit, delays, or defects in the service provided by or through us; (c) damage or injury caused by the use of service or Device, including use in a vehicle; (d) claims against you by third parties; (e) damage or injury caused by a suspension or termination of service by AT&T; or (f) damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service. Notwithstanding the foregoing, if your service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly service fee for the time period your service was unavailable, not to exceed the monthly service fee. Our liability to you for service failures is limited solely to the credit set forth above. Unless applicable law precludes parties from contracting to so limit liability, and provided such law does not discriminate against arbitration clauses, AT&T shall not be liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, service or Equipment provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injuries. To the full extent allowed by law, you hereby release, indemnify, and hold AT&T and its officers, directors, employees and agents harmless from and against any and all claims of any person or entity for damages of any nature arising in any way from or relating to, directly or indirectly, service provided by AT&T or any person's use thereof (including, but not limited to, vehicular damage and personal injury), INCLUDING CLAIMS ARISING IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF AT&T, or any violation by you of this Agreement. This obligation shall survive termination of your service with AT&T. AT&T is not liable to you for changes in operation, equipment, or technology that cause your Device or software to be rendered obsolete or require modification. SOME STATES, INCLUDING THE STATE OF KANSAS, DO NOT ALLOW DISCLAIMERS OF IMPLIED WARRANTIES OR LIMITS ON REMEDIES FOR BREACH. THEREFORE, THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THIS AGREEMENT GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

## ACCOUNT ACCESS
You authorize us to provide information about and to make changes to your account, including adding new service, upon the direction of any person able to provide information we deem sufficient to identify you.

## VOICEMAIL SERVICE
We may deactivate your voicemail service if you do not initialize it within a reasonable period after activation. We will reactivate the service upon your request.

## DISPUTE RESOLUTION BY BINDING ARBITRATION
Please read this carefully. It affects your rights.
Summary: Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1 800-331-0500. In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction. Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted. AT&T will pay all costs of arbitration, no matter who wins, so long as your claim is not frivolous. Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court. In addition, under certain circumstances (as explained below), AT&T will pay you and your attorney a special premium if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute.

**Addendum**
**Exhibit 1 – Page 4**

**ARBITRATION AGREEMENT**

(1) AT&T and you agree to arbitrate all disputes and claims between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "AT&T","you,"and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Device under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an individual action in small claims court. You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

(2) A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to AT&T should be addressed to: General Counsel, AT&T, 5565 Glenridge Connector, 20th Floor, Atlanta, GA 30342 ("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If AT&T and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or AT&T may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by AT&T or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or AT&T is entitled. You may download or copy a form Notice and a form to initiate arbitration at http://att.com/arbitration-forms.

(3) After AT&T receives notice at the Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee. (The filing fee currently is $125 for claims under $10,000 but is subject to change by the arbitration provider. If you are unable to pay this fee, AT&T will pay it directly upon receiving a written request at the Notice Address.) The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at http://att.com/arbitration-information.) All issues are for the arbitrator to decide, including the scope of this arbitration provision, but the arbitrator is bound by the terms of this Agreement. Unless AT&T and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Except as otherwise provided for herein, AT&T will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse AT&T for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules.

(4) If, after finding in your favor in any respect on the merits of your claim, the arbitrator issues you an award that is:

- equal to or less than the greater of (a) $5,000 or (b) the maximum claim that may be brought in small claims court in the county of your billing address; and
- greater than the value of AT&T's last written settlement offer made before an arbitrator was selected,

then AT&T will:

- pay you the greater of (a) $5,000 or (b) the maximum claim that may be brought in small claims court in the county of your billing address ("the premium") instead of the arbitrator's award; and
- pay your attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses that your attorney reasonably accrues for investigating, preparing, and pursuing your claim in arbitration ("the attorney premium").

If AT&T did not make a written offer to settle the dispute before an arbitrator was selected, you and your attorney will be entitled to receive the premium and the attorney premium, respectively, if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the premium and the attorney premium at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits.

(5) The right to attorneys' fees and expenses discussed in paragraph (4) supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this provision does not preclude the arbitrator from awarding you that amount. However, you may not recover duplicative awards of attorneys' fees or costs. Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award.

(6) The arbitrator may award injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER

IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

(7) Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any change to this arbitration provision (other than a change to the Notice Address) during your Service Commitment, you may reject any such change and require AT&T to adhere to the language in this provision if a dispute between us arises.

**MISCELLANEOUS**
This Agreement, the signature or rate summary sheet, the terms included in the rate brochure(s) describing your plan and services, terms of service for products and services not otherwise described herein that are posted on applicable AT&T websites, and any documents expressly referred to herein or therein, make up the complete agreement between you and AT&T and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement. If any provision of this Agreement is found to be unenforceable by a court or agency of competent jurisdiction, the remaining provisions will remain in full force and effect. The foregoing does not apply to the prohibition against class or representative actions that is part of the arbitration clause; if that prohibition is found to be unenforceable, the arbitration clause (but only the arbitration clause) shall be null and void. AT&T may assign this Agreement, but you may not assign this Agreement without our prior written consent. The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law. Your caller identification information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of caller identification information. You consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our services or other matters we believe may be of interest to you. In any event, we reserve the right to contact you by any means regarding customer service-related notifications, or other such information. The original version of this Agreement is in the English language. Any discrepancy or conflicts between the English version and any other language version will be resolved with reference to and by interpreting the English version.

**Connecticut Customers/Questions About Your Service**
If you have any questions or concerns about your AT&T Mobility service, please call Customer Care at 1-800-331-0500, dial 611 from your wireless phone or visit www.att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance service, please call 1-800-288-2020 or visit www.att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Department of Public Utility Control (DPUC). Online: www.state.ct.us/dpuc; Phone: 866-381-2355; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

**Addendum**
**Exhibit 1 – Page 6**

# Exhibit 2

T· ·Mobile·                                                                     close

---

# Terms & Conditions

**Effective 12/04 until amended**
Welcome to T-Mobile. **BY ACTIVATING OR USING OUR SERVICE, YOU AGREE TO BE BOUND BY THESE TERMS AND CONDITIONS ("T&Cs"). PLEASE READ THESE T&Cs CAREFULLY. They affect your legal rights by, among other things, requiring MANDATORY ARBITRATION OF DISPUTES and charging an EARLY CANCELLATION FEE. IF YOU DO NOT AGREE TO THESE T&Cs, DO NOT ACTIVATE OR USE THE SERVICE OR YOUR WIRELESS PHONE, DEVICE, SMART CARD, OR OTHER EQUIPMENT ("PHONE") AND FOLLOW THE DIRECTIONS IN SEC. 5 BELOW.**

These T&Cs and your Service Agreement (if any) constitute your agreement with T-Mobile USA, Inc. and its affiliates (together, "T-Mobile", "we", or "us") for any wireless services and other telecommunications services that we provide you ("T-Mobile Services"), any applications, Phones, or products that you purchase or obtain from us or use with the Service ("Products"), and any applications or services that you purchase, obtain, or use that are provided through or with the Service, or billed to your T-Mobile account ("Third-Party Services") (T-Mobile Services and Third-Party Service together, the "Service"). These T&Cs supersede all earlier versions. To the extent these T&Cs conflict with the T-Mobile Terms and Conditions you receive with your Phone, these T&Cs apply. Rate plan and feature information for the Services you select or use are available to you when you purchase the Service at retail locations and on our Web site, and are a part of our agreement and are incorporated by reference into these T&Cs (the T&Cs, your Service Agreement, and the rate plan information together are referred to as the "Agreement"). You acknowledge that no employee, dealer, or other agent is authorized to make any representation or warranty (other than as described in the Agreement or our current materials) with respect to the Agreement, Service, Products, or rate plans and offerings, or to waive or modify any terms or provisions of the Agreement.

1. **Acceptance of Agreement**: You accept this Agreement by: (a) activating or using the Service; (b) signing, orally or electronically accepting the Agreement; or (c) are deemed to accept the Agreement, whichever occurs first. You must activate Service within 30 days after purchase of your Phone (unless returned as provided in Sec. 5). If you don't activate Service within 30 days, you are deemed to accept the Agreement, and you agree to pay monthly Service charges for the Term according to your rate plan.

2.
   **MANDATORY ARBITRATION TO RESOLVE DISPUTES/CLASS ACTION WAIVER/JURY TRIAL WAIVER: ARBITRATION. PLEASE READ THIS PROVISION CAREFULLY. IT MEANS THAT, EXCEPT AS NOTED BELOW, YOU AND WE WILL ARBITRATE OUR DISPUTES. ANY CLAIM OR DISPUTE BETWEEN YOU AND US IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OR THE PROVISION OF SERVICES OR PRODUCTS TO YOU, INCLUDING ANY BILLING DISPUTES ("CLAIM"), SHALL BE SUBMITTED TO FINAL, BINDING ARBITRATION BEFORE THE AMERICAN ARBITRATION ASSOCIATION ("AAA").** This agreement to arbitrate also requires you to arbitrate claims against other parties relating to Services or Products provided or billed to you, including suppliers of Services and Products and our retail dealers, if you also assert Claims against us in the same proceeding. You and we acknowledge that the Agreement affects interstate commerce and that the Federal Arbitration Act and federal arbitration law apply to arbitrations under the Agreement (despite the choice of law provision in Sec. 23).

   BEFORE INSTITUTING ARBITRATION, YOU AGREE TO PROVIDE US WITH AN OPPORTUNITY TO RESOLVE YOUR CLAIM BY SENDING A WRITTEN DESCRIPTION OF YOUR CLAIM TO US AT T-MOBILE CUSTOMER RELATIONS, P.O. BOX 37380, ALBUQUERQUE, NM 87176-7380 AND NEGOTIATING WITH US IN GOOD FAITH REGARDING YOUR CLAIM. IF WE ARE NOT ABLE TO RESOLVE YOUR CLAIM WITHIN 30 DAYS OF RECEIPT OF YOUR NOTICE, THEN YOU OR WE, INSTEAD OF SUING IN COURT, MAY INITIATE ARBITRATION PROCEEDINGS WITH THE AAA. YOU MUST SERVE OUR REGISTERED AGENT (SEE SEC. 20) IN ORDER TO BEGIN AN ARBITRATION. ARBITRATION WILL BE CONDUCTED UNDER THE AAA'S PUBLISHED WIRELESS INDUSTRY ARBITRATION RULES AND SUPPLEMENTAL PROCEDURES FOR CONSUMER-RELATED DISPUTES, WHICH ARE AVAILABLE BY CALLING THE AAA AT 1-800-778-7879 OR VISITING ITS WEB SITE AT

www.adr.org. The AAA has a fee schedule for arbitrations. You will pay your share of the arbitrator's fees and administrative expenses ("Fees and Expenses") except that: (a) for Claims less than $25.00, we will pay all Fees and Expenses; and (b) for Claims between $25.00 and $1,000.00, you will pay only $25.00 in Fees and Expenses, or any lesser amount as provided under AAA's Supplemental Procedures for Consumer-Related Disputes. **You and we agree to pay our own other fees, costs, and expenses, including those for any attorneys, experts, and witnesses.** An arbitrator may only award as much and the type of relief as a court with jurisdiction in the place of arbitration that is consistent with law and this Agreement. An arbitrator may issue injunctive or declaratory relief but only applying to you and us and not to any other customer or third party. **As a limited exception to the agreement to arbitrate, you and we agree that:** (a) you may take Claims to small claims court, if your Claims qualify for hearing by such court; and (b) if you fail to timely pay amounts due, we may assign your account for collection, and the collection agency may pursue in court claims limited strictly to the collection of the past due debt and any interest or cost of collection permitted by law or the Agreement.

**CLASS ACTION WAIVER. WHETHER IN COURT, SMALL CLAIMS COURT, OR ARBITRATION YOU AND WE MAY ONLY BRING CLAIMS AGAINST EACH OTHER IN AN INDIVIDUAL CAPACITY AND NOT AS A CLASS REPRESENTATIVE OR A CLASS MEMBER IN A CLASS OR REPRESENTATIVE ACTION. NOTWITHSTANDING SEC. 22, IF A COURT OR ARBITRATOR DETERMINES IN A CLAIM BETWEEN YOU AND US THAT YOUR WAIVER OF ANY ABILITY TO PARTICIPATE IN CLASS OR REPRESENTATIVE ACTIONS IS UNENFORCEABLE UNDER APPLICABLE LAW, THE ARBITRATION AGREEMENT WILL NOT APPLY, AND YOU AND WE AGREE THAT SUCH CLAIMS WILL BE RESOLVED BY A COURT OF APPROPRIATE JURISDICTION, OTHER THAN A SMALL CLAIMS COURT.**

**JURY TRIAL WAIVER. WHETHER ANY CLAIM IS IN ARBITRATION OR IN COURT (AS PROVIDED IN THIS SEC. 2) YOU AND WE WAIVE ANY RIGHT TO JURY TRIAL INVOLVING ANY CLAIMS OR DISPUTES BETWEEN YOU AND US.**

3. **Changes to the Agreement or Charges.** EXCEPT TO THE EXTENT PROHIBITED BY LAW, IF WE: (A) INCREASE THE CHARGES INCLUDED IN YOUR MONTHLY RECURRING ACCESS RATE PLAN, OR (B) MODIFY A MATERIAL TERM OF OUR AGREEMENT WITH YOU AND THE MODIFICATION WOULD BE MATERIALLY ADVERSE TO YOU, WE WILL NOTIFY YOU OF THE INCREASE OR MODIFICATION AND YOU CAN CANCEL THAT SERVICE WITHOUT PAYING A CANCELLATION FEE (WHICH IS YOUR ONLY REMEDY) BY FOLLOWING THE CANCELLATION INSTRUCTIONS IN THE NOTICE. IF YOU DO NOT CANCEL YOUR SERVICE BY FOLLOWING THOSE INSTRUCTIONS, OR YOU OTHERWISE ACCEPT THE CHANGE, THEN YOU AGREE TO THE INCREASE OR MODIFICATION, EVEN IF YOU PAID FOR SERVICE IN ADVANCE. IF THE NOTICE DOES NOT SAY HOW LONG YOU HAVE TO CANCEL, THEN IT IS WITHIN **14 DAYS** AFTER THE DATE OF THE NOTICE, UNLESS A LONGER PERIOD IS REQUIRED BY LAW. EXCEPT TO THE EXTENT PROHIBITED BY LAW, CHARGES FOR PRODUCTS, SERVICES, OPTIONAL SERVICES, OR ANY OTHER CHARGES THAT ARE NOT INCLUDED IN YOUR MONTHLY RECURRING ACCESS RATE PLAN (SUCH AS DIRECTORY ASSISTANCE, ROAMING, DOWNLOADS, AND THIRD-PARTY CONTENT) ARE SUBJECT TO CHANGE AT ANY TIME WITHOUT NOTICE, AND IF YOU CONTINUE TO USE THOSE SERVICES, OR YOU OTHERWISE AGREE TO THE CHANGES, THEN YOU AGREE TO THE NEW CHARGES. VISIT OUR WEB SITE, RETAIL LOCATIONS, OR CALL CUSTOMER CARE FOR CURRENT CHARGES.

4. **Term; Cancellation of Service.** If you select a rate plan with a fixed term longer than 1 month, then this Agreement will continue for the full number of months selected ("Term"). **You may cancel Service for any reason by providing us with notice (we may require up to 30 days), which cancellation will take effect on or before the beginning of the next billing cycle after the notice period, BUT IF YOU CANCEL SERVICE OR BREACH THE AGREEMENT BEFORE YOUR TERM ENDS, YOU AGREE THAT THE RESULTING HARM TO US IS IMPRACTICABLE OR EXTREMELY DIFFICULT TO MEASURE AND YOU AGREE TO PAY US IN ADDITION TO AMOUNTS OWED, AS A REASONABLE ESTIMATE OF OUR HARM, A $200.00 CANCELLATION FEE PER NUMBER (which may be deducted from your deposit or any amounts prepaid by you, charged to your card or billed to your account). Our cost of providing your Service and Phone is not incurred evenly over the Term. Our monthly charges and other rates are based on the assumption that you will remain a customer for the whole Term. You and we agree that it is reasonable for your rates to include the amount of the cancellation fee. We may suspend or terminate your Service for any reason or no reason upon 3 days notice (unless a**

**Addendum**
**Exhibit 2 – Page 2**

longer period is required by law). If you breach the Agreement, we may suspend or terminate your Service immediately without prior notice (except to the extent prohibited by law) and do the same for any other service you receive under any other agreement with us. You breach the Agreement by: (a) failing to pay any sum when due; (b) failing to comply with any provision in this Agreement or any other agreement between us; (c) becoming the subject of any proceedings under the Bankruptcy Code; (d) becoming insolvent; or (e) your financial institution dishonoring or returning for insufficient funds your check or credit card. In the event of cancellation, you are responsible for payment of all charges (including any cancellation fee) due to us under the Agreement, which charges will be immediately due and payable. If we reinstate Service to you after discontinuing Service, you may be subject to a credit check and agree to pay reactivation charges or deposits. After the Term expires, you become a month-to-month customer but are still subject to the Agreement, as modified.

5.  **Cancellation and Return Policy.** There is a Return Period during which you can cancel a newly activated line of Service without paying a cancellation fee. **The Return Period is 14 calendar days from the date of Service activation or 30 days from the Phone's purchase date if you have not activated Service (the Return Period may be longer in some states, such as CA - visit T-Mobile.com, or ask a sales or customer care representative). Even if you cancel Service, you must pay all Service and other charges incurred prior to cancellation.** In order to receive a refund of the purchase price (minus shipping and rebates) of your Phone, you must return it in "like-new" condition with proof of purchase to the place of purchase during the Return Period along with its original packaging and contents. You may be required to pay a restocking fee. The purchase price of your Phone may have been subsidized to facilitate your subscription to the Service. **If you cancel service and do not return the Phone in "like-new" condition within the Return Period, you will be charged for the difference between the full retail price of the Phone without activation (which may be more than the price with Service activation) and the price you paid for the Phone (minus rebate).** This Sec. 5 does not apply to Phone upgrade, replacement, exchange, or other similar programs; see those program materials for details.

6.  **Service Availability and Limits.** Your Phone operates as a radio and Service is only available when your Phone is within range of an antenna providing Service. Coverage maps only approximate our wireless coverage area outdoors; actual service area, coverage, and quality may vary and change without notice. There may be gaps in Service within the estimated coverage areas shown on coverage maps. Even within a coverage area, factors, such as: network changes, emergencies, traffic volume, transmission limits, service outages, technical limitations, signal strength, your equipment, interconnecting carriers, terrain, structures, weather and other conditions (without limit) may interfere with actual service, quality, and availability. Calls may be interrupted, dropped, refused, or limited. Coverage maps may depict coverage in areas where networks are operated by our affiliates and roaming partners; such coverage may change without notice. We are not responsible for those networks and some Services are not available on third-party networks or while roaming. We may impose credit, usage, or other limits to Service, cancel or suspend Service, or block certain types of calls, messages, or sessions (such as international, 900, or 976 calls) at our discretion. We may suspend Service without notice if you exceed any credit limit. Service may not be transferred to another market except at our discretion, and we may charge transfer fees. WE ARE NOT LIABLE FOR ANY SERVICE LIMITS, FAILURES, OR OUTAGES, INCLUDING WITHOUT LIMIT, THE FAILURE OF ALERTS, 9-1-1 EMERGENCY, PRIORITY ACCESS, OR SECURE SERVICE CALLS TO BE CONNECTED OR COMPLETED, OR THE FAILURE TO PROVIDE ALERTS OR ACCURATELY LOCATE ANY 9-1-1 CALL (SEE SEC. 14). Location services, including 9-1-1 location services, emergency or other alert systems, priority access, and secure service calls may not be available in your area and are subject to the Service limitations in this Sec. 6.

7.  **Use of Service.** You may not use, or attempt to use, the Service, the network, or your Phone for any fraudulent, unlawful, improper, harassing, excessive, harmful, or abusive purpose ("Improper Uses"), or so as to adversely or negatively impact our customers, employees, business, ability to provide quality service, reputation, or network, or any other person. We may determine on a case-by-case basis what constitutes Improper Uses. Improper Uses include, without limit: (a) using an automatic dialer or program; (b) sending unsolicited messages or calls; (c) attempting to interfere with the access of any user, host, or network; (d) identity theft; (e) attempting to decipher, decompile, or reverse engineer any software; (f) posting or transmitting unlawful, infringing, or objectionable content as determined by us; (g) probing, or attempting to tamper with or harm our systems, network, or customers; or (h) reselling

**Addendum**
**Exhibit 2 – Page 3**

or attempting to resell any aspect of the Service, whether for profit or otherwise. If we suspect a violation of this provision, we may: (i) begin legal action; (ii) suspend or terminate Service immediately and without prior notice; (iii) suspend or terminate service provided to you under any other agreement with us; and (iv) cooperate with law enforcement in prosecuting offenders. You agree to cooperate with us in investigating suspected violations. We may terminate your Service or change your rate plan at any time, with notice, if we determine, in our sole discretion, that your use of the Service is excessive, unusually burdensome, or unprofitable to us. You have no proprietary or ownership rights to a specific wireless telephone number ("Number"), IP address, or e-mail address assigned to you or your Phone; we may change them at any time. You may not program any other Number into your Phone. We may charge you to change your Number.

8.  **Use of Phone with Other Providers/Phone Purchases.** **Wireless devices and networks do not all use the same technologies. Your Phone may not be compatible with the network and services provided by another wireless service provider and, therefore, may not work with that provider's wireless service. You may buy a Phone from us, or from someone else, but it must be GSM/GPRS equipment that is compatible and approved for use with our network and Services and we do not guarantee that all T-Mobile features will be available with such equipment. A T-Mobile Phone may be programmed to accept only a T-Mobile SIM card.**

9.  **Changes to Your Account.** **If you give your personal account validation information to someone, they can access and make changes to your account just as you can.** You may request to switch to another rate plan, and if we authorize the change, a transfer fee may apply and the new rates will become effective by the start of your next billing cycle. **Changes may require your agreement to a new Term (if you select a promotional rate plan or special Phone pricing) or new T&Cs. If we allow you to temporarily suspend your account, you may continue to pay monthly charges and we may extend the Term for the length of that suspension.**

10. **Deposits.** At any time, we may require a deposit from you (in which you grant us a security interest) or increase the amount of your deposit. If we notify you of an increase not associated with a change in rate plan, you may either (a) provide us with the increased deposit or (b) cancel Service within 7 days following the date of the notice (any cancellation fee will be waived). Except to the extent prohibited by law, your deposit may be commingled with other funds and will not earn interest. You may not use your deposit to pay your bills or delay payment, but we can apply your deposit to any charges that you owe us. If Service is cancelled for any reason, any deposit will be applied toward amounts you owe us at or after cancellation. Any remaining deposit will be returned to you at your billing address. Except to the extent prohibited by law, we will not refund any balances of $5.00 or less unless you contact us to request it. We will hold such money for you for up to 1 year (without accruing interest for your benefit), but you forfeit to us any portion of the money left after 1 year. You also forfeit any money that the U.S. Mail cannot deliver and returns to us.

11. **Billing, Charges, and Late Fees.** You authorize us to verify your creditworthiness with a credit-reporting agency at any time. You will be charged for Service and other features on a monthly billing cycle basis and we may change your billing cycle at any time. **You agree to timely pay in full each month all charges and fees associated with the Service, including without limit, monthly recurring Service charges, charges described in Sec. 12, airtime, roaming, long distance, toll, landline access, messages (whether read or unread, solicited or unsolicited), images, sounds, data, features (such as Web access, text messages, and voicemail), calling services (such as operator or directory assistance and calling card use), additional or optional services that you use or are processed through your Phone (or Number, IP address, or e-mail address assigned to or authorized by you), and you remain liable for payment even if a third party agrees to pay your charges. You will be charged for more than one call when you use certain features resulting in multiple inbound or outbound calls (such as call forwarding, call waiting, voicemail retrieval, and conference calling). All lines use and share the airtime and features included in Family or other pooling plans. Mobile to mobile minutes are those used between T-Mobile Phones while on the T-Mobile USA network (and not roaming or affiliate networks). Except to the extent prohibited by law, billing of roaming charges and minutes or Services used may be delayed or applied against included minutes or Services in subsequent billing cycles, which may cause you to exceed your included minutes or Services in a particular billing cycle. Roaming and other call rating (such as time of call) depend on the location of the network equipment providing Service for a particular call and not the location of the Phone. For billing purposes, you agree not to rely on indicators on your Phone (such as roaming and call time), which**

may be inaccurate. **UNUSED MINUTES OR OTHER ALLOTMENTS FROM YOUR RATE PLAN EXPIRE AT THE END OF YOUR BILLING CYCLE AND DO NOT CARRY OVER TO SUBSEQUENT BILLING CYCLES. PARTIAL MINUTES OF AIRTIME USAGE ARE ROUNDED UP AND CHARGED, OR DEDUCTED FROM ANY INCLUDED MINUTES, AS FULL MINUTES; AIRTIME USAGE IS MEASURED FROM THE TIME THE NETWORK BEGINS TO PROCESS THE CALL (BEFORE THE PHONE RINGS OR THE CALL IS ANSWERED) THROUGH ITS TERMINATION OF THE CALL (AFTER YOU HANG UP). FOR BILLING PURPOSES, THE TIME OR DAY (SUCH AS NIGHTS AND WEEKENDS) OF AN ENTIRE CALL IS DETERMINED BY THE TIME THE CALL STARTS. UNLESS OTHERWISE SPECIFIED IN YOUR RATE PLAN MATERIALS, WEEKENDS ARE MIDNIGHT FRIDAY TO MIDNIGHT SUNDAY. NIGHTS ARE 9:00 P.M. TO 6:59 A.M.**

**Incorrect Charges. If you believe your bill contains an incorrect charge, you have 60 days from the date of the first bill that contains the charge to notify us or you waive any right to dispute the charge.** To notify us, please contact Customer Care at T-Mobile.com, 1-800-937-8997, or 611 from your Phone. We may require you to describe the dispute in writing. Any written communications concerning charges must be sent to the T-Mobile Customer Relations address in Sec. 2. If you accept a credit to resolve an issue, you agree the issue is fully resolved. If Customer Care does not resolve your dispute and you still wish to pursue the matter, follow the dispute resolution process described in Sec. 2. **California customers:** our Utility number is U-3056-C; if you file a billing-related claim with the Consumer Affairs Branch ("CAB") of the CPUC you must, within 24 hours of filing, inform us by writing to the Customer Relations address in Sec. 2 with sufficient information to identify you and your account. If we resolve your dispute, your CAB claim will be deemed resolved at that time, and you agree to promptly withdraw your claim with the CAB. **Payments.** We may require payment before your due date if we are concerned about your ability to pay us (such as when you have an unusually high balance). For your payment to be deemed received by us and your account to be timely credited, you must provide with your payment information sufficient to identify you and your account (your account number). If we accept late or partial payments or payments with limiting notations, it will not waive any of our rights to collect all amounts that you owe us and it will not be an accord and satisfaction. If we agree to an alternate payment plan, we may confirm it in any manner, including by electronic means. **If your financial institution dishonors or returns for insufficient funds your check or credit card, it is a breach of this Agreement and we may (a) charge you a fee of $20.00 or such amount as may be permitted by law, (b) stop accepting checks, credit card or other similar payment methods from you, and (c) immediately suspend or cancel your Service.** We may use a collection agency and charge you for their fees billed to us for trying to collect what you owe us. Late Fees. You agree to pay 1.5% or $5.00 per month (or portion of a month), whichever is greater, on any past due balances until paid, subject to the highest amount permitted by law. Except to the extent prohibited by law, this late fee may be charged regardless of any disputes you may have raised regarding your invoiced charges.

12. **Taxes & Fees/Regulatory and Administrative Fees.** We bill you for taxes, fees, and other charges (such as sales, use, excise, public utility and other taxes) levied by or remitted to domestic or foreign governments or authorities and imposed on you or us as a result of providing the Service or your Phone ("Taxes & Fees"). Any tax exemption only applies after the date we receive from you acceptable documentation. We will determine, in our discretion, the type and amount of the Taxes & Fees to be billed. These Taxes & Fees may change at any time without notice. We may also bill you for regulatory and administrative fees ($0.86 per line per month as of 12/04) to recover our costs of complying with certain regulatory mandates (in our discretion) and Universal Service Fees ("USF") or similarly imposed charges (the amount or method of calculation of these fees may change at any time without notice to you) except to the extent prohibited by law. Regulatory and administrative fees and USF are not taxes or government required charges. We may impose regulatory and administrative fees whether or not all or some services are used, or available to you, or in your location. We are required to use the residential or business street address you provided us to determine certain Taxes & Fees. If you give us an address (such as a PO box) that is not a recognized street address, does not identify the taxing jurisdictions applicable to the address or does not reflect the service area associated with your Number, you may be assigned a default location for Taxes & Fees calculation, which may result in a higher or lower charge for certain Taxes & Fees and you have 60 days from the date of the first bill that contains disputed Taxes & Fees to notify us or you waive your right to dispute those Taxes & Fees.

**Addendum**
**Exhibit 2 – Page 5**

13. **Disclaimer of Warranties.** EXCEPT FOR ANY OTHER WRITTEN WARRANTY THAT MAY BE PROVIDED, AND TO THE EXTENT PERMITTED BY LAW, ALL SERVICES, PRODUCTS, AND THIRD-PARTY PRODUCTS ARE PROVIDED "AS IS", "WITH ALL FAULTS", AND WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMIT, WARRANTIES OF TITLE, MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. YOU ASSUME ALL RESPONSIBILITY AND RISK FOR USE OF THE SERVICE OR PRODUCTS. WE DO NOT AUTHORIZE ANYONE TO MAKE A WARRANTY OF ANY KIND ON OUR BEHALF, AND YOU SHOULD NOT RELY ON ANY SUCH STATEMENT. ANY STATEMENTS MADE IN PACKAGING, MANUALS OR OTHER DOCUMENTS, OR BY ANY OF OUR DEALERS (EXCEPT FOR ANY WRITTEN LIMITED WARRANTY THAT MAY BE PROVIDED), ARE FOR INFORMATIONAL PURPOSES ONLY AND ARE NOT WARRANTIES BY US OF ANY KIND. WE AND OUR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, DEALERS, SUPPLIERS, PARENTS, SUBSIDIARIES OR AFFILIATES ("T-MOBILE AFFILIATES") DO NOT WARRANT THAT THE INFORMATION, SOFTWARE, PRODUCTS, PROCESSES, OR SERVICES WILL BE UNINTERRUPTED, ACCURATE, COMPLETE, USEFUL, FUNCTIONAL, BUG OR ERROR FREE. IF YOU RECEIVED A WRITTEN "T-MOBILE LIMITED WARRANTY" WITH YOUR PHONE, IT IS THE ONLY WARRANTY MADE BY US WITH RESPECT TO THE PHONE. IF APPLICABLE STATE LAW DOES NOT ALLOW THE DISCLAIMER OF CERTAIN IMPLIED WARRANTIES, THE RELEVANT PORTIONS OF THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

14. **Limitation of Liability. We are not liable to you, other users of your Phone or third parties for any deficiency in performance or quality, caused in whole or in part by an act or omission of an underlying carrier or service provider, Web site, messaging community, dealer, equipment or facility failure, Phone failure or unavailability, discontinuation of Service, or Phones, network problems, lack of coverage or network capacity, equipment or facility upgrade or modification, delay or failure of number portability, acts of God, strikes, fire, terrorism, war, riot, emergency, government actions, equipment or facility shortage or relocation, the failure of an incoming or outgoing call, including 9-1-1 emergency, priority access, or secured service call, to be connected or completed or for the functionality of location services, including 9-1-1 location services, priority access, or secured call or alert service, or causes beyond our reasonable control.** EVEN IF T-MOBILE HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES, T-MOBILE AND T-MOBILE AFFILIATES WILL NOT BE LIABLE TO YOU OR ANY OF YOUR EMPLOYEES, AGENTS, CUSTOMERS OR ANY THIRD PARTIES FOR ANY DAMAGES ARISING FROM USE OF THE SERVICE OR ANY PHONE, INCLUDING WITHOUT LIMITATION: PUNITIVE, EXEMPLARY, INCIDENTAL, TREBLE, SPECIAL, OR CONSEQUENTIAL DAMAGES; LOSS OF PRIVACY OR SECURITY DAMAGES; PERSONAL INJURY OR PROPERTY DAMAGES; COPYRIGHT, TRADEMARK, PATENT, TRADE SECRET, OR OTHER INTELLECTUAL PROPERTY DAMAGES; OR ANY DAMAGES WHATSOEVER ARISING FROM INTERRUPTION OR FAILURE OF SERVICE, LISTING ERRORS, LOST PROFITS, LOSS OF BUSINESS, LOSS OF DATA, LOSS DUE TO UNAUTHORIZED ACCESS OR DUE TO VIRUSES OR OTHER HARMFUL COMPONENTS, COST OF REPLACEMENT PRODUCTS AND SERVICES, SUSPENSION, TERMINATION, OR THE INABILITY TO USE THE SERVICE OR ANY PRODUCT, THE CONTENT OF ANY DATA TRANSMISSION, COMMUNICATION, OR MESSAGE TRANSMITTED TO OR RECEIVED BY YOUR PHONE (WHETHER READ OR UNREAD, SOLICITED OR UNSOLICITED), OR LOSSES RESULTING FROM ANY PRODUCTS, GOODS, OR SERVICE PURCHASED, MESSAGES RECEIVED, OR TRANSACTIONS ENTERED INTO THROUGH THE SERVICE. IF THE STATE LAW APPLICABLE TO YOUR CLAIMS DOES NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, OR OTHER MODIFICATIONS OF OR LIMITATIONS TO CERTAIN REMEDIES, THE RELEVANT PORTIONS OF THE ABOVE EXCLUSION OR LIMITATION WILL NOT APPLY TO YOU.

THE MAXIMUM AGGREGATE LIABILITY OF T-MOBILE AND T-MOBILE AFFILIATES TO YOU, AND THE EXCLUSIVE REMEDY AVAILABLE IN CONNECTION WITH THE AGREEMENT FOR ANY AND ALL DAMAGES, INJURY OR LOSSES ARISING FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION RELATED TO SERVICES OR PHONES, SHALL BE A REFUND OR REBATE OF THE PRORATED MONTHLY OR OTHER CHARGES YOU PAID OR OWE US FOR THE APPLICABLE SERVICE OR PHONE. THE EXISTENCE OF MULTIPLE CLAIMS OR SUITS UNDER OR RELATED TO THIS AGREEMENT WILL NOT ENLARGE OR EXTEND THE LIMITATION OF MONEY DAMAGES. **EXCEPT TO THE EXTENT PROHIBITED BY LAW, ALL CLAIMS MUST BE BROUGHT WITHIN 2 YEARS OF THE DATE THE CLAIM ARISES.**

**Addendum**
**Exhibit 2 – Page 6**

15. **Indemnification.** You agree to defend, indemnify, and hold us, T-Mobile Affiliates, and any roaming or network partner harmless from any and all claims, demands, actions, liabilities, costs, or damages arising out of your use of the Service or Products, any legal disclosures we make relating to your Service or Product, or your breach of this Agreement. You further agree to pay our reasonable attorneys' and expert witnesses' fees and costs arising from any actions or claims by third parties and those incurred in establishing whether this Sec. 15 applies.

16. **Privacy.** Wireless systems use radios to transmit communications over a complex network. We do not guarantee that your communications using the Service or Products will be private or secure, and we are not liable to you for any lack of privacy or security you may experience. You are responsible for taking precautions and providing security measures best suited for your situation and intended use of the Service. **We may (but are not required to) monitor, intercept, and disclose your transmissions, location or communications and may disclose your billing, account, calling records, or other information, in good faith reliance on legal process, if required by law or to protect our rights, business, network or customers. We may locate you through our network. Your caller identification (such as your name and Number) even if unlisted may be displayed to others (for example, on the equipment or bill of the person receiving your call or any Internet site you visit.)** We may list your name, address, and Number in a published directory with your consent. For more information on our privacy policies, please see our privacy notice at www.t-mobile.com/privacy. The way third parties handle and use your personal information is governed by their policies and we are not responsible for their policies, or their compliance with them.

17. **Lost or Stolen Phone.** If your Phone is lost or stolen ("Lost Phone") you will not be liable for unauthorized airtime charges incurred on the Lost Phone if you: (a) notify us immediately; (b) ask us to deactivate the Lost Phone; and (c) provide within 14 days any documentation we request, including a police report. **You must fulfill the remainder of your Term by activating a replacement Phone (which may be full price) or the cancellation fee will apply.**

18. **Number Portability.** You may be able to transfer your Number to another wireless carrier or to bring your number to us. For information about Number Portability, please visit T-Mobile.com or contact Customer Care at 1-800-937-8997 or 611 from your Phone. You may not transfer your Number if your account has been cancelled or suspended, or prepaid account expired. **You remain liable for charges incurred resulting from your Service with us or service with your former carrier, including cancellation fees. If you call 9-1-1 after you request a transfer, but before you receive confirmation of completion, the 9-1-1 operator may not have accurate information on your identity and location. You must inform the 9-1-1 operator of your identity and location immediately upon placing the call.**

19. **Assignment.** We may assign all or part of our rights or duties under the Agreement without such assignment being considered a change to the Agreement, and without notice to you, except to the extent provided by law. We are then released from all liability. You may not assign the Agreement without our prior written consent. Subject to these restrictions, the Agreement will bind the heirs, successors, subcontractors, and assigns of the respective parties, who will receive its benefits.

20. **Notices/Customer Communications.** We may send you written notice, which may be on or included with your bill, which is considered given and received by you on the third day after the date deposited in the US Mail to your address in our billing records. You agree we may also notify and communicate with you, or respond to your inquiries electronically through your Phone or otherwise, such as by e-mail, voicemail, or text messaging, which is considered given and received immediately upon transmission. Written notice to us is considered given when received by our registered agent, Corporation Services Company ("CSC") 1010 Union Ave. SE, Olympia, WA 98501.

21.

**Digital Millennium Copyright Act ("DMCA") Notice.** To the extent in providing Service we may act as a "services provider" (as defined by DMCA) and offer services as online provider of materials and links to third-party sites. As a result, third-party materials that we do not own or control may be transmitted, stored, accessed, or made available using the Service. If you believe material available via the Service infringes a copyright, notify us using the notice procedure under the DMCA. We will respond expeditiously to remove or disable access to such material and will follow the procedures specified in the DMCA to resolve the claim. Our designated agent to whom you must address infringement notices under the DMCA is CSC (see Sec.

**Addendum**
**Exhibit 2 – Page 7**

6/5/2008 1:57 PM

20).

22. **Severability and Survivability.** Except to the extent expressly set forth in Sec. 2, all terms and conditions of these T&Cs are independent of each other and if any provision of these T&Cs is held to be inapplicable or unenforceable, then (a) that term or provision shall be construed, as nearly as possible, to reflect the intentions of the parties with the other terms or provisions remaining in full force and effect, (b) the T&Cs will not fail their essential purpose, and (c) the balance of the T&Cs remain unaffected and in full force and effect, unless our obligations are materially impaired, in which event we have the right to terminate the Agreement. You and we will continue to be bound by the following Secs. (and any other provisions or rights and obligations that may reasonably be construed as surviving) of these T&Cs after the Agreement ends, regardless of reason: 2-6, 10-15, 18, 19, 20, 22, 23, 25, and 26.

23. **Entire Agreement/Applicable Law/Venue/Miscellaneous.** This Agreement represents the final and entire agreement between you and us regarding the Service and Products. Electronic images of the Agreement will be considered originals. You acknowledge that you have not relied on any other representations not specifically included in this Agreement. If we don't enforce our rights under any of the provisions of the Agreement, we may still require strict compliance in the future. You represent that you are of legal age and have the legal capacity to enter into this Agreement. If you are contracting on behalf of a company, you represent that you are authorized to enter into this Agreement and agree to be personally liable for all accounts if you are not so authorized. **This Agreement is governed by the Federal Arbitration Act, applicable federal law, and the laws of the state in which your billing address in our records is located. Foreign laws do not apply. Arbitration proceedings or any actions to enforce an arbitration award must be in the state where your Service is principally provided, but not outside the US.**

24. **Additional Terms for Prepaid Customers.** You are responsible for prepaying all charges for using the Service. The airtime balance in your prepaid account is reduced by the charges attributable to your use of the Service. Service lasts as long as the earlier of (a) the time period on a prepaid card or coupon or (b) when the airtime balance goes to zero, then Service will be interrupted. You may continue to use Service by purchasing additional prepaid Service. If your account expires, you may lose your Number. You will not receive a monthly bill or activity record. **Prepaid Service is non-refundable (even if returned during the return period), and no refunds or other compensation will be given for unused airtime balances, lost or stolen prepaid cards, or coupons. Applicable Taxes & Fees will be included in your prepaid charges.**

25. **Additional Terms for SmartAccess Customers.** SmartAccess is subject to credit eligibility, determined in our discretion. We may suspend Service to any Number without prior notice if your account balance exceeds your spending limit or you are late with a payment (whether or not you exceed your spending limit). If we suspend Service because your balance exceeds your spending limit, we may, in our sole discretion, reinstate Service after you make a payment that reduces your account balance and your account is not in arrears. If we suspend Service because you are late with payment, we may, in our sole discretion, reinstate Service if you pay the entire balance owing on your account. Regardless of suspension, you will be liable for all charges for Service under the Agreement, including monthly Service and usage charges, and other charges or purchases billed to your account, whether or not you reinstate Service. SmartAccess customers are only eligible for select rate plans. Smart Access activation fees are non-refundable unless you: (a) purchased the Phone and Service directly from a T-Mobile store, T-Mobile.com, 1-877-387-4324, or 1-800-T-MOBILE; and (b) cancel Service and return the Phone to the place of purchase in accordance with Sec. 5.

26. **Other Agreements or Warranties.** Other Services (such as T-Mobile HotSpot or Equipment Protection) or Products may come with separate written terms or conditions, and warranties that govern their use or purchase. Please see those other agreements or warranties for your rights and duties regarding their use.

# FlexPay Supplemental Terms and Conditions

Effective July 2007 until amended

These **FlexPay Supplemental Terms and Conditions** ("FlexPlay T&C's") are in addition to the T-Mobile Terms and Conditions you have received, and are part of your Agreement with T-Mobile. To the extent these FlexPlay

T&C's conflict with the T-Mobile Terms and Conditions applicable to your Service or any Prepaid Refill terms and conditions, these FlexPlay T&C's will apply.

1. **FlexPay.** With FlexPay you pay in advance for your monthly rate plan services and features ("Monthly Services"). If you agreed to a one or two-year Term contract, you are obligated to pay for Monthly Services for the Term of your contract. If you agreed to a month-to-month term, you are only obligated to pay for your first month of Monthly Services. For your current Amount Due, dial #BAL# or go to my.t-mobile.com. Your Monthly Services will become available after we receive and apply your payment (the time of day may vary; check my.t-mobile.com or #MIN# for availability). If you run out of a Monthly Services allotment, you will be unable to use that service for the remainder of that monthly service cycle unless you have sufficient funds in a FlexAccount to pay for them. A FlexAccount balance also will be needed to purchase other services not included in your Monthly Services (see below for details).

2. **FlexAccount/Prepaid Refills.** You can set up a FlexAccount by purchasing and depositing Prepaid Refill dollars. Please note that while different terms and rates apply to your use of Prepaid Refill dollars. You can use your FlexAccount to: (1) purchase services when you run out of your monthly allotments (such as Whenever Minutes or messages); (2) purchase other services that are not included in your Monthly Services (such as international dialing and roaming, downloads, messaging, 411 and data services); and (3) pay for your Monthly Services by transferring dollars from your FlexAccount to your Monthly Services account (account holder only). If you use any additional services, applicable charges will automatically be deducted from your FlexAccount (see rate plan information or t-mobile.com for current applicable rates for minutes, messages and other services and usage). To check your FlexAccount balance, dial #999# or go to my.t-mobile.com. Each line on a multi-line account may have a FlexAccount. You may transfer FlexAccount dollars to pay for your Monthly Services on the account associated with your FlexAccount. You cannot transfer funds among FlexAccounts, or use FlexAccount funds to pay for monthly service for other billing accounts.

3. **Refunds. All monthly charges paid in advance for each line of service are non-refundable, even if you have not used the service or service is cancelled during the Return Period.** If your account is cancelled, we will refund unused money in your FlexAccount, and any other amounts in your Monthly Services account that have not yet been applied toward your Monthly Services charges. If your account is cancelled during the Return Period, you also may be eligible for a handset refund if you meet the conditions of our Return Policy. **We may deduct amounts you owe us, such as an early termination fee, from any refund we may owe you.**

4. **Payment Reminder/Billing.** Prior to the start of each service cycle, you will receive a payment reminder showing the Amount Due for your Monthly Services. Your payment reminder will not contain detailed billing information. You may access bill details on our website at my.t-mobile.com (which requires you to provide a user name and password to log on.) my.t-mobile.com **may reflect more recent activity on your account, so your current Amount Due may differ from the amount stated on your payment reminder. Service Cycle.** Your first service month may start up to several days after your service is activated and you may have several additional days during that first service cycle in which to use your monthly allotments. **Billing.** For billing purposes, each minute of a call will be billed according to the time or day applicable to that minute (such as Nights and Weekends). **EasyPay.** Your Amount Due will include a **Control Charge of $4.99 per line per month if you are not enrolled in and using EasyPay** (an automatic monthly recurring payment service). EasyPay enrollment, changes or cancellation, may not take effect until at least the next service cycle after you contact us. The Control Charge may apply for at least one service cycle after you sign up for EasyPay. If your EasyPay payment cannot be processed for any reason, your account will be suspended and you will be required to pay the Amount Due and the Control Charge to reinstate your Monthly Services.

5. 
   **Payments. Amount Due. If you do not pay the Amount Due in advance, your Monthly Services will not be available.** To receive your full Monthly Services allotment, you must pay the Amount Due by the date on your payment reminder. If you pay after the date on your payment reminder, the Amount Due and the Monthly Services allotment you receive will be prorated for the number of days remaining in your monthly service cycle. It may take up to one day after receipt and application of your payment to restart your Monthly Services. You can obtain your current Amount Due (prorated or otherwise) by dialing #BAL# or going to my.t-mobile.com. **Partial Payment.** If you underpay or partial pay, your Monthly Services will not be available until your partial payment is equal to or greater than the prorated charges for service for the

remaining days in your service cycle. The Monthly Services you receive will be prorated based on the number of days remaining in that service cycle. **Payment in Last Five Days.** To start Monthly Services during the last five days of the service cycle, you must pay the prorated amount for those remaining days plus the total Amount Due for the following service cycle. If you do not pay that full amount, then your payment will be applied as a partial payment toward the Amount Due for next month's service cycle. **Extension of Term.** If you agreed to a one or two-year Term contract, your Term may be extended by the total number of days for which you have not paid for Monthly Services (e.g., if you only pay for prorated Monthly Services for the last 10 days of a 30 day service cycle your Term may be extended by 20 days.) **Overpayment.** We will apply any overpayment toward the Amount Due for the following service cycle when it becomes due. If the overpayment does not cover the total Amount Due for that cycle, it will be treated as a partial payment for that cycle, and your Monthly Services will be prorated (see Partial Payment above). **Multi-line accounts.** You will have one Amount Due for all lines on a multi-line account, and any payments will be applied to all lines and all Monthly Services. For example, if you have three lines on your account, you cannot pay for only one of the three lines, or just for certain Monthly Services. If you make a partial payment, services for all lines will be prorated, and the Amount Due will reflect the prorated charges for all lines.

6. **Account Changes.** You may be unable to make changes to your account during certain periods of your service cycle. **Voluntary Suspension.** If we allow you to voluntarily suspend your Monthly Services, we will not refund amounts paid in advance for those services, or credit any remaining unused allotments in your current service cycle. Upon suspension, your Monthly Services and FlexAccount will no longer be available for use. To maintain the voluntary suspension for the period permitted (at T-Mobile's discretion) and avoid cancellation, you must pay in advance a monthly access fee and the Control Charge (if you are not using Easy Pay) for each line. If you have a one or two-year Term contract and the Term has not expired, it may be extended for the period of your voluntary suspension.

7. **Service Cancellation. Month-To-Month Plan.** You can keep your account active by paying for Monthly Services, adding Prepaid Refill dollars to your FlexAccount, or by using your FlexAccount for services, at least once every 90 days. Otherwise, your account will be cancelled. **Contract Plan.** If you have a one or two-year contract Term, you must pay in advance for Monthly Services, each month, for the total number of months in your Term (12 or 24 months) for all lines on your account. All lines on the account will be cancelled unless payment for Monthly Services is received and your Monthly Services (prorated or otherwise) are activated at least once every forty-five days after the due date listed in your payment reminder. This cancellation policy applies both during and after your contract Term. **A $200 per line early termination fee applies if service is cancelled during your one or two-year contract Term. All Plans: You agree that we may apply any balance in your FlexAccount to any amounts you owe us (including any early termination fees) at the time of service cancellation. Any remaining unused FlexAccount or other balance will be refunded to you according to T-Mobile's Terms and Conditions.**

T-Mobile.com: © 2002-08 T-Mobile USA, Inc.

## CERTIFICATE OF SERVICE

I am employed in the City of Newport News, Virginia. I am over the age of eighteen (18) and not a party to the within action; my business address is P.O. Box 1951, Newport News, VA 23601.

On Monday, June 9th 2008, I served two (2) copies each of the following documents via Federal Express courier: (1) Appellants' Opening Brief; and (2) Appellants' Excerpts of Record

The foregoing documents were served on:

**Julia B. Strickland**
**Stroock & Stroock & Lavan, L.L.P.**
**2029 Century Park East**
**Los Angeles, CA 90067-3086**
**(310) 556-5806**
**jstrickland@stroock.com.**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on the 9th day of June 2008 in Newport News, Virginia.

Matthew S. Hale
*Counsel for Appellants*

By: _____